C. Taylor Ashworth, AZ Bar No. 10143
Christopher Graver, AZ Bar No. 13235
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
jkahn@stinson.com

Alexander Terras
Ann E. Pille
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| In re | Chapter 11 |
|---|---|
| ARETE HOLDINGS, LLC, | Case No. 2:11-bk-02009-RTB |
| | (Joint Administration Pending) |
| Debtor. | Case No. 2:11-bk-02010; |
| | Case No. 2:11-bk-02011; |
| | Case No. 2:11-bk-02012; and |
| | Case No. 2:11-bk-02020 |

This filing applies to:
- ■ All Debtors
- ☐ Arete Holdings, LLC
- ☐ Arete NW, LLC
- ☐ Arete Sleep Therapy NW, LLC
- ☐ Arete Sleep, LLC
- ☐ Arete Sleep Therapy, LLC

**DEBTOR'S MOTION FOR AN ORDER APPROVING SALE OF DEBTOR'S ASSETS UNDER ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND FOR AN EMERGENCY HEARING ON APPROVAL OF CERTAIN AUCTION AND BID PROCEDURES, INCLUDING A BREAK-UP FEE; SETTING DATE AND TIME FOR HEARING ON PROPOSED SALE; AND APPROVING FORM OF NOTICE OF AUCTION AND SALE HEARING**

| Hearing Date: | **None** |
|---|---|
| **Hearing Time:** | |
| **Location:** | **Courtroom #703** |
| | **230 N First Ave** |
| | **Phoenix AZ 85003** |

Areté Holdings, LLC, Areté NW, LLC, Areté Sleep, LLC, Areté Sleep Therapy, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"), Debtors and Debtors-In-Possession in the above-captioned matter, hereby move the Court for an Order: (i) approving the sale of substantially all of Debtors' assets free and clear of all liens, claims and encumbrances under an Asset Purchase Agreement with Sleep Science, Inc. (the "Agreement"); (ii) approving Debtors' assumption and assignment of certain unexpired leases and executory contracts; and (iii) approving notice, bidding and sales procedures related to the proposed sale, including a break-up fee and expense reimbursement (the "Motion").[1]

To minimize potentially prejudicial delay to Debtors, Debtors request that the Court set an emergency hearing within ten (10) days on that portion of the Motion requesting that the Court approve certain bidding and sales procedures described below, including a break-up fee and expense reimbursement (the "Bid Procedures"); set a date and time for a hearing on the proposed sale (the "Sale Hearing"); and approve a form of notice of the Bid Procedures and Sale Hearing.

I.      **JURISDICTION**

1.      On January 26, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses as debtors-in-possession.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

4.      The statutory bases for the relief requested herein are §§ 105(a), 363 and 365 of the Bankruptcy Code.

---

[1] Unless the context otherwise requires, capitalized terms not defined in this Motion have the meaning ascribed to them in the Agreement.

## II.    BACKGROUND

5.    Since 2002, the Debtors have been a leading provider of integrated, high quality sleep medicine and total patient care services.    Headquartered at 6263 N. Scottsdale Road, Suite 395, Scottsdale, Arizona, the Debtors operate nineteen sleep diagnostic clinics across Arizona, Oregon, Texas and Washington which generate annual gross revenues of approximately $18,000,000.    Of these revenues, approximately: (i) 15% is attributable to federal Medicare and Medicaid reimbursements administered by the Centers for Medicare and Medicaid Services ("CMS"); (ii) 25% is attributable to state-managed Medicaid reimbursements, and (iii) 60% is attributable to reimbursements from private insurance companies and payments received directly from patients.

6.    As of the Petition Date, the Debtors employed approximately 140 medical and non-medical professionals, and engaged the services of approximately 33 independent contractors, including eight medical directors and twenty-five reading physicians.

7.    The Debtors specialize within the sleep disorder subset of the health care industry, and focus their business primarily on the provision of diagnostic procedures aimed at detecting sleep breathing disorders, the most common of which is obstructive sleep apnea.    In addition to these diagnostic capabilities, the Debtors also offer therapy and treatment services for patients' sleep breathing disorders once diagnosed, including the provision of durable medical equipment such as continuous positive airway pressure devices.

8.    In 2002, True North Partners, LLC ("True North") furnished the equity necessary to acquire the assets used to commence the Debtors' business operations.[2]    The Debtors were focused on an aggressive growth strategy with the goal of achieving rapid expansion and becoming a leading company providing sleep services.

9.    The Debtors made large commitments to building infrastructure and growing the business through organic growth and acquisitions.    In 2007, after five years of losses and more limited growth opportunities the strategy changed to: (i) eliminate the losses for needs for additional

---

[2] True North continues to be the ultimate parent of each of the Debtors, and is the owner of not less than 99% of all equity interests in Areté Holdings, LLC, which in turn is the owner of not less than 99% of all equity interests in Areté Sleep NW, LLC, Areté Sleep, LLC, and Areté  Sleep Therapy, LLC.  Areté  Sleep Therapy NW, LLC is a wholly-owned subsidiary of Areté Sleep NW, LLC.

investment, (ii) transition True North's involvement in the Debtors' to one of a minority participant, or (iii) dispose of the Debtors' business operations in connection with a sale.

10.     Reacting to this revised business plan, the Debtors instituted certain cost-saving mechanisms that resulted in positive cash flow by the end of 2009.  Subsequently, and for the reasons set forth below, these improved operational results once again became negative over time.

11.     On March 16, 2009, the Board of Directors (the "Board") for Areté Holdings, LLC ("Holdings") held a meeting to discuss the prospect of selling the Debtors' businesses and/or soliciting new equity investors.  At that time, the Board established December 31, 2009 as the projected deadline for any prospective sale.

12.     In furtherance of these goals, in September 2009, Holdings retained the services of two consultants to explore the partnering, sale and investment opportunities for the Debtors: (i) Paul Wallace of Step Function Partners ("Wallace") was tasked with exploring the prospect of locating a financial partner for the Debtors, and (ii) Lawrence Bain of ITH Partners, LLC ("Bain") was tasked with locating strategic partners for the Debtors that would acquire all, or substantially all, of the Debtors' assets.

13.     By December 2009, both Wallace and Bain had invested ample time and resources into exploring both sale and restructuring opportunities for the Debtors, but both had been unsuccessful in obtaining a single additional investment dollar or concrete sale offer.

14.     In late December 2009, Bain advised the Debtors he no longer believed that the sale partnering or sale of the Debtors' business operations was a viable prospect and terminated his relationship with the Debtors.  Similarly, by January 2010, Wallace had ceased providing his services to the Debtors.

15.     In February 2010, the Debtors received an unsolicited communication from Clinical Research Advantage, Inc. ("CRA"), the parent company of Sleep Science, Inc. (the "Proposed Purchaser"), pursuant to which CRA expressed its interest in purchasing substantially all of the Debtors' assets.

16.     In March  2010, the Debtors and CRA executed a non-disclosure agreement to facilitate the exchange of information in furtherance of a potential sale, and, in May 2010, the Debtors received

a Letter of Intent from CRA, pursuant to which CRA offered to purchase substantially all of Arete's assets (the "Letter of Intent").

17.  In July 2010, CRA amended the First Letter of Intent in order to limit its purchase offer to the Debtors' assets within the State of Arizona, and to exclude all assets located within Oregon, Texas and Washington (the "Non-Arizona Assets").

18.  In August 2010, the Debtors attempted to locate a potential purchaser for the Non-Arizona Assets, and contacted a number of companies that operate within the sleep disorder diagnosis industry to solicit interest, including without limitation the following:  (i) SleepMed, Inc., the nation's largest provider of diagnostic services for sleep disorders and epilepsy; (ii) Sleep Health Centers, an operator of sleep testing laboratories in Arizona, Connecticut, Massachusetts and Rhode Island; (iii) Graymark Healthcare, Inc., a publically-traded corporation that operates sleep diagnostic centers in Florida, Iowa, Kansas, Missouri, Minnesota, Nebraska, New York, Oklahoma, South Dakota and Texas; (iv) Total Sleep Diagnostics, a sleep diagnostic organization with testing facilities in Arizona, Georgia, Indiana, Kansas, Louisiana, Massachusetts, Missouri, and Texas; (v) SleepWorks, Inc., an operator of forty-five sleep center locations throughout eleven states located primarily in the eastern half of the United States; and (vi) Dormir, Inc., a sleep disorder health care provider that operates, together with certain of its affiliates, diagnostic and testing facilities across the nation.

19.  Although some limited interest in the Non-Arizona Assets was expressed by entities other than CRA and the Proposed Purchaser, none of those prospects resulted in an asset purchase agreement, and all letters of intent related to the Non-Arizona Assets have expired and/or been terminated.

20.  However, in December 2010, CRA and the Proposed Purchaser increased the purchase price under discussion to also include consideration for the Non-Arizona Assets.

21.  As a result, following nearly eighteen months of concerted efforts at marketing the Debtors' assets for sale and/or soliciting interest from additional equity investors, the Debtors believe that the Proposed Purchaser – the party designated by CRA to acquire the assets of the Debtors – is the sole entity that has expressed a sincere interest in entering into an asset purchase agreement to purchase substantially all the Debtors' assets.

DB04/810420.0002/3913538.3 DD02

22.     This may be attributable, at least in part, to the current market conditions facing sleep diagnostic centers.   With the recent economic downturn, many employers have been forced to modify the medical benefits they provide to their employees, and those medical benefit plans have been scaled down and/or adapted to require a larger contribution from employees for the services provided.  At the same time, rising unemployment rates have both increased the number of uninsured patients and caused both insured and uninsured patients to limit their health care services to strict "necessities" that may not include diagnosis or treatment of sleep disorders.

23.     In addition, federal and state governments, as well as private insurance companies, have reduced the reimbursement rates for certain medical services, including those attributable to the diagnosis and treatment of sleep disorders, and Debtors and other similarly situated companies have been forced to accept less compensation for the services they render.

24.     Despite this reduction in reimbursement rates, the increased awareness of sleep disorders and their impact on general health has caused an increase in the desire of patients to diagnose and treat their sleep disorders.  As such, the number of providers offering sleep disorder testing and treatment has increased in recent years, as have alternative diagnosis options that permit patients to submit to testing at home or in another non-clinic based setting.  At the same time, the sleep disorder diagnostic industry has become more regulated, thereby increasing the cost of doing business.

25.     The net result of such changes is that the average profits per clinic location has decreased in recent years, thereby making it more difficult to operate a successful sleep disorder diagnostic center that is cash positive.

26.     In addition to these general market conditions, in January 2010, the Debtors received communications from CMS regarding a review of the Debtors' Medicare and Medicaid reimbursement accounts.

27.     The review of the Debtors' books and records by CMS continued for nine months after the initial inquiry.   This review caused significant disruption to the Debtors' normal business operations and resources were directed away from ordinary business operations to assist in the administration of, and compliance with, the review.  During the nine-month period, the Debtors incurred an estimated $500,000 in expense directly attributable to the CMS review.  Furthermore,

DB04/810420.0002/3913538.3 DD02

modifications to the Debtors' business practices prompted by the findings of the CMS review have created an additional $500,000 in annual operating expenses.

28.     The general market conditions of the sleep disorder diagnostic and treatment industry, together with the particular challenges faced by the Debtors, have caused the Debtors to operate their business with a negative cash flow throughout 2010, thereby prompting significant liquidity problems and necessitating the extensive marketing efforts related to the sale of substantially all the Debtors' assets culminating in the filing of these Chapter 11 Cases.

29.     On January 25, 2011, the Debtors and the Proposed Purchaser finalized the terms of the Agreement, which contemplates the Proposed Purchaser's acquisition of substantially all the Debtors' assets free and clear of liens, claims, and encumbrances.  In order to maximize the value of the Debtors estates, the Agreement requires that the proposed sale close no later than April 30, 2011.

30.     While this timeline is aggressive, the Debtors and the Proposed Purchaser acknowledge that the Debtors' are facing a cash crisis.  Anticipating an unsustainable negative cash flow, these Chapter 11 Cases were commenced, *inter alia*, because the only available source of funds to sustain operations and maximize the value of the Debtors' assets was debtor-in-possession financing while the Debtors' finalize the sale process.  The proposed debtor-in-possession financing should provide the Debtors with sufficient funds to operate their business while seeking to sell their assets on a going concern basis

A.     **Liens Claimed Against Debtors' Assets**

31.     Five creditors assert liens on some or all of Debtors' assets.

a.     US Bancorp, in its capacity as assignee of Direct Capital Corporation, asserts a secured lien against Areté Sleep, LLC secured by the Debtors' interests in certain discrete medical equipment arising from financing provided to purchase that equipment.  The Debtors estimate that the total outstanding balance due to US Bancorp is approximately $33,417.76.

b.     Dell Financial Services, L.P. asserts a secured lien against Areté Sleep, LLC secured by the Debtors' interests in certain discrete computer equipment arising from financing provided to purchase that equipment.  The Debtors estimate that the total outstanding balance due to Dell Financial Services, L.P. is approximately $59,189.42.

c.     LCA Bank Corporation asserts a secured lien against Arete Sleep, LLC secured by the Debtors' interests in certain discrete medical equipment arising from financing provided to purchase that equipment.  The Debtors estimate that the total outstanding balance due to LCA Bank Corporation is approximately $26,273.50.

d.     General Electric Capital Corporation asserts a secured lien against Arete Sleep, LLC secured by the Debtors' interests in certain discrete equipment arising from financing provided to purchase that equipment. The Debtors estimate that the total outstanding balance due to General Electric Capital Corporation is approximately $66,079.31.

e.     TCF Equipment Finance, Inc. d/b/a VGM Financial Services ("VGM") asserts a secured lien against Arete Sleep Therapy, LLC secured by the Arete Sleep Therapy, LLC's interests in, *inter alia*, certain equipment, inventory, accounts, general intangibles and proceeds thereof, arising from that certain Master Lease Agreement dated December 10, 2008, and certain equipment schedules related thereto.  The Debtors estimate that the total outstanding balance due to VGM is approximately $667,000.

B.     **The Asset Purchase Agreement**

32.     On or about January 25, 2011, Debtors entered into the Agreement with the Proposed Purchaser.  A true and correct copy of the Agreement is attached hereto as **Exhibit A**[3] The terms of the Agreement are summarized as follows:

a.     **Assets to be Purchased**.  Debtors shall sell the Purchased Assets to the Proposed Purchaser or such other party that submits a higher or otherwise better offer in accordance with the Bid Procedures (the "Successful Bidder").  As set forth in section 1.1 of the Agreement, the Purchased Assets include, among other things, all of Debtors' tangible property, Inventory, Business Proprietary Rights, Transferred Records, Licenses, security deposits, warranties, claims, certifications, and goodwill, and any other assets owned by Debtors as set forth in the Agreement other than Excluded Assets, including the Debtors' rights under certain executory contracts and unexpired leases designated by the Proposed Purchaser (the "Assumed Contracts").  Pursuant to the Bid Procedures, Debtors will provide notice of the Proposed Sale, including the proposed assumption and assignment of the Assumed Contracts to counterparties of the

---

[3] All capitalized terms used herein and not otherwise defined shall have the meaning ascribed thereto in the Agreement.

Assumed Contracts (the "<u>Counterparties</u>"), and the Counterparties will have an opportunity to object to the Proposed Sale and the assumption and assignment of the Assumed Contracts (and cure amounts, if any, related to same) and be heard at the Sale Hearing.

b. **<u>Excluded Assets.</u>** As set forth in Section 1.1 of the Agreement, the Purchased Assets do not include, among other things, certain "<u>Excluded Assets</u>" which include corporate books and records, cash, equity interests, Accounts Receivable, Transaction Documents, Non-Assumed Contracts, and those assets set forth in Schedule 1.1(c) to the Agreement.

c. **<u>Liabilities Assumed.</u>** Pursuant to the Agreement, the liabilities to be assumed by the Proposed Purchaser include those obligations specifically set forth on Schedule 1.1(b) to the Agreement, including all obligations of the Debtors related to the Assumed Contracts.

d. **<u>Purchase Price.</u>** Subject to the provisions of Section 6.2 of the Agreement, the purchase price is One Million Nine Hundred Thousand Dollars ($1,900,000).

e. **<u>Termination Rights</u>**. As set forth in Section 7.1 of the Agreement, the Debtors and the Proposed Purchaser (collectively, the "<u>Parties</u>") have certain rights to terminate the Agreement, including, without limitation,

    i.    by mutual written consent of the Debtors and the Proposed Purchaser;

    ii.    by Proposed Purchaser if the Bankruptcy Court has not entered the Bid Procedures Order on or before February 15, 2011;

    iii.    by Proposed Purchaser, if the aggregate amount of the Break-Up Fee and the Expense Reimbursement agreed upon pursuant to the Bid Procedures Order is less than $100,000;

    iv.    by Proposed Purchaser if (i) the Auction has not concluded on or before March 20, 2011; (ii) the Sale Order has not been entered by the Bankruptcy Court by March 31, 2011; or (iii) the Sale Order has not become a Final Order by April 15, 2011;

    v.    subject to certain limitations, by Proposed Purchaser or Debtors if the Closing Date has not occurred on or before April 30, 2011;

vi.     by either Party if a Governmental Entity issues a ruling or Order prohibiting the transactions contemplated hereby, which ruling or Order is final and non-appealable;

vii.    by Proposed Purchaser or Debtors if Proposed Purchaser is not the winning bidder at the Auction;

viii.   by Proposed Purchaser or the Debtors at any time after any Debtor files a stand-alone Chapter 11 Plan with the Bankruptcy Court or at any time after any Debtor files any Chapter 11 Plan that involves approval of a sale of substantially all or a material portion of the Purchased Assets to a party other than the Proposed Purchaser;

ix.     by Proposed Purchaser if any of the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any portion of the Purchased Assets or which results in the loss of a material benefit reasonably expected to be received by Proposed Purchaser;

x.      by Proposed Purchaser if Debtors' exclusive period to file and/or solicit acceptance of a plan of reorganization under section 1121 of the Bankruptcy Code shall have expired or been terminated;

xi.     by Proposed Purchaser if the Payee (as such term is defined in the Promissory Note) terminates disbursements to Sellers to be made in accordance with the terms of the Promissory Note; or

xii.    by Proposed Purchaser if the Sale Order is appealed and the closing of the sale is stayed by the Bankruptcy Court pending appeal.

f.      **Manner of Sale.**  Except as otherwise agreed by the Proposed Purchaser, or a Successful Bidder, the sale of the Purchased Assets will be free and clear of liens, encumbrances, charges, claims and interests of every kind and description, with any and all such liens, encumbrances, charges, claims and interests to attach to the proceeds of the sale in accordance with the Bankruptcy Code and applicable law.  Pursuant to the Bid Procedures, the Debtors will provide notice of the Proposed Sale to all parties listed in paragraph 31, *supra*, which assert a security interest in some or all of the Debtors' assets (the "Secured Claimants"), and the Secured Claimants will have an opportunity to object to the Proposed Sale and be heard at the Sale Hearing.

g.      **Break-Up Fee and Expense Reimbursement.**  In order to induce the Proposed Purchaser to expend the time, energy and resources necessary to submit a "stalking

DB04/810420.0002/3913538.3 DD02

horse" bid, Debtors agree to provide, and to seek this Court's approval of, a Break-Up Fee and an Expense Reimbursement.  As set forth in Sections 1.1 and 7.2 of the Agreement, in the event that the Proposed Purchaser is not the Successful Bidder (as defined herein) of the Purchased Assets, the Proposed Purchaser shall be entitled to a Break-up Fee equal to $75,000 plus an Expense Reimbursement not to exceed $100,000.

33.     Section 2.5 of the Agreement also contemplates the approval of the Bid Procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Purchased Assets, which are proposed to govern the Auction and the Sale, including approval of the Break-up Fee.  The Bid Procedures are an integral part of the Agreement, and ensure that there will be a fair and expeditious process under which Debtors solicit bids for the sale of their assets and hold an Auction thereon in a manner that would ensure it maximizes the value of the assets for all parties-in-interest. Pursuant to the Agreement, Debtors are seeking approval of the following Bid Procedures:

a.      Participation Requirements.  Any person who wishes to participate in the bidding process (a "Potential Bidder") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than the Proposed Purchaser, must deliver (unless previously delivered) to the following addresses: (i)  Areté  Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona  85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) Stinson Morrison Hecker, LLP, Attn:  Josh Kahn, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004; (iv) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona  85258; and (v) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona  85003:

i.      An executed confidentiality agreement in form and substance satisfactory to Debtors;

ii.     Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, including a portion of the Purchased Assets, current audited financial statements of the equity holders of the Potential Bidder, who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors;

iii.     A preliminary (non-binding) proposal reflecting: (i) the purchase price range, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction, (iv) any anticipated regulatory approvals required to close the transaction, (v) the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) any additional conditions to closing that the Potential Bidder may wish to impose, and (vii) the nature and extent of any additional due diligence that the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

A Potential Bidder who satisfies the requirements above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale if selected as a Successful Bidder, and who the Debtors determine is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder." Notwithstanding the foregoing, the Proposed Purchaser will be deemed a Qualified Bidder for purposes of the bidding process. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors will then promptly allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as described below.

b.     <u>Due Diligence</u>.   The Debtors will afford each Qualified Bidder due diligence access to the Purchased Assets and the Business Due diligence access may include such management presentations as may be scheduled by Debtors, access to data rooms, on site inspections, and such other matters which a Qualified Bidder may request and as to which the Debtors may agree. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. The Debtors may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.    The Debtors (or any of their respective representatives) shall not be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

c.     <u>Bid Deadline.</u> A Qualified Bidder who desires to make a bid must deliver the Required Bid Documents to: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii)

Stinson Morrison Hecker, LLP, Attn: Josh Kahn, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004; (iv) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; and (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; so as to be received not later than 11:00 a.m. (prevailing Mountain time) on March 1, 2011 (the "Bid Deadline"). The Debtors may extend the Bid Deadline once or successively, but are not obligated to do so. If the Debtors extends the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

    d.    <u>Bid Requirements</u>.  All bids must include the following documents (the "Required Bid Documents"):

        i.    A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Purchased Assets.

        ii.    A complete, comprehensive, and binding asset purchase agreement, together with all schedules and exhibits to such agreement (a "Competing Agreement")

        iii.    A good faith deposit (the "Good Faith Deposit") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Debtors in their sole discretion) payable to the order of Arete Holdings, LLC (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price identified in the Competing Agreement.

        iv.    Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that is satisfactory to the Debtors and their advisors.

    e.    <u>Consideration of Qualified Bids</u>.  A bid will be considered only if the bid:

        i.    Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the Qualified Bidder.

        ii.    Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtors determine are similar to and are not materially more burdensome or conditional than those contained in the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee and Expense Reimbursement.  In the case of the initial Qualified Bid, the value of the Qualified Bid must be more than $190,000 in excess of the Purchase Price, and, in the case of any subsequent Qualified Bids, the value of the Qualified Bis must be more than $50,000 over the immediately preceding highest Qualified Bid.

iii.    Is not conditioned upon (A) any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment and (B) such bid being deemed the Successful Bid by the Debtors.

iv.    Includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or a Competing Agreement.

v.    Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required Governmental Approvals) within not more than 15 days after entry of the Sale Approval Order, or in the case of any governmental approvals, 60 days after entry of such order.

vi.    Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, the Debtors will have the right to entertain bids for the Purchased Assets that do not conform to one or more of the requirements specified in this section, and may deem such bids to be Qualified Bids, including bids for a portion of the Purchased Assets. Notwithstanding the foregoing, the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bid Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Proposed Purchaser is referred to herein as a "Subsequent Bid."

If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, the Debtors will report the same to the Bankruptcy Court and will request approval of the Sale pursuant to the terms of the Agreement as soon as reasonably practicable after the Bid Deadline.

f.    Bid Protection    Recognizing the Proposed Purchaser's expenditure of time, energy, and resources, the Debtors have agreed to provide certain bidding protections to the Proposed Purchaser. Specifically, the Debtors have determined that the Agreement furthers the goals of the Bid Procedures by setting a floor which all other Qualified Bids must exceed. As a result, the Debtors have agreed that if they do not close with the Proposed Purchaser because the Debtors consummate an Alternative Transaction, as that term is defined in the Bid Procedures, and the Proposed Purchaser is not in breach of the Agreement or the Bidding

Procedures, the Debtors will, in certain circumstances, pay to the Proposed Purchaser a Break-Up Fee and Expense Reimbursement. The payment of the Break-Up Fee will be governed by the provisions of the Agreement and the Bid Procedures Order.

g.      Auction  If the Debtors receive one or more Qualified Bids in addition to the Agreement, the Debtors will conduct an auction (the "Auction") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 11:00 a.m. (prevailing Mountain time) on March 14, 2011, at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second Business Day prior to the Sale Hearing), in accordance with the following procedures:

Only the Debtors, the Proposed Purchaser, a representative of the Office of the United States Trustee, a representative of True North, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only the Proposed Purchaser and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer  (the "High Bid") to all Qualified Bidders who have informed the Debtors of their intent to participate in the Auction.

All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids), provided that such rules are not inconsistent with these Bid Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Bankruptcy Court entered in connection herewith.

Bidding at the Auction will begin with the High Bid and continue, on terms and conditions identical to the High Bid (other than the name of the purchaser(s)) in minimum increments of at least $50,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each Qualified Bidder has had

the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Proposed Purchaser), the Debtors may give effect to any Break-Up Fee that may be payable to the Proposed Purchaser under the Agreement.

Notwithstanding the foregoing, the Bankruptcy Court may conduct the Auction at the Sale Hearing.

h.     <u>Selection Of Successful Bid</u>.  At the conclusion of the foregoing Auction, or as soon thereafter as practicable, the Debtors will identify the highest offer(s) for the Purchased Assets and the Business received at the Auction (the "<u>Successful Bid(s)</u>" and the bidder(s) making such bid, the "<u>Successful Bidder(s)</u>").

The Debtors will sell the Purchased Assets for the highest Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Sellers' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

i.     <u>The Sale Hearing</u>.  The Sale Hearing will be held in the above-captioned proceeding on March 18, 2011, at a time acceptable to the Bankruptcy Court in the United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, but may be adjourned or rescheduled in the Debtors' reasonable discretion, subject to Bankruptcy Court approval, as necessary, without further notice other than an announcement of the adjourned date at the Sale Hearing. The Bankruptcy Court may conduct the Auction at the Sale Hearing. If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Proposed Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Proposed Purchaser following entry of the Sale Order. If the Debtors do receive additional Qualified Bids, then, at the Sale Hearing, the Debtors will seek approval of the Successful Bid(s) as well as the second highest or best Qualified Bid(s) (the "<u>Alternate Bid(s)</u>," and such bidder(s), the "<u>Alternate Bidder(s)</u>"). Following approval of the Sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder(s) or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such alternate Bidder(s) without further order of the Bankruptcy Court.

**C.** **Debtor's Anticipated Timeline for the Bankruptcy**

34.     Debtors are filing this Motion contemporaneously with the filing of its Chapter 11 petition, and plan on consummating the Proposed Sale as quickly as possible.  The Agreement requires that the Court schedule a hearing to approve the Bid Procedures and enter an order approving the Bid Procedures no later than February 15, 2011, that the Sale Order be entered no later than March 31, 2011, and that the Closing Date occur no later than April 30, 2011.

35.     For these reasons, the Debtors request that the Court set an emergency hearing on approval of the Bid Procedures, including consideration of the Break-Up Fee and the Expense Reimbursement, within ten (10) days of the filing of this Motion, to expedite the sale process while providing any potential bidders a sufficient opportunity to perform due diligence and appear and bid for the Purchased Assets.  As set out above, Debtors have already spent substantial time and effort marketing their Business, and the only serious expression of interest was from the Proposed Purchaser. Debtors' continued operations will be funded post-petition through a stipulation for the use of cash collateral and certain debtor-in-possession funding provided by True North (the "DIP Facility"), which contemplates timely consummation of the proposed sale.  Without the use of cash collateral and/or the DIP Facility, Debtors may be unable to continue operations, resulting in a liquidation rather than a sale of a going business.  Given the expedited schedule required by the Proposed Purchaser in the Agreement, it is questionable whether the deadlines will be met if hearings on both the Bid Procedures and the sale are set in the ordinary course.  Debtors have therefore requested that the Court set the hearing on approving the Bid Procedures, including the Break-Up Fee, on an emergency basis.

36.     Debtors have already undertaken substantial efforts to market their assets, and plan on continuing to do so up until the Auction.  To maximize the time that interested parties will have to conduct due diligence and prepare Auction bids, Debtors will hold the Auction approximately one week prior to the Sale Hearing, or, if the Court orders otherwise, at the Sale Hearing.  If no competing Qualified Bids are received, Debtor will proceed with the sale of the Purchased Assets to the Proposed Purchaser, and will present the sale pursuant to the terms of the Agreement to the Court for approval at the Sale Hearing.  If a competing Qualified Bid is received, and such Qualified Bid presents the

highest and best offer for the Purchased Assets, then Debtor will seek to approve the Qualified Bid and such Successful Bidder at the Sale Hearing.

37. Debtors further intend on filing a Plan of Reorganization (the "Proposed Plan") prior to the Sale Hearing. The Proposed Plan will provide for the treatment of Debtors' creditors and interest holders, and will provide for the liquidation of any remaining assets that are not included in the Proposed Sale.

III. **RELIEF REQUESTED**

38. Through this Motion, Debtors seek the following relief:

a. *Approval of Certain Auction and Bid Procedures and Break-up Fee*. Pursuant to the Agreement, unless the Court prefers that the Auction occur at the Sale Hearing, a sale is proposed to be conducted by auction followed by an approval hearing before the Court. The Proposed Purchaser will serve as a stalking horse purchaser at the Auction. The Bid Procedures include, inter alia, approval of a Break-up Fee and Expense Reimbursement if Proposed Purchaser is unsuccessful, and entry of a Bid Procedures Order acceptable to Proposed Purchaser. Debtors request that the Court enter an order approving the Bid Procedures described above, and ordering that the Auction and the Sale Hearing be held in accordance with such Bid Procedures.

b. *Setting a Time and Date for a Hearing on Approval of the Bid Procedures and Proposed Sale*. Debtors request that the Court set a time and date for a hearing on the sale of the Purchased Assets to the successful bidder at the Auction. Unless the Court orders that the Court will conduct the Auction at the Sale Hearing, Debtors will schedule the Auction at least one week prior to the Sale Hearing.

c. *Approving the Form for Notice of the Auction and Sale Hearing*. Debtors request that the Court approve the form and procedure for Debtors to provide notice of the Auction and Sale Hearing**.**

d. *Approving Asset Purchase Agreement, Including Assumption and Assignment of the Assumed Contracts*. Debtors seeks entry of a final order at the Sale Hearing approving the Agreement and the sale of the Purchased Assets thereunder, including assumption and assignment of the Assumed Contracts, free and clear of liens, claims and encumbrances.

DB04/810420.0002/3913538.3 DD02

e.     _Approving the Debtors' Name Change Following the Closing of the Sale and the Modification of the Caption for These Chapter 11 Cases_.  Given that the Agreement contemplates that the Proposed Purchaser will purchase as a Purchased Asset all rights in the Debtors' corporate names, the Debtors request that, as soon as practicable after Closing, the Debtors be permitted to effectuate a name change to change the names of the Debtors.  In addition, upon a filing by the Debtors of a notice that the Closing has occurred, the Debtors request that the Clerk of the Bankruptcy Court be directed to change the name of the Debtors on the docket of these Chapter 11 Cases and revise the captions of these Chapter 11 Cases accordingly.

IV.     **BASIS FOR RELIEF**

A.     **The Sale of the Purchased Assets**

39.     Bankruptcy Code § 363(b)(1), provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…"  11 U.S.C. § 363(b)(1).  Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have uniformly held that approval of a proposed sale of property under Bankruptcy Code § 363(b) is appropriate if the transaction is supported by the sound business judgment of the debtor.  _See Committee of Equity Securityholders v. Lionel Corp. (In re Lionel Corp.)_, 722 F.2d 1063 (2d Cir. 1983); _see also In re Delaware & Hudson Ry. Co._, 124 B.R. 169, 176 (D.Del. 1991); _Stephens Indus. V. McClung_, 789 F.2d 386, 398-90 (6th Cir. 1986).

40.     Courts have traditionally applied four factors in determining whether a sound business justification exists to authorize a debtor to sell assets outside of the ordinary course:  (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is being provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.  _See In re Delaware & Hudson Ry. Co._, 123 B.R. at 175 (adopting the _Lionel_ factors in determining whether sound business purpose exists for sale outside ordinary course of business).

DB04/810420.0002/3913538.3 DD02

41.     As discussed in the Dempsey Declaration, business exigencies justify a prompt sale of Debtors' Assets on an ongoing basis.  Debtors have been operating at a loss and have limited funding to maintain operations.  To support an expedited sale, Debtors' ultimate parent, True North, has agreed to provide debtor-in-possession financing to the Debtors in accordance with the DIP Facility for which separate approval is being sought.  Debtors undertook their best efforts to market the sale of the Purchased Assets, and negotiated the Proposed Sale in good faith and at arms-length.  Debtors believe that the Purchased Assets have been sufficiently exposed to the market, and that the Bidding Procedures will ensure that the Proposed Sale, in conjunction with the Bidding Procedures, will result in the highest or otherwise best offer for the Purchased Assets, and represent the best scenario for Debtors' estate and creditors.

B.      **Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

42.     Debtors are requesting authorization to sell the Purchased Assets free and clear of liens, claims, encumbrances and interests.  Bankruptcy Code § 363(f) authorizes the debtor-in-possession to sell property under section 363(b) "free and clear of any interest in such property an entity other than the estate" if one of the following conditions is satisfied:

    (1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

    (2)     such entity consents;

    (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)     such interest is in bona fide dispute; or

    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § § 363(f)(1) – (f)(5).

43.     Debtors submit that, with regard to the Secured Claimants, either the Secured Claimants have consented to the Proposed Sale or the creditors will be paid their secured claims in full from the Proposed Sale.  Consequently, the proposed sale free and clear of all liens, claims, encumbrances and interests satisfies § 363(f) of the Bankruptcy Code.

C.     **Determination of Good Faith Purchaser**

44.     Section 363(m) of the Bankruptcy Code provides that the reversal or modification on appeal of an order approving a sale under sections 363(b) or (c) does not affect the validity of a sale to an entity that purchased property in good faith, whether or not it knew of the appeal, unless the sale was stayed pending appeal.  If a Qualified Bidder is the Successful Bidder, Debtors will ask the Court at the Sale Hearing to determine that the Successful Bidder is a good faith purchaser entitled to the protection of section 363(m).

D.     **Assumption and Assignment of the Executory Agreements**

45.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession may assume any executory contract or unexpired lease, subject to approval of the Bankruptcy Court.  Section 365(f) provides that a debtor-in-possession may assign an executory contract or unexpired lease if the debtor-in-possession assumes such contract or lease in accordance with Section 365(a) and adequate assurance of future performance by the assignee of such contract or lease is provided.

46.     Moreover, the business judgment test applies to the Court's determination of whether to approve a debtor's assumption and assignment of an executory contract.  Approval under Section 365 is appropriate if the debtor's business judgment is that assumption and assignment would be beneficial to the estate.  *See In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd* 465 U.S. 513 (1984); *In re Transworld Airlines, Inc.,* 261 B.R. 103, 120-21 (Bankr.D.Del. 2001).

47.     Debtors are only seeking in this motion to assume Assumed Contracts.  Debtors believe that the assumption of such Assumed Contracts is in the best interest of the estate because it will facilitate the Proposed Sale, and ensure the highest sale price by increasing the value of the sssets being transferred.

48.     Debtors believe that all Counterparties to the Assumed Contracts will be satisfied that the Proposed Purchaser, or the Successful Bidder, will be capable of curing arrearages and performing under the Assumed Contracts.

DB04/810420.0002/3913538.3 DD02

E. **The Court Should Authorize Debtors to Conduct the Auction in Accordance with the Bid Procedures**

49.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. By this Motion, Debtors seek authority to proceed with the Auction in accordance with the Bid Procedures. As set forth above, Debtors have determined that the sale of their assets through the Auction will enable them to obtain the highest and best offers for the assets, and thus maximize the value of the estate for the benefit of its creditors. Accordingly, Debtors believe it is in the best interest of Debtors, their estates, and their creditors to conduct the Auction and consummate the sale. Debtors propose to conduct the Auction on the terms and conditions set forth in the Bid Procedures detailed above.

50.     The Auction and Bid Procedures represent the outcome of lengthy discussions and negotiations among Debtors, True North and the Proposed Purchaser, and Debtors believe the Bid Procedures fairly balance the interests of all parties and are reasonably calculated to promote a fair and equitable process for the sale of the Purchased Assets. The Bid Procedures are intended to provide any interested parties with a reasonable period of time to conduct due diligence and, if qualified, to submit bids, while still providing a prompt, orderly process addressing Debtors' urgent need to sell the Purchased Assets in an expeditious manner, and protecting the Proposed Purchaser's financial and temporal investment. Debtors believe that the Bid Procedures, coupled with their prepetition efforts to identify potential purchasers of the Purchased Assets, should result in a successful auction and sale process. Accordingly, Debtors believe that good cause exists to approve the terms and conditions of the Bid Procedures, and that the Bid Procedures are a fair and reasonable means to achieve a sale of the Purchased Assets to the Proposed Purchaser or the Successful Bidder. Debtors therefore request that the Court enter its Order approving the Bid Procedures.

F. **The Break-Up Fee and Expense Reimbursement are Warranted**

51.     Under the terms of the Agreement and the Bid Procedures, if a Qualified Bid is accepted by Debtors and approved by the Court, the Proposed Purchaser will be entitled to a Break-Up Fee equal to $75,000, together with the Proposed Purchaser's reasonable out-of-pocket legal and other fees and expenses not to exceed $100,000.

52.     In the context of bankruptcy cases, it is frequently appropriate to grant protections to the "stalking horse" bidder.  Buyer protections, including break-up fees, are designed to compensate a prospective purchaser for the costs and risks involved in preparing and proposing a bid that will establishing a minimum standard for competing bids.  *In re Integrated Resources, Inc.,* 147 B.R. 650, 58 (S.D.N.Y. 1992).  Historically, bankruptcy courts have approved break-up fees under the "business judgment rule," which proscribes judicial second-guessing of the actions of management taken in good faith and in the exercise of honest judgment.  *In re Integrated Resources, Inc.,* the leading case on break-up fees, established three basic factors for determining whether to approve such fees:   (i) whether the relationship between the initial bidder and the seller is tainted by self-dealing or manipulation; (ii) whether the fee is designed to encourage bidding; and (iii) whether the amount of the fee is reasonable in relation to the purchase price.  *Id.* at 657-58.

53.     Debtors submit that the Break-Up Fee satisfies the three factors set forth in *In re Integrated Resources*.  First, there is no relationship between Debtors and Proposed Purchaser.  The Proposed Purchaser is a subsidiary of CRA, which has no interest in or affiliation with the Debtors.  Second, the Break-Up Fee and Expense Reimbursement is an inseparable component of the Agreement.  The Agreement encourages bidding by (i) providing a platform upon which Qualified Bids may be made, and (ii) inspiring interest in the Purchased Assets by providing a recognizable and well-respected institution that is interested in purchasing the Purchased Assets.  Finally, the Break-Up Fee and Expense Reimbursement are reasonable in light of the time and effort invested by the Proposed Purchaser in connection with the Agreement and the Proposed Sale.

54.     In the Ninth Circuit, courts have held that, in considering whether to approve a break-up fee, the court must determine whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike,"  *In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr.D.Ariz. 1994) *quoting In re Lionel Corp.,* 722 F.2d at 1071, and "be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected."  *Id., citing In re Hupp Indus., inc.,* 140 B.R. 191, 196 (Bankr.N.D.Ohio 1992).  Debtors submit that the Break-up Fee and Expense Reimbursement fall within these standards and should be approved.

55.     Debtors' decision to sell the Purchased Assets is based upon its reasonable exercise of the Debtors' sound business judgment.  Debtors have undertaken significant efforts to sell the Purchased Assets, and to the best of their knowledge, the Proposed Sale represents Debtors' highest, best and only offer for the Purchased Assets.  Debtors believe the terms of the Agreement are fair and reasonable and represent the best, and perhaps only, chance of providing some recovery for Debtors' unsecured creditors.

56.     The Break-Up Fee and Expense Reimbursement were highly negotiated components of the Agreement.  Moreover, the Break-Up Fee and Expense Reimbursement will only be payable if Debtors receive a higher or better offer than the proposed price, and pursuant to the Bid Procedures, any initial Qualified Bid must exceed the proposed sale price by $190,000.  Consequently, in the event a Break-Up Fee and Expense Reimbursement are paid, they will necessarily be on account of a sale price that exceeds the Proposed Sale price by at least $190,000.

G.     **Scheduling a Hearing on the Proposed Sale and Bid Procedures**

57.     As discussed above, in light of Debtors' cash position, the terms of the DIP Facility, and the terms of the Agreement, Debtors request that the Court schedule an emergency hearing to approve the Bid Procedures, including approving the Break-Up Fee and Expense Reimbursement within ten (10) days of the date of this Motion.  Debtors further request the Court schedule the Sale Hearing for a date that is no later than thirty (30) days after entry of the Bid Procedures Order.

58.     The Debtors will timely give notice of this Motion, the hearing on the Bid Procedures, and the Sale Hearing, as they are set.  Moreover, Debtors will schedule and give notice of the proposed Auction upon the Court's setting of the Sale Hearing (unless the Court orders that it will conduct the Auction at the Sale Hearing), and such Auction will be held at the offices of Stinson Morrison Hecker, LLP, 1850 N. Central Ave., Suite 2100, Phoenix, Arizona, 85004-4584.

H.     **Notice of Auction and Sale Hearing**

59.     In accordance with Bankruptcy Rule 2002, Debtors propose to give notice of the Auction and Sale Hearing substantially in the form attached to the hereto as <u>Exhibit B</u> (the "<u>Auction and Sale Hearing Notice</u>") by first class mail deposited as soon as practicable after the date of the

Order setting the date and time of the Sale Hearing to (i) the Office of the United States Trustee, (ii) all counterparties to the Assumed Contracts, (iii) all creditors of the Debtors, (iv) all parties who have expressed interest to Debtors in acquiring the Purchased Assets, (v) all appropriate federal, state and local taxing authorities, and (vi) all parties having filed a notice of appearance in the this case.

60. The Auction and Sale Hearing Notice will set forth, among other things, a general description of Debtors' business, including the Purchased Assets, the Assumed Contracts, the Bid Procedures and the name and address of a contact person for Debtors. Debtors submit that such notice constitutes good and sufficient notice of the Auction and the Sale Hearing and that no further notice need be given. Accordingly, Debtors request the Court approve the form and manner of notice set forth herein.

V. **CONCLUSION**

WHEREFORE, Debtors respectfully request that the Court

(A) Set a hearing to approve the Bid Procedures, including the Break-Up Fee, on an emergency basis;

(B) Enter a Bid Procedures Order in the form of <u>Exhibit C</u> hereto, authorizing the sale of the Purchased Assets through the Auction and approving the Bid Procedures, including the Break-Up Fee and Expense Reimbursement;

(C) Set a hearing on approval of the sale of Debtors' assets no later than March 18, 2011;

(D) Enter a Sale Order, at or after the Sale Hearing, in the form of <u>Exhibit D</u>, hereto, approving the Agreement and authorizing and approving the sale of substantially all of Debtors' assets free and clear of all liens, claims, interests and encumbrances pursuant to Section 363 of the Bankruptcy Code;

(E) Approve the assumption and assignment to the successful bidder, pursuant to Section 365 of the Bankruptcy Code, of the Assumed Contracts included on Schedule 1.1(a) of the Agreement, as may be supplemented and/or modified by Proposed Purchaser in accordance with the Agreement; and

(F) Approve the form for providing notice of the Auction and Sale Hearing in the form attached hereto as Exhibit B.

RESPECTFULLY SUBMITTED this January 26, 2011.

**STINSON MORRISON HECKER** LLP

By:     /s/ Josh Kahn (#026284)
       C. Taylor Ashworth
       Christopher Graver
       Josh Kahn
       1850 N. Central Avenue, Suite 2100
       Phoenix, Arizona  85004-4584
       and
       **REED SMITH LLP**
       Alexander Terras
       10 S. Wacker Drive, Suite 4000
       Chicago, Illinois 60606
       Proposed Attorneys for Debtors

COPY of the foregoing sent this January 26, 2011, to:
Office of the U.S. Trustee
230 N First Ave #204
Phoenix AZ  85003-1706

And the list of 20 largest creditors for each case, a list of which is attached hereto.


 /s/ Rebecca J. McGee

DB04/810420.0002/3913538.3 DD02

# EXHIBIT "A"

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## ARETÉ SLEEP, LLC,

## ARETÉ SLEEP THERAPY, LLC,

## ARETÉ HOLDINGS, LLC

## ARETÉ NW, LLC

## ARETÉ SLEEP THERAPY NW, LLC

## AND

## SLEEP SCIENCE, INC.

## DATED AS OF JANUARY 25, 2011

# TABLE OF CONTENTS

**Article I Definitions**...................................................................................................**2**
 Section 1.1  Defined Terms ....................................................................2
 Section 1.2  Interpretation......................................................................14

**Article II Transfer of Purchased Assets and Assumed Liabilities; Purchase Price;**
  **Closing; Closing Transactions; Tax Treatment** ....................................**14**
 Section 2.1  Transfer of Purchased Assets and Assumed Liabilities ............14
 Section 2.2  Purchase Price ...................................................................15
 Section 2.3  Closing; Closing Date ........................................................15
 Section 2.4  Closing Transactions..........................................................15
 Section 2.5  Method and Manner of Sale; Approvals and Consents;
         Cooperation; Notification ....................................................18
 Section 2.6  Provider Contracts and Management/Leaseback Agreement ...................21
 Section 2.7  Collection of Accounts Receivable.......................................22

**Article III Representations And Warranties Of Sellers and Seller Parent** ...........................**22**
 Section 3.1  Organization and Power......................................................23
 Section 3.2  Authorization of Transactions..............................................23
 Section 3.3  Members; Investments ........................................................23
 Section 3.4  Absence of Conflicts..........................................................23
 Section 3.5  Certain Developments.........................................................23
 Section 3.6  Real Property ....................................................................24
 Section 3.7  Tax Matters ......................................................................25
 Section 3.8  Contracts and Commitments................................................25
 Section 3.9  Proprietary Rights ..............................................................27
 Section 3.10 Litigation; Proceedings.......................................................28
 Section 3.11 Brokerage.........................................................................28
 Section 3.12 Governmental Licenses and Permits......................................28
 Section 3.13 Employees........................................................................29
 Section 3.14 ERISA.............................................................................29
 Section 3.15 Affiliate Transactions.........................................................30
 Section 3.16 Compliance with Laws .......................................................30
 Section 3.17 Environmental Matters........................................................31
 Section 3.18 Assets..............................................................................32
 Section 3.19 Undisclosed Liabilities.......................................................32
 Section 3.20 Disclosure ........................................................................33

**Article IV Representations And Warranties Of Buyer** ....................................................**33**
 Section 4.1  Organization and Power......................................................33
 Section 4.2  Authorization of Transaction................................................33
 Section 4.3  Absence of Conflicts..........................................................33
 Section 4.4  Brokerage.........................................................................34
 Section 4.5  Litigation..........................................................................34

i

Case 2:11-bk-02009-RTB Doc 11 Filed 01/26/11 Entered 01/26/11 18:20:14 Desc
Main Document Page 29 of 232

**Article V Covenants** ................................................................................**34**
    Section 5.1    Operation and Maintenance of the Business.............................................34
    Section 5.2    Retention of Retained Records; Continuing Assistance ...........................35
    Section 5.3    Press Releases and Announcements; Confidentiality..............................35
    Section 5.4    Further Assurances...................................................................................36
    Section 5.5    Business Employees..................................................................................36
    Section 5.6    Consents....................................................................................................37
    Section 5.7    Use of Names............................................................................................37
    Section 5.8    Payment of Holdback Amount..................................................................37

**Article VI Survival; Indemnification and Related Matters** ......................................**38**
    Section 6.1    Survival.....................................................................................................38
    Section 6.2    Indemnification.........................................................................................38
    Section 6.3    Sole Manner of Payment..........................................................................39
    Section 6.4    Knowledge No Effect ...............................................................................40
    Section 6.5    Treatment of Indemnification Payments...................................................40
    Section 6.6    Application of this Article VI ...................................................................40

**Article VII Termination** ......................................................................................**40**
    Section 7.1    Termination Events...................................................................................40
    Section 7.2    Break-Up Fee and Expense Reimbursement ............................................41

**Article VIII Release** .............................................................................................**42**
    Section 8.1    Release of Sellers.....................................................................................42
    Section 8.2    Release of Buyer ......................................................................................42

**Article IX Miscellaneous** .....................................................................................**42**
    Section 9.1    Amendment and Waiver............................................................................42
    Section 9.2    Notices......................................................................................................43
    Section 9.3    Binding Agreement; Assignment..............................................................44
    Section 9.4    Severability ...............................................................................................44
    Section 9.5    No Strict Construction ..............................................................................44
    Section 9.6    Captions....................................................................................................44
    Section 9.7    Entire Agreement......................................................................................44
    Section 9.8    Counterparts.............................................................................................44
    Section 9.9    Governing Law .........................................................................................45
    Section 9.10   Specific Performance ...............................................................................45
    Section 9.11   Expenses ...................................................................................................45
    Section 9.12   Parties in Interest.....................................................................................45
    Section 9.13   Waiver of Jury Trial.................................................................................45

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Proposed Bidding Procedures |
| Exhibit B | – | Proposed Bidding Procedures Order |
| Exhibit C | – | Proposed Sale Order |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Assumed Contracts |
| Schedule 1.1(b) | Paid-Off Capital Assets |
| Schedule 1.1(c) | Rejected Capital Assets |
| Schedule 2.4(c)(x) | Employee Closing Condition |
| Schedule 3.1 | Organization and Power |
| Schedule 3.4 | Required Consents; Conflicts |
| Schedule 3.5 | Terminated Contracts |
| Schedule 3.6(b) | Leased Real Property |
| Schedule 3.8(a) | Contracts |
| Schedule 3.9(a) | Proprietary Rights |
| Schedule 3.9(c) | Proprietary Rights Disputes |
| Schedule 3.9(e) | Business Systems |
| Schedule 3.11 | Brokerage |
| Schedule 3.14 | Employee Benefit Plans |
| Schedule 3.18(b) | Diagnostic Equipment |
| Schedule 3.18(c) | Inventory |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this **"Agreement"**) is entered into as of January 25, 2011 by and among (i) **ARETÉ SLEEP, LLC**, a Delaware limited liability company, **ARETÉ SLEEP THERAPY, LLC**, a Delaware limited liability company, **ARETÉ NW, LLC**, a Delaware limited liability company, and **ARETÉ SLEEP THERAPY NW, LLC**, a Delaware limited liability company (each a **"Seller"**, and collectively, **"Sellers"**), (ii) **ARETÉ HOLDINGS, LLC**, a Delaware limited liability company (**"Seller Parent"**), and (iii) **SLEEP SCIENCE, INC.**, a Delaware corporation (**"Buyer"**). Buyer, Sellers and Seller Parent are sometimes referred to as the **"Parties"**, and each a **"Party"**.

WHEREAS, Sellers are engaged in the business of owning and operating sleep health centers and diagnostic testing facilities and renting and selling durable medical equipment (the **"Business"**) and owns or has the right to use all of the Purchased Assets;

WHEREAS, on January ___, 2011 (the **"Petition Date"**), each Seller filed a voluntary petition (the **"Petitions"**) for relief commencing cases (the **"Chapter 11 Cases"**) under Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**) in the United States Bankruptcy Court for the District of Arizona (the **"Bankruptcy Court"**);

WHEREAS, the Buyer desires to purchase, and Sellers desire to sell to the Buyer, the Purchased Assets, and the Buyer is willing to assume, and Sellers desire to assign and delegate to the Buyer, the Assumed Liabilities, upon the terms and conditions hereinafter set forth (the sale and purchase of the Purchased Assets and the assignment and assumption of the Assumed Liabilities are collectively referred to herein as the **"Asset Purchase"**);

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement by Sellers and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court under, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code.

WHEREAS, with the exception of Areté Sleep Therapy NW, LLC, which is a wholly-owned subsidiary of Areté Sleep NW, LLC, Seller Parent holds not less than 99% of the membership interests of each Seller; and

WHEREAS, Sellers desire to sell and Buyer desires to purchase the Purchased Assets in exchange for, upon the terms of and subject to the conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Article I**

**Definitions**

Section 1.1 **Defined Terms**. In this Agreement, the following terms shall have the following respective meanings:

"**2010 OIG Claim**" has the meaning set forth in the definition of "Excluded Liabilities" herein.

"**Accounts Receivable**" has the meaning set forth in the definition of "Excluded Assets" herein.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such first Person.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Applicable Rate**" means the rate of interest from time to time announced publicly by JPMorgan Chase Bank, N.A., as its prime rate.

"**Asset Purchase**" has the meaning set forth in the Recitals.

"**Assumed Contracts**" means the Contracts specifically listed on Schedule 1.1(a).

"**Assumed Liabilities**" means those obligations of any Seller related solely to the Assumed Contracts (in each case, in no event to include any obligations of any Seller or their Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date under any Assumed Contract); provided, that, in no event will the Assumed Liabilities include obligations of any Seller that are to be paid or performed on or before the Closing Date.

"**Assumption Agreement**" has the meaning set forth in Section 2.1(c).

"**Avoidance Actions**" means all claims, causes of action and rights of any Seller under Sections 544 through 553 of the Bankruptcy Code

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Benefit Plan**" means any "employee benefit plan" (as such term is defined in ERISA § 3(3)) and any other benefit plan, program or arrangement of any kind.

"**Bid Procedures**" means bid procedures in substantially the form attached hereto as Exhibit A, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order,

2

<u>provided</u> that any changes or modifications to <u>Exhibit A</u> shall be in form and substance acceptable to Buyer.

**"Bid Procedures Order"** means an Order of the Bankruptcy Court in substantially the form attached hereto as <u>Exhibit B</u> approving the Bidding Procedures, the Break-Up Fee and the Expense Reimbursement, <u>provided</u> that any changes or modifications to <u>Exhibit B</u> that relate to provisions other than the Break-Up Fee and Expense Reimbursement shall be in form and substance reasonably acceptable to Buyer; and <u>provided</u>, <u>further</u>, that, except as expressly limited herein, any changes or modifications to <u>Exhibit B</u> that relate to the Break-Up Fee and Expense Reimbursement shall be in form and substance acceptable to Buyer in its sole discretion.

**"Bill of Sale"** has the meaning set forth in Section 2.1(c).

**"Break-Up Fee"** means an amount equal to Seventy-Five Thousand Dollars ($75,000) which shall be afforded the protections, and be paid, as set forth in Section 7.2.

**"Business"** has the meaning set forth in the Recitals.

**"Business Day"** means any day, other than a Saturday or Sunday, on which commercial banks in New York, New York are open for the general transaction of business.

**"Business Proprietary Rights"** has the meaning set forth in the definition of "<u>Purchased Assets</u>" herein.

**"Business Software"** has the meaning set forth in Section 3.9(e).

**"Business Systems"** means Sellers' computer systems, including the Software, firmware, hardware, networks, interfaces, and related systems owned, leased or licensed for use by any Seller in the Business included on <u>Schedule 3.9(e).</u>

**"Buyer"** has the meaning set forth in the preamble to this Agreement.

**"Buyer Indemnitee"** has the meaning set forth in Section 6.2(a).

**"CERCLA"** means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

**"Certifications"** has the meaning set forth in the definition of "<u>Purchased Assets</u>" herein.

**"Chapter 11 Cases"** has the meaning set forth in the Recitals.

**"Closing"** has the meaning set forth in Section 2.3.

**"Closing Date"** has the meaning set forth in Section 2.3.

**"Closing Purchase Price"** means the Purchase Price <u>less</u> the Holdback Amount.

3

**"Closing Transactions"** has the meaning set forth in Section 2.4.

**"COBRA"** has the meaning set forth in Section 3.14(e).

**"Code"** means the United States Internal Revenue Code of 1986, as amended.

**"Consent"** means any consent, order, approval, authorization or other action of, or any filing with or notice to or other action with respect to, any Governmental Entity or any other Person which is (a) required or necessary for any of (i) the execution, delivery or performance of this Agreement or any other Transaction Document, (ii) the consummation of any Closing Transaction or other transaction contemplated hereby or thereby, or (iii) the conduct of the Business by Buyer after Closing in the same manner as presently conducted or proposed to be conducted by any Seller or the holding or utilization of any Purchased Asset thereafter, whether such requirement or necessity arises pursuant to any Legal Requirement, Contract, License, or Certification (including any of the foregoing which is required in order to prevent a breach of or a default under or a termination or modification of any Contract) or (b) set forth on the attached Schedule 3.4.

**"Contract"** means any oral or written agreement, instrument, document, lease, license, contract, assignment or other business or commercial arrangement (in each case, including any extension, renewal, amendment or other modification thereof) to which any Seller is party or by which it is bound or to which it or any Purchased Asset is subject or which pertains to the Business.

**"Cure Costs"** has the meaning set forth in Section 2.5(f).

**"Environmental and Safety Requirements"** shall mean, whenever in effect, all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"ERISA Affiliate"** has the meaning set forth in the definition of "Excluded Liabilities" herein.

**"Excluded Assets"** means any Seller's rights in, to and under the following, in each case to the extent existing immediately prior to the Closing Date:

(a) Corporate Books and Records. All minutes of meetings of the board of directors, equityholders, partners or members of each Seller and files and other records which are not Transferred Records;

(b) Accounts Receivable. All trade receivables, accounts receivable, accrued receivable and notes receivable and other monies receivable relating to or arising out of the Business or any Purchased Asset (the **"Accounts Receivable"**);

4

(c) <u>Cash</u>.  All of any Seller's cash, undeposited funds and cash equivalents as of the Closing Date;

(d) <u>Transaction Documents</u>.  The Transaction Documents;

(e) <u>Non-Assumed Contracts</u>.  The Non-Assumed Contracts;

(f) <u>Equity Interests</u>.  The capital stock or membership interests, as the case may be, of any Seller;

(g) <u>Rejected Capital </u>Assets.  The Rejected Capital Assets, subject to the provisions of subclause (c) of the definition of "<u>Purchased Assets</u>"); and

(h) <u>Paper Medical Records</u>.  Any paper patient medical records held by any Seller.

**"Excluded Liabilities"** means all Liabilities and obligations of each Seller or its respective Affiliates (or otherwise relating to any Seller, its Affiliates, the Business or the Purchased Assets) other than the Assumed Liabilities, including all Liabilities and obligations:

(a) relating to or arising under or in connection with any Plan, any "employee benefit plan" (as defined in ERISA § 3(3)), or any other benefit plan, program or arrangement of any kind at any time maintained, sponsored or contributed or required to be contributed to by any Seller or any Person which is or has ever been under common control, or which is or has ever been treated as a single employer, with any Seller under Code § 414 (**"ERISA Affiliate"**) or with respect to which any Seller or any ERISA Affiliate has any Liability;

(b) pertaining to the employment or service with, or termination from employment or service from, any Seller or any ERISA Affiliate, of any individual;

(c) relating to any claims (whether asserted before or after the Closing Date) for any breach of a representation, warranty or covenant, or for any claim for indemnification, contained in any Assumed Contract agreed to be performed pursuant to this Agreement by Buyer, to the extent that such breach or claim arises out of or by virtue of any Seller's performance or nonperformance thereunder prior to the Closing Date, it being understood that, as between the Parties hereto, this subsection shall apply notwithstanding any provision which may be contained in any form of consent to the assignment of any such Assumed Contract, which by its terms, imposes such Liabilities upon Buyer and which assignment is accepted by Buyer notwithstanding the presence of such a provision, and that such Seller's failure to discharge any such Liability shall entitle Buyer to indemnification in accordance with the provisions of Article VI hereof;

(d) relating to warranty Liabilities of any Seller with respect to any products, merchandise or services of the Business sold or rendered on or prior to the Closing Date; it being understood and agreed that any such claim or Liability asserted after the Closing Date arising out of any such sale or service prior to the Closing Date shall be considered to be a claim against or a Liability of such Seller and therefore not assumed hereunder by Buyer;

5

(e) relating to any Liabilities of any Seller with respect to such Seller's failure to take reasonable steps to safeguard the Proprietary Rights or the Business Systems utilized in the Business by such Seller;

(f) relating to Liabilities of any Seller for injury to or death of persons or damage to or destruction of property (including any worker's compensation claim) with respect to acts or omissions by such Seller which occur on or prior to the Closing Date regardless of when said claim or Liability is asserted, including any claim for consequential damages in connection with the foregoing; it being understood and agreed that any such claim or Liability asserted after the Closing Date, but arising from acts or omissions by such Seller which occur before the Closing Date shall be considered to be a claim against or a Liability of such Seller for injury to or death of persons or damages to or destruction of property and therefore not assumed hereunder by Buyer;

(g) arising out of or relating to infringement, misappropriation of or other conflict with the Proprietary Rights of any Person to the extent the same arise out of acts or omissions occurring on or prior to the Closing Date;

(h) arising out of violations occurring on or prior to the Closing Date of any Legal Requirement;

(i) arising out of any conduct, acts or omissions giving rise to the allegations made by, or settlement entered into with, the Department of Health and Human Services Office of Inspector General, the Centers for Medicare and Medicaid Services or any other Governmental Entity, including, without limitation, all Liabilities and obligations relating to the subpoena received by Seller Parent on January 6, 2010 regarding the submission of alleged improper claims related to Medicare and Medicaid (the **"2010 OIG Claim"**);

(j) arising out of or relating to any Environmental and Safety Requirement, irrespective of whether such liability is incurred by Buyer or any Seller in the first instance;

(k) in respect of any claim, action, litigation, suit, proceeding, hearing or investigation of any Seller or related to the Business or any Purchased Asset arising on or prior to the Closing Date (whether asserted or commenced before or after the Closing Date);

(l) relating to the Excluded Assets (but, with respect to the Rejected Capital Assets, subject to the provisions of subclause (c) of the definition of "Purchased Assets");

(m) with respect to Indebtedness of any Seller or any of its Affiliates or dividends payable by any Seller whether incurred or accrued before or after the Closing Date;

(n) relating to membership interests of any Seller or any operating agreement to which any Seller is party;

(o) relating to obligations of any Seller under this Agreement or any Transaction Document;

6

(p)  relating to any transactions between any Seller and any of its Insiders whether occurring before or after the Closing Date;

(q)  for or on account of any Tax;

(r)  under capitalized leases (other than any capitalized leases that are Assumed Contracts) with respect to which any Seller is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which any Seller assures a creditor against loss;

(s)  relating to Liens on the Purchased Assets arising on or before the Closing Date;

(t)  any amounts payable for fees or expenses incurred by any Seller in respect to this Agreement, the agreements contemplated hereby and/or the transactions contemplated hereby and thereby or otherwise in connection with such Seller's sale of the Purchased Assets, including all amounts payable to Reed Smith LLC, or to any of their respective Affiliates and all amounts payable in connection with any employee transaction bonuses; and

(u)  without limitation by the specific enumeration of the foregoing, any other obligation or Liability not expressly included in the definition of Assumed Liabilities.

**"Expense Reimbursement"** has the meaning set forth in Section 7.2(a).

**"FIRPTA Certificate"** has the meaning assigned to it in Section 2.4(a)(v).

**"GAAP"** means U.S. generally accepted accounting principles, as in effect from time to time.

**"Government Programs"** has the meaning set forth in Section 3.16(b).

**"Governmental Entity"** means any government, agency, governmental department, commission, board, bureau, court, arbitration panel or instrumentality of the United States of America or any other country or any state or other political subdivision thereof, including any contractors, subcontractors or agents thereof, as well as Medicare Advantage and Medicaid Plans (whether now or hereafter constituted and/or existing) and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**"Holdback Amount"** means $125,000.

**"Indebtedness"** means, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, mortgage, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the Ordinary Course), (iv) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (v) any indebtedness guaranteed in any manner by a Person

7

(including guarantees in the form of an agreement to repurchase or reimburse), (vi) any indebtedness secured by a Lien on a Person's assets, (vii) any obligations of a Person under capitalized leases according to GAAP, (viii) any payment to be made pursuant to sale-leaseback transactions, (ix) any payment to be made pursuant to a non-compete payment obligation or change of control payment obligation, (x) net Liabilities associated with reconciled intercompany balances, (xi) Liabilities related to acquisition of or by any Seller and including earn-out or similar contingent purchase amounts, (xii) any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA and (xiii) any amounts outstanding under any letters of credit, bankers acceptance or similar instrument, in each case, including interest, fees and prepayment premiums or penalties thereon.

**"Insider"** means any stockholder, partner, member, officer or director (or similar official) of any Seller, any Affiliate or natural or adoptive member of the immediate family of any of the foregoing Persons, or any Person in which any of the foregoing Persons directly or indirectly owns any material beneficial interest. The "immediate family" of any individual means such individual's (and such individual's present or former spouse's) grandparents, parents, spouse, siblings, children and grandchildren.

**"Inventory"** has the meaning set forth in the definition of "Purchased Assets" herein.

**"IRS"** has the meaning set forth in Section 3.14(c).

**"Leased Real Property"** has the meaning set forth in Section 3.6(b).

**"Legal Requirement"** means all federal, state and local laws, statutes, codes, rules, regulations, ordinances, judgments, orders, decrees and the like of any Governmental Entity, including common law.

**"Liability"** means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

**"Licenses"** has the meaning set forth in the definition of "Purchased Assets" herein.

**"Lien"** means any mortgage, pledge, hypothecation, lien (statutory or otherwise), preference, priority, charge, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or similar right), defect of title, security interest, license or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and any assignment or deposit arrangement in the nature of a security device).

**"Loss"** has the meaning set forth in Section 6.2(a).

**"Management Agreement"** has the meaning set forth in Section 2.4(a)(iii).

8

**"Mark"** has the meaning set forth in the definition of "<u>Proprietary Rights</u>" herein.

**"Material Adverse Effect"** means any of the following: (i) a failure to maintain, for any reason, gross monthly revenues in excess of $2,000,000 for any consecutive two month period between the date hereof and the Closing Date; (ii) the termination, expiration or failure to renew of any Licenses; (iii) the institution of any proceedings against any Seller stemming from and/or related to accusations of fraud with respect to provision of services or equipment provided by the Business to patients covered by Medicare, Medicaid and TRICARE; or (iv) the failure to assign any of the Assumed Contracts that, in the aggregate, have generated at least $750,000 of gross revenue for the Sellers and Seller Parent, taken as a whole, during the twelve (12)-month period ending on the date hereof.

**"Non-Assumed Contracts"** means all Contracts of any Seller other than the Assumed Contracts.

**"OIG"** means the Department of Health and Human Services Office of Inspector General.

**"Ordinary Course"** means, with respect to any Person, in the ordinary course of that Person's business consistent with past practice, including as to the quantity, quality and frequency.

**"Parties"** have the meaning set forth in the preamble to this Agreement.

**"Permitted Liens"** means:

(a) Liens on Purchased Assets arising by operation of law and securing the payment of Taxes which are not yet due and payable;

(b) restrictions on transfer imposed under state or federal securities laws;

(c) the lessors' and sublessors' rights under leases of personal property by any Seller as lessee which are part of the Purchased Assets; and

(d) mechanics', carriers', workers', repairers', and similar non-consensual Liens arising by operation of law and relating to obligations which are incurred in the Ordinary Course and which secure only Assumed Liabilities which are not yet due and payable.

**"Person"** means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any Governmental Entity or any similar entity.

**"Petitions"** has the meaning set forth in the Recitals.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Plan"** and **"Plans"** each have the meaning set forth in Section 3.14(a).

**"Previously Disclosed Contracts"** has the meaning set forth in Section 3.8.

**"Prior Disclosure Letter"** means that certain correspondence dated as of January 24, 2011, delivered by Sellers to Buyer.

**"Private Programs"** has the meaning set forth in Section 3.16(b).

**"Promissory Note"** means that certain Secured Promissory Note, issued by Sellers in favor of True North Partners, LLC, dated as of the date hereof.

**"Property Taxes"** shall mean real, personal and intangible property Taxes.

**"Proprietary Rights"** means all of the following items and all corresponding rights, throughout the world: (i) patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice), all improvements thereto and any reissue, continuation, continuation-in-part, divisional, revision, extension or reexamination of the foregoing; (ii) trademarks, service marks, certification marks, trade dress, logos, trade names, slogans, Internet domain names and corporate names together with all with all translations, adaptations, derivations, and combinations thereof, all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing (collectively, **"Marks"**); (iii) copyrights and other works of authorship (whether or not copyrightable, including "look and feel"), mask works and moral rights, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other confidential information (including ideas, formulae, compositions, know-how, processes, techniques, methods, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial, business and marketing plans, and customer and supplier lists and related information); (v) computer software and software systems, including source code, object code, data, databases, interfaces, tools and related documentation (collectively, **"Software"**); (vi) rights of publicity and privacy, including the right to use names, likenesses, voices and biographical information of real persons; (vii) other intellectual property and proprietary rights; and (viii) all copies and tangible embodiments of the foregoing (in whatever form or medium).

**"Proprietary Rights Assignment"** has the meaning set forth in Section 2.1(c).

**"Provider Contracts"** means those rights and numbers of Sellers specified in the Prior Disclosure Letter permitting Sellers to submit invoices for services rendered and medical equipment provided to the government payors specified in Schedule 3.8(a) and the Previously Disclosed Contracts.

**"Purchase Price"** means $1,900,000.

**"Purchased Assets"** means any Seller's rights, title and interest in, to and under all assets, rights and properties of the Business (whether real, personal or mixed, tangible and intangible, and of every kind, character and description), which are used, or held for use, in the Business (including the Business as a going concern) or otherwise (other than the Excluded Assets), including any Seller's rights in, to and under the following:

10

(a) <u>Tangible Personal Property</u>. All equipment (including the diagnostic equipment set forth on <u>Schedule 3.18(b)</u>), furniture, fixtures, machines, hardware, peripherals, network devices, software, networks, office materials and supplies, spare parts and other tangible personal property of every kind and description owned, leased or subleased as of the date of this Agreement by any Seller and used, or held for use, in the conduct of the Business at the locations at which the Business is conducted or at suppliers' premises or customers' premises on consignment, and any additions, improvements, replacements, and alterations thereto made on or prior to the Closing Date; including the rights to all property listed on <u>Schedule 1.1(b),</u> but not including the rights to all property listed on <u>Schedule 1.1(c)</u> for which capital lessors have valid security interests (the **"Rejected Capital Assets"**) unless and until the rights under the capital lease agreements to which such property is subject are assumed by Buyer pursuant to subclause (c) of this definition of "Purchased Assets";

(b) <u>DME Inventory</u>. All durable medical equipment (including those set forth on <u>Schedule 3.18(c)</u>) held by any Seller for sale or rental (the **"Inventory"**);

(c) <u>Contracts</u>. All Assumed Contracts; provided, further, that Buyer may elect assume Seller's rights under the capital lease agreements listed on <u>Schedule 1.1(c)</u> to which the Rejected Capital Assets are subject by providing written notice thereof and an updated Schedule 1.1(a) to Seller Parent no later than three (3) Business Days before the date of the Sale Hearing, and Buyer may elect to assume each Seller's rights to any such capital lease agreement;

(d) <u>Proprietary Rights</u>. All Proprietary Rights and all goodwill associated therewith, owned by any Seller or used, or held for use, in connection with the Business, including the items set forth on <u>Schedule 3.9(a)</u>, together with all rights to collect income, royalties, damages, products, proceeds and payments due or payable at the Closing or thereafter with respect to the foregoing and all claims against third parties for past, present or future infringements or misappropriations thereof or other conflicts therewith, and the right to sue and recover for past, present or future infringements or misappropriations of or other conflicts with any of the foregoing, the right to recover damages or lost profits in connection therewith, and all corresponding rights throughout the world (collectively, the **"Business Proprietary Rights"**);

(e) <u>Files and Records</u>. All files, data and other records of any Seller which relate to the Business (other than those listed in the Excluded Assets), including all lists and records pertaining to customers, suppliers, distributors, personnel and agents, all related books, records, accounts, canceled checks and payment records, and copies of Tax Returns for the Business and other Tax records relating to the Business (including payroll, unemployment, real estate, and other records relating to Tax, and all other similar books and records of any Seller relating to the Business other than to the extent relating exclusively to any Excluded Asset or Excluded Liability), as may reasonably be requested by Buyer (the **"Transferred Records"**);

(f) <u>Licenses</u>. All licenses, registrations, certifications, accreditation, permits, franchises, certificates, and other authorizations issued by any Governmental Entity or accreditation body issued to or held by any Seller with respect to the Business, including all applications therefor and all renewals, extensions, or modifications thereof and additions thereto (collectively, the **"Licenses"**);

Case 2:11-bk-02009-RTB    Doc 11    Filed 01/26/11    Entered 01/26/11 18:20:14    Desc
Main Document    Page 42 of 232

(g) <u>Security Deposits</u>.  All security deposits deposited by or on behalf of any Seller as lessee or sublessee, under any leases or subleases of real or personal property or otherwise relating to the Business or any Purchased Asset, other than with respect to Excluded Assets;

(h) <u>Warranties</u>.  All rights of any Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with products sold to or services provided to such Seller for the Business, or affecting the property, machinery or equipment used in the conduct of the Business or any Purchased Asset;

(i) <u>Claims</u>.  All claims, deposits, prepayments, warranties, guaranties, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature related to, or in connection with, any Purchased Asset;

(j) <u>Certifications</u>.  All certifications, ratings, listings and similar rights or benefits obtained from any customer, product certification organization or Governmental Entity related to, or in connection with, the Business or the Purchased Assets (collectively, the **"<u>Certifications</u>"**);

(k) <u>Other Assets</u>.  All other property owned by any Seller, or as to which such Seller has any right (irrespective of title), in each case, related to the Business, on the Closing Date, other than the Excluded Assets;

(l) <u>Goodwill</u>.  All of Sellers' goodwill in, and going concern value of, the Business or otherwise associated with any of the foregoing; and

(m) <u>Avoidance Actions</u>.  All Avoidance Actions.

**"<u>Rejected Capital Assets</u>"** has the meaning set forth in subclause (a) of the definition of "Purchased Assets".

**"<u>Relevant Group</u>"** means any affiliated, combined, consolidated, unitary or other group for Tax purposes of which any Seller is or was a member.

**"<u>Required Consents</u>"** has the meaning set forth in Section 2.4(a)(ii).

**"<u>Restricted Marks</u>"** has the meaning set forth in Section 5.7.

**"<u>Sale Hearing</u>"** means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a competing transaction.

**"<u>Sale Motion</u>"** means the motion, in form and substance reasonably acceptable to Sellers and Buyer, filed by Sellers pursuant to, <u>inter alia</u>, Sections 363 and 365 of the Bankruptcy Code to request approval of the Bidding Procedures Order and the Sale Order.

**"<u>Sale Order</u>"** means an Order of the Bankruptcy Court in substantially the form attached hereto as <u>Exhibit C</u> authorizing and approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, <u>provided</u>, that, except as expressly limited herein,

any changes or modifications to Exhibit C that relate to the Purchase Price, the Excluded Assets, the Excluded Liabilities, the Purchased Assets, the Holdback Amount, the Cure Costs, the Break-Up Fee or the Expense Reimbursement and any other provisions of the Sale Order that are related to the material economic terms of this Agreement or the operation of the Business shall be in form and substance acceptable to Buyer in its sole discretion; provided, further, that any changes to Exhibit C that relate to provisions of the Sale Order that are not related to the terms set forth in preceding proviso or the other material economic terms of this Agreement or the operation of the Business shall be in form and substance reasonably acceptable to Buyer.

**"Seller"** has the meaning set forth in the preamble to this Agreement.

**"Seller Indemnitee"** has the meaning set forth in Section 6.2(b).

**"Seller Parent"** has the meaning set forth in the preamble to this Agreement.

**"Software"** has the meaning set forth in the definition of "Proprietary Rights" herein.

**"Tax"** (and, with correlative meaning, **"Taxes," "Taxable"** and **"Taxing"**) means (i) any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profits, environmental (including under Section 59A of the Code), customs, duty, real property, real property gains, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding or other tax assessment, fees, levy or other governmental charge of any kind whatever, whether disputed or not, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing; (ii) any liability for or in respect of the payment of any amount of a type described in clause (i) of this definition arising as a result of being or having been a member of any Relevant Group and (iii) any liability for or in respect of the payment of any amount of a type described in clauses (i) or (ii) of this definition as a transferee or successor, by contract or otherwise.

**"Tax Return"** means any return, declaration, report, claim for refund, information return or other document (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of Taxes or the administration of any Legal Requirement relating to any Taxes.

**"Taxing Authority"** means any governmental agency, board, bureau, body, department or authority of any U.S. federal, state, commonwealth or local jurisdiction or any non-U.S. jurisdiction, having or purporting to exercise jurisdiction with respect to any Tax.

**"Terminated Contracts"** means the Contracts specifically listed on Schedule 3.5 and in the Prior Disclosure Letter.

**"Transaction Documents"** means this Agreement, the Bill of Sale, the Proprietary Rights Assignment, the Assumption Agreement and the Management Agreement, if applicable.

"**Transfer Taxes**" means sales, use, transfer, real property transfer, filing, recording, stock transfer, stamp, stamp duty reserve, value added, documentary and other similar Taxes.

"**Transferred Records**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Treasury Regulations**" means the regulations promulgated or proposed by the United States Treasury Department under the Code.

**Section 1.2    Interpretation**.  The terms "hereof," "herein" and "hereunder" and terms of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement.  Section, clause, exhibit and schedule references contained in this Agreement are references to Sections, clauses, exhibits and schedules in or attached to this Agreement, unless otherwise specified.  Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.  Each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form.  As used in this Agreement, the terms "knowledge" or "aware" will include the actual knowledge and awareness of the Person in question, and the knowledge and awareness that such Person would have obtained after exercising reasonable diligence in the performance of such Person's duties in the Ordinary Course.  Each reference in this Agreement to any Legal Requirement will be deemed to include such Legal Requirement as it hereafter may be amended, supplemented or modified from time to time and any successor thereto, unless such treatment would be contrary to the express terms of this Agreement.  Unless expressly stated otherwise, the word "including" shall mean including without limitation regardless of whether such words are included in some contexts but not others.

## Article II

## Transfer of Purchased Assets and Assumed Liabilities; Purchase Price; Closing; Closing Transactions; Tax Treatment

**Section 2.1    Transfer of Purchased Assets and Assumed Liabilities**.  Subject to the satisfaction of the conditions herein:

(a) Transfer of Purchased Assets.  Each Seller agrees to sell or otherwise to convey, assign, transfer, deliver and set over to Buyer, or to its assignee pursuant to Section 9.3 hereof, at the Closing, all of such Seller's rights in, to and under all of the Purchased Assets (including the Business as a going concern), in each case free and clear of any Lien (other than Permitted Liens) or restrictions on transfer.

(b) Assumption of Assumed Liabilities.  Except as specifically excluded pursuant to the provisions of this Agreement, Buyer, or its assignee pursuant to Section 9.3 hereof, agrees to assume, at the Closing, and thereafter pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities.  Buyer, or its assignee pursuant to Section 9.3 hereof, shall not assume or otherwise be responsible at any time for any Excluded Liability.  Each Seller agrees to satisfy and discharge each of the Excluded Liabilities as the

14

same shall become due. Buyer's (or its assignee's, pursuant to Section 9.3 hereof) assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer, or its assignee pursuant to Section 9.3 hereof, as compared to the rights and remedies which such parties would have had against any Seller had this Agreement not been consummated.

(c) <u>Method of Conveyance</u>. The transfer and conveyance by each Seller of the Purchased Assets to Buyer or its assignee pursuant to Section 9.3 hereof, in accordance with Section 2.1(a) shall be effected at the Closing by each Seller's execution and delivery to Buyer or its assignee pursuant to Section 9.3 hereof, of instruments of transfer, including: (i) a bill of sale in a form reasonably acceptable to Buyer (the **"<u>Bill of Sale</u>"**); (ii) one or more assignments of the Proprietary Rights, in a form reasonably acceptable to Buyer (the **"<u>Proprietary Rights Assignment</u>"**); and (iii) the Required Consents. The assumption by Buyer of the Assumed Liabilities from each Seller in accordance with Section 2.1(b) shall be effected on the Closing Date at the Closing by Buyer's (or its assignee's, pursuant to Section 9.3 hereof) execution and delivery to Sellers of an assumption agreement, in a form reasonably acceptable to Sellers (the **"<u>Assumption Agreement</u>"**).

**Section 2.2    <u>Purchase Price</u>**. At the Closing, Buyer shall pay Seller Parent, in accordance with the wire instructions received from Seller Parent, the Closing Purchase Price in immediately available funds, and Seller Parent shall hold the Closing Purchase Price for the benefit of itself, the Sellers, their creditors and their estates until directed to distribute those proceeds by order of the Bankruptcy Court; <u>provided</u> that Buyer shall have no further liability pursuant to this Section 2.2 after payment of the Closing Purchase Price.

**Section 2.3    <u>Closing; Closing Date</u>**. The closing of the transactions contemplated by this Agreement (the **"<u>Closing</u>"**) will occur at the offices of Kirkland & Ellis LLP located at 601 Lexington Avenue, New York, New York at 10:00 a.m. on the date hereof or at such other time and at such place as mutually agreed upon by the Parties. The date upon which the Closing actually occurs is referred to herein as the **"<u>Closing Date</u>."**

**Section 2.4    <u>Closing Transactions</u>**. Subject to the terms and conditions set forth herein, the Parties will consummate the following transactions (the **"<u>Closing Transactions</u>"**) at the Closing:

(a) <u>Sellers' Closing Actions and Deliverables</u>. Sellers will have delivered to Buyer all of the following:

(i)    <u>Conveyance Documents</u>. The Bill of Sale and the Proprietary Rights Assignment executed by each Seller and such other deeds, bills of sale and other instruments of assignment as Buyer reasonably deems necessary in order to effect the sale of the Purchased Assets;

(ii)    <u>Consents</u>. Copies of all Consents set forth on <u>Schedule 2.4</u> (the **"<u>Required Consents</u>"**);

(iii)    <u>Management/Leaseback Agreement</u>. That Management/Leaseback Agreement, duly executed by each Seller, if required under Section 2.6;

15

(iv)    <u>Nonsolicitation Agreement</u>.  The execution of a nonsolicitation and confidentiality agreement, by and between Buyer and Anthony Baumann, pursuant to which Anthony Baumann will agree, subject to the terms and conditions therein, to refrain, for a period not to exceed twelve months from the Closing Date, from making any offers of employment to any Business Employee that has been actively employed by Buyer within six months of the date any such offer of employment is made

(v)    <u>FIRPTA</u>.  An affidavit, sworn under penalties of perjury and dated as of the Closing Date, certifying that each Seller is not a foreign person pursuant to Section 1.445-2(b) of the Treasury Regulations (**"FIRPTA Certificate"**);

(vi)    <u>UCC-3's; Releases</u>.  A copy of fully executed UCC-3 termination statements and other terminations, pay-offs and/or releases (and, as applicable, evidence that each has been duly recorded with the appropriate Governmental Entity), or, at Buyer's option, assignments or other documents necessary to terminate, release or assign, as the case may be, all Liens (other than Permitted Liens) on any Purchased Asset;

(vii)    <u>Consent of Members and Board of Directors</u>.  Evidence to the effect that all approvals required under each Seller's respective organizational documents and under applicable law (including in the necessary consents from the stockholders and board of directors, as the case may be, from each Seller) to approve this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been obtained;

(viii)    <u>Good Standing Certificate</u>.  A certificate, dated not earlier than the tenth (10th) Business Day prior to the Closing Date, of the Secretary of State of the states under the laws of which each Seller is organized or qualified to conduct business stating that such Seller is in good standing; and

(ix)    <u>Other Documents</u>.  Such other certificates and documents as may be called for under this Agreement or any of the other Transaction Documents, or as Buyer shall reasonably request.

(b) <u>Buyer's Closing Actions and Deliverables</u>.  On or prior to the Closing Date, Buyer will have delivered to Sellers all of the following:

(i)    <u>Purchase Price</u>.  The Closing Purchase Price in immediately available funds;

(ii)    <u>Assumption Agreement</u>.  The Assumption Agreement, duly executed by Buyer, or its assignee pursuant to Section 9.3 hereof;

(iii)    <u>Management Agreement</u>.  The Management Agreement, duly executed by Buyer, if required under Section 2.6;

(iv)    <u>Consent of Board of Directors</u>.  Evidence to the effect that all approvals required under the respective organizational documents and under applicable law from Buyer's Board of Directors to approve this Agreement and the Transaction

Documents and the consummation of the transactions contemplated hereby and thereby have been obtained;

(v) <u>Good Standing Certificate</u>. A certificate, dated not earlier than the tenth (10th) Business Day prior to the Closing Date, of the Secretary of State of the state under the laws of which Buyer is organized stating that Buyer is in good standing; and

(vi) <u>Other Documents</u>. Such other certificates and documents as may be called for under this Agreement or any of the other Transaction Documents, or as any Seller shall reasonably request.

(c) <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated hereby are subject to the satisfaction or waiver (where permissible) of the following conditions:

(i) <u>Closing Deliveries</u>. Sellers shall have delivered the deliveries set forth in Section 2.4(a) hereof.

(ii) <u>Bankruptcy Court Orders</u>. The orders of the Bankruptcy Court as specified in Section 2.5 hereof shall have been approved as set forth therein.

(iii) <u>Compliance with Law</u>. No provisions of any applicable Legal Requirement that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated hereby will be in effect or have been enacted issued or promulgated, subject to Section 2.5(b) hereof.

(iv) <u>Cure Costs</u>. Sellers shall have paid all Cure Costs, as set forth in Section 2.5(f).

(v) <u>Assumption of the Provider Contracts and Management/Leaseback Agreement</u>. At the election of Buyer, either (A) the Parties shall have entered into a Management/Leaseback Agreement in the form and substance acceptable to Buyer or (B) Buyer shall have assumed the Provider Contracts pursuant to Section 2.6(b).

(vi) <u>Submission to OIG</u>. At least five (5) days prior to the Closing, Sellers shall have submitted this Agreement, the Sale Order and the Management/Leaseback Agreement, if applicable, to the OIG (and shall have contacted the OIG telephonically if no response has been received from the OIG three (3) days prior to the Closing), and the OIG shall not have objected to the transactions contemplated hereby.

(vii) <u>OIG Claim Settlement</u>. The 2010 OIG Claim shall have been settled in a manner reasonably satisfactory to the Buyer.

(viii) <u>Software Licenses.</u> Evidence, in a form reasonably satisfactory to Buyer, that Sellers have all necessary licenses (including the numbers set forth therein) for the Software listed on <u>Schedule 3.9(e)</u>.

17

(ix)    No Material Adverse Effect.  There shall not have occurred any Material Adverse Effect.

(x)    Employees.   Not fewer than eleven (11) of the fifteen (15) employees denoted on Schedule 2.4(c)(x) shall have become employees of Buyer.

**Section 2.5    Method and Manner of Sale; Approvals and Consents; Cooperation; Notification**

(a) Required Consents.  Sellers will reasonably cooperate with Buyer to secure, before the Closing Date, all Required Consents to the extent such consents are not provided for or satisfied by the Sale Order, provided that neither Sellers nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers, except for the Cure Costs.

(b) Efforts to Close.  During the period prior to the Closing Date, Sellers and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Entity required to be obtained by them in order to assign or transfer any Assumed Contracts to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth herein, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order.

(c) Cooperation with Governmental Matters.  Sellers and Buyer (i) shall promptly inform each other of any communication from any Governmental Entity concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Entity in response thereto. In addition, none of the Parties shall agree to participate in any meeting with any Governmental Entity in respect of any filings, investigations or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Entity, given the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives, on the one hand, and the Governmental Entity or members of its staff, on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to pre-existing confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Parties with such necessary information and assistance as such other Parties and their respective Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submission of information to the Governmental Entity in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.   Sellers shall prosecute all required requests for

18

approval with all necessary diligence, and Buyer shall use commercially reasonable efforts to cooperate with such prosecution, and the Parties otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an order as soon as possible.

(d) <u>Notice of Breach</u>.  Sellers shall promptly notify Buyer, and Buyer shall promptly notify Sellers, of any event, condition or circumstance of which any Seller or Buyer, as applicable, becomes aware after the date hereof and prior to the Closing Date that would constitute a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement).  During the period prior to the Closing Date, Sellers will promptly advise Buyer in writing of any written notice, or to Sellers' knowledge, other communication, from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.

(e) <u>Further Assurances</u>.  In addition to the provisions of this Agreement, from time to time after the Closing Date, Sellers and the Buyer shall use reasonable best efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Purchased Assets to the Buyer and the assumption of the Assumed Liabilities by the Buyer; <u>provided</u> that nothing in this Section 2.5(e) shall require any Party or any Affiliate thereof to make any significant expenditure or incur any significant obligation on its own or on behalf of any other Party not otherwise contemplated herein or prohibit any Seller or any Affiliate thereof from ceasing operations or winding up its affairs following the Closing, or filing, confirming and implementing plans of reorganization under the Bankruptcy Code for the purpose of liquidation and distribution, or converting their respective Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code after the Closing.

(f) <u>Cure Costs</u>.  On or prior to the Closing, Sellers shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses relating to the assignment and assumption of the Assumed Contracts (the **"Cure Costs"**) to which any Seller is a party and which are included in the Purchased Assets.

(g) <u>Bankruptcy Court Approval and Filings</u>.

(i)  Sellers and Buyer acknowledge that this Agreement, and the sale of the Purchased Assets, are subject to Bankruptcy Court approval.  Sellers and Buyer acknowledge that to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting an auction in respect of the Purchased Assets (the **"Auction"**).  Buyer agrees that it will take such commercially reasonable actions as are reasonably requested by Sellers to assist in obtaining the Sale Order, including furnishing affidavits or other non-confidential documents or information for filing with the Bankruptcy Court to demonstrate adequate assurance of future performance under the Assumed Contracts.

19

(ii)     On the Petition Date, Sellers shall file the Sale Motion with the Bankruptcy Court, together with appropriate supporting papers and notices.

(iii)     Sellers shall use reasonable efforts to obtain entry of the Bidding Procedures Order and the Bidding Procedures.  Sellers shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Bidding Procedures Order, the Bidding Procedures and the Sale Order, and shall serve all parties entitled to notice of such pleadings under applicable provision of the Bankruptcy Code and the Bankruptcy Rules.  Sellers shall serve the Sale Motion upon (i) the Office of the United States Trustee for the District of Arizona; (ii) the Internal Revenue Service; (iii) the United States Attorney Office for District of Arizona; (iv) counsel to any committee; (v) all entities known to have expressed an interest in a transaction with respect to any of the Purchased Assets during the past year from the Petition Date of the Agreement; (vi) Buyer and counsel to Buyer; (vii) all known creditors; and (viii) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in the Chapter 11 Cases.  After entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall serve a notice of the transactions contemplated by this Agreement, along with this Agreement, the Sale Motion, the Sale Order, the Bidding Procedures, and the Bidding Procedures Order upon (i) all of the parties set forth in the preceding sentence, (ii) all parties to the Assumed Contracts, (iii) all parties asserting Liens on any of the Purchased Assets; and (iv) taxing authorities having jurisdiction over Sellers or any of the Purchased Assets.  In addition, after entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers shall serve notice of the transaction contemplated by this Agreement upon all parties identified as creditors set forth on Schedules D through H of each of Sellers' Schedules of Statements and Liabilities filed with the Bankruptcy Court.

(iv)     In the event an appeal is taken or a stay pending appeal is requested, from the Bidding Procedures Order or the Sale Order, Sellers shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay.  Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.  If an appeal or a stay pending appeal is taken with respect to the Bidding Procedures Order or the Sale Order, Sellers shall use their best efforts to cause the timely opposing and dismissing of such appeal or stay pending appeal and to cause such order to become final and non-appealable.

(v)     From and after the Petition Date, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.  In addition, provided that Buyer is the Successful Bidder at the Auction, following completion of the Auction contemplated hereby, Sellers shall not, and shall cause their respective representatives and affiliates not to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Buyer and their authorized agents and Representatives) in connection with any sale or other disposition of the Purchased Assets, except as may be approved by the Bankruptcy Court as part of the Bidding Procedures.  In addition, Sellers shall not after completion of the Auction contemplated herein respond to any inquiries or offers to

20

purchase all or any part of the Purchased Assets or perform any other acts related thereto, including supplying information relating to the Business and the assets of Sellers to prospective buyers.

(vi) From and after the date of this Agreement, Sellers shall provide Buyer at least two (2) days in advance of filing with the Bankruptcy Court, a draft of any motions, orders, notices, or other pleadings that Sellers propose to file with the Bankruptcy Court, including the Sale Motion and the exhibits thereto. Sellers shall cooperate with Buyer and consider in good faith the views and any changes or revisions requested by Buyer with respect to all such filings.

(vii) The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Sellers and their representatives and affiliates are and may continue to solicit higher and better bids than that of Buyer contained in this Agreement for the Purchased Assets.

(viii) In contemplation of Sections 363(m) and (n) of the Bankruptcy Code, Buyer shall not prior to the Closing communicate with any Person regarding any sale or other disposition of any of the Purchased Assets to such Person by Buyer subsequent to the Closing.

### Section 2.6    Provider Contracts and Management/Leaseback Agreement

(a) Sellers shall request the Bankruptcy Court authorize, in the Sale Order, the Parties to enter into a Management/Leaseback Agreement pursuant to which Buyer will lease back to Seller certain purchased assets and shall retain management responsibility for key aspects of the Sellers' leaseback operations (the "Management/Leaseback Agreement"). The Buyer's management responsibilities shall include, but not be limited to, billing to third party payors under the Sellers' existing billing and provider numbers, which may not be transferred assets. The Management/Leaseback Agreement shall govern during the period between the Closing Date and the date on which Buyer, in the exercise of reasonable diligence, is able to obtain the necessary Licenses, provider numbers and certifications in order to provide and bill for services in its own name; provided, however, that the term of the Management/Leaseback Agreement shall not extend more than nine (9) months beyond the Closing Date unless the Buyer has not been assigned provider numbers in its name after such nine (9)-month period, in which case Buyer and Sellers shall agree to at most three (3) additional one (1)-month renewal periods of the Management/Leaseback Agreement.

(b) At any time prior to the Closing, Buyer may, at its sole election, and subject to the approval of the Bankruptcy Court: (i) direct Sellers to assume and assign the Provider Contracts to Buyer, (ii) require, to the extent provided in Section 365(f), that government payor counterparties accept such assignment without condition other than Buyer's provision of adequate assurance of future performance and compliance with all terms of such Provider Contracts and regulations promulgated in relation thereto, including the usual and ordinary conditions for submission of invoices, and (iii) terminate and annul any request or claim, including financial and integrity requirements, of the government payor counterparties to assert

21

any right or claim related to or connected with the 2010 OIG Claim.  If Buyer elects to assume the Provider Contracts pursuant to this Section 2.6(b), then neither Sellers nor Buyer shall have any further obligation or rights pursuant to Section 2.6(a).

(c) Prior to the Closing, Sellers will notify the OIG of the transactions contemplated hereby and will submit this Agreement, the Sale Order and the Management/Leaseback Agreement, if applicable, to the OIG.  Sellers will make reasonable efforts to confirm that the OIG does not object to the transaction contemplated hereby.  In the event that the OIG objects to any aspect of the transaction or its related arrangements, the parties agree to use commercially reasonable efforts to restructure the arrangement as necessary in order to adequately address any such objection.

### Section 2.7    Collection of Accounts Receivable

(a) After Closing, Buyer may, at its own expense, collect Accounts Receivable of Sellers and remit net collections to Sellers no less frequently than weekly for a period of nine (9) months after Closing, provided, however, that Buyer is under no obligation to collect any of Sellers' Accounts Receivable, and further provided either Sellers or Buyer may terminate Buyer's ability to collect such Accounts Receivable upon ten (10) days' written notice.

(b) Buyer shall be compensated for collection of Sellers' Accounts Receivable by payment of a fee(s) by Sellers equal to: (i) 5% of the first $1,450,000 collected within nine (9) months after Closing, (ii) 20% of collections in excess of $1,450,000 collected within nine (9) months after Closing; and (iii) 100% of collections received more than nine (9) months after Closing.

(c) The application of payments and other aspects of the implementation of this Section 2.7 shall be subject to the following conditions: (i) the Buyer's continuing obligation to maintain comprehensive and accurate business records (in a manner substantially similar to Buyer's own practice) related to the collection of any Accounts Receivable and/or the application of payments to same; (ii) the Sellers' ability to audit such records upon the provision of reasonable notice, and during normal business hours, to the Buyer, but no more than four (4) times per quarter; (iii) the Buyer's agreement to hold all proceeds received from the Sellers' and Seller Parent's Accounts Receivable in a constructive trust for the benefit of Sellers and Seller Parent; and (iv) the understanding that any payment received by Buyer from any Person that remains obligated on any unpaid Accounts Receivable that does not expressly identify the invoice or service to which it relates shall be credited to the oldest open balance due from such Person.

### Article III

### Representations And Warranties Of Sellers and Seller Parent

As a material inducement to Buyer to enter into this Agreement and to consummate the Closing Transactions contemplated hereby, Seller Parent and each Seller hereby, jointly and severally, make the representations and warranties set forth in this Article III as of the date hereof, or such other date as set forth below.

22

Section 3.1    **Organization and Power**.  Each Seller is a limited liability company duly formed or organized and validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in every jurisdiction in which the nature of its business or its ownership of property requires it to be qualified.  Schedule 3.1 sets forth each jurisdiction in which the nature of the Business or the ownership of the Purchased Assets makes such qualification necessary.  Each Seller has the full power necessary to own and operate its properties and carry on the Business as now conducted and as proposed by it to be conducted.

Section 3.2    **Authorization of Transactions**.  Subject to approval of the Bankruptcy Court, each of Sellers and Seller Parent has full power and authority to execute and deliver this Agreement and all other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby.  Each of Sellers and Seller Parent has duly approved this Agreement and all other Transaction Documents to which it is a party and has duly authorized its execution and delivery of this Agreement and such Transaction Documents and the performance of its obligations hereunder and thereunder.

Section 3.3    **Members; Investments**.  Seller Parent owns all of the membership interests of each Seller.  The Purchased Assets do not include any shares of capital stock or any other security, interest or investment in, or loan to (other than extensions of trade credit in the ordinary course of business), any other Person or any right which is exercisable or exchangeable for or convertible into any capital stock or other security, interest or investment in any other Person.

Section 3.4    **Absence of Conflicts**.  Except as set forth on the attached Schedule 3.4, neither the execution, delivery and performance of this Agreement or any other Transaction Document by any Seller or Seller Parent nor the consummation by any Seller or Seller Parent of the transactions contemplated hereby or thereby:

(a) does or will (i) conflict with or result in any breach of any of the provisions of, (ii) constitute a default under, (iii) result in a violation of, (iv) give any third party the right to terminate or to accelerate any obligation under or (v) result in the creation of any Lien upon any Purchased Asset, in each case under the provisions of the articles or certificate of incorporation, bylaws, limited liability company agreement or similar organizational document of any Seller or Seller Parent or any material indenture, mortgage, lease, loan agreement or other agreement, instrument or Contract or any Legal Requirement by which any Seller or Seller Parent or any Purchased Asset is affected, or to which any Seller or Seller Parent or any Purchased Asset is subject; or

(b) without limiting clause (a) above, requires any Consent of any Governmental Entity or any other Person.

Section 3.5    **Certain Developments**Since September 30, 2010, each Seller has not:

(a) except in the Ordinary Course, and with the exception of obtaining pre-petition and debtor-in-possession financing secured only by accounts receivable, (i) incurred indebtedness for borrowed money in connection with the Business or (ii) assumed, guaranteed,

23

endorsed or made other accommodations of the obligations of any other Person, any loans or advances to any other Person, or sales to customers on credit in connection with the Business;

(b) suffered any material theft, damage, destruction or casualty loss to any portion of the Purchased Assets;

(c) sold, leased, assigned, licensed, transferred, abandoned or otherwise disposed of any portion of the Purchased Assets (other than, with respect to tangible assets, dispositions in the Ordinary Course for fair consideration, including diagnostic equipment leases with VGM Financial Services and dispositions of Purchased Assets which have been replaced with Purchased Assets of equal or greater value and utility);

(d) except as provided in Schedule 3.5 or as set forth in the Prior Disclosure Letter, accelerated, terminated, modified, or canceled any Contract (or series of related Contracts) involving more than $50,000 (individually or in the aggregate) to which such Seller is a party or by which such Seller is bound in connection with the Business;

(e) adopted, amended or modified in any material respect or terminated any bonus, profit sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or taken any such action with respect to any other Benefit Plan);

(f) entered into any other transaction involving the Business in excess of $50,000 other than in the Ordinary Course, or materially changed any material business practice;

(g) entered into or amended any severance, retention, employment or change of control agreement with any employee of the Business;

(h) made or granted any bonus or any wage, salary or compensation increase in excess of $5,000 per year other than in the Ordinary Course to any employee or independent contractor of the Business, except pursuant to the express terms of any Contract which is described on the attached Schedule 3.8(a);

(i) taken any action (or failed to take any action) that could reasonably be expected to result in the loss, lapse, abandonment, invalidity or unenforceability of any Business Proprietary Rights; or

(j) agreed or committed to do any of the foregoing.

Notwithstanding anything contained in this Section 3.5 to the contrary, since September 30, 2010, Sellers have taken certain actions outside the Ordinary Course in connection with the filing of the Chapter 11 Cases, including the payment of counsel in connection therewith.

**Section 3.6** **Real Property**.

(a) Owned Real Property. No Seller owns any real property.

(b) Real Property Used in the Business.  The property identified on Schedule 3.6(b) (the **"Leased Real Property"**) comprises all of the real property used or intended to be used in, or otherwise related to, the Business.  Other than the Leased Real Property, no Seller leases or subleases, or otherwise uses or occupies pursuant to any license, concession or other agreement (written or oral), any real property which is used or intended to be used, or otherwise related to, the Business.

### Section 3.7    Tax Matters.

(a) Each Seller has filed (or has had filed on its behalf) all Tax Returns that it was required to file under applicable laws and regulations. All such Tax Returns were correct and complete in all respects and were prepared in substantial compliance with all applicable laws and regulations. All Taxes due and owing by (or with respect to the operations of) any Seller (whether or not shown on any Tax Return) have been paid.  No Seller is the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by any Taxing Authority in a jurisdiction where any Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.  There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of any Seller.

(b) Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

(c) No foreign, federal, state, or local Tax audits or administrative or judicial Tax proceedings are pending or being conducted with respect to any Seller.  No Seller has received from any foreign, federal, state, or local Taxing Authority (including jurisdictions where such Seller has not filed Tax Returns) any (i) notice indicating an intent to open an audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against such Seller.

(d) No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e) No Seller is a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local or foreign Tax law).  No Seller is a party to or bound by any Tax allocation or sharing agreement.

### Section 3.8    Contracts and Commitments.

(a) Generally.  Except for (i) those Contracts disclosed to Buyer in the Prior Disclosure Letter (the "Previously Disclosed Contracts"), (ii) the Transaction Documents or (iii) the Contracts described on Schedule 3.8(a), no Seller is party to or bound by, and no Seller is, in each case, in connection with the Business, nor is any Purchased Asset subject to any written or oral:

25

(i)     license or other Contract involving Proprietary Rights, other than licenses for commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000;

(ii)     agreement or other Contract granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any material asset of the Business;

(iii)     agreement concerning non-competition or that otherwise restricts or limits such Seller, or any officer or key employee of such Seller from engaging in any business similar to or related to the Business in any jurisdiction or using any Proprietary Rights (including any agreement with provisions regarding non-solicitation of employees, co-existence agreements, and settlement agreements) or any material agreement concerning confidentiality;

(iv)     lease or agreement under which such Seller is lessee of, or holds or operates, any personal property owned by any other party calling for payments in excess of $10,000 annually or entered into outside of the Ordinary Course, or under which such Seller holds or occupies any real property or interest therein;

(v)     Contract under which such Seller is lessor of or permits any third party to hold or operate any Purchased Asset, except Purchased Assets in the possession of patients; inventory equipment on patient, physician, and other premises in the Ordinary Course; and/or tangible assets and the right to operate and access software;

(vi)     Contracts or agreements with any insurance payor (whether private or with any Governmental Entity) that governs the payment for and/or reimbursement of any medical or patient claims;

(vii)     supplier or vendor agreements;

(viii)     any other Contract material to the operation of the Business; or

(ix)     any commitment or arrangement to enter into any of the foregoing.

(b) Absence of Breach.  Each of the Previously Disclosed Contracts and the items which is described or required to be described on Schedule 3.8(a) is a valid, binding and enforceable obligation of the third parties thereto in accordance with the terms thereof and will be in full force and effect immediately following the Closing Date.  Each Seller has performed in all material respects all obligations required to be performed by it in connection with the Previously Disclosed Contracts and the items which are described or required to be described on Schedule 3.8(a) and is not in receipt of any claim of default under any such item; No Seller has waived or assigned any of its material rights under any of the Previously Disclosed Contracts items described or required to be described on Schedule 3.8(a) with respect to any period following the Closing Date.

(c) Copies.  Sellers have furnished to Buyer a true and correct copy of the Previously Disclosed Contracts and all written contracts and other items which are described or

26

required to be described on Schedule 3.8(a), in each case together with all amendments, waivers or other changes thereto. Schedule 3.8(a) contains an accurate and complete description of all material terms of all oral contracts and other oral items which are described or required to be described thereon.

### Section 3.9    Proprietary Rights.

(a) Schedule 3.9(a) sets forth a complete and correct list of all of the following included in the Business Proprietary Rights (specifying for each, the owner): (i) all patented and registered Proprietary Rights, including Internet domain names, and all pending patent applications or other applications for registration of Proprietary Rights (specifying for each, the patent, registration and application number, as applicable), (ii) all trade names and material unregistered Marks, and (iii) all Software (other than commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000).

(b) Sellers exclusively own and possess all right, title and interest in and to, or have a valid and enforceable right to use pursuant to an agreement set forth on Schedule 3.8(a) and, as applicable, have the valid number of user licenses for, all Proprietary Rights necessary for, used or held for use in the conduct of the Business, free and clear of all Liens. All of the Business Proprietary Rights are valid, subsisting, and enforceable, no loss or expiration of any Business Proprietary Right (other than patents at the end of their statutory term) is pending, reasonably foreseeable or, to any Seller's knowledge, threatened, and each Seller has taken all reasonable or necessary measures to protect the Business Proprietary Rights, including protecting the secrecy and confidentiality of trade secrets and other confidential information. The Business Proprietary Rights are not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling restricting the use thereof. All of the Business Proprietary Rights and Business Systems shall be owned or available for use by Buyer immediately after the Closing Date on terms and conditions identical to those under which any Seller owned or used the Business Proprietary Rights and Business Systems immediately prior to the Closing Date.

(c) Except as set forth on Schedule 3.9(c), (i) no claim by any third party contesting the validity, enforceability, use, ownership or registrability of any of the Business Proprietary Rights has been made, is currently outstanding or, to any Seller's knowledge, is threatened, and, to any Seller's knowledge, there is no reasonable basis for such claim; (ii) no Seller has received any notice of any infringement or misappropriation by, or any other conflict with, any third party with respect to any Proprietary Rights (including any demand or request that such Seller license rights from a third party); (iii) no Seller has infringed, misappropriated or otherwise conflicted with any rights of any Person, and the operation of the Business as currently conducted will not infringe, misappropriate, or otherwise conflict with, and will not result in any infringement or misappropriation of, or other conflict with, any Proprietary Rights of any Person; and (iv) to any Seller's knowledge, no Person has infringed, misappropriated or otherwise conflicted with any Business Proprietary Rights.

(d) All past and present employees and independent contractors of each Seller or Seller Parent have entered into agreements pursuant to which such employee or independent contractor agrees to protect the confidential information of such Seller or Seller Parent, as the case may be, and assign to such Seller or Seller Parent, as the case may be, all Proprietary Rights

Case 2:11-bk-02009-RTB    Doc 11    Filed 01/26/11    Entered 01/26/11 18:20:14    Desc
Main Document    Page 58 of 232

developed by such employee or independent contractor in the course of his or her relationship with such Seller or Seller Parent, without further consideration or any restrictions or obligations on the use or ownership of such Proprietary Rights whatsoever.

(e) The Software owned or purported to be owned by Seller that is included in the Business Proprietary Rights (the **"Business Software"**) is not subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License) that could (i) require, or condition the use or distribution of such Software on, the disclosure, licensing or distribution of any source code for any portion of such Software or (ii) otherwise impose any limitation, restriction, or condition on the right or ability of any Seller to use, license or distribute any Business Software.

(f) No source code for any Business Software has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of any Seller. No Seller has a duty or obligation (whether present, contingent or otherwise) to deliver, license or make available the source code for any such Software to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of any Seller.

(g) Each Seller is, and for the last five (5) years has been, in compliance with any privacy policies or related policies, programs or other notices that concern the Business's collection or use of personal information. In the past five (5) years, there have not been any incidents of data security breaches or complaints, notices to, or audits, proceedings or investigations conducted or claims asserted by any other person (including any Governmental Entity) regarding the collection or use of personal information by any Person in connection with the Business or any violation of applicable law, and, to any Seller's knowledge, there is no reasonable basis for the same and no such claim has been threatened.

**Section 3.10   Litigation; Proceedings**.  Except for the 2010 OIG Claim, there are no, and during the previous one (1) year there have not been any, inquiries, actions, suits, charges, complaints, claims, proceedings, orders, judgments, decrees, audits or investigations pending or, to any Seller's knowledge, threatened, in each case against or affecting any Seller or Seller Parent, the Business or any Purchased Asset at law or in equity, or before or by any Governmental Entity. Neither any Seller nor Seller Parent has received notice of any accident, happening or event which is caused or allegedly caused by or otherwise involving any services performed in connection with or on behalf of any Seller or Seller Parent that is reasonably likely to result in a Loss.

**Section 3.11   Brokerage**.  Except as set forth on the attached Schedule 3.11, no agent, broker, investment banker, finder, financial advisor or other Person is or will be entitled to any brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement and the Transaction Documents based on any arrangement or agreement made by or on behalf of any Seller, Seller Parent or their respective Affiliates or to which any of the foregoing entities is subject.

**Section 3.12   Governmental Licenses and Permits**.  The Prior Disclosure Letter sets forth a complete listing and summary description of all material Licenses and provider numbers

owned or possessed by any Seller or used by any Seller, in each case, in connection with the conduct of the Business. Each Seller owns or possesses all right, title and interest in and to all of the Licenses and provider numbers which are necessary for the lawful conduct of the Business as currently conducted or proposed to be conducted by such Seller. All of such Licenses and provider numbers are valid, in good standing and in full force and effect and the applicable Seller has performed all of its obligations under such Licenses and provider numbers. No loss or expiration of any material License or provider number is pending, reasonably foreseeable or, to any Seller's knowledge, threatened (including as a result of the transactions contemplated by this Agreement and the Transaction Documents) other than by reason of expiration in accordance with the terms thereof or applicable law or regulation.

Section 3.13 **Employees**. To any Seller's knowledge, no key employee or key group of employees and no independent contractors of the Business (including all Persons who have physician agreements in place with any Seller) have any plans to terminate his, her, its or their employment or relationship as an independent contractor with the Business. Each Seller has complied in all material respects with all applicable Legal Requirements relating to the employment of personnel and labor, including provisions thereof relating to wages, hours, equal opportunity, workplace safety, layoffs, immigration, collective bargaining and the payment of social security and other Taxes. No Seller has experienced any strike, grievance, unfair labor practice claim or other material employee or labor dispute, and no Seller has engaged in any unfair labor practice. To any Seller's knowledge, there is no organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of any Seller. Each Seller has satisfied any notice or bargaining obligation it may have under any law or collective bargaining agreement to any employee representative. The Prior Disclosure Letter sets forth a true and complete list of and the name, start date, title or position, and the annual or, as the case may be, hourly rate of compensation (including salary, bonuses and commissions), as of the date of this Agreement each individual engaged by any Seller as an employee or independent contractor in connection with the Business whose annual income (of all types) in the 2009 calendar year has exceeded, or in the 2010 calendar year is expected to exceed, $50,000.

Section 3.14 **ERISA**.

(a) Schedule 3.14 sets forth an accurate and complete list of each Benefit Plan at any time maintained, sponsored, or contributed or required to be contributed to by any Seller or Seller Parent with respect to the Business or with respect to which any Seller or Seller Parent has any Liability with respect to the Business (each a **"Plan"** and collectively the **"Plans"**).

(b) Neither Seller nor any ERISA Affiliates maintains, sponsors, contributes to or has any Liability under (or with respect to) any "defined benefit plan" (as such term is defined in ERISA § 3(35)), or any "multiemployer plan" (as such term is defined in ERISA § 3(37)). No asset of any Seller is subject to any lien under ERISA or the Code. There are no pending or threatened actions, suits, investigations or claims with respect to any Plan (other than routine claims for benefits).

(c) Each Plan that is intended to be qualified under Code § 401(a) has received a determination from the Internal Revenue Service (**"IRS"**) that such Plan is so qualified, and nothing has occurred that could adversely affect the qualified status of such Plan.

29

(d) Each of the Plans and all related trusts, insurance contracts and funds have been maintained, funded and administered in compliance with their terms and in compliance with the applicable provisions of ERISA, the Code, and any other applicable Legal Requirements. With respect to each Plan, all required payments, premiums, contributions, distributions, or reimbursements for all periods ending prior to or as of the Closing Date have been made or properly accrued.

(e) Each Plan which is subject to the health care continuation requirements of Part 6 of Subtitle B of Title I of ERISA or Code § 4980B (**"COBRA"**) has been administered in compliance with such requirements. No Plan provides post-employment or post-termination medical or life or other welfare or welfare-type benefits other than as required pursuant to COBRA.

(f) With respect to each Plan, Sellers have provided Buyer with true, complete and correct copies of (to the extent applicable): (i) all documents pursuant to which the Plan is maintained, funded and administered (including the plan and trust documents, any amendments thereto, the summary plan descriptions, and any insurance contracts or service provider agreements); (ii) the most recent annual report (Form 5500 series) filed with the IRS (with applicable attachments); and (iii) the most recent determination letter received from the IRS.

**Section 3.15** **Affiliate Transactions**. Except as otherwise set forth in the Prior Disclosure Letter, no Insider (i) is or was a party to any Contract, commitment or transaction with any Seller or which pertains to the Business (other than in such Insider's capacity as an employee of any Seller, the compensation for which is reflected in the Prior Disclosure Letter), or (ii) has any interest in any Purchased Asset, other than indirectly, as a member of any Seller.

**Section 3.16** **Compliance with Laws**.

(a) Except as set forth in the Prior Disclosure Letter, Seller Parent and each Seller and each of its respective independent contractors, agents and employees has complied with and is in compliance with all applicable Legal Requirements which affect the Business or any Purchased Asset and to which any Seller or any Purchased Asset is subject, and no claim has been filed against, nor any notice (formal or informal) given to, Seller Parent or any Seller alleging a violation of any such Legal Requirement. Except as set forth on Schedule 3.16(a), no Seller is now subject (nor has any Seller been subject in the last year) to any investigation, penalty assessment, or audit by any Governmental Entity or to any other allegation that Seller (including any agent, representative or broker acting on behalf of such Seller) or Seller Parent has violated the regulations of any such Governmental Entity or made a materially false statement or omission to any Governmental Entity. Except as set forth on Schedule 3.16(a), no Seller or Seller Parent has received any written notice from any Governmental Entity alleging any existing non-compliance of the Business with any Legal Requirements. Seller and Seller Parent are not relying on any exemption from or deferral of any Legal Requirement that would not be available to Buyer after the Closing.

(b) Except as set forth in the Prior Disclosure Letter, each Seller (i) is eligible to receive payment without restriction under the Medicare program, each applicable Medicaid program, TRICARE, and any other government programs (the "Government Programs") and is a

"provider" or "supplier" with valid and current provider agreements and with one or more provider numbers with each Government Program, (ii) currently participates in private, non-governmental programs (including any private insurance program) under which such Seller directly or indirectly receive payments (the "<u>Private Programs</u>"), (iii) are in good standing with the Government Programs and Private Programs, and (iv) have no outstanding overpayments or refunds due to Government Programs or Private Programs in excess of $10,000. Except as set forth in the Prior Disclosure Letter, each Seller is in compliance with the conditions of participation, coverage and payment for the Government Programs and Private Programs and has received all approvals or qualifications necessary for reimbursement. Except as set forth in the Prior Disclosure Letter, there is no pending or, to the knowledge of Sellers, threatened Action under the Government Programs or Private Programs involving any Seller, the Purchased Assets, or the Business. Each Seller has timely filed all claims and reports required to be filed prior to the date hereof with respect to the Governmental Programs and Private Programs, all fiscal agents and government contractors, and other insurance carriers, and all such claims and reports are complete and accurate in all material respects and have been prepared in material compliance with all applicable Legal Requirements and contractual obligations governing reimbursement and payment claims. Each Seller has maintained all records required to be maintained except where the failure to comply would not have a material adverse effect on the Business.

(c) Neither any Seller nor any employee, agent or independent contractor of any Seller has been excluded from participating in Medicare or any other Federal health care program (as that term is defined in 42 U.S.C. § 1320a-7b(f)) or any other Government Program, and none of any Seller's officers, directors, agents or management employees (as that term is defined in 42 U.S.C. § 1320a-5(b)), have been (i) excluded from participating in Medicare or any other Federal health care program (as that term is defined in 42 U.S.C. § 1320a-7b(f)), (ii) subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8, (iii) convicted of a criminal offense under the Anti-Kickback Laws, or (iv) convicted of, charged with, or investigated for any violation of any Legal Requirement related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, controlled substances or has committed any other violation of any Legal Requirement that could serve as the basis for exclusion, suspension, debarment or other ineligibility.

**Section 3.17 <u>Environmental Matters</u>**.

(a) Each Seller has at all times complied, and is in compliance, with all Environmental and Safety Requirements in connection with the Business, which compliance has included obtaining and complying at all times with all permits, licenses and other authorizations required pursuant to Environmental and Safety Requirements for the operation of the Business.

(b) No Seller has received any written or oral notice, report, order, directive or other information regarding any actual or alleged violation of, or any Liability (including any investigative, corrective or remedial obligation) under, Environmental and Safety Requirements relating to the Business.

(c) No Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, or exposed any Person to, any substance (including any hazardous substance), or owned or operated any property or facility which is or has been

31

contaminated by any substance, so as to give rise to any current or future Liabilities, including any such Liability for response costs, corrective action costs, personal injury, property damage, natural resources damages, or attorney fees, or any investigative, corrective or remedial obligations, pursuant to CERCLA or any other Environmental and Safety Requirements.

(d) No Seller has, either expressly or by operation of law, assumed, undertaken, or provided an indemnity with respect to any Liability, including any investigative, corrective or remedial obligation, of any other Person relating to Environmental and Safety Requirements.

(e) Sellers have furnished to Buyer true and correct copies of all environmental audits, reports and assessments and all other documents materially bearing on environmental, health or safety Liabilities relating to the past or current operations, properties or facilities of the Business (including the Leased Real Property), in each case which are in its possession or under its reasonable control.

**Section 3.18   Assets**.

(a) Title.  Sellers collectively own, lease or license all of the Purchased Assets and have good and marketable title to, or a valid leasehold or license to, all such Purchased Assets free and clear of any Liens (other than Permitted Liens and security interests arising from capital lease obligations with respect to the Rejected Capital Assets).  Upon completion of the Closing Transactions, Buyer will acquire good title to all of the Purchased Assets, free and clear of any Liens (other than Permitted Liens).

(b) Diagnostic Equipment.  Schedule 3.18(b) sets forth all of the diagnostic equipment, including identification number, currently on the premises of the Leased Real Property.

(c) Inventory.  Schedule 3.18(c) sets for all durable medical equipment inventory currently held by any Seller for the Business.  The Inventory set forth on Schedule 3.18(c) is suitable and in operating condition as of the Closing Date for the purposes for which it is presently used and presently proposed by any Seller to be used.  The quantities of each item of Inventory are not excessive or deficient in any material respect, but are reasonable in the present circumstances of Sellers.

(d) Rejected Capital Assets.  The amounts owing to the lessors with respect to the Rejected Capital Assets are as set forth on Schedule 1.1(c).  The aggregate amount due as of the date hereof with respect to all assets of the Sellers in which a capital lessor has a valid security interest does not exceed $247,828.35.

(e) Except as otherwise set forth in this Section 3.18, Sellers and Seller Parent make no warranty regarding the Purchased Assets or the Business, and the Purchased Assets and the Business being transferred to the Buyer are conveyed on an "as is, where is" basis as of the Closing, and the Buyer shall rely upon its own examination thereof, except as expressly provided in this Agreement.

**Section 3.19   Undisclosed Liabilities**.  No Seller has Liability related to the Purchased Assets (and to any Seller's knowledge there is no basis for any present or future action, suit,

proceeding, hearing, investigation, charge, complaint, claim or demand against it giving rise to any Liability related to the Purchased Assets), except Liabilities which have arisen in the Ordinary Course (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, environmental matter, infringement, or violation of law).

Section 3.20    **Disclosure**.  No representation or warranty made by any Seller or Seller Parent in this Agreement (including the schedules hereto), contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

<div align="center">

**Article IV**

**Representations And Warranties Of Buyer**

</div>

As a material inducement to each Seller and Seller Parent to enter into this Agreement and to consummate the Closing Transactions contemplated hereby, Buyer hereby makes the representations and warranties set forth in this Article IV as of the date hereof, or such other date as set forth below.

Section 4.1    **Organization and Power**.    Buyer is a corporation which is validly existing and in good standing under the laws of the State of Delaware and is qualified to do business in every jurisdiction in which the execution, delivery and performance of its obligations under this Agreement requires it to be so qualified.  Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which Buyer is a party.

Section 4.2    **Authorization of Transaction**.  No other proceedings or actions on the part of Buyer are necessary to approve and authorize Buyer's execution and delivery of this Agreement or any other Transaction Document to which Buyer is a party or the performance of Buyer's obligations hereunder or thereunder.  This Agreement constitutes, and each of the other Transaction Documents to which Buyer is a party will when executed constitute, a valid and binding obligation of Buyer, enforceable in accordance with their terms, except as enforceability hereof may be limited by bankruptcy, insolvency or other laws affecting creditor's rights generally and limitations on the availability of equitable remedies.

Section 4.3    **Absence of Conflicts**.  Neither the execution, delivery and performance of this Agreement or any other Transaction Document by Buyer nor the consummation by Buyer of the transactions contemplated hereby or thereby does or will (i) conflict with or result in a breach of any of the provisions of, (ii) constitute a default under, (iii) result in the violation of, (iv) give any third party the right to terminate or to accelerate any obligation under, or (v) require any consent, order, approval, authorization or other action of, or any filing with or notice to, any Governmental Entity or other Person, in each case under the Buyer's certificate of incorporation or bylaws or under the provisions of any indenture, mortgage, lease, loan agreement or other agreement or instrument to which Buyer is bound or by which it or any of its assets are affected, or any Legal Requirement to which Buyer or any of its assets are subject.

<div align="center">33</div>

**Section 4.4    Brokerage**.  No agent, broker, investment banker, finder, financial advisor or other Person is or will be entitled to any brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement and the Transaction Documents based on any arrangement or agreement made by or on behalf of Buyer or its Affiliates or to which any of the foregoing entities is subject.

**Section 4.5    Litigation**.  With the exception of the 2010 OIG Claim, there are no actions, suits, proceedings, orders or investigations pending or, to Buyer's knowledge, threatened, against or affecting Buyer at law or in equity, or before or by any Governmental Entity, which could reasonably be expected to adversely affect Buyer's performance under this Agreement or the other agreements contemplated hereby to which Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

<div align="center">

**Article V**

**Covenants**

</div>

**Section 5.1    Operation and Maintenance of the Business**

.  From the date of this Agreement through the Closing Date, unless Buyer otherwise consents in writing, no Seller will engage in any practice, take any action, enter into any transaction or conduct its business outside of the Ordinary Course.  Without limiting the generality of the foregoing, Sellers shall not engage in any practice, take any action, or enter into any transactions of the sort described in Section 3.5 above and Sellers shall, except as otherwise required pursuant to the Chapter 11 Cases:

(a) not take or fail to take any action which would cause any of the representations set forth in Article III hereof to be untrue;

(b) not cause any Seller's current insurance (or reinsurance) policies to be canceled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(c) use all necessary or commercially reasonable efforts to keep in full force and effect each Seller's existence and all its rights and contractual rights;

(d) not sell, assign, transfer, license or permit the loss, lapse or abandonment of, or fail to maintain, enforce and protect any of the Business Proprietary Rights, except in the Ordinary Course;

(e) not (i) enter into any Contract or arrangement that would need to be disclosed on Schedule 3.8(a) if entered into prior to the date hereof, other than any such Contracts or arrangements entered into in the Ordinary Course, or (ii) materially amend, modify, impair or waive any rights under, or cancel or terminate any Previously Disclosed Contract, any Contract disclosed on Schedule 3.8(a) or any Contract or arrangement described in clause (i);

<div align="center">34</div>

(f) use reasonable efforts to keep each Seller's present business organization, including the present business operations, physical facilities, working conditions and employees and their present relationships with lessors, licensors, suppliers, customers, independent contractors and others having business relations with it;

(g) maintain each Seller's books, accounts and records in the Ordinary Course; and

(h) comply in all material respects with all applicable Laws and all contractual obligations applicable to any Seller and pay all applicable Taxes which are due and payable prior to the Closing.

**Section 5.2    Retention of Retained Records; Continuing Assistance**.  Subject to their respective obligations under Section 5.3, after the Closing, each Seller and Seller Parent shall provide Buyer and Buyer's counsel, accountants and other representatives, with reasonable access during normal business hours to the books, records, property, personnel, contracts, commitments and documents relating to the Purchased Assets and the Business in their possession pertaining to transactions occurring prior to the Closing Date when requested; provided, that such access does not unreasonably interfere with the Business or the Person providing such access.  At the request and expense of Buyer, each Seller and Seller Parent shall deliver copies of any such books and records to Buyer.  Without limiting the foregoing, each Seller and Seller Parent will give Buyer and Buyer's counsel, accountants and other representatives such access to such books and records as may reasonably be required in order to permit Buyer to perform any audit or other review which they may deem appropriate in connection with any offering of securities by Buyer or any Affiliate thereof, and, each Seller and Seller Parent (to the extent such consent is necessary) hereby consent to the use of information contained in such books and records for any such purpose.

**Section 5.3    Press Releases and Announcements; Confidentiality**.

(a) Press Releases and Announcements.  Except for any public disclosure which either Party in good faith believes is required by any Legal Requirement (in which case, if practicable, the disclosing Party will give the other Parties an opportunity to review and comment upon such disclosure before it is made) after the Closing, neither any Seller nor Seller Parent will make any press release or other public announcement of or with respect to the Business, this Agreement or any Closing Transaction without Buyer's consent.

(b) Confidentiality.  From and after the Closing Date, subject to any disclosures required to be made subject to Section 2.5 hereof, each Seller and Seller Parent shall maintain the confidentiality of, and shall not use for the benefit of themselves or others, any confidential information concerning the Business, the Purchased Assets or the Assumed Liabilities.  Each Seller and Seller Parent agree not to divulge, communicate, use to the detriment of Buyer or any of its Affiliates, for such Seller's or Seller Parent's benefit or the benefit of any other person, firm, corporation, association or other entity, or misuse in any way, in whole or in part, any proprietary or confidential information, including trade secrets related to the Business or the Purchased Assets, as they may exist from time to time.  Each Seller and Seller Parent acknowledge that the information that relates to the conduct of activities of the Business,

including the trade secrets of the Business, are valuable, special and unique assets of the Business and are confidential information (all of the foregoing, **"Confidential Information"**; provided, however, that Confidential Information shall not include information generally known to the public other than information disclosed in violation of this Section 5.3(b)).  In the event that any Seller or Seller Parent is requested or required pursuant to written or oral question or request for information or documents in any legal proceeding, interrogatory, subpoena or similar process to disclose any Confidential Information, such Seller or Seller Parent, as applicable, will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.3(b).  If, in the absence of a protective order or the receipt of a waiver hereunder, such Seller or Seller Parent is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such Seller or Seller Parent, as applicable, may disclose the Confidential Information to the tribunal; provided, however, that such Seller or Seller Parent, as applicable, shall use it or his best efforts to obtain, at the request of Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate. The foregoing provisions shall not apply to any Confidential Information that is generally available to the public immediately prior to the time of disclosure unless such Confidential Information is so available due to the actions of such Seller or Seller Parent in violation of this Section 5.3(b).

Section 5.4    **Further Assurances**.  Each Party will execute and deliver such further instruments of conveyance and transfer and take such additional actions (including updating title to the Business Proprietary Rights) as any other Party may reasonably request to effect, consummate, confirm or evidence the transfer to Buyer of, or the ownership by Buyer of, the Purchased Assets, the assumption by Buyer of the Assumed Liabilities and the other Closing Transactions contemplated hereby.

Section 5.5    **Business Employees**.

(a) Effective as of the Closing, Buyer shall offer employment to all of the individuals who are actively employed by any Seller in connection with the Business immediately prior to the Closing and who are listed on a schedule to be provided by Buyer to Sellers at least two (2) Business Days prior to the Closing (the **"Business Employees"**).  The Business Employees' employment with any Seller or Seller Parent, as applicable, shall be terminated by Seller effective as of the Closing.

(b) Buyer shall offer employment to the Business Employees on terms and conditions deemed appropriate by Buyer, in its sole discretion.  For the avoidance of doubt, nothing herein shall be construed to require Buyer to maintain any particular benefit plan, policy or arrangement for Business Employees after the Closing Date.  This Section 5.5 is a covenant among Buyer, Sellers and Seller Parent and shall not, in any manner, create any contractual right of employment for any Business Employee or any other Person.

(c) Without limiting the generality of subclause (a) of the definition of "Excluded Liabilities" in Section 1.1, each of Seller and Seller Parent agrees that it shall be responsible for any and all liabilities and obligations related to, or arising from, any Person's (including all Business Employees') employment by, or termination from employment with, any Seller, Seller

Parent or any of its Affiliates, including claims for severance pay, expense reimbursement and any other benefit provided to any such individual by such Seller, Seller Parent or any of its Affiliates. Each of Sellers and Seller Parent hereby agrees that it shall be responsible for any and all liabilities and obligations related to the pre-Closing period for any bonuses that are earned and payable to any employees of the Business (in a manner consistent with past practices) for the fiscal quarter or the fiscal or calendar year in which Closing occurs or any other applicable period, and each Seller or Seller Parent, as applicable, shall pay any such bonuses to any such employees of the Business. Notwithstanding the foregoing, it is the intention of the parties to adjust and enforce the foregoing provisions by pro-ration at the Closing and future payment of salary and benefits not yet due by Buyer to retained employees of Sellers.

(d) Nothing contained in this Section 5.5 or this Agreement, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement, or arrangement; (ii) is intended to confer upon any current or former employee or any other Person any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment; or (iii) is intended to confer upon any Person (including employees, retirees, or dependents or beneficiaries of employees or retirees) any rights as a third-party beneficiary of this Agreement.

**Section 5.6  Consents**. Except as provided in the Sale Motion of the Sale Order, nothing in this Agreement shall be construed as an attempt to assign any contract, agreement, permit, license, guaranty, warranty, franchise or claim included in the Purchased Assets which is by its terms or by law nonassignable without the consent of the other party or parties thereto, unless such consent shall have been given, or as to which all the remedies for the enforcement thereof enjoyed by each Seller would, as a matter of law, pass to Buyer as an incident of the assignments provided for by this Agreement. In order, however, to provide Buyer the full realization and value of every Contract, permit, license, guaranty, warranty, franchise and claim of the character described in the immediately preceding sentence, each Seller agrees that after the Closing, it will, at the request and under the direction of Buyer, in the name of such Seller or otherwise as Buyer shall specify, take all actions necessary or proper (a) to assure that the rights of such Seller under such Contracts, permits, licenses, guaranties, warranties, franchises and claims shall be preserved for the benefit of Buyer and (b) to facilitate receipt of the consideration to be received by such Seller in and under every such contract, agreement, permit, license, guaranty, warranty, franchise or claim, which consideration shall be held for the benefit of, and shall be delivered to, Buyer.

**Section 5.7  Use of Names**. Immediately upon the Closing, Sellers shall discontinue use of the "Areté" Mark and all other Marks included in the Business Proprietary Rights, including any derivations thereof or Marks similar thereto (collectively, the **"Restricted Marks"**) and any Marks similar. Within ten (10) days of Closing, Sellers shall take all action necessary or reasonably requested by the Buyer to change the name of Sellers to a name that does not include any Restricted Mark, including by making filings with each applicable Secretary of State and other Governmental Entity and changing the name in the caption of the Chapter 11 Cases.

**Section 5.8  Payment of Holdback Amount**. Upon the (i) date that is four (4) years from the Closing Date, if the Provider Contracts are assumed by Buyer (whether pursuant to

37

Section 2.6(b), the Management Agreement or otherwise), or (ii) the later of (x) 120 days from the Closing Date and (y) the date of expiration or termination of the Management Agreement, if the Provider Contracts are not assigned to the Buyer (whether pursuant to Section 2.6(b), the Management Agreement or otherwise) (the "Survival Period"), Buyer shall pay Seller Parent in accordance with the wire instructions received from each Seller, such Seller's pro rata share of the Holdback Amount, less any deductions taken pursuant to Section 6.3(b) in immediately available funds.

<div align="center">

**Article VI**

**Survival; Indemnification and Related Matters**

</div>

**Section 6.1    Survival**.  The representations and warranties of Buyer, each Seller and Seller Parent contained herein shall survive for the Survival Period and shall terminate on such date, provided, that to the extent that any claims for indemnification in respect of a breach of any such representation or warranty is made on or before such date, such representation or warranty shall survive until the resolution of such claim.  The covenants and agreements of Buyer, each Seller and Seller Parent contained herein shall survive until fully discharged and performed.

**Section 6.2    Indemnification**.

(a) By Sellers and Seller Parent.  Subject to the limitations set forth in this Section 6.2 and in Section 6.3, after the Closing, each of Sellers and Seller Parent, jointly and severally, shall indemnify Buyer and/or its officers, directors, employees, Affiliates and/or agents (each a **"Buyer Indemnitee"** and, collectively, the **"Buyer Indemnitees"**), and hold each Buyer Indemnitee harmless from and against any loss, Liability, deficiency, diminution in value, damage, Tax or expense (including reasonable legal expenses and costs and any cost or expense arising from or incurred in connection with any action, suit, proceeding, claim or judgment relating to any matter described in this clause, or in enforcing the indemnity provided by this Section 6.2 (any such amount, a **"Loss"**)), which such Buyer Indemnitee may suffer, sustain or become subject to, as a result of:

(i)    any breach by any Seller or Seller Parent of any representation or warranty set forth in this Agreement or any certificate delivered by any Seller or Seller Parent in connection with the Closing;

(ii)    any Liability or obligation of any Seller or Seller Parent or related to the Business (including any Indebtedness) which is not an Assumed Liability, including any Excluded Liability and any Liabilities resulting from the 2010 OIG Claim;

(iii)    any failure by any Seller or Seller Parent to perform any covenant or obligation of such Seller or Seller Parent set forth herein or in any certificate, document or instrument prepared by any Seller or Seller Parent and delivered to Buyer hereunder;

(iv)    the failure or alleged failure to obtain any Consent;

<div align="center">38</div>

(v)     any Liabilities or costs that arise from activities prior to the Closing with respect to the provider numbers, including Medicare and Medicaid billing and compliance Liabilities and costs; or

(vi)     any violation of or liability under any applicable bulk sales law in connection with the transfer of the Purchased Assets.

(b) By Buyer.  After the Closing, Buyer will indemnify Sellers and Seller Parent (each a **"Seller Indemnitee"** and collectively, the **"Seller Indemnitees"**) and hold the Seller Indemnitees harmless from and against any Loss which the Seller Indemnitee may suffer, sustain or become subject to, as the result of:

(i)     any breach by Buyer of any representation, warranty, covenant or agreement of Buyer set forth in this Agreement or any certificate delivered by Buyer in connection with the Closing;

(ii)     any Assumed Liability; or

(iii)     any failure by Buyer to perform any covenant or obligation of Buyer set forth herein or in any certificate, document or instrument prepared by Buyer and delivered to Sellers or Seller Parent hereunder.

(c) Determination of Loss and Amount.  For purposes of determining whether any Loss has occurred, or the amount of any such Loss, the representations, warranties, covenants and agreements of the Parties set forth in this Agreement and the other Transaction Documents will be considered without regard to any materiality qualification set forth therein.  None of Sellers nor Seller Parent shall indemnify the Buyer Indemnitees pursuant to Section 6.2(a)(i), and the Buyer Indemnitees shall not be entitled to recover any amount for any Loss pursuant to Section 6.2(a)(i), until and unless (and then only to the extent that) the amount which the Buyer Indemnitees are entitled to recover in respect of such Losses exceeds, in the aggregate, $10,000.00.  The maximum aggregate amount recoverable pursuant to Section 6.2 by the Buyer Indemnitees shall in the aggregate be equal to the Holdback.

### Section 6.3     Sole Manner of Payment.

(a) Any indemnification payments shall be made together with interest accruing thereon from the date such payment is finally determined to be payable to the date of payment at the Applicable Rate.

(b) Any indemnification owing to Buyer Indemnitees pursuant to this Article VI shall be paid solely by deduction of such amount owing to Buyer Indemnitees from the Holdback Amount and no additional recourse to any Seller, Seller Parent or any shareholder, officer, director, employee, attorney or agent of the foregoing shall be created or exist.

(c) Any indemnification owing to the Seller Indemnitees pursuant to this Article VI shall be effected by wire transfer of immediately available funds from Buyer to an account designated in writing by Seller Indemnitees within fifteen (15) days after the determination thereof.

39

**Section 6.4** **Knowledge No Effect**. No knowledge of any breach, claim, Liability, or other obligation, whether obtained by notice hereunder or otherwise, will affect any Party's right to indemnification or other remedy provided for in this Agreement in respect of any such matter of which it obtains knowledge or receives such notice unless the relevant Party expressly waives such right or remedy in writing.

**Section 6.5** **Treatment of Indemnification Payments**. Each Party will treat all payments made pursuant to Section 6.2 as adjustments of the Purchase Price for all purposes.

**Section 6.6** **Application of this Article VI**. Any claim for a breach of this Agreement (other than equitable claims and claims of fraud or willful misconduct) shall be governed by the provisions of this Article VI.

## Article VII

## Termination

**Section 7.1** **Termination Events**. Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a) by mutual written consent of Sellers and Buyer;

(b) by Buyer if the Bankruptcy Court has not entered the Bidding Procedures Order on or before February 15, 2011; provided, however, that Buyer shall only be permitted to terminate this Agreement pursuant to this Section 7.1(b) if it is not then in material breach of any of their material representations, warranties, covenants or agreements contained herein or in the Bidding Procedures Order;

(c) by Buyer, if the aggregate amount of the Break-Up Fee and the Expense Reimbursement agreed upon pursuant to the Bidding Procedures Order is less than $100,000;

(d) by Buyer if (i) the Auction has not concluded on or before March 20, 2011; (ii) the Sale Order has not been entered by the Bankruptcy Court by March 31, 2011; or (iii) the Sale Order has not become a Final Order by April 15, 2011, provided, however, that Buyer shall only be permitted to terminate this Agreement pursuant to this Section 7.1(c) if it is not then in material breach of any of their material representations, warranties, covenants or agreements contained herein;

(e) by Buyer or Sellers if the Closing Date has not occurred on or before April 30, 2011; provided, however, that (i) Buyer or Sellers, as applicable, shall only be permitted to terminate this Agreement pursuant to this Section 7.1(e) if Buyer, in the event of a termination by Buyer, or Sellers, in the event of a termination by Sellers, are not then in material breach of any of their respective material representations, warranties, covenants or agreements contained herein; and (ii) Seller shall not be permitted to terminate pursuant to this Section 7.1(e) if the Chapter 11 Cases are ongoing at such time;

Case 2:11-bk-02009-RTB    Doc 11    Filed 01/26/11    Entered 01/26/11 18:20:14    Desc
Main Document    Page 71 of 232

(f) by either Party if a Governmental Entity issues a ruling or Order prohibiting the transactions contemplated hereby, which ruling or Order is final and non-appealable;

(g) by Buyer or Sellers if Buyer is not the winning bidder at the Auction;

(h) by Buyer or Sellers at any time after any Seller files a stand-alone Chapter 11 Plan with the Bankruptcy Court or at any time after any Seller files any Chapter 11 Plan that involves approval of a sale of substantially all or a material portion of the Purchased Assets to a party other than the Buyer;

(i) by Buyer if the any of the Chapter 11 Cases is converted to cases under Chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed pursuant to the Bankruptcy Code or the Bankruptcy Court enters an order pursuant to section 362 of the Bankruptcy Code lifting the automatic stay with respect to any portion of the Purchased Assets or which results in the loss of a material benefit reasonably expected to be received by Buyer;

(j) by Buyer if Sellers' exclusive period to file and/or solicit acceptance of a plan of reorganization under section 1121 of the Bankruptcy Code shall have expired or been terminated;

(k) by Buyer if the Payee (as such term is defined in the Promissory Note) terminates disbursements to Sellers to be made in accordance with the terms of the Promissory Note; or

(l) by Buyer if the Sale Order is appealed and the closing of the sale is stayed by the Bankruptcy Court pending appeal.

### Section 7.2    Break-Up Fee and Expense Reimbursement.

(a) Sellers shall, within two (2) Business Days after any termination of this Agreement pursuant to Section 7.1(g) reimburse Buyer for all of the out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates, including fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the transactions contemplated hereby, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions (such fees, costs and expenses, the "Expense Reimbursement"); provided that in no event shall Seller be required to pay Reimbursable Expenses in an amount greater than $100,000 in the aggregate.

(b) Sellers shall within two (2) Business Days after any termination of this Agreement pursuant to Section 7.1(g), pay to Buyer the Break-Up Fee.

(c) Each Seller acknowledges and agrees that (i) the payment of the Break-Up Fee and Expense Reimbursement are integral parts of the transactions contemplated by this Agreement, (ii) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement, (iii) time is of the essence with respect to the approval of any

41

payment of the Break-Up Fee and Expense Reimbursement, and (iv) the Break-Up Fee and Expense Reimbursement shall constitute an administrative expense of Sellers' bankruptcy estate senior to all other administrative expense claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

## Article VIII

## Release

**Section 8.1**    **Release of Sellers**.  Effective as of the Closing, Buyer hereby releases and causes its Affiliates to release each Seller, each Seller's respective Affiliates, and each of their respective officers, directors, managers and employees (in their capacity as such and for services provided to any Seller and their Affiliates), director or indirect equityholders  and non-employee agents and representatives (collectively, the "Seller Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of actions, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to the Closing, that Buyer or its Affiliates and all such Persons' respective successors and assigns have or may have against any of the Seller Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive the Closing.  Each Seller Released Party that is not a Party shall be considered a third-party beneficiary of this Agreement with respect to any rights of indemnity or release provided herein.

**Section 8.2**    **Release of Buyer**.  Effective as of the Closing, Seller hereby releases Buyer and its Affiliates, and each of their respective equityholders, directors, managers, officers, employees, agents and representatives (collectively, the "Buyer Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons respective successors and assigns, have or may have against any of the Buyer Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive the Closing.  Each Buyer Released Party that is not a Party shall be considered a third-party beneficiary of this Agreement with respect to any rights of indemnity or release provided herein.

## Article IX

## Miscellaneous

**Section 9.1**    **Amendment and Waiver**.  This Agreement may be amended and any provision of this Agreement may be waived; provided, that any such amendment or waiver (a) will be binding upon Sellers or Seller Parent only if such amendment or waiver is set forth in a writing executed by such Seller or Seller Parent and (b) will be binding upon Buyer only if such amendment or waiver is set forth in a writing executed by Buyer.  No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to

42

modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement. No failure by any Party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof will constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

      **Section 9.2** <u>**Notices**</u>. All notices, demands and other communications given or delivered under this Agreement will be in writing and will be deemed to have been given when personally delivered or delivered by express courier service. Notices, demands and communications to the Parties will, unless another address is specified in writing, be sent to the address indicated below:

      <u>To Sellers or Seller Parent</u>:

        Areté Holdings, LLC
        6263 North Scottsdale Road
        Suite 395
        Scottsdale, Arizona 85250
        Attn: Daniel Dempsey, CRO
        Facsimile No.: 772.778.2150
        Email: dempsey_daniel@att.net

      <u>with a copy to (which shall not constitute notice to Sellers or Seller Parent)</u>:

        Alexander Terras
        Reed Smith LLP
        10 S. Wacker Drive, Suite 4000
        Chicago, Illinois 60606
        Attn: Alexander Terras
        Facsimile: 312.207.6400

      <u>To Buyer</u>:

        Sleep Science, Inc.
        c/o Clinical Research Advantage Holdings, LLC
        2141 East Broadway Road
        Tempe, Arizona 85282
        Attn: Mark Hanley
        Facsimile No.: 480.820.5521
        Email: hanley@crastudies.com

with a copy to (which shall not constitute notice to Buyer):

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York  10022
> Attn:  Elazar Guttman
> Facsimile No.:  212.446.6460
> Email:  elazar.guttman@kirkland.com

**Section 9.3**    **Binding Agreement; Assignment**.    This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any of Sellers or Seller Parent without the prior written consent of Buyer.  Any such assignment made by any of Sellers or Seller Parent without Buyer's prior written consent shall be null and void.  Without limiting but subject to the foregoing, at or prior to the Closing, Buyer may assign all or some of its rights under this Agreement, in whole or in part, (a) to or for the benefit of any lender as collateral, which lender shall be permitted to exercise any or all of such rights and transfer and assign all such rights to any purchaser, upon foreclosure or other exercise of remedies as to such collateral and (b) to one or more Affiliates of Buyer, including by designating such Affiliate to take all title and right to any of the Purchased Assets and/or any Assumed Liability.

**Section 9.4**    **Severability**.    Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**Section 9.5**    **No Strict Construction**.    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.6**    **Captions**.    The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

**Section 9.7**    **Entire Agreement**.    This Agreement and the Schedules attached hereto and the documents referred to herein contain the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way.

**Section 9.8**    **Counterparts**.    This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which taken together will constitute one and the same instrument.

**Section 9.9** **Governing Law**.  All questions concerning the construction, validity and interpretation of this Agreement (and all schedules and exhibits hereto) will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**Section 9.10** **Specific Performance**.  Each of Sellers and Seller Parent acknowledge that the Business and operations of each Seller is unique, and recognizes and affirms that in the event of a breach of this Agreement by any Seller or Seller Parent, monetary damages may be inadequate and Buyer may have no adequate remedy at law.  Accordingly, in the event of any such breach, Buyer and/or its successors or assigns may, in addition to any other rights and remedies existing in their favor, enforce their rights and any Seller's or Seller Parent's obligations hereunder by an action or actions for specific performance, injunctive and/or other relief, without any requirement of proving actual damages or posting any bond or other security.

**Section 9.11** **Expenses**.  Each of Sellers, Seller Parent and Buyer each will pay all of their own fees, costs and expenses (including fees, costs and expenses of legal counsel, investment bankers, accountants, brokers or other representatives and consultants and appraisal fees, costs and expenses) in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby.  Sellers will prepare and file, on or before the due dates thereof, any required Tax Returns or Tax forms with respect to any Transfer Taxes imposed by any Taxing jurisdiction by reason of the transactions contemplated by this Agreement.  Buyer agrees to cooperate with each Seller in connection with the preparation and filing thereof.  Each Seller will be solely responsible for all Transfer Taxes imposed by reason of any transaction contemplated by this Agreement.

**Section 9.12** **Parties in Interest**.  Nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns any rights or remedies under or by virtue of this Agreement.

**Section 9.13** **Waiver of Jury Trial**.  AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN.

*     *     *     *     *

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date first written above.

**ARETÉ SLEEP, LLC**

By: _____
Name: Daniel Dempsey
Title: Chief Restructuring Officer

**ARETÉ SLEEP THERAPY, LLC**

By: _____
Name: Daniel Dempsey
Title: Chief Restructuring Officer

**ARETÉ HOLDINGS, LLC**

By: _____
Name: Daniel Dempsey
Title: Chief Restructuring Officer

**ARETÉ NW, LLC**

By: _____
Name: Daniel Dempsey
Title: Chief Restructuring Officer

**ARETÉ SLEEP THERAPY NW, LLC**

By: _____
Name: Daniel Dempsey
Title: Chief Restructuring Officer

**SLEEP SCIENCE, INC.**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date first written above.

**ARETÉ SLEEP, LLC**

By: _____

     Name:

     Title:

**ARETÉ SLEEP THERAPY, LLC**

By: _____

     Name:

     Title:

**ARETÉ HOLDINGS, LLC**

By: _____

     Name:

     Title:

**ARETÉ NW, LLC**

By: _____

     Name:

     Title:

**ARETÉ SLEEP THERAPY NW, LLC**

By: _____

     Name:

     Title:

**SLEEP SCIENCE, INC.**

By: _____

     Name:  MARK S HANLEY

     Title:  CEO

| |
|---|
| All agreements listed below and any schedules, exhibits, annexes and amendments thereto: |
| |
| Ancillary Provider Agreement for Traditional Indemnity Business, by and between Blue Cross and Blue Shield of Texas and Arete Sleep, LLC, effective September 1, 2009 |
| Ancillary Provider Agreement for HMO Network Participation, by and between Blue Cross and Blue Shield of Texas and Arete Sleep, LLC, effective September 1, 2009 |
| Ancillary Provider Agreement for PPO/POS Network Participation, by and between Blue Cross and Blue Shield of Texas and Arete Sleep, LLC, effective September 1, 2009 |
| Participating Ancillary Provider Agreement Oregon Health Plan (OHP), by and between ODS Community Health, Inc. and Arete NW LLC dba Arete Sleep Health, dated March 15, 2010 |
| Medicare Advantage Plan Participating System Agreement, by and between Sterling Life Insurance Company and Arete NW, LLC dba Arete Sleep Health, dated July 8, 2009 |
| Medicare Advantage Plan Participating System Agreement, by and between Sterling Life Insurance Company and Arete Sleep Therapy NW, LLC dba Arete Sleep Health, dated July 8, 2009 |
| Letter Agreement, dated August 17, 2009, from Washington State Department of Social & Health Services to Arete Sleep Therapy NW LLC rendering Provider Number 1568591618 |
| Specialty Care Provider Agreement, by and between Community Health Network of Washington and Arete Sleep Health, dated April 1, 2008 |
| Texas Participating Ancillary Provider Agreement, by and between Bravo Health Texas, Inc., Bravo Health Insurance Company and Arete Sleep, LLC, dated March 16, 2010 |
| Professional Services Agreement, by and between CareOregon, Inc. and Sleep Health & Wellness NW - Astoria, effective October 18, 2005 |
| Provider Agreement, by and between Arete Sleep Therapy LLC and CareCentrix, Inc., dated May 21, 2010 |
| Provider Application Approval, dated May 25, 2007, from Oregan Department of Human Services, Division of Medical Assistance Programs, Office of Medical Assistance Programs, issued to Arete NW LLC, Roseburg |
| Provider Application Approval, dated May 25, 2007, from Oregan Department of Human Services, Division of Medical Assistance Programs, Office of Medical Assistance Programs, issued to Arete NW LLC, Astoria |
| Provider Application Approval, dated May 25, 2007, from Oregan Department of Human Services, Division of Medical Assistance Programs, Office of Medical Assistance Programs, issued to Arete NW LLC, Gresham |
| Provider Application Approval, dated May 25, 2007, from Oregan Department of Human Services, Division of Medical Assistance Programs, Office of Medical Assistance Programs, issued to Arete NW LLC, Hillsboro |
| Provider Agreement, by and between HealthEZ, Inc. and Arete NW, LLC dba Arete Sleep Health, dated November 1, 2009 |
| Letter Agreement, dated January 25, 2010, from Oregon Department of Human Services to Arete Sleep Therapy NW LLC |
| Ancillary Provider Participation Agreement, by and between Health Value Management, Inc. d/b/a ChoiceCare Network and Arete Sleep Health, dated June 19, 2009 |
| Letter Agreement, dated April 10, 2009, from Texas Medicaid & Healthcare Partnership to Arete Sleep LLC |
| Medical Group Participation Agreement, by and between United HealthCare Insurance Company and Arete Sleep, LLC, effective as of March 1, 2008 |
| Facility Participation Agreement, by and between United HealthCare Insurance Company and Advanced Respiratory Therapy, LLC, effective as of March 1, 2008 |

| |
|---|
| Letter Agreement, dated April 16, 2009, from Oregon Department of Human Services to Arete Sleep Therapy NW LLC |
| Letter Agreement, dated August 17, 2009, from Washington State Department of Social & Health Services to Arete Sleep Therapy NW LLC rendering Provider Number 1407985559 |
| Letter Agreement, dated April 16, 2009, from Oregon Department of Human Services to Arete Sleep Therapy NW LLC |
| Core Provider Agreement, by and between Department of Social and Health Services and Arete NW LLC, dated March 3, 2009 |
| Letter Agreement, dated August 17, 2009, from Washington State Department of Social & Health Services to Arete Sleep Health re Billing Provider Number 1528193042 |
| Letter Agreement, dated August 17, 2009, from Washington State Department of Social & Health Services to Arete Sleep Health re Billing Provider Number 1316072838 |
| Provider Agreement, by and between DCIPA, LLC and Arete Sleep NW, LLC, effective as of January 1, 2010 |
| Participating Ancillary Provider Agreement Oregon Health Plan (OHP), by and between ODS Community Health, Inc. and Arete Sleep Therapy NW LLC, dated March 15, 2010 |
| Oregon Participating Ancillary Provider Agreement (PPO and Point-of-Service Benefit Plans), by and between ODS Health Plan, Inc. and Arete Sleep Therapy NW, LLC, dated December 12, 2009 |
| Oregon Participating Ancillary Provider Agreement Medicare Advantage (Medicare Advantage & Medicare Advantage PPO Benefit Plans), by and between ODS Health Plan, Inc. and Arete NW, LLC dba Arete Sleep Health, no date provided |
| Oregon Participating Ancillary Provider Agreement Medicare Advantage (Medicare Advantage & Medicare Advantage PPO Benefit Plans), by and between ODS Health Plan, Inc. and Arete Sleep Therapy NW, LLC, no date provided |
| Oregon Participating Ancillary Provider Agreement (PPO and Point-of-Service Benefit Plans), by and between ODS Health Plan, Inc. and Arete NW, LLC dba Arete Sleep Health, dated December 12, 2009 |
| Participating Ancillary Provider Agreement Oregon Health Plan (OHP), by and between ODS Community Health, Inc. and Arete NW LLC dba Arete Sleep Health, dated March 15, 2010 |
| Participating Practitioner Agreement Interhospital Physicians Association, by and between Interhospital Physicians Association, Inc. and the other party thereto, dated January 1, 2004. |
| Payor Group Discount Pricing Agreement, by and between Southwest Sleep Labs, LLC d.b.a. American Sleep Diagnostic and Action Healthcare Management, dated December 27, 1998 |
| Managed Care Program(s) Ancillary Provider Participation Agreement, by and between Admar Corporation and American Sleep Diagnostics, LLC, effective August 1, 2000 |
| Facility Agreement, by and between Aetna U.S. Healthcare Inc. and American Sleep Diagnostics, LLC., effective as of April 1, 2001, as subsequently amended. |
| Facility Agreement, by and between Aetna U.S. Healthcare Inc. and Southwest Sleep Labs, LLC d/b/a Southwest Sleep Diagnostics, effective as of February 15, 2000, as subsequently amended. |
| Participating Provider Agreement, by and between Arizona Foundation for Medical Care and PhoenixSleep, d.b.a. American Sleep Diagnostics, Inc., dated March 30, 2004, as amended on April 1, 2004. |
| Participating Provider Agreement, by and between Arizona Foundation for Medical Care and Arizona Sleep Examiners, dated September 25, 2001. |
| Amendment and Restatement of the standard American CareSource Provider Agreeeent, by and between American Caresource and American Sleep Diagnostics, dated January 24, 2003 |
| Ancillary Health Care Provider Agreement, by and between ASPA and Southwest Sleep Diagnostics, dated October 1, 1998 |

| |
|---|
| Facility Service Agreement, by and between Beech Street Corporation and Southwest Sleep Labs, LLC, dated December 20, 1999, as amended on November 10, 2006 |
| Standard Provider Participation Agreement, by and between Blue Cross and Blue Shield of Arizona, Inc. and American Sleep Diagnostics, LLC, dated October 1, 2001 |
| Ancillary Services Agreement between Care 1st Health Plan of Arizona and American Sleep Diagnostics, dated March 1, 2004 |
| Ancillary Services Agreement between Care 1st Health Plan of Arizona and American Health Services, dated February 12, 2004 |
| Ancillary Provider Agreement, by and between CCN Managed Care, Inc. d/b/a CCN and Southwest Sleep Lab, LLC dba Southwest Sleep Diagnostics, dated February 1, 2000, as amended on May 1, 2005. |
| Ancillary Services Agreement, between CIGNA Healthcare of Arizona, Inc. and Phoenix Sleep, LLC dba American Sleep Diagnostics, effective January 1, 2006 |
| Ancillary Provider Managed Care Agreement, by and between CIGNA HealthCare of Arizona, Inc. and American Sleep Diagnostics, dated November 1, 2003 |
| Ancillary Provider Managed Care Agreement, by and bewteen CIGNA HealthCare of Arizona, Inc. and Arizona Sleep Examiners, LLC, dated September 1, 2002 |
| Ancillary Provider Managed Care Agreement, by and bewteen CIGNA Private Practice Plan of Arizona and Southwest Sleep Diagnostics, dated August 1, 1998, as amended on January 1, 1999 |
| Ancillary Provider Managed Care Agreement, by and between CIGNA Community Choice and Arizona Sleep Examiners, LLC, dated as of September 1, 2002 |
| HCP Agreement, by and between Cofinity, Inc. and Arete Sleep, LLC, dated January 1, 2009 |
| Facility Agreement, by and between Galaxy Health Network and American Sleep Diagnostics, dated April 4, 2003 |
| Preferred Provider Services Agreement, by and between Gila River Health Care and Arete Sleep, LLC, dated October 1, 2008 |
| Provider Services Agreement, by and between Gila River Health Care Corporation and Phoenix Sleep dba American Sleep Diagnostics, dated September 1, 2005 |
| PPO/POS Ancillary Services Agreement, by and between American Sleep Diagnostics and One of Arizona, Inc., dated June 1, 2000, as amended on April 1, 2001 |
| Ancillary Services Agreement, by and between American Sleep Diagnostics and One of Arizona, Inc., dated June 1, 2000, as amended on April 1, 2001 |
| Fee-for-Service Ancillary Subcontractor Agreement, by and between Health Choice Arizona, Inc. and Arete Sleep, L.L.C., effective as of April 1, 2009 |
| Fee-for-Service Specialist Subcontractor Agreement, by and between Health Choice Arizona, Inc. and Arete Sleep, L.L.C., effective as of April 9, 2004, as amended on November 1, 2006 |
| Ancillary Provider Service Agreement, by and between Health Management Network, Inc. and American Sleep Diagnostics, dated March 14, 2000 |
| Agreement by and between Mercy Care Plan and Arete Sleep LLC, dated December 1, 2006, as amended December 3, 2008 |
| Agreement by and between Mercy Care Plan and Phoenix Sleep LLC dba American Sleep Diagnostics, dated September 27, 2004 |
| Preferred Provider Organization (PPO) Provider Agreement, by and between PacifiCare Health Plan Administrators, Inc. and American Sleep Diagnostics, LLC |
| Participating Hospital Agreement, by and between Three Rivers Provider Network, Incorporated and American Sleep Diagnostics, dated May 3, 2001 |

Tricare Ancillary Provider Contract, by and between Blue Cross and Blue Shield of Arizona, Inc. and American Sleep Diagnostics, LLC, effective as of January 1, 2005

Provider Agreement, by and between HealthEZ, Inc. and Arete Sleep Therapy, LLC, dated November 1, 2009

Ancillary Provider Participation Agreement, by and between Health Value Management, Inc. d/b/a ChoiceCare Network and the provider party thereto, dated December 22, 2005

Ancillary Provider Participation Agreement, by and between Humana Insurance Company and the provider party thereto, effective February 1, 2006

Rate Quotation for Professional Health Care Services, by and between Phoenix Sleep, LLC dba American Sleep Diagnostics and Indian Health Service, dated September 6, 2005

Facility Agreement, by and between LifeWise Health Plan of Arizona and American Sleep Diagnostics, L.L.C., effective January 1, 2004

Ancillary Provider Contract, between Lutheran Physicians IPA, Inc. and Southwest Sleep Diagnostics, dated May 1, 1999, as amended effective January 1, 2010

Ancillary Services Agreement, by and between Maricopa Integrated Health Systems dba Maricopa Health Plan (MHP) and Phoenix Sleep, LLC dba American Sleep Diagnostics, effective April 1, 2006, as amended effective October 1, 2006 and January 1, 2008

Ancillary Provider Agreement, by and between MMSI, Inc. d/b/a Mayo Management Services, Inc. and PhoenixSleep dba American Sleep Diagnostics, effective September 1, 2004

Participating Provider Agreement, by and between MultiPlan, Inc. and American Sleep Diagnostic, effective as of February 15, 2000

Ancillary Services Agreement, by and between Pacificare of Arizona, Inc. and American Sleep Diagnostics, dated May 15, 2003

Agreement by and between Pima County and Arete Sleep, L.L.C., dated February 19, 2009, as amended effective January 1, 2010

Participating Ancillary Provider Agreement, by and between ppoNext, Inc. and Phoenix Sleep LLC dba American Sleep Diagnostics, dated June 24, 2004

Provider Network Agreement, by and between Schaller Anderson Healthcare, L.L.C. and Phoenix Sleep LLC dba American Sleep Diagnostics, dated August 30, 2004

Medicare Advantage Plan Participating System Agreement, by and between Sterling Life Insurance Company and Arete Sleep, LLC, dated July 8, 2009

Agreement, by and between Three Rivers Provider Network, Inc. and Phoenix Sleep dba American Sleep Diagnostics L.L.C., dated April 16, 2004

Tricare Corporate Services Provider Contract, by and between Blue Cross Blue Shield of Arizona, Inc. and Arete Sleep LLC, dated January 20, 2006

Ancillary Group Participation Agreement, by and between United HealthCare of Arizona, Inc. and Southwest Sleep Diagnostics, dated May 1, 1999

Ancillary Services Agreement, by and between University Physicians, Inc. dba University Physicians Health Plans and Phoenix Sleep Centers, effective January 1, 2006, and as amended effective January 1, 2008, October 1, 2008 and August 1, 2009

Health Care Service Ancillary Agreement, by and between Phoenix Sleep LLC, dba American Sleep Diagnostics and USA Managed Care Organization, Inc., dated August 22, 2005

Standard Participation Agreement, by and between Blue Cross and Blue Shield of Arizona, Inc. and Arete Sleep Therapy, LLC, effective as of July 1, 2009

Facility Service Agreement, by and between Beech Street Corporation and ASD Acquisition, LLC, dated 2003

Ancillary Provider Agreement, by and between CCN Managed Care, Inc. d/b/a CCN and Southwest Sleep Lab, LLC dba Southwest Sleep Diagnostics, dated February 1, 2000, as amended on May 1, 2005.

| |
|---|
| Provider Agreement, by and between HealthEZ, Inc. and Arete Sleep, LLC, dated November 1, 2009 |
| Outpatient Diagnostic Center Participation Agreement, by and between Humana Insurance Company and Southwest Sleep Diagnostics, dated June 9, 1998, as amended January 12, 2001 and October 18, 2004 |
| Tricare Corporate Services Provider Contract, by and between Blue Cross Blue Shield of Arizona, Inc. and Arete Sleep Therapy LLC, as amended effective on February 1, 2010 |
| Medical Group Participation Agreement, by and between United HealthCare Insurance Company and Advanced Respiratory Therapy, dated September 22, 2006 |
| Medicare Advantage Plan Participating System Agreement, by and between Arete Sleep Therapy, LLC and Sterling Life Insurance Company, dated July 8, 2009 |
| Facility Services Agreement, by and between Arete Sleep, LLC and Aetna Health Inc., dated September 1, 2007 |
| Provider Agreement, by and between Arete Sleep Therapy NW LLC and CareCentrix, Inc., dated November 13, 2009 |
| All agreements by and between any Seller and Molina Healthcare of Texas |
| All agreements by and between any Seller and Secure Horizons |
| All agreements by and between any Seller and Pyramid Todays Option |
| Any contract identified in that certain correspondence dated as of January 27, 2011, to be delivered by Buyer to Sellers. |

| # | | Lesee name | Description | Balance | Maturity Date |
|---|---|---|---|---|---|
|  | | **Outstanding Capital Leases per UCC** | | | |

| # | | Lesee name | Description | Balance | Maturity Date |
|---|---|---|---|---|---|
| 1 | ASL | Direct Capital Corporation | Sandman Med. Equipment | $0 | 10/30/2009 |
| 2 | | CIT Technologies Corp. | Resmed Equipment | $0 | |
| 3 | ASL | Direct Capital Corporation | Sandman Med. Equipment | $0 | 01/31/2010 |
| 4 | AHL | Dell Financial Services | IT- Computer Hardware | $0 | 06/03/2010 |
| 5 | | CIT Technologies Corp. | IT- Computer Hardware | $0 | |
| 6 | AHL | Dell Financial Services | IT- Computer Hardware | $0 | 10/10/2010 |

| | | | | | |
|---|---|---|---|---|---|
| **Outstanding Capital Leases per UCC** | | | | | |
| | | | | | |
| | | | | | |
| **#** | | **Lessee name** | **Description** | **Balance** | **Maturity Date** |
| | | | | | |
| 7 | AHL | Dell Financial Services | IT- Dragon Pilot System | $1,322.99 | 10/01/2011 |
| 8 | AHL | Dell Financial Services | IT- System Virtualization | $35,879.67 | 09/30/2012 |
| 9 | ASL | LCA Bank Corporation | Sandman Med. Equipment | $26,273.50 | 02/03/2013 |
| 10 | AHL | Dell Financial Services | IT- Server, Software | $16,129.23 | 08/30/2012 |
| 11 | ASL | US BanCorp | Sandman Med. Equipment | $33,417.76 | 04/24/2015 |
| 12 | ASL | General Electric Capital Corp. | Sandman Med. Equipment | $66,079.31 | 06/01/2015 |
| 13 | AHL | Dell Financial Services | IT- Server | $5,857.53 | 11/01/2012 |
| | | | | | |
| **Other Capital leases not under UCC** | | | | | |
| 1 | AHL | Insight Global | IT- MetaFrame Server | $3,343.83 | 03/17/2011 |
| 2 | AHL | Insight Global | IT-Baracuda | $1,248.88 | 01/28/2011 |
| 3 | AHL | Insight Global | IT-Microsoft Server | $8,450.17 | 09/30/2012 |
| 4 | AHL | Insight Global | IT-1 year Cisco Warranty | $17,309.29 | 09/30/2012 |
| 5 | ANW | Marlin leasing | Sandman Med. Equipment | $32,516.19 | 09/30/2012 |

<u>**Schedule 2.4(c)(x)**</u>

Employee Closing Condition

Nicholas Pierce
Kari Boesen
Shelly Long
Rusty Fife
Joe Seeler
Christian Landy
Chad Hoskins
Matt Minton
Kim Krepp
Jamie Curry
Rick Gamble
Jennifer Pate
Abbey Speight
Kim Sylvester
Jennifer Burris

| Entity | Jurisdictions |
|---|---|
| Arete Sleep, LLC | - Arizona<br>- Texas |
| Arete Holdings, LLC | - Arizona<br>- Texas<br>- California<br>- Oregon<br>- WA |
| Arete Sleep Therapy, LLC | - Arizona<br>- Texas |
| Arete Sleep Therapy NW, LLC | - WA<br>- OR |
| Arete NW, LLC | - WA<br>- OR |

| Contract Type | Contract | Entity |
|---|---|---|
| Government Managed Care Contract | Care Oregon | Arete NW LLC |
| Government Managed Care Contract | DCIPA | Arete NW LLC |
| Government Managed Care Contract | DSHS | Arete NW LLC |
| Government Managed Care Contract | OMAP | Arete NW LLC |
| Government Managed Care Contract | Tricare | Arete NW LLC |
| Government Managed Care Contract | Molina Healthcare | Arete NW LLC |
| Government Managed Care Contract | Community Health Plan of WA | Arete NW LLC |
| Government Managed Care Contract | Family Care OHP | Arete NW LLC |
| Government Managed Care Contract | Noridian Medicare | Arete NW LLC |
| Government Managed Care Contract | DSHS | Arete Sleep Therapy NW LLC |
| Government Managed Care Contract | OMAP/DMAP | Arete Sleep Therapy NW LLC |
| Government Managed Care Contract | National Supplier Clearinghouse Medicare | Arete Sleep Therapy NW LLC |
| Government Managed Care Contract | Care First of Arizona | Arete Sleep LLC |
| Government Managed Care Contract | One Healthcare | Arete Sleep LLC |
| Government Managed Care Contract | Health Choice of Arizona | Arete Sleep LLC |
| Government Managed Care Contract | Indian Health Services | Arete Sleep LLC |
| Government Managed Care Contract | Maricopa Health Plan | Arete Sleep LLC |
| Government Managed Care Contract | Tricare | Arete Sleep LLC |
| Government Managed Care Contract | Texas Medicaid | Arete Sleep LLC |
| Government Managed Care Contract | University Physicians | Arete Sleep LLC |
| Government Managed Care Contract | Noridian Medicare | Arete Sleep LLC |
| Government Managed Care Contract | Tricare | Arete Sleep Therapy LLC |
| Government Managed Care Contract | National Supplier Clearinghouse Medicare | Arete Sleep Therapy LLC |

| Agreement Type | Party | Entity | Effective Date of Termination |
|---|---|---|---|
| Professional Services Agreement | Steven Marks, DO | Arete Sleep, LLC | 01/14/2011 |

| Street Address | City | State | Zip |
|---|---|---|---|
| 1475 Richardson Dr, Suite 200 | Richardson | TX | 75080 |
| 1115 W. Randol Mill Rd, Suite 200 | Arlington | TX | 76012 |
| 2460 NE Griffin Oaks St. | Hillsboro | OR | 97124 |
| 1320 E. Powell Blvd. | Gresham | OR | 97030 |
| 2550 NW Edenbower Blvd | Roseburg | OR | 97470 |
| 1230 Marine Dr. | Astoria | OR | 97103 |
| 1409 Franklin St | Vancouver | WA | 98660 |
| 5677-5687 N. Swan Rd | Tucson | AZ | 85718 |
| 6009 E. Grant Road | Tucson | AZ | 85712 |
| 7384 N. La Cholla Blvd. | Tucson | AZ | 85741 |
| 1951 N. Wilmot Rd, Bldg 1, Unit 4 | Tucson | AZ | 85712 |
| 2350 W. Ray Rd. | Chandler | AZ | 85224 |
| 6641 E. Baywood, Suite C-1 | Mesa | AZ | 85211 |
| 13203 N. 103rd Ave, Suite I-7 | Sun City | AZ | 85351 |
| 926 E. McDowell Rd | Phoenix | AZ | 85006 |
| 9305 W. Thomas Rd, Suite 465 | Phoenix | AZ | 85037 |
| 6263 N. Scottsdale Rd., #395 | Scottsdale | AZ | 85250 |
| 8436 E. Shea Blvd., Suite 101 | Scottsdale | AZ | 85260 |

| Contract Party | Contract Type |
|---|---|
| Health EZ | Managed Care Agreement |
| Health Management Network | Managed Care Agreement |
| Humana | Managed Care Agreement |
| Indian Health Services | Managed Care Agreement |
| Lifewise | Managed Care Agreement |
| Banner Health | Managed Care Agreement |
| Maricopa Health Plan | Managed Care Agreement |
| Mayo | Managed Care Agreement |
| Multiplan/ PHCS | Managed Care Agreement |
| Pacificare | Managed Care Agreement |
| Pima Health | Managed Care Agreement |
| PPO Next | Managed Care Agreement |
| Schaller Anderson | Managed Care Agreement |
| Sterling Life | Managed Care Agreement |
| Secure Horizons | Managed Care Agreement |
| Three Rivers | Managed Care Agreement |
| Tricare | Managed Care Agreement |
| Texas Medicaid | Managed Care Agreement |
| United Healthcare | Managed Care Agreement |
| University Physicians | Managed Care Agreement |
| USAMCO | Managed Care Agreement |
| United Healthcare of Texas | Managed Care Agreement |
| Aetna Healthcare of Texas | Managed Care Agreement |
| Humana Healthcare of Texas | Managed Care Agreement |
| Bravo Health of Texas | Managed Care Agreement |
| Molina Healthcare of Texas | Managed Care Agreement |
| Medicare | Managed Care Agreement |
| Ancillary Care Services | Managed Care Agreement |
| BCBS of AZ | Managed Care Agreement |
| Beechstreet Network | Managed Care Agreement |
| Coventry / First Health Network | Managed Care Agreement |
| Health EZ | Managed Care Agreement |
| Humana | Managed Care Agreement |

| Contract Party | Contract Type |
|---|---|
| Tricare | Managed Care Agreement |
| United Healthcare | Managed Care Agreement |
| BCBS of TX | Managed Care Agreement |
| United Healthcare of Texas | Managed Care Agreement |
| Sterling Life | Managed Care Agreement |
| Medicare | Managed Care Agreement |
| Care Centrix | Managed Care Agreement |
| Care Centrix | Managed Care Agreement |
| ODS | Managed Care Agreement |
| Sterling Life | Managed Care Agreement |
| DSHS | Managed Care Agreement |
| Pyramid Todays Option | Managed Care Agreement |
| OMAP/DMAP | Managed Care Agreement |
| Health EZ | Managed Care Agreement |
| Medicare | Managed Care Agreement |
| Ancillary Care Services | Managed Care Agreement |
| STS Properties, LLC | Commercial Real Property Lease |
| CP/IPERS Prince Forum, LLC | Commercial Real Property Lease |
| Baywood Medical Center | Commercial Real Property Lease |
| HTA - SC Royal Oaks, LLC | Commercial Real Property Lease |
| Slumber, LLC | Commercial Real Property Lease |
| Alsace, LLC | Commercial Real Property Lease |
| Estrella Medical Plaza 1, LLC | Commercial Real Property Lease |
| Riviera Properties, INC | Commercial Real Property Lease |
| Pinehurst Land Development, LLC | Commercial Real Property Lease |
| Powell Professional Center | Commercial Real Property Lease |
| Chapman & Chapman Investments | Commercial Real Property Lease |
| RYJE, LLC | Commercial Real Property Lease |
| Franklin Commons | Commercial Real Property Lease |
| Inhale, LLC | Commercial Real Property Lease |
| Long Realty Company | Commercial Real Property Lease |
| R.O.I. Properties | Commercial Real Property Lease |
| Majit Sehat, DDS | Commercial Real Property Lease |

| Contract Party | Contract Type |
|---|---|
| Richardson Dr Reo, LLC | Commercial Real Property Lease |
| Pacific Office Automation | Office Equipment Lease |
| Pitney Bowse | Postage Machine Lease |
| Future Digiatl Imaging | Office Equipment Lease |
| Qwest Communication Compnay, LLC | Telecom/Long Distance/internet |
| Sprint Solutions | Wireless Data/Air Cards |
| Verizon Business | Data Service |
| DP Air | Building AC Maintenance |
| Natip, Inc | Transcription Agreement |
| PMT, Inc | Transcription Agreement |
| Iron Mountain | Document Storage AZ,OR,TX |
| AZ Pest Prevention | Pest Control all AZ |
| Image First | Linen Service all AZ |
| Debra Collins | Janitorial Service TX |
| Aqua Chill | Water Service, AZ |
| Crystal Sierra Springs | Water Service, OR, TX |
| Zirmed | Eligibility Service |
| Emdeon | Eligibility Service |
| VGM Group | BT Licenses/Users |
| Nationwide | 401K/Profit Sharing |
| Escreen | Drug Screen |
| Clarifacts | Background Check |
| Aerotek | Temp Agencies |
| Ajilon | Temp Agencies |
| Grafton | Temp Agencies |
| PES | Temp Agencies |
| Career Builder | Recruiting Agreement |
| | |

## Schedule 3.9(a)
## Proprietary Rights

## TRADEMARKS

| Mark | Country | Status | Reg. No./Date | Owner |
|---|---|---|---|---|
| ARETE SLEEP HEALTH | U.S. Federal | Registered | 3494081<br><br>26-AUG-2008 | PHOENIX SLEEP HOLDINGS, L.L.C. |
| ARETÉ | U.S. Federal | Registered | 3494080<br><br>26-AUG-2008 | PHOENIX SLEEP HOLDINGS, L.L.C. |
| Design Only  | U.S. Federal | Registered | 3494082<br><br>26-AUG-2008 | PHOENIX SLEEP HOLDINGS, L.L.C. |
| SLEEP HEALTH SPECIALISTS | U.S. Federal | Registered | 78/636,927<br><br>25-MAY-2005 | PHOENIX SLEEP HOLDINGS, L.L.C. |
| SLEEP HEALTH SPECIALISTS | U.S. Federal | Registered | 78/636,933<br><br>25-MAY-2005 | PHOENIX SLEEP HOLDINGS, L.L.C. |
| YOUR DAYS ARE ONLY AS GOOD AS YOUR NIGHTS | U.S. Federal | Registered | 3041201<br><br>10-JAN-2006 | PHOENIX SLEEP HOLDINGS, L.L.C. |

## DOMAIN NAMES

| Domain Name | Registrant |
|---|---|
| aretesleep.com | Arete Sleep |
| aretesleep.net | Arete Sleep |
| phoenixsleep.com | Arete Sleep |
| phoenixsleep.net | Arete Sleep |
| americansleepdiagnostics.com | Arete Sleep |
| sleepwellnessnw.com | Arete Sleep |

**Software**: WyNX/MPF Practice Management Software

| Type | Description |
|------|-------------|
| None | |
| | |

| Software/System | Quantity | Business Use |
|---|---:|---|
| MS Windows XP | 135 | Operating System |
| MS Windows Vista | 8 | Operating System |
| MS Windows 7 | 8 | Operating System |
| MS Windows Server 2000 (Cisco) | 4 | Operating System |
| MS Windows Server 2003 | 10 | Operating System |
| MS Windows Server 2008 | 6 | Operating System |
| MS Windows Server 2003 CALS | 80 | Operating System |
| MS Windows Server 2008 CALS | 5 | Operating System |
| RedHat Enterprise Linux | 2 | Operating System |
| Hyper ]V | 1 | VM |
| VMWare vCenter Server | 2 | VM |
| MS Office 2003 | 55 | User Productivity |
| MS Office 2007 | 10 | User Productivity |
| MS Office 2010 | 5 | User Productivity |
| MS Exchange 2003 Server | 1 | Email |
| MS TechNet Subscription | 1 | Development/Support |
| MS SQL Server 2005 | 1 | Database |
| MS SQL 2005 CAL | 10 | Database access |
| Postgres | | Database |
| MySQL | | Database |
| Crystal Reports 2008 Server | 1 | Reporting Services |
| Crystal Reports Named users | 5 | Reporting Services |
| Crystal Reports Access users | 10 | Reporting Services |
| BrightTree hosted service | | Invoicing/Collections |
| Core FTP Server | 1 | Sleep Study Xfer |
| Zabbix | | System Monitoring |
| Symantec AV | 150 | Endpoint Security |
| Backup Exec Server | 1 | Backups |
| Medisoft | 10 | Invoicing and Collection |
| ConnectWise (hosted) | 4 | Trouble Ticket System |
| Xmedius Server (Fax Software) | 1 | Fax |
| Call Rex | 19 | Call Recording |
| Blackberry Users | 10 | PDA |
| IPCC | 21 | Call Center |
| Cisco Unity VM | 115 | Voice Mail |
| Cisco Call Manager | 135 | Phone System |
| Citrix Licenses | 40 | Remote connectivity |
| ADP PCPW Server | 1 | Accounting/HR |
| QuickBooks Pro 2009 | 5 | Accounting |
| MAS500 | 5 | Accounting |
| FAS | 5 | Fixed Asset Accounting |
| 17" 1280x1024 ThinEdge Monitor for Corp | 8 | monitors |
| 18.1 LCD 1280X1024 VP181-2 | 1 | monitors |
| 18.1 LCD 1280X1024 VP181-2 | 6 | monitors |
| 19" LCD 1280x1024 DVI-I 600 1 | 47 | monitors |
| 19in Monitors | 12 | monitors |

| Software/System | Quantity | Business Use |
|---|---|---|
| APC SMART UPS 750VA USB & ACCSSERIAL RM 2U 120V | 6 | backup battery system for remote site |
| APC Symmetra UPS system for Server room | 1 | backup battery system for server racks |
| Avocent Autoview 1000R ILOC/1 Rem-User 16 Sys | 1 | KVM system for servers |
| Canon DR-2580C Col Scan 20pp-600DPI | 16 | desktop scanners |
| Cisco 1760 router | 8 | MPLS routers (lab locations) |
| Cisco 2610 router | 2 | MPLS routers (lab locations) |
| Cisco 2811 router | 9 | MPLS routers (lab locations) |
| Cisco 2921 router | 1 | telephone router (new) |
| Cisco 2950 switch | 11 | network switches (labs) |
| Cisco 3560 switch | 1 | network switch (lab) |
| Cisco 3725 router | 1 | Internet router (corporate) |
| Cisco 3745 router | 1 | MPLS / PRI router (corporate) |
| Cisco 4506 core router | 1 | core router for corporate office |
| Cisco 79xx IP Phones | 120 | Cisco telephones |
| Cisco ASA5505 firewall | 3 | firewalls for remote locations |
| Cisco ASA5520 firewall | 1 | firewall (corporate) |
| Cisco MCS7800 server (MCS 7825) | 4 | telephone servers (IPCC, VM, TELCO) |
| Cisco PIX 525 Chas-Unrestrict SW 2GE | 1 | old firewall (corporate) |
| Dell CX300 SAN system | 1 | original SAN (production) |
| Dell Dimension 3000 Computer | 1 | desktop computer |
| Dell Dimension 3100 | 1 | desktop computer |
| Dell EqualLogic PS6000 SAN system | 1 | new SAN for VM environments |
| Dell Inspiron 700M | 1 | laptop computer |
| Dell Inspiron 9300, Pentium M 730 | 1 | laptop computer |
| Dell Latitude D410 | 1 | laptop computer |
| Dell Latitude D500 laptop | 3 | laptop computer |
| Dell Latitude D505 | 2 | laptop computer |
| Dell Latitude D520 Laptops | 4 | laptop computer |
| Dell LATITUDE D600 | 6 | laptop computer |
| Dell Latitude D610 | 17 | laptop computer |
| Dell Latitude D620 laptop | 8 | laptop computer |
| Dell Latitude D630 | 15 | laptop computer |
| Dell Latitude E6400 laptop | 11 | laptop computer |
| Dell Latitude E6410 laptop | 2 | laptop computer |
| Dell Latitude E6500 laptop | 3 | laptop computer |
| Dell OpitPlex SX280 Ultra Small Form | 17 | desktop computer |
| Dell Optiflex GX620 Minitower | 2 | desktop computer |
| Dell OptiPlex 745 workstations | 23 | desktop computer |
| Dell OptiPlex 755 stations for Billing Department | 3 | desktop computer |
| Dell OptiPlex 760 Ultra computers for Billing department | 16 | desktop computer |
| Dell OptiPlex 780 Minitowers for corporate | 8 | desktop computer |
| Dell OptiPlex GX620 | 21 | desktop computer |
| DELL OPTIPLEX SX260 | 1 | desktop computer |
| DELL OPTIPLEX SX270 | 13 | desktop computer |

| Software/System | Quantity | Business Use |
|---|---|---|
| DELL PowerEdge 1750 servers | 18 | servers |
| Serial Numbers | | 3J72J31 |
| | | 6J72J31 |
| | | BJ72J31 |
| | | JH72J31 |
| | | HH72J31 |
| | | FJ72J31 |
| | | 2J72J31 |
| | | 102YH31 |
| | | 1K72J31 |
| | | 2YNWH31 |
| | | GJ72J31 |
| | | 1YNWH31 |
| | | JJ72J31 |
| | | 8J72J31 |
| | | 3K72J31 |
| | | CJ72J31 |
| | | 2K72J31 |
| | | 7J72J31 |
| Dell PowerEdge 1950 server | 6 | servers |
| Serial Numbers | | 6N7YXB1 |
| | | GN7YXB1 |
| | | CN7YXB1 |
| | | 2N7YXB1 |
| | | 3N7YXB1 |
| | | 5N7YXB1 |
| Dell PowerEdge 2950 server | 3 | servers |
| Serial Numbers | | 2N8XZF1 |
| | | 4N8XZF1 |
| | | F025PH1 |
| Dell PowerEdge R710 server | 5 | servers |
| Serial Numbers | | 7H0XGM1 |
| | | 97GTLM1 |
| | | 6R31MN1 |
| | | 38R7VK1 |
| | | 48R7VK1 |
| DELL Precision M2400 | 1 | laptop computer |
| DELL Precision M4400 notebook | 1 | laptop computer |
| Dell UltraSharp 17 inch Monitors | 6 | monitors |
| DELL ULTRASHARP FLAT PANEL LCD Monitors | 22 | monitors |
| HP Color LaserJet 3550N | 1 | color laser printer (corporate) |
| HP Digital sender-scanner for corporate | 1 | scanner (corporate) |
| Iomega NAS 200D Series 320GB (server) | 3 | NAS storage appliances (labs) |
| Laptop X41T 778 | 1 | laptop computer |
| Muratec 3550 multifunction printer (lease) | 12 | printers (corporate, labs) |

| Software/System | Quantity | Business Use |
|---|---|---|
| Network rack 13U WALL-MOUNT ENCLOSURE NMS ACCSVENTED FRONT DOOR | 3 | wall racks for terminating cabling |
| OVERLAND POWERLOADER 1 LT02 DRIVE 3.4/6.6 17 SLOT (Tape Backup Drive for Servrs) | 1 | old LTO2 backup autoloader |
| Overland Storage Arc Vault Backup library (LTO3) | 1 | LTO3 library (restores) |
| Overland Storage Arc Vault Backup library (LTO5) | 1 | LTO5 library (production) |
| Sharp MX-B401 multifunction copier (lease) | 7 | copier/printer/fax (corporate) |
| Sharp MX-M450 multifunction copier (lease) | 1 | copier/printer/fax (corporate) |
| VIEWSONIC VG800 monitor | 1 | monitors |
| VIEWSONIC VP171B 17" 1280X1024 BLACK LCD MONITOR | 3 | monitors |
| Viewsonic VP720B 17in monitors and splitters for PCC | 6 | monitors |
| Viewsonic VP920B 19IN LCD 12x10- Doctors | 3 | monitors |
| Viewsonic VP930B 19 in LCD 12x10 monitors | 2 | monitors |

| Brokerage |
|-----------|
| None |

| Benefit Plan |
| --- |
| 401K |
| Short-Term Disability |
| Long-Term Disability |
| Life Insurance |
| Health Insurance (Medical) |
| Health Insurance (Dental) |
| Health Insurance (Vision) |
| COBRA |

| Chandler | | Astoria | |
|---|---|---|---|
| **Dell Computers** | **Serial number** | **Dell Computers** | **Serial number** |
| Bed 1 | 45628442674 | Bed 1 | C8BM221 |
| Bed 2 | 45643092655 | Bed 2 | BPS5401 |
| Bed 3 | 45642516928 | | |
| Bed 4 | 45508843275 | | |
| Bed 5 | 45509284421 | | |
| Bed 6 | 45573664156 | | |
| | | | |
| **Sandman Amplifiers** | | **Sandman Amplifiers** | |
| Bed 1 | OTA03003 | Bed 1 | F632039-CU-0200 |
| Bed 2 | OTA03002 | Bed 2 | 2007-C0711006-CU-0310 |
| Bed 3 | OTA02151 | | |
| Bed 4 | OTA02463 | | |
| Bed 5 | OTA04631 | | |
| Bed 6 | OTA04628 | | |
| **Pulse Ox** | | **Pulse Ox** | |
| Bed 1 | Same as AMP | Bed 1 | 370845 |
| Bed 2 | Same as AMP | Bed 2 | |
| Bed 3 | Same as AMP | | |
| Bed 4 | Same as AMP | | |
| Bed 5 | Same as AMP | | |
| Bed 6 | Same as AMP | | |
| **Respironics PAP Machines** | | **Respironics PAP Machines** | |
| Bed 1 | 5203468 | Bed 1 | 4827247 |
| Bed 2 | 5204185 | Bed 2 | 2007088942 |
| Bed 3 | 5201083 | | |
| Bed 4 | 5204200 | | |
| Bed 5 | 5204223 | | |
| Bed 6 | 4751966 | | |

| Central | | Hillsboro | |
|---|---|---|---|
| **Dell Computers** | Serial number | **Dell Computers** | Serial number |
| Bed 1 | DFXR481 | Bed 1 | 7VKGOB1 |
| Bed 2 | 9MXR481 | Bed 2 | BZKGOB1 |
| Bed 3 | HNXR481 | Bed 3 | YKGOB1 |
| Bed 4 | JXXR481 | Bed 4 | 2VKGOB1 |
| Bed 5 | DB27Q91 | | |
| Bed 6 | DZK3191 | | |
| | | **Sandman Amplifiers** | |
| **Sandman Amplifiers** | | | |
| Bed 1 | 2303 | Bed 1 | OTAOU94 |
| Bed 2 | 318 | Bed 2 | GTA04096 |
| Bed 3 | 313 | Bed 3 | GTA04131 |
| Bed 4 | OTA04223 | Bed 4 | OTA04073 |
| Bed 5 | OTA04061 | | |
| Bed 6 | OTA04097 | | |
| **Pulse Ox** | | **Pulse Ox** | |
| Bed 1 | Same as AMP | Bed 1 | 651319 |
| Bed 2 | Same as AMP | Bed 2 | |
| Bed 3 | Same as AMP | Bed 3 | |
| Bed 4 | Same as AMP | Bed 4 | |
| Bed 5 | Same as AMP | | |
| Bed 6 | Same as AMP | | |
| **Respironics PAP Machines** | | **Respironics PAP Machines** | |
| Bed 1 | 5204246 | Bed 1 | 20040037407 |
| Bed 2 | 4751175 | Bed 2 | 2007088938 |
| Bed 3 | 5204220 | Bed 3 | 20040037428 |
| Bed 4 | 5204191 | Bed 4 | 473325 |
| Bed 5 | 5204182 | | |
| Bed 6 | 5204198 | | |

| Scottsdale | | | Vancouver | |
|---|---|---|---|---|
| **Dell Computers** | Serial number | | **Dell Computers** | Serial number |
| Bed 1 | 1Z2K5M1 | | Bed 1 | GYR5X91 |
| Bed 2 | HQY4Z91 | | Bed 2 | GQD5Q01 |
| Bed 3 | 9N15JM1 | | Bed 3 | G59K9C1 |
| Bed 4 | GN15JM1 | | Bed 4 | FP554D1 |
| | | | **Sandman Amplifiers** | |
| **Sandman Amplifiers** | | | | |
| Bed 1 | 14220788 | | Bed 1 | 2007-C0711100-CU-0310 |
| Bed 2 | 14420678 | | Bed 2 | F585039-CU-0200 |
| Bed 3 | OTDO5582 | | Bed 3 | F525039-CU-0200 |
| Bed 4 | OTD05583 | | Bed 4 | F537039-CU-0200 |
| **Pulse Ox** | | | **Pulse Ox** | |
| Bed 1 | G02853445 | | Bed 1 | 350336 |
| Bed 2 | G99801388 | | Bed 2 | |
| Bed 3 | Same as AMP | | Bed 3 | |
| Bed 4 | Same as AMP | | Bed 4 | |
| **Respironics PAP Machines** | | | **Respironics PAP Machines** | |
| Bed 1 | 5204194 | | Bed 1 | 4796031 |
| Bed 2 | 5204221 | | Bed 2 | 20060662855 |
| Bed 3 | 4751195 | | Bed 3 | 20050691957 |
| Bed 4 | 5204173 | | Bed 4 | 20050691955 |

| Estrella | | | Gresham | |
|---|---|---|---|---|
| **Dell Computers** | Serial number | | **Dell Computers** | Serial number |
| Bed 1 | 9YKGOB1 | | Bed 1 | B88M2D1 |
| Bed 2 | 3YKGOB1 | | Bed 2 | G7Z851 |
| Bed 3 | 40Y4Z991 | | Bed 3 | CF72S51 |
| Bed 4 | 269k9C1 | | Bed 4 | SLN4X31 |
| | | | **Sandman Amplifiers** | |
| **Sandman Amplifiers** | | | | |
| Bed 1 | OTD03473 | | Bed 1 | 2007-C0711038-CU0310 |
| Bed 2 | OTD03472 | | Bed 2 | F458040-CU-0110 |
| Bed 3 | OTD03887 | | Bed 3 | 2007-CO711025-CU0310 |
| Bed 4 | OTD03816 | | Bed 4 | F587039-CU-0200 |
| **Pulse Ox** | | | **Pulse Ox** | |
| Bed 1 | Same as AMP | | Bed 1 | LR83810 |
| Bed 2 | Same as AMP | | Bed 2 | |
| Bed 3 | Same as AMP | | Bed 3 | |
| Bed 4 | Same as AMP | | Bed 4 | |
| **Respironics PAP Machines** | | | **Respironics PAP Machines** | |
| Bed 1 | 5204240 | | Bed 1 | 20060807444 |
| Bed 2 | 5204209 | | Bed 2 | 20040294137 |
| Bed 3 | 5204237 | | Bed 3 | 20060550480 |
| Bed 4 | 5203437 | | Bed 4 | 4796027 |

| Mesa | | | Roseburg | |
|---|---|---|---|---|
| **Dell Computers** | Serial number | | **Dell Computers** | Serial number |
| Bed 1 | 75XY181 | | Bed 1 | JF7ZS51 |
| Bed 2 | 75STS61 | | Bed 2 | 9YR5X91 |
| | | | Bed 3 | 72WSN31 |
| **Sandman Amplifiers** | | | Bed 4 | 3N37071 |
| Bed 1 | 30220 | | **Sandman Amplifiers** | |
| Bed 2 | 30282 | | Bed 1 | F461040-CU-0110 |
| **Pulse Ox** | | | Bed 2 | F545039-CU-0200 |
| Bed 1 | G05072381 | | Bed 3 | F474040-CU-0200 |
| Bed 2 | G05805200 | | Bed 4 | F493051-CU-0200 |
| **Respironics PAP Machines** | | | **Pulse Ox** | |
| Bed 1 | 5204245 | | Bed 1 | 262761 |
| Bed 2 | 4752169 | | Bed 2 | |
| | | | Bed 3 | |
| | | | Bed 4 | |
| | | | **Respironics PAP Machines** | |
| | | | Bed 1 | 20050065430 |
| | | | Bed 2 | 20050691988 |
| | | | Bed 3 | 20050065428 |
| | | | Bed 4 | 4793862 |

| Sun City | | Arlington | |
|---|---|---|---|
| **Dell Computers** | **Serial number** | **Dell Computers** | **Serial number** |
| Bed 1 | 6WLVM31 | Bed 1 | 4D55P41 |
| Bed 2 | FWNWQ91 | Bed 2 | 7RKXRK1 |
| Bed 3 | CVLVM31 | Bed 3 | 5D55P41 |
| Bed 4 | BWNWQ91 | Bed 4 | GZJDW61 |
| Bed 5 | 4JXY181 | **Sandman Amplifiers** | |
| Bed 6 | 2Z8V1371 | Bed 1 | 14530137 |
| Bed 7 | JX04591 | Bed 2 | 14530141 |
| Bed 8 | 85STS61 | Bed 3 | 14500697 |
| **Sandman Amplifiers** | | Bed 4 | 14500518 |
| Bed 1 | 14220782 | **Pulse Ox** | |
| Bed 2 | 14230302 | Bed 1 | 295-62702D |
| Bed 3 | 14220362 | Bed 2 | G08836165 |
| Bed 4 | OTD03471 | Bed 3 | G02848869 |
| Bed 5 | 14230395 | Bed 4 | G08838376 |
| Bed 6 | 14220843 | **Respironics PAP Machines** | |
| Bed 7 | 14230276 | Bed 1 | 20061896131 |
| Bed 8 | 14230135 | Bed 2 | 20060896124 |
| **Pulse Ox** | | Bed 3 | Doesn't Have |
| Bed 1 | G99835088 | Bed 4 | 2006896131 |
| Bed 2 | G04850422 | | |
| Bed 3 | G99822144 | | |
| Bed 4 | Same as AMP | | |
| Bed 5 | G05872449 | | |
| Bed 6 | G06813400 | | |
| Bed 7 | G06813710 | | |
| Bed 8 | G21687158 | | |
| **Respironics PAP Machines** | | | |
| Bed 1 | 4751183 | | |
| Bed 2 | 4752178 | | |
| Bed 3 | 5204202 | | |
| Bed 4 | 5202440 | | |
| Bed 5 | 5204176 | | |
| Bed 6 | 5204228 | | |
| Bed 7 | 5204183 | | |
| Bed 8 | 5204178 | | |

| Wilmot | | | Richardson | |
|---|---|---|---|---|
| **Dell Computers** | Serial number | | **Dell Computers** | Serial number |
| Bed 1 | 824J491 | | Bed 1 | 5ZKG0B1 |
| Bed 2 | FLYC291 | | Bed 2 | 1YKG0B1 |
| Bed 3 | 4HWV071 | | Bed 3 | DYKG0B1 |
| Bed 4 | 4K12W11 | | Bed 4 | GYKG0B1 |
| Bed 5 | 5RPDHN1 | | **Sandman Amplifiers** | |
| Bed 6 | 8QPDHN1 | | Bed 1 | 14200424 |
| Bed 7 | 5OL3T91 | | Bed 2 | 14200479 |
| **Sandman Amplifiers** | | | Bed 3 | OTA04134 |
| Bed 1 | 0135-Canada | | Bed 4 | |
| Bed 2 | 14200480 | | **Pulse Ox** | |
| Bed 3 | 14200293 | | Bed 1 | 6048505502004 |
| Bed 4 | 14220248 | | Bed 2 | G008171572000 |
| Bed 5 | OTD05646 | | Bed 3 | OTA04134 |
| Bed 6 | OTD05647 | | Bed 4 | Unable to Read Serial Number |
| Bed 7 | OTA04335 | | **Respironics PAP Machines** | |
| **Pulse Ox** | | | Bed 1 | 20060896137 |
| Bed 1 | G02849311 | | Bed 2 | 20060896127 |
| Bed 2 | G02848866 | | Bed 3 | 20060896126 |
| Bed 3 | G03844304 | | Bed 4 | 2006896122 |
| Bed 4 | G05872330 | | | |
| Bed 5 | Same as AMP | | | |
| Bed 6 | Same as AMP | | | |
| Bed 7 | Same as AMP | | | |
| **Respironics PAP Machines** | | | | |
| Bed 1 | 4599882 | | | |
| Bed 2 | 3744501 | | | |
| Bed 3 | 3608466 | | | |
| Bed 4 | 4429143 | | | |
| Bed 5 | 3608447 | | | |
| Bed 6 | 2583033 | | | |
| Bed 7 | 4751219 | | | |

| La Cholla | |
|---|---|
| **Dell Computers** | **Serial number** |
| Bed 1 | FOL3291 |
| Bed 2 | 3MYC291 |
| Bed 3 | CYKGOB1 |
| Bed 4 | 9H521C1 |
| Bed 5 | Being Replaced |
| Bed 6 | FW2DQN1 |
| **Sandman Amplifiers** | |
| Bed 1 | OTA04323 |
| Bed 2 | OTA04289 |
| Bed 3 | OTA04132 |
| Bed 4 | OTA04294 |
| Bed 5 | OTA04301 |
| Bed 6 | OTD03815 |
| **Pulse Ox** | |
| Bed 1 | Same as AMP |
| Bed 2 | Same as AMP |
| Bed 3 | Same as AMP |
| Bed 4 | Same as AMP |
| Bed 5 | Same as AMP |
| Bed 6 | Same as AMP |
| **Respironics PAP Machines** | |
| Bed 1 | 4621091 |
| Bed 2 | 4621075 |
| Bed 3 | 4621119 |
| Bed 4 | 4621071 |
| Bed 5 | 4621115 |
| Bed 6 | 4448454 |

| Grant | |
|---|---|
| **Dell Computers** | **Serial number** |
| Bed 1 | 4J521C1 |
| Bed 2 | 8WNWQ91 |
| Bed 3 | CQY4291 |
| **Sandman Amplifiers** | |
| Bed 1 | OTA04093 |
| Bed 2 | 14220165 |
| Bed 3 | 14230294 |
| **Pulse Ox** | |
| Bed 1 | Same as AMP |
| Bed 2 | G05862796 |
| Bed 3 | G03844304 |
| **Respironics PAP Machines** | |
| Bed 1 | 4751405 |
| Bed 2 | 4793748 |
| Bed 3 | 4751221 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Hurst | |
|---|---|
| **Dell Computers** | |
| Bed 1 | B24J491 |
| Bed 2 | B24J491 |
| **Sandman Amplifiers** | |
| Bed 1 | 14230278 |
| Bed 2 | 14220508 |
| **Pulse Ox** | |
| Bed 1 | G03846029 |
| Bed 2 | G04850574 |
| **Respironics PAP Machines** | |
| Bed 1 | 20060896125 |
| Bed 2 | 20060896132 |
| | |
| | |
| | |
| | |

| Baylor | |
|---|---|
| **Dell Computers** | |
| Bed 1 | 4RKXRK1 |
| Bed 2 | D7FC221 |
| Bed 3 | B5STS61 |
| **Sandman Amplifiers** | |
| Bed 1 | 14220622 |
| Bed 2 | 14200484 |
| Bed 3 | 14230122 |
| **Pulse Ox** | |
| Bed 1 | G00882724 |
| Bed 2 | G008830124 |
| Bed 3 | G008830097 |
| **Respironics PAP Machines** | |
| Bed 1 | 20060896130 |
| Bed 2 | 20060896128 |
| Bed 3 | 20060896121 |

| Dallas Medical Center | |
|---|---|
| **Dell Computers** | |
| Bed 1 | HRCC3M1 |
| Bed 2 | ZRCC3M1 |
| **Sandman Amplifiers** | |
| Bed 1 | OTM01751 |
| Bed 2 | OTM01753 |
| **Pulse Ox** | |
| Bed 1 | OTM01751 |
| Bed 2 | OTM01753 |
| **Respironics PAP Machines** | |
| Bed 1 | 5205833 |
| Bed 2 | 5205809 |

| December 2010 MONTH-END INVENTORY | |
|---|---|
| PHX Region | $ 127,906 |
| TUC Region | $ 66,146 |
| TX Region | $ 38,622 |
| PNW Region | $ 146,530 |
| Parcel Port | $ 61,920 |
| Total | $ 441,124 |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHXRT | 100332 | Circadiance- Sleep Weaver Advance Mask w/headgear | 796 | 3 | 180.00 | 4 | 240.00 | 6 | 360.00 | 3 | 180.00 | 60.00 | 960.00 | Circadiance |
| PHXRT | 1002064 | Respironics Softcap Headgear Med | 3 | 0 | - | 0 | - | 0 | - | 3 | 67.40 | 22.47 | 67.40 | Respironics |
| PHXRT | 100200D | Respironics - Wired Data Modem | 158 | 5 | 150.00 | 0 | - | 0 | - | 3 | 90.00 | 30.00 | 240.00 | Respironics |
| PHXRT | 1002065 | Respironics Softcap Headgear Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PHXRT | 1002757 | Respironics Simplicity Nasal - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 65.00 | - | Respironics |
| PHXRT | 1002759 | Respironics - Simplicity Nasal - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 65.00 | - | Respironics |
| PHXRT | 1002800 | Respironics - Deluxe Headgear | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 9.00 | - | Respironics |
| PHXRT | 1003756 | Respironics - M-Series Water Chamber R2B/R3B Kit | 75 | 0 | - | 0 | - | 4 | 70.00 | 1 | 17.50 | 17.50 | 87.50 | Respironics |
| PHXRT | 1003757 | Respironics - M-Series Replacement water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.50 | - | Respironics |
| PHXRT | 1004086 | Respironics - Profile Lite Nasal - Petite | 168 | 0 | - | 2 | 110.00 | 1 | 55.00 | 0 | - | 55.00 | 165.00 | Respironics |
| PHXRT | 1004087 | Respironics - Profile Lite Nasal - Small | 168 | 1 | 55.00 | 2 | 110.00 | 0 | - | 0 | - | 55.00 | 165.00 | Respironics |
| PHXRT | 1004088 | Respironics - Profile Lite Nasal - Medium/Small | 392 | 2 | 110.00 | 3 | 165.00 | 2 | 110.00 | 0 | - | 55.00 | 385.00 | Respironics |
| PHXRT | 1004089 | Respironics - Profile Lite Nasal - Medium | 224 | 2 | 110.00 | 0 | - | 2 | 110.00 | 0 | - | 55.00 | 220.00 | Respironics |
| PHXRT | 1004110 | Respironics - Profile Lite Nasal Mask - Med Wide | 1 | 0 | - | 0 | - | 0 | - | 1 | 55.00 | 55.00 | 55.00 | Respironics |
| PHXRT | 1004111 | Respironics - Profile Lite with headgear - Large | 113 | 0 | - | 2 | 110.00 | 0 | - | 1 | 55.00 | 55.00 | 165.00 | Respironics |
| PHXRT | 1004112 | Respironics - Profile Lite W/O headgear - Lg Narro | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | - | Respironics |
| PHXRT | 1004872 | Respironics - Comfort Full - Medium | 244 | 1 | 80.00 | 0 | - | 2 | 160.00 | 1 | 80.00 | 80.00 | 320.00 | Respironics |
| PHXRT | 1004880 | Respironics - Comfort Full - Small | 325 | 2 | 160.00 | 0 | - | 2 | 160.00 | 1 | 80.00 | 80.00 | 400.00 | Respironics |
| PHXRT | 1004950 | Respironics - Comfort Full - Large | 245 | 1 | 80.00 | 0 | - | 2 | 160.00 | 2 | 160.00 | 80.00 | 400.00 | Respironics |
| PHXRT | 1005792 | Respironics - REMstar Heated Humidifier | 1 | 0 | - | 0 | - | 1 | - | 0 | - | - | - | Respironics |
| PHXRT | 1007919 | Respironics - Comfort Select Nasal - Medium | 53 | 1 | 50.00 | 0 | - | 0 | - | 2 | 100.00 | 50.00 | 150.00 | Respironics |
| PHXRT | 1007930 | Respironics Comfort Select Nasal - Small | 205 | 2 | 100.00 | 0 | - | 2 | 100.00 | 1 | 50.00 | 50.00 | 250.00 | Respironics |
| PHXRT | 1007931 | Respironics - Comfort Select Nasal - Small Wide | 206 | 2 | 100.00 | 0 | - | 2 | 100.00 | 2 | 100.00 | 50.00 | 300.00 | Respironics |
| PHXRT | 1007935 | Respironics - Comfort Select Nasal - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PHXRT | 1007936 | Respironics - Comfort Select Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PHXRT | 1007937 | Respironics Comfort Select Nasal - Small Wide | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PHXRT | 1007963 | Respironics - Comfort Classic Nasal - Small | 155 | 3 | 90.00 | 0 | - | 2 | 60.00 | 0 | - | 30.00 | 150.00 | Respironics |
| PHXRT | 1007964 | Respironics - Comfort Classic Nasal - Med | 124 | 3 | 90.00 | 0 | - | 1 | 30.00 | 0 | - | 30.00 | 120.00 | Respironics |
| PHXRT | 1009040 | Respironics Comfort Gel mask and headgear - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | - | Respironics |
| PHXRT | 1009041 | Respironics Comfort Gel mask and headgear - Small | 58 | 1 | 55.00 | 0 | - | 0 | - | 2 | 110.00 | 55.00 | 165.00 | Respironics |
| PHXRT | 1009042 | Respironics Comfort Gel mask and headgear - Medium | 171 | 1 | 55.00 | 2 | 110.00 | 0 | - | 3 | 165.00 | 55.00 | 330.00 | Respironics |
| PHXRT | 1009043 | Respironics Comfort Gel mask and headgear - Large | 56 | 1 | 55.00 | 0 | - | 0 | - | 0 | - | 55.00 | 55.00 | Respironics |
| PHXRT | 1009048 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PHXRT | 1009049 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PHXRT | 1009050 | Respironics - Comfort Gel Cushion - Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PHXRT | 1009051 | Respironics - Comfort Gel Cushion - LG | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PHXRT | 1010641 | Respironics Comfort Gel MASK ONLY - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | - | Respironics |
| PHXRT | 1012911 | Respironics - Premium Chin Strap | 110 | 2 | 20.00 | 3 | 30.00 | 5 | 50.00 | 0 | - | 10.00 | 100.00 | Respironics |
| PHXRT | 1017442 | Respironics - RemStar BiPAP Auto Core package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PHXRT | 1019185 | Respironics - Comfort Curve | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 95.00 | - | Respironics |
| PHXRT | 1021821 | Respironics - Comfort Lite II Cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 18.00 | - | Respironics |
| PHXRT | 1021823 | Respironics - Comfort Lite II Cushion - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 18.00 | - | Respironics |
| PHXRT | 1021830 | Respironics - Comfort Lite II Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 18.00 | - | Respironics |
| PHXRT | 1021835 | Respironics - Comfort Lite II Cushion - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 18.00 | - | Respironics |
| PHXRT | 1022334 | Respironics - M-Series Heated Humidifier | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PHXRT | 1029331 | Respironics - M Series Ultra Fine Filters Disp. | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 5.00 | - | Respironics |
| PHXRT | 1029533 | Respironics - M-Series Replacement water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 17.50 | - | Respironics |
| PHXRT | 1030494 | Respironics - Comfort Lite 2 - Small/Medium | 61 | 1 | 60.00 | 0 | - | 0 | - | 0 | - | 60.00 | 60.00 | Respironics |
| PHXRT | 1030495 | Respironics - Comfort Lite 2 - Medium/Large | 62 | 1 | 60.00 | 0 | - | 0 | - | 1 | 60.00 | 60.00 | 120.00 | Respironics |
| PHXRT | 1030502 | Respironics - Comfort Lite 2 - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 60.00 | - | Respironics |
| PHXRT | 1030503 | Respironics - Comfort Lite II Pillow Repl. - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1030504 | Respironics - Comfort Lite II Pillow Repl. - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1030505 | Respironics - Comfort Lite II Pillow Repl. - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1031391 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 22.00 | - | Respironics |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHXRT | 1031392 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 22.00 | - | Respironics |
| PHXRT | 1031403 | Respironics - Comfort Gel Cushion - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 22.00 | - | Respironics |
| PHXRT | 1031404 | Respironics - Comfort Gel Cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 22.00 | - | Respironics |
| PHXRT | 1032907 | Respironics-Performance Tubing ultralight | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 6.00 | - | Respironics |
| PHXRT | 1033678 | Respironics - Premium Headgear | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 12.00 | - | Respironics |
| PHXRT | 1035162 | Respironics - REMStar replacement water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 11.81 | - | Respironics |
| PHXRT | 1036800 | Respironics - Optilife Nasal pillow Mask - Kit | 307 | 0 | - | 0 | - | 5 | 300.00 | 2 | 120.00 | 60.00 | 420.00 | Respironics |
| PHXRT | 1036801 | Respironics - Optilife Nasal Pillow w/ CradleCushi | 1228 | 5 | 300.00 | 10 | 600.00 | 5 | 300.00 | 8 | 480.00 | 60.00 | 1,680.00 | Respironics |
| PHXRT | 1036802 | Respironics - Optilife Nasal Pillow w/ CradleCushi | 1595 | 7 | 420.00 | 13 | 780.00 | 6 | 360.00 | 9 | 540.00 | 60.00 | 2,100.00 | Respironics |
| PHXRT | 1036838 | Respironics - Optilife Pillow- Pet | 3 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1036839 | Respironics - Optilife Pillow- Sm | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1036840 | Respironics - Optilife Pillow- Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1036841 | Respironics - Optilife Pillow- LG | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PHXRT | 1036846 | OPTILIFE CRADLE CUSHION, SIZE S, SINGLE | 3 | 0 | - | 0 | - | 0 | - | 3 | 99.75 | 33.25 | 99.75 | Respironics |
| PHXRT | 1036847 | OPTILIFE CRADLE CUSHION, SIZE S, SINGLE | 3 | 0 | - | 0 | - | 0 | - | 3 | 114.00 | 38.00 | 114.00 | Respironics |
| PHXRT | 1037688 | Respironics - M-series Wired Modem | 102 | 0 | - | 3 | 90.00 | 0 | - | 9 | 270.00 | 30.00 | 360.00 | Respironics |
| PHXRT | 1040135 | Respironics - Comfort Gel mask and headgear- Sm | 1731 | 7 | 630.00 | 2 | 180.00 | 10 | 900.00 | 2 | 180.00 | 90.00 | 1,890.00 | Respironics |
| PHXRT | 1040136 | Respironics - Comfort Gel mask and headgear- Med | 2642 | 2 | 180.00 | 3 | 270.00 | 24 | 2,160.00 | 3 | 270.00 | 90.00 | 2,880.00 | Respironics |
| PHXRT | 1040137 | Respironics - Comfort Gel mask and headgear- Lrg | 2733 | 4 | 360.00 | 6 | 540.00 | 20 | 1,800.00 | 3 | 270.00 | 90.00 | 2,970.00 | Respironics |
| PHXRT | 1040716 | Respironics - BiPap Auto SV Core Package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 2,510.00 | - | Respironics |
| PHXRT | 1047919 | Full Life face mask with headgear- Small | 884 | 2 | 158.00 | 4 | 316.00 | 5 | 395.00 | 4 | 316.00 | 79.00 | 1,185.00 | Respironics |
| PHXRT | 1040768 | Respironics - Comfort Fusion Sm/Med Mask Kit | 2096 | 13 | 650.00 | 8 | 400.00 | 20 | 1,000.00 | 5 | 250.00 | 50.00 | 2,300.00 | Respironics |
| PHXRT | 1040840 | Respironics - Comfort Fusion Cushion & Ring - Small | 4 | 0 | - | 0 | - | 0 | - | 4 | 200.00 | 50.00 | 200.00 | Respironics |
| PHXRT | 1040841 | Respironics - Comfort Fusion Cushion & Ring - Med | 361 | 4 | 200.00 | 0 | - | 3 | 150.00 | 4 | 200.00 | 50.00 | 550.00 | Respironics |
| PHXRT | 1042907 | Respironics - SleepEasy with Humidifier | 12555 | 0 | - | 0 | - | 5 | 12,550.00 | 0 | - | 2,510.00 | 12,550.00 | Respironics |
| PHXRT | 1043237 | Respironics - SleepEasy with Humidifier | 825 | 1 | 205.00 | 0 | - | 3 | 615.00 | 1 | 205.00 | 205.00 | 1,025.00 | Respironics |
| PHXRT | 1048988 | SleepEasy Replacement Chamber Kit | 1 | 0 | - | 0 | - | 0 | - | 1 | 17.50 | 17.50 | 17.50 | Respironics |
| PHXRT | 1049109 | Respironics - M-Series Heated Humidifier | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PHXRT | 1051158 | Respironics - M-Series Heated Humid R3 Core PK | 2 | 1 | - | 0 | - | 0 | - | 1 | - | - | - | Respironics |
| PHXRT | 1056215 | Respironics - M-Series Heated Humid R3 Core PK | 96 | 30 | 30 | 11 | - | 27 | - | 28 | - | - | - | Respironics |
| PHXRT | 1050001 | Respironics - Easy Life Mask - Xsmall | 1433 | 10 | 500.00 | 7 | 350.00 | 11 | 550.00 | 5 | 250.00 | 50.00 | 1,650.00 | Respironics |
| PHXRT | 1050002 | Respironics - Easy Life Mask - Small | 922 | 7 | 350.00 | 3 | 150.00 | 8 | 400.00 | 4 | 200.00 | 50.00 | 1,100.00 | Respironics |
| PHXRT | 1050003 | Respironics - Easy Life Mask - Medium | 361 | 0 | - | 4 | 200.00 | 3 | 150.00 | 4 | 200.00 | 50.00 | 550.00 | Respironics |
| PHXRT | 1050004 | Respironics - Easy Life Mask- Large | 255 | 0 | - | 2 | 100.00 | 3 | 150.00 | 0 | - | 50.00 | 250.00 | Respironics |
| PHXRT | 1060801 | FitLife Mask with headgear-Small | 728 | 1 | 120.00 | 0 | - | 5 | 600.00 | 2 | 240.00 | 120.00 | 960.00 | Respironics |
| PHXRT | 1060802 | FitLife Mask with headgear-Medium | 973 | 2 | 240.00 | 0 | - | 6 | 720.00 | 5 | 600.00 | 120.00 | 1,560.00 | Respironics |
| PHXRT | 1070037 | Respironics-Comfort Gel Blue Mask- Large | 840 | 0 | - | 0 | - | 15 | 825.00 | 0 | - | 55.00 | 825.00 | Respironics |
| PHXRT | 1070038 | Respironics- Comfort Gel Blue Mask- Medium | 2016 | 1 | 55.00 | 1 | 55.00 | 34 | 1,870.00 | 0 | - | 55.00 | 1,980.00 | Respironics |
| PHXRT | 1070039 | Respironics- Comfort Gel Blue Mask- Small | 2074 | 4 | 220.00 | 2 | 110.00 | 31 | 1,705.00 | 2 | 110.00 | 55.00 | 2,145.00 | Respironics |
| PHXRT | 1070040 | Respironics- Comfort Gel Blue Mask- Petite | 449 | 2 | 110.00 | 2 | 110.00 | 4 | 220.00 | 1 | 55.00 | 55.00 | 495.00 | Respironics |
| PHXRT | 16015 | ResMed - Chin Restraint | 142 | 9 | 81.00 | 5 | 45.00 | 0 | - | 2 | 18.00 | 9.00 | 144.00 | ResMed |
| PHXRT | 16333 | ResMed - Mirage Micro - Small | 795 | 10 | 600.00 | 0 | - | 3 | 180.00 | 2 | 120.00 | 60.00 | 900.00 | ResMed |
| PHXRT | 16334 | ResMed - Mirage Micro - Med and Large | 1285 | 17 | 1,020.00 | 2 | 120.00 | 2 | 120.00 | 4 | 240.00 | 60.00 | 1,500.00 | ResMed |
| PHXRT | 16548 | ResMed - Ultra Mirage II Nasal Mask - Standard | 224 | 3 | 165.00 | 0 | - | 1 | 55.00 | 0 | - | 55.00 | 220.00 | ResMed |
| PHXRT | 16549 | ResMed - Ultra Mirage II Nasal Mask - Large | 56 | 0 | - | 0 | - | 1 | 55.00 | 0 | - | 55.00 | 55.00 | ResMed |
| PHXRT | 16550 | ResMed - Ultra Mirage II Nasal Mask - Shallow | 114 | 1 | 55.00 | 0 | - | 1 | 55.00 | 2 | 110.00 | 55.00 | 220.00 | ResMed |
| PHXRT | 16556 | ResMed - UM II Nasal Cushion - Standard | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 16.00 | - | ResMed |
| PHXRT | 16557 | ResMed - UM II Nasal Cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 16.00 | - | ResMed |
| PHXRT | 16558 | ResMed - UM II Nasal Cushion - Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 16.00 | - | ResMed |
| PHXRT | 16577 | ResMed - Ultra Mirage II Nasal Mask - Shallow Wide | 112 | 1 | 55.00 | 0 | - | 1 | 55.00 | 0 | - | 55.00 | 110.00 | ResMed |
| PHXRT | 16604 | ResMed - Ult Mirage FF Cushion-Small Std | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 16605 | ResMed - Ult Mirage FF Cushion-Medium Std | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 16606 | ResMed - Ult Mirage FF Cushion-Large Std | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 16672 | ResMed - Ult Mirage FF Cushion-Med Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 16673 | ResMed - Ult Mirage FF Cushion-Large Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 16735 | ResMed - Ult Mirage FF Cushion-Shallow Wide | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 28.00 | - | ResMed |
| PHXRT | 19408 | ResMed - S8 Replacement Unit | 3 | 0 | - | 0 | - | 0 | - | 3 | - | - | - | ResMed |
| PHXRT | 21127 | ResMed - S6 | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 24101 | ResMed VPAP III - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 24111 | ResMed VPAP III - S8 Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 26008 | ResMed VPAP SV - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 26013 | ResMed VPAP Adapt SV - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 2,700.00 | - | ResMed |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHXRT | 26101 | ResMed VPAP Auto 25 | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 995.00 | - | ResMed |
| PHXRT | 26201 | ResMed VPAP Malibu - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 26940 | ResMed Humidaire 4i heated humidifier | 1 | 0 | - | 0 | - | 1 | - | 0 | - | - | - | ResMed |
| PHXRT | 26952 | ResMed - H4i Water Chamber | 31 | 0 | - | 0 | - | 2 | 28.00 | 1 | 14.00 | 14.00 | 42.00 | ResMed |
| PHXRT | 26959 | ResMed - H4i Upgrade Water Chamber Kit | 17 | 0 | - | 0 | - | 1 | 15.00 | 1 | 15.00 | 15.00 | 30.00 | ResMed |
| PHXRT | 30001 | ResMed- S7 Autoset Spirit | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 30002 | ResMed- S7 Elite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 30011 | ResMed- S7 Lightweight | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 302218 | Respironics - Contour Nasal - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 37.00 | - | Respironics |
| PHXRT | 302328 | Respironics - Simple Chin Strap | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 9.00 | - | Respironics |
| PHXRT | 302425 | Respironics - Deluxe Chin Strap | 223 | 3 | 57.00 | 4 | 76.00 | 4 | 76.00 | 3 | 57.00 | 19.00 | 266.00 | Respironics |
| PHXRT | 302465 | Respironics Softcap Headgear Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PHXRT | 30902 | ResMed Humidaire 2i heated humidifier | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 30951 | ResMed - H2i replacement water chamber | 47 | 0 | - | 1 | 22.50 | 1 | 22.50 | 0 | - | 22.50 | 45.00 | ResMed |
| PHXRT | 33007 | ResMed - S8 Escape | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PHXRT | 33007R | ResMed - S8 Escape Replacement | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PHXRT | 33021 | ResMed - S8 Elite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PHXRT | 33021R | ResMed - S8 Elite Replacement | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 33039 | ResMed - S8 Elite II | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 350.00 | - | ResMed |
| PHXRT | 33051 | ResMed - S8 Escape II | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PHXRT | 33112 | ResMed - S8 Autoset Vantage | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PHXRT | 33129 | ResMed - Autoset Vantage II | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 435.00 | - | ResMed |
| PHXRT | 33906 | ResMed Humidaire 3i heated humidifier | 5 | 0 | - | 0 | - | 5 | - | 0 | - | - | - | ResMed |
| PHXRT | 33957 | ResMed - H3i replacement water chamber | 168.5 | 5 | 112.50 | 0 | - | 2 | 45.00 | 4 | 90.00 | 22.50 | 247.50 | ResMed |
| PHXRT | 33963 | | 82.2 | 0 | - | 0 | - | 12 | 70.20 | 0 | - | 5.85 | 70.20 | ResMed |
| PHXRT | 36015 | ResMed - S9 Auto Set w/H5 | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 550.00 | - | ResMed |
| PHXRT | 36900 | ResMed - S9 Auto Set w/H5 | 551 | 0 | - | 1 | 550.00 | 0 | - | 0 | - | 550.00 | 550.00 | ResMed |
| PHXRT | 36995 | ResMed - S9 Auto Set w/H5/Climate control | 1142 | 0 | - | 2 | 1,140.00 | 0 | - | 0 | - | 570.00 | 1,140.00 | ResMed |
| PHXRT | 400439 | Fisher & Paykel - Zest Nasa Mask Small | 308 | 3 | 180.00 | 0 | - | 2 | 120.00 | 3 | 180.00 | 60.00 | 480.00 | Fisher & Paykel |
| PHXRT | 400441 | Fisher & Paykel - Zest Nasa Mask Medium | 432 | 2 | 120.00 | 2 | 120.00 | 3 | 180.00 | 5 | 300.00 | 60.00 | 720.00 | Fisher & Paykel |
| PHXRT | 400470 | Fisher & Paykel - Forma Face Mask-Small | 771 | 5 | 475.00 | 1 | 95.00 | 2 | 190.00 | 3 | 285.00 | 95.00 | 1,045.00 | Fisher & Paykel |
| PHXRT | 400471 | Fisher & Paykel - Forma Face Mask-Md/Lrg | 577 | 2 | 190.00 | 1 | 95.00 | 3 | 285.00 | 1 | 95.00 | 95.00 | 665.00 | Fisher & Paykel |
| PHXRT | 400HC103 | Fisher & Paykel - Lrg Cushion for HC431A | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC104 | Fisher & Paykel - Med Cushion for HC431A | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC112 | Fisher & Paykel - Small Cushion for HC431A | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC113 | Fisher & Paykel - Small Cushion for HC432AS | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC114 | Fisher & Paykel - Med Cushion for HC432AM | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC115 | Fisher & Paykel - Lrg Cushion for HC432AL | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC116 | Fisher & Paykel - Opus HC482 Repl. Pillow - Sm | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 11.00 | - | Fisher & Paykel |
| PHXRT | 400HC117 | Fisher & Paykel - Opus HC482 Repl. Pillow - Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 11.00 | - | Fisher & Paykel |
| PHXRT | 400HC118 | Fisher & Paykel - Opus HC482 Repl. Pillow - Lrg | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 11.00 | - | Fisher & Paykel |
| PHXRT | 400HC501 | Fisher & Paykel- Cushion/Seal for HC407 - 1 size | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400HC509 | Fisher & Paykel- Cushion/Seal for HC406 - 1 size | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 400440 | Fisher & Paykel- Zest nasal mask- Standart | 916 | 10 | 600.00 | 0 | - | 5 | 300.00 | 1 | 60.00 | 60.00 | 960.00 | Fisher & Paykel |
| PHXRT | 60000 | ResMed - Mirage Vista - Standard nasal | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 59.00 | - | ResMed |
| PHXRT | 60001 | ResMed - Mirage Vista - nasal | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 59.00 | - | ResMed |
| PHXRT | 60100 | ResMed - Mirage Activa - Standard nasal | 264 | 1 | 65.00 | 3 | 195.00 | 0 | - | 0 | - | 65.00 | 260.00 | ResMed |
| PHXRT | 60101 | ResMed - Mirage Activa - Large nasal | 264 | 4 | 260.00 | 0 | - | 0 | - | 0 | - | 65.00 | 260.00 | ResMed |
| PHXRT | 60102 | ResMed - Mirage Activa - Shallow nasal | 264 | 2 | 130.00 | 2 | 130.00 | 0 | - | 0 | - | 65.00 | 260.00 | ResMed |
| PHXRT | 60117 | ResMed Activa replacement cushion - Standard | 1 | 0 | - | 0 | - | 0 | - | 1 | 19.00 | 19.00 | 19.00 | ResMed |
| PHXRT | 60118 | ResMed Activa replacement cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 19.00 | - | ResMed |
| PHXRT | 60119 | ResMed Activa replacement cushion - Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 19.00 | - | ResMed |
| PHXRT | 60148 | ResMed - Mirage Activa LT Nasal Mask - Med | 561.45 | 6 | 299.70 | 2 | 99.90 | 3 | 149.85 | 1 | 49.95 | 49.95 | 599.40 | ResMed |
| PHXRT | 60149 | ResMed - Mirage Activa LT Nasal Mask - Lrg | 769.25 | 8 | 399.60 | 3 | 149.85 | 4 | 199.80 | 5 | 249.75 | 49.95 | 999.00 | ResMed |
| PHXRT | 60512 | ResMed - Swift II Nasal pillow Mask - Kit | 1652 | 15 | 1,110.00 | 1 | 74.00 | 6 | 444.00 | 2 | 148.00 | 74.00 | 1,776.00 | ResMed |
| PHXRT | 60520 | ResMed - Swift Pillow sleeve - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | ResMed |
| PHXRT | 60521 | ResMed - Swift Pillow sleeve - Medium | 30 | 0 | - | 0 | - | 2 | 28.00 | 0 | - | 14.00 | 28.00 | ResMed |
| PHXRT | 60522 | ResMed - Swift Pillow sleeve - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | ResMed |
| PHXRT | 60541 | ResMed - Swift 2 Pillow sleeve - Small | 60 | 4 | 56.00 | 0 | - | 0 | - | 0 | - | 14.00 | 56.00 | ResMed |
| PHXRT | 60542 | ResMed - Swift 2 Pillow sleeve - Medium | | | | | | 2 | 28.00 | | | 14.00 | 14.00 | ResMed |
| PHXRT | 60560 | ResMed - Swift LT Nasal Pillow System | 2246 | 11 | 715.00 | 5 | 325.00 | 18 | 1,170.00 | 2 | 130.00 | 65.00 | 2,340.00 | ResMed |
| PHXRT | 60588 | ResMed - Swift LT Nasal for Her | | | | | | | | | 455.00 | 65.00 | 2,665.00 | ResMed |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHXRT | 60600 | ResMed - Ultra Mirage Full - Small Standard | 1 | 0 | - | 0 | - | 0 | - | 1 | 105.00 | 105.00 | 105.00 | ResMed |
| PHXRT | 60601 | ResMed - Ultra Mirage Full - Small Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 105.00 | - | ResMed |
| PHXRT | 60602 | ResMed - Ultra Mirage Full - Medium Standard | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 105.00 | - | ResMed |
| PHXRT | 60603 | ResMed - Ultra Mirage Full - Medium Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 105.00 | - | ResMed |
| PHXRT | 60604 | ResMed - Ultra Mirage Full - Large Standard | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 105.00 | - | ResMed |
| PHXRT | 60605 | ResMed - Ultra Mirage Full - Large Shallow | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 105.00 | - | ResMed |
| PHXRT | 60922 | ResMed - Vista Deep, Cushion only | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | ResMed |
| PHXRT | 61200 | ResMed - Quattro Full Face- X-Small | 1595 | 2 | 210.00 | 7 | 735.00 | 6 | 630.00 | 5 | 525.00 | 105.00 | 2,100.00 | ResMed |
| PHXRT | 61201 | ResMed - Quattro Full Face- Small | 3606 | 6 | 630.00 | 3 | 315.00 | 25 | 2,625.00 | 2 | 210.00 | 105.00 | 3,780.00 | ResMed |
| PHXRT | 61202 | ResMed - Quattro Full Face- Medium | 8067 | 13 | 1,365.00 | 15 | 1,575.00 | 48 | 5,040.00 | 11 | 1,155.00 | 105.00 | 9,135.00 | ResMed |
| PHXRT | 61203 | ResMed - Quattro Full Face- Large | 2981 | 1 | 105.00 | 0 | - | 27 | 2,835.00 | 13 | 1,365.00 | 105.00 | 4,305.00 | ResMed |
| PHXRT | 61290 | ResMed - Quattro FF Cushion - X-Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 32.00 | - | ResMed |
| PHXRT | 61291 | ResMed - Quattro FF Cushion - Small | 1 | 0 | - | 0 | - | 0 | - | 1 | 32.00 | 32.00 | 32.00 | ResMed |
| PHXRT | 61292 | ResMed - Quattro FF Cushion - Medium | 3 | 0 | - | 0 | - | 0 | - | 3 | 96.00 | 32.00 | 96.00 | ResMed |
| PHXRT | 61293 | ResMed - Quattro FF Cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 32.00 | - | ResMed |
| PHXRT | 61300 | ResMed - Liberty Full Face - Small | 849 | 2 | 210.00 | 2 | 210.00 | 4 | 420.00 | 1 | 105.00 | 105.00 | 945.00 | ResMed |
| PHXRT | 61301 | ResMed - Liberty Full Face - Large | 636 | 1 | 105.00 | 0 | - | 5 | 525.00 | 0 | - | 105.00 | 630.00 | ResMed |
| PHXRT | 61330 | ResMed - Liberty Mouth Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 21.00 | - | ResMed |
| PHXRT | 61331 | ResMed - Liberty Mouth Cushion - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 21.00 | - | ResMed |
| PHXRT | 61333 | ResMed - Liberty Pillows - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 8.00 | - | ResMed |
| PHXRT | 61334 | ResMed - Liberty Pillows - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 8.00 | - | ResMed |
| PHXRT | 61335 | ResMed - Liberty Pillows - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 8.00 | - | ResMed |
| PHXRT | 61500 | ResMed - Mask | 1906 | 10 | 750.00 | 8 | 600.00 | 7 | 525.00 | 6 | 450.00 | 75.00 | 2,325.00 | ResMed |
| PHXRT | 622038 | Respironics - Tubing, 6 ft, Standard Grey | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 3.60 | - | Respironics |
| PHXRT | 900HC240 | | 178 | 25 | 31.25 | 0 | - | 23 | 28.75 | 70 | 87.50 | 1.25 | 147.50 | Fisher & Paykel |
| PHXRT | 900HC427 | Fisher & Paykel - HC405A foam & seal cushion - Sm | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | 900HC428 | Fisher & Paykel - HC405A foam & seal cushion - Lg | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Fisher & Paykel |
| PHXRT | DS100 | Respironics - M-Series Core Package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 260.00 | - | Respironics |
| PHXRT | DS150HS | Respironics - M-Series Core Package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 289.00 | - | Respironics |
| PHXRT | DS200 | Respironics - M-Series Core Package with Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 325.00 | - | Respironics |
| PHXRT | DS200HS | Respironics - M-Series Core Package with Flex | 308 | 1 | 307.00 | 0 | - | 0 | - | 0 | - | 307.00 | 307.00 | Respironics |
| PHXRT | DS250HS | Respironics - Rem Star Pack w/SD Card | 15012 | 28 | 9,100.00 | 2 | 650.00 | 16 | 5,200.00 | 16 | 5,200.00 | 325.00 | 20,150.00 | Respironics |
| PHXRT | DS400HS | Respironics - M-Series Core Package with Flex Smar | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 399.00 | - | Respironics |
| PHXRT | DS450HS | Respironics - M-Series Core Package with Flex Smar | 1593 | 1 | 395.00 | 1 | 395.00 | 2 | 790.00 | 9 | 3,555.00 | 395.00 | 5,135.00 | Respironics |
| PHXRT | DS500S | Respironics - M-Series Auto w/Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 520.00 | - | Respironics |
| PHXRT | DS510HS | Respironics - M-Series Auto w/A Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 492.00 | - | Respironics |
| PHXRT | DS550HS | Respironics - RemStar Auto Core Pack | 4710 | 2 | 940.00 | 5 | 2,350.00 | 3 | 1,410.00 | 0 | - | 470.00 | 4,700.00 | Respironics |
| PHXRT | DS700HS | Respironics - MSeries BiPAP Auto w/Bi-Flex Core pa | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 915.00 | - | Respironics |
| PHXRT | DS750HS | Respironics - RemStar Auto Core Pack | 2748 | 0 | - | 2 | 1,830.00 | 1 | 915.00 | 0 | - | 915.00 | 2,745.00 | Respironics |
| PHXRT | HC234JHU | SleepStyle 234 CPAP with Compliance Data Storage | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 210.00 | - | Fisher & Paykel |
| PHXRT | HC300 | Fisher & Paykel - HC300 water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PHXRT | HC325 | Fisher & Paykel - HC325 water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PHXRT | HC385S | Fisher & Paykel - HC385 water chamber | 199 | 20 | 160.00 | 0 | - | 0 | - | 19 | 152.00 | 8.00 | 312.00 | Fisher & Paykel |
| PHXRT | HC401A | Fisher & Paykel - Acclaim II Nasal Mask | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PHXRT | HC405A | Fisher & Paykel - Nasal Mask Standard size HC405A | 249 | 2 | 60.00 | 0 | - | 6 | 180.00 | 1 | 30.00 | 30.00 | 270.00 | Fisher & Paykel |
| PHXRT | HC406A | Fisher & Paykel - Nasal Mask Petite Size HC406A | 338 | 1 | 55.00 | 1 | 55.00 | 4 | 220.00 | 2 | 110.00 | 55.00 | 440.00 | Fisher & Paykel |
| PHXRT | HC407A | Fisher & Paykel - Nasal Mask Standard size HC407A | 337 | 3 | 165.00 | 0 | - | 3 | 165.00 | 1 | 55.00 | 55.00 | 385.00 | Fisher & Paykel |
| PHXRT | HC431A | Fisher & Paykel - Full face mask HC431A | 88 | 1 | 85.00 | 0 | - | 0 | - | 2 | 170.00 | 85.00 | 255.00 | Fisher & Paykel |
| PHXRT | HC432AL | Fisher & Paykel - Full face mask HC432 - Lrg | 351 | 4 | 340.00 | 0 | - | 0 | - | 7 | 595.00 | 85.00 | 935.00 | Fisher & Paykel |
| PHXRT | HC432AM | Fisher & Paykel - Full face mask HC432 - Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 85.00 | - | Fisher & Paykel |
| PHXRT | HC432AS | Fisher & Paykel - Full face mask HC432 - Small | 260 | 2 | 170.00 | 0 | - | 1 | 85.00 | 2 | 170.00 | 85.00 | 425.00 | Fisher & Paykel |
| PHXRT | HC452A | Fisher & Paykel - Oracle Oral appliance | 1 | 0 | - | 0 | - | 0 | - | 1 | 85.00 | 85.00 | 85.00 | Fisher & Paykel |
| PHXRT | HC482A | Fisher & Paykel - Opus Nasal Pillows Mask | 1182 | 8 | 440.00 | 9 | 495.00 | 4 | 220.00 | 6 | 330.00 | 55.00 | 1,485.00 | Fisher & Paykel |
| PHXRT | HYB530 | Innomed Hybrid Headgear | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 125.00 | - | |
| PHXRT | HYB500 | Innomed Hybrid Nasal Pillow/Oral Mask | 1 | 0 | - | 0 | - | 0 | - | 1 | 125.00 | 125.00 | 125.00 | InnoMed |
| PHXRT | K2LG | InnoMed - Nasal Aire II - Nasal Pillows Mask- LG | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PHXRT | K2MP | InnoMed - Nasal - Aire II - Nasal Pillows- Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PHXRT | K2SM | InnoMed - Nasal - Aire II - Nasal Pillows- SM | 0 | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PHXRT | TCF-142 | Respironics - Solo/Virtuoso Ultrafine filters-Disp | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0.42 | - | Roscoe |
| PHXRT | TCF-145 | Respironics - Remstar Ultra fine filters-Disp | | | | | | 0 | | | | 1.25 | 8.75 | Roscoe |
| PHXRT | | Respironics - Remstar fine filters-Disp | | | | | | 0 | | | | 1.25 | | Roscoe |
| PHXRT | TCF-149 | Respironics - M-series Ultra fine filters Disp. | 94136 | 264 | 89.76 | 224 | 76.16 | 156 | 53.04 | 79 | 26.86 | 0.34 | 245.82 | Roscoe |
| PHXRT | TCF-176 | NPB - 420g disposable filter | 0 | | | | | | | 0 | | 2.50 | - | Roscoe |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PHXRT | TCF-242 | Respironics - Solo/Virtuoso/Aria Non-Disposable F | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 2.39 | - | Roscoe |
| PHXRT | TCF-245 | Respironics - RemStar Pollen Non Disposable Filter | 2 | 0 | - | 0 | - | 0 | - | 2 | 1.76 | 0.88 | 1.76 | Roscoe |
| PHXRT | TCF-247 | Respironics - BiPap Pro w/Bi Flex- Non Disposable | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 2.89 | - | Roscoe |
| PHXRT | TCF-249 | Respironics - M- Series Non Disposable Filter | 47.38 | 14 | 8.82 | 0 | - | 12 | 7.56 | 5 | 3.15 | 0.63 | 19.53 | Roscoe |
| PHXRT | TCF-276 | NPB - 420g Foam filter Non Disposable | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0.90 | - | Roscoe |
| PHXRT | TCF-508 | ResMed - S6 filters | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0.59 | - | Roscoe |
| PHXRT | TCF-510 | ResMed - S7 filters | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0.50 | - | Roscoe |
| PHXRT | TCF-511 | ResMed - S8 filters | 244 | 98 | 49.00 | 0 | - | 0 | - | 97 | 48.50 | 0.50 | 97.50 | Roscoe |
| PHXRT | TMS-08 | Tiara (Respironics) - Deluxe Chin Strap | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 9.95 | - | Roscoe |
| PHXRT | TMS-30345 | Tiara - Snapp X Direct Nasal Interface Mask | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 84.50 | - | |
| PHXRT | TSB-10GLT | Tubing - 10 foot | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 3.95 | - | |
| PHXRT | TSB-6GLT | Tubing, Standard 6 ft | 137.45 | 8 | 23.60 | 0 | - | 23 | 67.85 | 15 | 44.25 | 2.95 | 135.70 | Roscoe |
| PHXRT | TSB-8GLT | Tubing - 8 foot | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 3.95 | - | |
| | | | | | 29,417.98 | | 17,714.41 | | 56,748.55 | | 24,024.87 | | 127,905.81 | |

**Tucson**

| Warehouse | Code | Description | Actual On-hand | Swan | Wilmot | Std. | Inventory Value | |
|---|---|---|---|---|---|---|---|---|
| TUCRT | 1002064 | Respironics Softcap Headgear Med | 0 | 0 | | 22.47 | 0.00 | Respironics |
| TUCRT | 100200D | Respironics - Wired Data Modem | 9 | 9 | | 30.00 | 270.00 | Respironics |
| TUCRT | 100200W | Respironics - Wired Data Modem | 0 | 0 | | 30.00 | 0.00 | Respironics |
| TUCRT | 1002065 | Respironics Softcap Headgear Large | 0 | 0 | | - | 0.00 | Respironics |
| TUCRT | 1002757 | Respironics Simplicity Nasal - Small | 0 | 0 | | 65.00 | 0.00 | Respironics |
| TUCRT | 1002759 | Respironics - Simplicity Nasal - Medium | 0 | 0 | | 65.00 | 0.00 | Respironics |
| TUCRT | 1002800 | Respironics - Deluxe Headgear | 0 | 0 | | 9.00 | 0.00 | Respironics |
| TUCRT | 1003756 | | 0 | 0 | | 17.50 | 0.00 | |
| TUCRT | 1003757 | Respironics - M-Series Water Chamber R2B | 0 | 0 | | 17.50 | 0.00 | Respironics |
| TUCRT | 1004086 | Respironics - Profile Lite Nasal - Petite | 1 | 1 | | 55.00 | 55.00 | Respironics |
| TUCRT | 1004087 | Respironics - Profile Lite Nasal - Small | 4 | 4 | | 55.00 | 220.00 | Respironics |
| TUCRT | 1004088 | Respironics - Profile Lite Nasal - Medium/Small | 5 | 5 | | 55.00 | 275.00 | Respironics |
| TUCRT | 1004089 | Respironics - Profile Lite Nasal - Medium | 6 | 6 | | 55.00 | 330.00 | Respironics |
| TUCRT | 1004111 | Respironics - Profile Lite with headgear - Large | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1004112 | Respironics - Profile Lite W/O headgear - Lg Narro | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1004872 | Respironics - Comfort Full - Medium | 0 | 0 | | 80.00 | 0.00 | Respironics |
| TUCRT | 1004880 | Respironics - Comfort Full - Small | 2 | 2 | | 80.00 | 160.00 | Respironics |
| TUCRT | 1004950 | Respironics - Comfort Full - Large | 0 | 0 | | 80.00 | 0.00 | Respironics |
| TUCRT | 1005792 | Respironics - REMstar Heated Humidifier | 0 | 0 | | - | 0.00 | Respironics |
| TUCRT | 1007919 | Respironics - Comfort Select Nasal - Medium | 4 | 4 | | 50.00 | 200.00 | Respironics |
| TUCRT | 1007930 | Respironics Comfort Select Nasal - Small | 5 | 5 | | 50.00 | 250.00 | Respironics |
| TUCRT | 1007931 | Respironics - Comfort Select Nasal - Small Wide | 5 | 5 | | 50.00 | 250.00 | Respironics |
| TUCRT | 1007935 | Respironics - Comfort Select Nasal - Medium | 0 | 0 | | 50.00 | 0.00 | Respironics |
| TUCRT | 1007936 | Respironics - Comfort Select Cushion - Small | 0 | 0 | | 50.00 | 0.00 | Respironics |
| TUCRT | 1007937 | Respironics Comfort Select Nasal - Small Wide | 0 | 0 | | 50.00 | 0.00 | Respironics |
| TUCRT | 1007963 | Respironics - Comfort Classic Nasal - Small | 1 | 1 | | 30.00 | 30.00 | Respironics |
| TUCRT | 1007964 | Respironics - Comfort Classic Nasal - Med | 6 | 6 | | 30.00 | 180.00 | Respironics |
| TUCRT | 1009040 | Respironics Comfort Gel mask and headgear - Petite | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1009041 | Respironics Comfort Gel mask and headgear - Small | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1009042 | Respironics Comfort Gel mask and headgear - Medium | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1009043 | Respironics Comfort Gel mask and headgear - Large | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1009048 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | | 17.00 | 0.00 | Respironics |
| TUCRT | 1009049 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | | 17.00 | 0.00 | Respironics |
| TUCRT | 1009050 | Respironics - Comfort Gel Cushion - Med | 0 | 0 | | 17.00 | 0.00 | Respironics |
| TUCRT | 1009051 | Respironics - Comfort Gel Cushion - LG | 0 | 0 | | 17.00 | 0.00 | Respironics |
| TUCRT | 1010641 | Respironics Comfort Gel MASK ONLY - Large | 0 | 0 | | 55.00 | 0.00 | Respironics |
| TUCRT | 1012911 | Respironics - Premium Chin Strap | 0 | 0 | | 10.00 | 0.00 | Respironics |
| TUCRT | 1017442 | Respironics - RemStar BiPAP Auto Core package | 0 | 0 | | - | 0.00 | Respironics |
| TUCRT | 1019185 | Respironics - Comfort Curve | 0 | 0 | | 95.00 | 0.00 | Respironics |
| TUCRT | 1021821 | Respironics - Comfort Lite II Cushion - Large | 0 | 0 | | 18.00 | 0.00 | Respironics |
| TUCRT | 1021823 | Respironics - Comfort Lite II Cushion - Medium | 0 | 0 | | 18.00 | 0.00 | Respironics |
| TUCRT | 1021830 | Respironics - Comfort Lite II Cushion - Small | 0 | 0 | | 18.00 | 0.00 | Respironics |
| TUCRT | 1021835 | Respironics - Comfort Lite II Cushion - Petite | 0 | 0 | | 18.00 | 0.00 | Respironics |
| TUCRT | | Respironics - | 0 | 0 | | | 0.00 | Respironics |
| TUCRT | 1025533 | Respironics - M-Series Replacement water chamber | 0 | 0 | | 17.50 | 0.00 | Respironics |
| TUCRT | 1030494 | Respironics - Comfort Lite 2 - Small/Medium | 0 | 0 | | 0.00 | | Respironics |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TUCRT | 1030495 | Respironics - Comfort Lite 2 - Medium/Large | 0 | 0 | | | | 60.00 | 0.00 | Respironics | | | |
| TUCRT | 1030502 | Respironics - Comfort Lite 2 - Petite | 0 | 0 | | | | 60.00 | 0.00 | Respironics | | | |
| TUCRT | 1030503 | Respironics - Comfort Lite II Pillow Repl. - Small | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1030504 | Respironics - Comfort Lite II Pillow Repl. - Med | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1030505 | Respironics - Comfort Lite II Pillow Repl. - Large | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1031391 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | | | | 22.00 | 0.00 | Respironics | | | |
| TUCRT | 1031392 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | | | | 22.00 | 0.00 | Respironics | | | |
| TUCRT | 1031403 | Respironics - Comfort Gel Cushion - Medium | 0 | 0 | | | | 22.00 | 0.00 | Respironics | | | |
| TUCRT | 1031404 | Respironics - Comfort Gel Cushion - Large | 0 | 0 | | | | 22.00 | 0.00 | Respironics | | | |
| TUCRT | 1032907 | Respironics-Performance Tubing ultralight | 0 | 0 | | | | 6.00 | 0.00 | Respironics | | | |
| TUCRT | 1035162 | Respironics - REMStar replacement water chamber | 0 | 0 | | | | 11.81 | 0.00 | Respironics | | | |
| TUCRT | 1036800 | Respironics - Optilife Nasal pillow Mask - Kit | 6 | 6 | | | | 60.00 | 360.00 | Respironics | | | |
| TUCRT | 1036801 | Respironics - Optilife Nasal pillow Mask - Kit | 2 | 2 | | | | 60.00 | 120.00 | Respironics | | | |
| TUCRT | 1036802 | Respironics - Optilife Nasal pillow cradle cushion | 5 | 5 | | | | 60.00 | 300.00 | Respironics | | | |
| TUCRT | 1036838 | Respironics - Optilife Pillow- Pet | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1036839 | Respironics - Optilife Pillow- Sm | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1036840 | Respironics - Optilife Pillow- Med | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1036841 | Respironics - Optilife Pillow- LG | 0 | 0 | | | | 14.00 | 0.00 | Respironics | | | |
| TUCRT | 1037688 | Respironics - M-series Wired Modem | 0 | 0 | | | | 30.00 | 0.00 | Respironics | | | |
| TUCRT | 1040135 | Respironics Comfort Gel FFM and Headgear - Sma | 19 | 19 | | | | 90.00 | 1,710.00 | Respironics | | | |
| TUCRT | 1040136 | Respironics - Comfort Gel mask and headgear- Med | 20 | 20 | | | | 90.00 | 1,800.00 | Respironics | | | |
| TUCRT | 1040137 | Respironics Comfort Gel FFM and Headgear - Large | 20 | 20 | | | | 90.00 | 1,800.00 | Respironics | | | |
| TUCRT | 1040716 | Respironics - BiPap Auto SV Core Package | 0 | 0 | | | | 2,510.00 | 0.00 | Respironics | | | |
| TUCRT | 1040768 | Respironics - Comfort Fusion Sm/Med Mask Kit | 34 | 34 | | | | 50.00 | 1,700.00 | Respironics | | | |
| TUCRT | 1040840 | Respironics - Comfort Fusion Cushion & Ring - Small | 0 | 0 | | | | 50.00 | 0.00 | Respironics | | | |
| TUCRT | 1040841 | Respironics - Comfort Fusion Cushion & Ring - Med | 0 | 0 | | | | 50.00 | 0.00 | Respironics | | | |
| TUCRT | 1042907 | BiPAP autoSV Core Package | 0 | 0 | | | | 2,510.00 | 0.00 | Respironics | | | |
| TUCRT | 1043237 | Respironics - SleepEasy with Humidifier | 0 | 0 | | | | 205.00 | 0.00 | Respironics | | | |
| TUCRT | 1047918 | Full Life face mask with headgear- Medium | 5 | 5 | | | | 79.00 | 395.00 | Respironics | | | |
| TUCRT | 1047919 | Full Life face mask with headgear- Small | 5 | 5 | | | | 79.00 | 395.00 | Respironics | | | |
| TUCRT | 1049109 | Respironics - M-Series Heated Humidifier | 3 | 3 | | | | - | 0.00 | Respironics | | | |
| TUCRT | 1051158 | Respironics - M-Series Heated Humid R3 Core PK | 0 | 0 | | | | - | 0.00 | Respironics | | | |
| TUCRT | 1056215 | Respironics - M-Series Heated Humid R3 Core PK | 47 | 47 | | | | - | 0.00 | Respironics | | | |
| TUCRT | 1050001 | Respironics - Easy Life Mask - Xsmall | 11 | 11 | | | | 50.00 | 550.00 | Respironics | | | |
| TUCRT | 1050002 | Respironics - Easy Life Mask - Small | 12 | 12 | | | | 50.00 | 600.00 | Respironics | | | |
| TUCRT | 1050003 | Respironics - Easy Life Mask - Medium | 3 | 3 | | | | 50.00 | 150.00 | Respironics | | | |
| TUCRT | 1050004 | Respironics - Easy Life Mask- Large | 3 | 3 | | | | 50.00 | 150.00 | Respironics | | | |
| TUCRT | 1060801 | FitLife Mask with headgear-Small | 9 | 9 | | | | 120.00 | 1,080.00 | Respironics | | | |
| TUCRT | 1060802 | FitLife Mask with headgear-Medium | 5 | 5 | | | | 120.00 | 600.00 | Respironics | | | |
| TUCRT | 1070037 | Respironics- Comfort Gel Blue Mask- Large | 50 | 50 | | | | 55.00 | 2,750.00 | Respironics | | | |
| TUCRT | 1070038 | Respironics- Comfort Gel Blue Mask- Medium | 26 | 26 | | | | 55.00 | 1,430.00 | Respironics | | | |
| TUCRT | 1070039 | Respironics- Comfort Gel Blue Mask- Small | 35 | 35 | | | | 55.00 | 1,925.00 | Respironics | | | |
| TUCRT | 1070040 | Respironics- Comfort Gel Blue Mask- Petite | 18 | 18 | | | | 55.00 | 990.00 | Respironics | | | |
| TUCRT | 16015 | ResMed - Chin Restraint | 6 | 6 | | | | 9.00 | 54.00 | ResMed | | | |
| TUCRT | 16333 | ResMed - Mirage Micro - Small | 5 | 5 | | | | 60.00 | 300.00 | ResMed | | | |
| TUCRT | 16334 | ResMed - Mirage Micro - Med and Large | 12 | 12 | | | | 60.00 | 720.00 | ResMed | | | |
| TUCRT | 16548 | ResMed - Ultra Mirage II Nasal Mask - Standard | 0 | 0 | | | | 55.00 | 0.00 | ResMed | | | |
| TUCRT | 16549 | ResMed - Ultra Mirage II Nasal Mask - Large | 0 | 0 | | | | 55.00 | 0.00 | ResMed | | | |
| TUCRT | 16550 | ResMed - Ultra Mirage II Nasal Mask - Shallow | 0 | 0 | | | | 55.00 | 0.00 | ResMed | | | |
| TUCRT | 16556 | ResMed - UM II Nasal Cushion - Standard | 0 | 0 | | | | 16.00 | 0.00 | ResMed | | | |
| TUCRT | 16557 | ResMed - UM II Nasal Cushion - Large | 0 | 0 | | | | 16.00 | 0.00 | ResMed | | | |
| TUCRT | 16558 | ResMed - UM II Nasal Cushion - Shallow | 0 | 0 | | | | 16.00 | 0.00 | ResMed | | | |
| TUCRT | 16577 | ResMed - Ultra Mirage II Nasal Mask - Shallow Wide | 0 | 0 | | | | 55.00 | 0.00 | ResMed | | | |
| TUCRT | 16604 | ResMed - Ult Mirage FF Cushion-Small Std | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 16605 | ResMed - Ult Mirage FF Cushion-Medium Std | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 16606 | ResMed - Ult Mirage FF Cushion-Large Std | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 16672 | ResMed - Ult Mirage FF Cushion-Med Shallow | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 16673 | ResMed - Ult Mirage FF Cushion-Large Shallow | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 16735 | ResMed - Ult Mirage FF Cushion-Shallow Wide | 0 | 0 | | | | 28.00 | 0.00 | ResMed | | | |
| TUCRT | 19408 | ResMed VPAP III - ST Bilevel device | 0 | 0 | | | | 0.00 | ResMed | | | |
| TUCRT | 24111 | ResMed VPAP III - ST Bilevel device | 0 | 0 | | | | 0.00 | ResMed | | | |
| TUCRT | 24116 | ResMed VPAP III - ST-A Bilevel device | 0 | 0 | | | | 1,050.00 | ResMed | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TUCRT | 26008 | ResMed VPAP Adapt SV - Bilevel device | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 26013 | ResMed VPAP Adapt SV - Bilevel device | 0 | 0 | | | | 2,700.00 | 0.00 | ResMed | | | |
| TUCRT | 26201 | ResMed VPAP Malibu - Bilevel device | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 26940 | | 0 | 0 | | | | - | 0.00 | | | | |
| TUCRT | 26959 | | 0 | 0 | | | | 15.00 | 0.00 | | | | |
| TUCRT | 30001 | ResMed- S7 Autoset Spirit | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 30002 | ResMed- S7 Elite | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 30011 | ResMed- S7 Lightweight | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 302218 | Respironics - Contour Nasal - Large | 0 | 0 | | | | 37.00 | 0.00 | Respironics | | | |
| TUCRT | 302328 | Respironics - Simple Chin Strap | 0 | 0 | | | | 9.00 | 0.00 | Respironics | | | |
| TUCRT | 302425 | Respironics - Deluxe Chin Strap | 0 | 0 | | | | 19.00 | 0.00 | Respironics | | | |
| TUCRT | 302465 | Respironics Softcap Headgear Small | 0 | 0 | | | | - | 0.00 | Respironics | | | |
| TUCRT | 30902 | ResMed Humidaire 2i heated humidifier | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 30951 | ResMed - H2i replacement water chamber | 0 | 0 | | | | 22.50 | 0.00 | ResMed | | | |
| TUCRT | 33007 | ResMed - S8 Escape | 0 | 0 | | | | 305.00 | 0.00 | ResMed | | | |
| TUCRT | 33021 | ResMed - S8 Elite | 0 | 0 | | | | 305.00 | 0.00 | ResMed | | | |
| TUCRT | 33051 | ResMed - S8 Escape II | 0 | 0 | | | | 305.00 | 0.00 | ResMed | | | |
| TUCRT | 33112 | ResMed - S8 Autoset Vantage | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 33129 | ResMed - S8 Autoset Vantage II | 0 | 0 | | | | 435.00 | 0.00 | ResMed | | | |
| TUCRT | 33906 | ResMed Humidaire 3i heated humidifier | 0 | 0 | | | | - | 0.00 | ResMed | | | |
| TUCRT | 33957 | ResMed - H3i replacement water chamber | 0 | 0 | | | | 22.50 | 0.00 | ResMed | | | |
| TUCRT | 400HC103 | Fisher & Paykel - Lrg Cushion for HC431A | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC104 | Fisher & Paykel - Med Cushion for HC431A | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC112 | Fisher & Paykel - Small Cushion for HC431A | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC113 | Fisher & Paykel - Small Cushion for HC432AS | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC114 | Fisher & Paykel - Med Cushion for HC432AM | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC115 | Fisher & Paykel - Lrg Cushion for HC432AL | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC116 | Fisher & Paykel - Opus HC482 Repl. Pillow - Sm | 0 | 0 | | | | 11.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC117 | Fisher & Paykel - Opus HC482 Repl. Pillow - Med | 0 | 0 | | | | 11.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC118 | Fisher & Paykel - Opus HC482 Repl. Pillow - Lrg | 0 | 0 | | | | 11.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC501 | Fisher & Paykel- Cushion/Seal for HC407 - 1 size | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 400HC509 | Fisher & Paykel- Cushion/Seal for HC406 - 1 size | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 60000 | ResMed - Mirage Vista - Standard nasal | 0 | 0 | | | | 59.00 | 0.00 | ResMed | | | |
| TUCRT | 60001 | ResMed - Mirage Vista - nasal | 0 | 0 | | | | 59.00 | 0.00 | ResMed | | | |
| TUCRT | 60100 | ResMed - Mirage Activa - Standard nasal | 0 | 0 | | | | 65.00 | 0.00 | ResMed | | | |
| TUCRT | 60101 | ResMed - Mirage Activa - Large nasal | 0 | 0 | | | | 65.00 | 0.00 | ResMed | | | |
| TUCRT | 60102 | ResMed - Mirage Activa - Shallow nasal | 0 | 0 | | | | 65.00 | 0.00 | ResMed | | | |
| TUCRT | 60117 | ResMed Activa replacement cushion - Standard | 0 | 0 | | | | 19.00 | 0.00 | ResMed | | | |
| TUCRT | 60118 | ResMed Activa replacement cushion - Large | 0 | 0 | | | | 19.00 | 0.00 | ResMed | | | |
| TUCRT | 60119 | ResMed Activa replacement cushion - Shallow | 0 | 0 | | | | 19.00 | 0.00 | ResMed | | | |
| TUCRT | 60512 | ResMed - Swift II Nasal pillow Mask - Kit | 22 | 22 | | | | 74.00 | 1,628.00 | ResMed | | | |
| TUCRT | 60520 | ResMed - Swift Pillow sleeve - Small | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60521 | ResMed - Swift Pillow sleeve - Medium | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60522 | ResMed - Swift Pillow sleeve - Large | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60588 | ResMed - Swift LT Nasal for Her | 26 | 26 | | | | 65.00 | 1,690.00 | ResMed | | | |
| TUCRT | 60541 | ResMed - Swift 2 Pillow sleeve - Small | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60542 | ResMed - Swift 2 Pillow sleeve - Medium | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60543 | ResMed - Swift 2 Pillow sleeve - Large | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 60560 | ResMed - Swift LT Nasal Pillow System | 42 | 42 | | | | 65.00 | 2,730.00 | ResMed | | | |
| TUCRT | 60601 | ResMed - Ultra Mirage Full - Small Shallow | 0 | 0 | | | | 105.00 | 0.00 | ResMed | | | |
| TUCRT | 60602 | ResMed - Ultra Mirage Full - Medium Standard | 0 | 0 | | | | 105.00 | 0.00 | ResMed | | | |
| TUCRT | 60603 | ResMed - Ultra Mirage Full - Medium Shallow | 0 | 0 | | | | 105.00 | 0.00 | ResMed | | | |
| TUCRT | 60604 | ResMed - Ultra Mirage Full - Large Standard | 0 | 0 | | | | 105.00 | 0.00 | ResMed | | | |
| TUCRT | 60605 | ResMed - Ultra Mirage Full - Large Shallow | 0 | 0 | | | | 105.00 | 0.00 | ResMed | | | |
| TUCRT | 60922 | ResMed - Vista Deep, Cushion only | 0 | 0 | | | | 14.00 | 0.00 | ResMed | | | |
| TUCRT | 61200 | ResMed - Quattro Full Face- X-Small | 5 | 5 | | | | 105.00 | 525.00 | ResMed | | | |
| TUCRT | 61201 | ResMed - Quattro Full Face- Small | 19 | 19 | | | | 105.00 | 1,995.00 | ResMed | | | |
| TUCRT | 61202 | ResMed - Quattro Full Face- Medium | 37 | 37 | | | | 105.00 | 3,885.00 | ResMed | | | |
| TUCRT | 61203 | ResMed - Quattro Full Face- Large | 39 | 39 | | | | 105.00 | 4,095.00 | ResMed | | | |
| TUCRT | 61290 | ResMed - Quattro FF Cushion - X-Small | 0 | 0 | | | | 32.00 | 0.00 | ResMed | | | |
| TUCRT | 61291 | ResMed - Quattro FF Cushion - Small | 0 | 0 | | | | 32.00 | 0.00 | ResMed | | | |
| TUCRT | 61292 | ResMed - Quattro FF Cushion - Medium | 0 | 0 | | | | 32.00 | 0.00 | ResMed | | | |
| TUCRT | 61293 | ResMed - Quattro FF Cushion - Large | 0 | 0 | | | | 32.00 | 0.00 | ResMed | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TUCRT | 61300 | ResMed - Liberty Full Face - Small | 8 | 8 | | | | 105.00 | 840.00 | ResMed | | | |
| TUCRT | 61301 | ResMed - Liberty Full Face - Large | 12 | 12 | | | | 105.00 | 1,260.00 | ResMed | | | |
| TUCRT | 61330 | ResMed - Liberty Mouth Cushion - Small | 0 | 0 | | | | 21.00 | 0.00 | ResMed | | | |
| TUCRT | 61331 | ResMed - Liberty Mouth Cushion - Large | 0 | 0 | | | | 21.00 | 0.00 | ResMed | | | |
| TUCRT | 61333 | ResMed - Liberty Pillows - Small | 0 | 0 | | | | 8.00 | 0.00 | ResMed | | | |
| TUCRT | 61334 | ResMed - Liberty Pillows - Medium | 0 | 0 | | | | 8.00 | 0.00 | ResMed | | | |
| TUCRT | 61335 | ResMed - Liberty Pillows - Large | 0 | 0 | | | | 8.00 | 0.00 | ResMed | | | |
| TUCRT | 622038 | Respironics - Tubing, 6 ft, Standard Grey | 0 | 0 | | | | 3.60 | 0.00 | Respironics | | | |
| TUCRT | 900HC427 | Fisher & Paykel - HC405A foam & seal cushion - Sm | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | 900HC428 | Fisher & Paykel - HC405A foam & seal cushion - Lg | 0 | 0 | | | | 14.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | DS100 | Respironics - M-Series Core Package | 0 | 0 | | | | 260.00 | 0.00 | Respironics | | | |
| TUCRT | DS200 | Respironics - M-Series Core Package with Flex | 0 | 0 | | | | 325.00 | 0.00 | Respironics | | | |
| TUCRT | DS200HS | | 0 | 0 | | | | 307.00 | 0.00 | | | | |
| TUCRT | DS200S | Respironics - M-Series Core w/Flex and Smartcard | 0 | 0 | | | | 291.65 | 0.00 | Respironics | | | |
| TUCRT | DS250HS | Respironics - Rem Star Pack w/SD Card | 26 | 26 | | | | 325.00 | 8,450.00 | Respironics | | | |
| TUCRT | DS500S | Respironics - M-Series Auto w/Flex | 0 | 0 | | | | 520.00 | 0.00 | Respironics | | | |
| TUCRT | DS510HS | Respironics - M-Series Auto w/A Flex | 0 | 0 | | | | 492.00 | 0.00 | Respironics | | | |
| TUCRT | DS550HS | Respironics - RemStar Auto Core Pack | 7 | 7 | | | | 470.00 | 3,290.00 | Respironics | | | |
| TUCRT | DS700HS | Respironics - MSeries BiPAP Auto w/Bi-Flex Core pa | 0 | 0 | | | | 915.00 | 0.00 | Respironics | | | |
| TUCRT | DS700S | Respironics - MSeries BiPAP Auto w/Bi-Flex | 0 | 0 | | | | 915.00 | 0.00 | Respironics | | | |
| TUCRT | DS750HS | Respironics - RemStar Auto Core Pack | 14 | 14 | | | | 915.00 | 12,810.00 | Respironics | | | |
| TUCRT | HC234JHU | SleepStyle 234 CPAP with Compliance Data Storage | 0 | 0 | | | | 210.00 | 0.00 | | | | |
| TUCRT | HC300 | Fisher & Paykel - HC300 water chamber | 0 | 0 | | | | 30.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC325 | Fisher & Paykel - HC325 water chamber | 0 | 0 | | | | 30.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC385S | Fisher & Paykel - HC385 water chamber | 0 | 0 | | | | 8.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC401A | Fisher & Paykel - Acclaim II Nasal Mask | 0 | 0 | | | | 30.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC405A | Fisher & Paykel - Nasal Mask Standard size HC405A | 1 | 1 | | | | 30.00 | 30.00 | Fisher & Paykel | | | |
| TUCRT | HC406A | Fisher & Paykel - Nasal Mask Petite Size HC406A | 1 | 1 | | | | 55.00 | 55.00 | Fisher & Paykel | | | |
| TUCRT | HC407A | Fisher & Paykel - Nasal Mask Standard size HC407A | 1 | 1 | | | | 55.00 | 55.00 | Fisher & Paykel | | | |
| TUCRT | HC431A | Fisher & Paykel - Full face mask HC431A | 0 | 0 | | | | 85.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC432AL | Fisher & Paykel - Full face mask HC432 - Lrg | 0 | 0 | | | | 85.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | HC432AM | Fisher & Paykel - Full face mask HC432 - Med | 1 | 1 | | | | 85.00 | 85.00 | Fisher & Paykel | | | |
| TUCRT | HC432AS | Fisher & Paykel - Full face mask HC432 - Small | 3 | 3 | | | | 85.00 | 255.00 | Fisher & Paykel | | | |
| TUCRT | HC452A | Fisher & Paykel - Oracle Oral appliance | 1 | 1 | | | | 85.00 | 85.00 | Fisher & Paykel | | | |
| TUCRT | HC482A | Fisher & Paykel - Opus Nasal Pillows Mask | 3 | 3 | | | | 55.00 | 165.00 | Fisher & Paykel | | | |
| TUCRT | HYB500 | Innomed Hybrid Nasal Pillow/Oral Mask | 0 | 0 | | | | 125.00 | 0.00 | Fisher & Paykel | | | |
| TUCRT | K2LG | InnoMed - Nasal Aire II - Nasal Pillows Mask- LG | 0 | 0 | | | | - | 0.00 | | | | |
| TUCRT | K2MP | InnoMed - Nasal - Aire II - Nasal Pillows- Med | 0 | 0 | | | | - | 0.00 | | | | |
| TUCRT | K2SM | InnoMed - Nasal - Aire II - Nasal Pillows- SM | 0 | 0 | | | | - | 0.00 | | | | |
| TUCRT | TCF-142 | Respironics - Solo/Virtuoso Ultrafine filters-Disp | 0 | 0 | | | | 0.42 | 0.00 | Roscoe | | | |
| TUCRT | TCF-145 | Respironics - Remstar-Ultra fine filters Disp | 0 | 0 | | | | 1.25 | 0.00 | Roscoe | | | |
| TUCRT | TCF-147 | Respironics - BiPap Pro/Plus Ultrafine filter-Disp | 0 | 0 | | | | 1.29 | 0.00 | Roscoe | | | |
| TUCRT | TCF-149 | Respironics - M-series Ultra fine filters Disp. | 0 | 0 | | | | 0.34 | 0.00 | Roscoe | | | |
| TUCRT | TCF-176 | NPB - 420g disposable filter | 0 | 0 | | | | 2.50 | 0.00 | Roscoe | | | |
| TUCRT | TCF-242 | Respironics - Solo/Virtuoso/Aria Non-Disposable F | 0 | 0 | | | | 2.39 | 0.00 | Roscoe | | | |
| TUCRT | TCF-245 | Respironics - RemStar Pollen Non Disposable Filter | 0 | 0 | | | | 0.88 | 0.00 | Roscoe | | | |
| TUCRT | TCF-247 | Respironics - BiPap Pro w/Bi Flex- Non Disposable | 0 | 0 | | | | 2.89 | 0.00 | Roscoe | | | |
| TUCRT | TCF-249 | Respironics - M- Series Non Disposable Filter | 0 | 0 | | | | 0.63 | 0.00 | Roscoe | | | |
| TUCRT | TCF-276 | NPB - 420g Foam filter Non Disposable | 0 | 0 | | | | 0.90 | 0.00 | Roscoe | | | |
| TUCRT | TCF-508 | ResMed - S6 filters | 0 | 0 | | | | 0.59 | 0.00 | Roscoe | | | |
| TUCRT | TCF-510 | ResMed - S7 filters | 0 | 0 | | | | 0.50 | 0.00 | Roscoe | | | |
| TUCRT | TCF-511 | ResMed - S8 filters | 0 | 0 | | | | 0.50 | 0.00 | Roscoe | | | |
| TUCRT | TMS-08 | Tiara (Respironics) - Deluxe Chin Strap | 12 | 12 | | | | 9.95 | 119.40 | Respironics | | | |
| TUCRT | TMS-30345 | Tiara - Snapp X Direct Nasal Interface Mask | 0 | 0 | | | | 84.50 | 0.00 | | | | |
| TUCRT | TSB-10GLT | Tubing - 10 foot | 0 | 0 | | | | 3.95 | 0.00 | | | | |
| TUCRT | TSB-6GLT | Tubing, Standard 6 ft | 0 | 0 | | | | 2.95 | 0.00 | Roscoe | | | |
| TUCRT | TSB-8GLT | Tubing - 8 foot | 0 | 0 | | | | 3.95 | 0.00 | | | | |
| | | | | | | | | | **66,146.40** | | | | |

| Warehouse | Code | Description | Actual On-hand | | | | | | | | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ParcelPort | | | | | | | | | | | | |
| PP | 1002800 | Respironics - Deluxe Headgear | | | | | | | | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1003756 | | 135 | | | | | 17.50 | 2,362.50 | Respironics | | | |
| | 1003757 | | 27 | | | | | 17.50 | 472.50 | Respironics | | | |
| PP | 1004086 | Respironics - Profile Lite Nasal - Petite | 3 | | | | | 55.00 | 165.00 | Respironics | | | |
| PP | 1004087 | Respironics - Profile Lite Nasal - Small | 4 | | | | | 55.00 | 220.00 | Respironics | | | |
| PP | 1004088 | Respironics - Profile Lite Nasal - Medium/Small | 4 | | | | | 55.00 | 220.00 | Respironics | | | |
| PP | 1004089 | Respironics - Profile Lite Nasal - Medium | 2 | | | | | 55.00 | 110.00 | Respironics | | | |
| PP | 1004111 | Respironics - Profile Lite with headgear - Large | 1 | | | | | 55.00 | 55.00 | Respironics | | | |
| PP | 1004872 | Respironics - Comfort Full - Medium | 0 | | | | | 80.00 | - | Respironics | | | |
| PP | 1004880 | Respironics - Comfort Full - Small | 6 | | | | | 80.00 | 480.00 | Respironics | | | |
| PP | 1004950 | Respironics - Comfort Full - Large | 0 | | | | | 80.00 | - | Respironics | | | |
| PP | 1007919 | Respironics - Comfort Select Nasal - Medium | 16 | | | | | 50.00 | 800.00 | Respironics | | | |
| PP | 1007930 | Respironics Comfort Select Nasal - Small | 2 | | | | | 50.00 | 100.00 | Respironics | | | |
| PP | 1007931 | Respironics - Comfort Select Nasal - Small Wide | 1 | | | | | 50.00 | 50.00 | Respironics | | | |
| PP | 1007935 | Respironics - Comfort Select Nasal - Medium | 21 | | | | | 50.00 | 1,050.00 | Respironics | | | |
| PP | 1007936 | Respironics - Comfort Select Cushion - Small | 8 | | | | | 50.00 | 400.00 | Respironics | | | |
| PP | 1007937 | Respironics Comfort Select Nasal - Small Wide | 14 | | | | | 50.00 | 700.00 | Respironics | | | |
| PP | 1007963 | Respironics - Comfort Classic Nasal - Small | 4 | | | | | 30.00 | 120.00 | Respironics | | | |
| PP | 1007964 | Respironics - Comfort Classic Nasal - Med | 1 | | | | | 30.00 | 30.00 | Respironics | | | |
| | 1008619 | RemStar Water Chamber | 0 | | | | | 17.50 | - | | | | |
| PP | 1009040 | Respironics Comfort Gel mask and headgear - Petite | 23 | | | | | 55.00 | 1,265.00 | Respironics | | | |
| PP | 1009041 | Respironics Comfort Gel mask and headgear - Small | 77 | | | | | 55.00 | 4,235.00 | Respironics | | | |
| PP | 1009042 | Respironics Comfort Gel mask and headgear - Medium | 71 | | | | | 55.00 | 3,905.00 | Respironics | | | |
| PP | 1009043 | Respironics Comfort Gel mask and headgear - Large | 97 | | | | | 55.00 | 5,335.00 | Respironics | | | |
| PP | 1009048 | Respironics - Comfort Gel Cushion - Petite | 11 | | | | | 17.00 | 187.00 | Respironics | | | |
| PP | 1009049 | Respironics - Comfort Gel Cushion - Small | 6 | | | | | 17.00 | 102.00 | Respironics | | | |
| PP | 1009050 | Respironics - Comfort Gel Cushion - Med | 0 | | | | | 17.00 | - | Respironics | | | |
| PP | 1009051 | Respironics - Comfort Gel Cushion - LG | 10 | | | | | 17.00 | 170.00 | Respironics | | | |
| PP | 1012911 | Respironics - Premium Chin Strap | 26 | | | | | 10.00 | 260.00 | Respironics | | | |
| PP | 1019185 | Respironics - Comfort Curve | 1 | | | | | 95.00 | 95.00 | Respironics | | | |
| PP | 1021821 | Respironics - Comfort Lite II Cushion - Large | 8 | | | | | 18.00 | 144.00 | Respironics | | | |
| PP | 1021823 | Respironics - Comfort Lite II Cushion - Medium | 8 | | | | | 18.00 | 144.00 | Respironics | | | |
| PP | 1021830 | Respironics - Comfort Lite II Cushion - Small | 10 | | | | | 18.00 | 180.00 | Respironics | | | |
| PP | 1021835 | Respironics - Comfort Lite II Cushion - Petite | 5 | | | | | 18.00 | 90.00 | Respironics | | | |
| PP | 1029533 | Respironics - M-Series Replacement water chamber | 0 | | | | | 17.50 | - | Respironics | | | |
| | 1030493 | | 2 | | | | | 60.00 | 120.00 | Respironics | | | |
| PP | 1030494 | Respironics - Comfort Lite 2 - Small/Medium | 3 | | | | | 60.00 | 180.00 | Respironics | | | |
| PP | 1030495 | Respironics - Comfort Lite 2 - Medium/Large | 3 | | | | | 60.00 | 180.00 | Respironics | | | |
| PP | 1030502 | Respironics - Comfort Lite 2 - Petite | 0 | | | | | 60.00 | - | Respironics | | | |
| PP | 1030503 | Respironics - Comfort Lite II Pillow Repl. - Small | 7 | | | | | 14.00 | 98.00 | Respironics | | | |
| PP | 1030504 | Respironics - Comfort Lite II Pillow Repl. - Med | 4 | | | | | 14.00 | 56.00 | Respironics | | | |
| PP | 1030505 | Respironics - Comfort Lite II Pillow Repl. - Large | 5 | | | | | 14.00 | 70.00 | Respironics | | | |
| PP | 1031391 | Respironics - Comfort Gel Cushion - Petite | 6 | | | | | 22.00 | 132.00 | Respironics | | | |
| PP | 1031392 | Respironics - Comfort Gel Cushion - Small | 4 | | | | | 22.00 | 88.00 | Respironics | | | |
| PP | 1031403 | Respironics - Comfort Gel Cushion - Medium | 4 | | | | | 22.00 | 88.00 | Respironics | | | |
| PP | 1031404 | Respironics - Comfort Gel Cushion - Large | 10 | | | | | 22.00 | 220.00 | Respironics | | | |
| PP | 1032907 | Respironics-Performance Tubing ultralight | 11 | | | | | 6.00 | 66.00 | Respironics | | | |
| PP | 1035162 | Respironics - REMStar replacement water chamber | 8 | | | | | 11.81 | 94.48 | Respironics | | | |
| PP | 1036800 | Respironics - Optilife Nasal pillow Mask - Kit | 24 | | | | | 60.00 | 1,440.00 | Respironics | | | |
| PP | 1036801 | Respironics - Optilife Nasal pillow cradle cushion | 24 | | | | | 60.00 | 1,440.00 | Respironics | | | |
| PP | 1036802 | Respironics - Optilife Nasal pillow cradle cushion | 22 | | | | | 60.00 | 1,320.00 | Respironics | | | |
| PP | 1036838 | Respironics - Optilife Pillow- Pet | 4 | | | | | 14.00 | 56.00 | Respironics | | | |
| PP | 1036839 | Respironics - Optilife Pillow- Sm | 5 | | | | | 14.00 | 70.00 | Respironics | | | |
| PP | 1036840 | Respironics - Optilife Pillow- Med | 1 | | | | | 14.00 | 14.00 | Respironics | | | |
| PP | 1036841 | Respironics - Optilife Pillow- LG | 6 | | | | | 14.00 | 84.00 | Respironics | | | |
| PP | 1036846 | Respironics - Optilife Repl. Pillow - Petite | 5 | | | | | 33.25 | 166.25 | Respironics | | | |
| PP | 1036847 | Respironics - Optilife Repl. Pillow - Small | 4 | | | | | 38.00 | 152.00 | Respironics | | | |
| PP | 1036848 | Respironics - Optilife Repl. Pillow - Med | 5 | | | | | 38.00 | 190.00 | Respironics | | | |
| PP | 1036849 | Respironics - Optilife Repl. Pillow - Lrg | 5 | | | | | 38.00 | 190.00 | Respironics | | | |
| PP | 1040135 | Respironics Comfort Gel mask and headgear - Small | 5 | | | | | 90.00 | 450.00 | Respironics | | | |
| PP | 1040136 | Respironics Comfort Gel mask and headgear - Medium | | | | | | 90.00 | 470.00 | Respironics | | | |
| PP | 1040768 | Respironics - Comfort Fusion Sm/Med Mask Kit | 48 | | | | | 50.00 | 2,400.00 | Respironics | | | |
| PP | 1040840 | Respironics - Comfort Fusion Cushion & Ring - Small | | | | | | | | Respironics | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PP | 1040841 | Respironics - Comfort Fusion Cushion & Ring - Med | 10 | | | | | 50.00 | 500.00 | Respironics | | | |
| PP | 14987 | ResMed - TUBING, CLEAR-GRAY RIBBED | 9 | | | | | 4.95 | 44.55 | ResMed | | | |
| PP | 16015 | | 4 | | | | | 9.00 | 36.00 | ResMed | | | |
| PP | 16333 | ResMed - Mirage Micro - Small | 1 | | | | | 60.00 | 60.00 | ResMed | | | |
| PP | 16334 | ResMed - Mirage Micro - Med and Large | 0 | | | | | 60.00 | - | ResMed | | | |
| PP | 16335 | ResMed - Mirage Micro - Large / Wide | 4 | | | | | 60.00 | 240.00 | ResMed | | | |
| PP | 16388 | ResMed - Mirage Micro Cush - SM | 2 | | | | | 19.00 | 38.00 | ResMed | | | |
| PP | 16389 | ResMed - Mirage Micro Cush - Med | 12 | | | | | 19.00 | 228.00 | ResMed | | | |
| PP | 16390 | ResMed - Mirage Micro Cush - Lrg | 12 | | | | | 19.00 | 228.00 | ResMed | | | |
| PP | 16391 | ResMed - Mirage Micro Cush - Lrg Wide | 3 | | | | | 19.00 | 57.00 | ResMed | | | |
| PP | 16392 | ResMed - Mirage Micro Cush - Extra Lrg Wide | 3 | | | | | 19.00 | 57.00 | ResMed | | | |
| PP | 16548 | ResMed - Ultra Mirage II Nasal Mask - Standard | 0 | | | | | 55.00 | - | ResMed | | | |
| PP | 16549 | ResMed - Ultra Mirage II Nasal Mask - Large | 0 | | | | | 55.00 | - | ResMed | | | |
| PP | 16550 | ResMed - Ultra Mirage II Nasal Mask - Shallow | 1 | | | | | 55.00 | 55.00 | ResMed | | | |
| PP | 16556 | ResMed - UM II Nasal Cushion - Standard | 9 | | | | | 16.00 | 144.00 | ResMed | | | |
| PP | 16557 | ResMed - UM II Nasal Cushion - Large | 8 | | | | | 16.00 | 128.00 | ResMed | | | |
| PP | 16558 | ResMed - UM II Nasal Cushion - Shallow | 5 | | | | | 16.00 | 80.00 | ResMed | | | |
| PP | 16577 | ResMed - Ultra Mirage II Nasal Mask - Shallow Wide | 1 | | | | | 55.00 | 55.00 | ResMed | | | |
| PP | 16604 | ResMed - Ult Mirage FF Cushion-Small Std | 3 | | | | | 28.00 | 84.00 | ResMed | | | |
| PP | 16605 | ResMed - Ult Mirage FF Cushion-Medium Std | 5 | | | | | 28.00 | 140.00 | ResMed | | | |
| PP | 16606 | ResMed - Ult Mirage FF Cushion-Large Std | 4 | | | | | 28.00 | 112.00 | ResMed | | | |
| PP | 16672 | ResMed - Ult Mirage FF Cushion-Med Shallow | 4 | | | | | 28.00 | 112.00 | ResMed | | | |
| PP | 16673 | ResMed - Ult Mirage FF Cushion-Large Shallow | 3 | | | | | 28.00 | 84.00 | ResMed | | | |
| PP | 16735 | ResMed - Ult Mirage FF Cushion-Shallow Wide | 5 | | | | | 28.00 | 140.00 | ResMed | | | |
| PP | 26926 | | 60 | | | | | - | - | | | | |
| PP | 26952 | | 0 | | | | | 14.00 | - | ResMed | | | |
| PP | 26959 | ResMed - H4i Upgrade Water Chamber Kit | 0 | | | | | 15.00 | - | ResMed | | | |
| PP | 302218 | Respironics - Contour Nasal - Large | 1 | | | | | 37.00 | 37.00 | Respironics | | | |
| PP | 302328 | Respironics - Simple Chin Strap | 0 | | | | | 9.00 | - | Respironics | | | |
| PP | 302425 | Respironics - Deluxe Chin Strap | 5 | | | | | 19.00 | 95.00 | Respironics | | | |
| PP | 30951 | ResMed - H2i replacement water chamber | 0 | | | | | 22.50 | - | ResMed | | | |
| PP | 33957 | ResMed - H3i replacement water chamber | 102 | | | | | 22.50 | 2,295.00 | ResMed | | | |
| PP | 33963 | ResMed - Tubing Wrap | 1 | | | | | 5.85 | 5.85 | ResMed | | | |
| PP | 34901 | ResMed - C-Series Water Chamber | 2 | | | | | 8.99 | 17.98 | ResMed | | | |
| PP | 400HC103 | Fisher & Paykel - Lrg Cushion for HC431A | 0 | | | | | 14.00 | - | Fisher & Paykel | | | |
| PP | 400HC104 | Fisher & Paykel - Med Cushion for HC431A | 1 | | | | | 14.00 | 14.00 | Fisher & Paykel | | | |
| PP | 400HC112 | Fisher & Paykel - Small Cushion for HC431A | 1 | | | | | 14.00 | 14.00 | Fisher & Paykel | | | |
| PP | 400HC113 | Fisher & Paykel - Small Cushion for HC432AS | 10 | | | | | 14.00 | 140.00 | Fisher & Paykel | | | |
| PP | 400HC114 | Fisher & Paykel - Med Cushion for HC432AM | 11 | | | | | 14.00 | 154.00 | Fisher & Paykel | | | |
| PP | 400HC115 | Fisher & Paykel - Lrg Cushion for HC432AL | 9 | | | | | 14.00 | 126.00 | Fisher & Paykel | | | |
| PP | 400HC116 | Fisher & Paykel - Opus HC482 Repl. Pillow - Sm | 6 | | | | | 11.00 | 66.00 | Fisher & Paykel | | | |
| PP | 400HC117 | Fisher & Paykel - Opus HC482 Repl. Pillow - Med | 4 | | | | | 11.00 | 44.00 | Fisher & Paykel | | | |
| PP | 400HC118 | Fisher & Paykel - Opus HC482 Repl. Pillow - Lrg | 10 | | | | | 11.00 | 110.00 | Fisher & Paykel | | | |
| PP | 400HC501 | Fisher & Paykel- Cushion/Seal for HC407 - 1 size | 2 | | | | | 14.00 | 28.00 | Fisher & Paykel | | | |
| PP | 400HC509 | Fisher & Paykel- Cushion/Seal for HC406 - 1 size | 5 | | | | | 14.00 | 70.00 | Fisher & Paykel | | | |
| PP | 60000 | ResMed - Mirage Vista - Standard nasal | 0 | | | | | 59.00 | - | ResMed | | | |
| PP | 60001 | ResMed - Mirage Vista - nasal | 3 | | | | | 59.00 | 177.00 | ResMed | | | |
| PP | 60100 | ResMed - Mirage Activa - Standard nasal | 0 | | | | | 65.00 | - | ResMed | | | |
| PP | 60101 | ResMed - Mirage Activa - Large nasal | 0 | | | | | 65.00 | - | ResMed | | | |
| PP | 60102 | ResMed - Mirage Activa - Shallow nasal | 2 | | | | | 65.00 | 130.00 | ResMed | | | |
| PP | 60117 | ResMed Activa replacement cushion - Standard | 6 | | | | | 19.00 | 114.00 | ResMed | | | |
| PP | 60118 | ResMed Activa replacement cushion - Large | 17 | | | | | 19.00 | 323.00 | ResMed | | | |
| PP | 60119 | ResMed Activa replacement cushion - Shallow | 6 | | | | | 19.00 | 114.00 | ResMed | | | |
| PP | 60149 | | 1 | | | | | 49.95 | 49.95 | ResMed | | | |
| PP | 60512 | ResMed - Swift II Nasal pillow Mask - Kit | 1 | | | | | 74.00 | 74.00 | ResMed | | | |
| PP | 60520 | ResMed - Swift Pillow sleeve - Small | 0 | | | | | 14.00 | - | ResMed | | | |
| PP | 60521 | ResMed - Swift Pillow sleeve - Medium | 0 | | | | | 14.00 | - | ResMed | | | |
| PP | 60522 | ResMed - Swift Pillow sleeve - Large | 0 | | | | | 14.00 | - | ResMed | | | |
| PP | 60541 | ResMed - Swift 2 Pillow sleeve - Small | 3 | | | | | 14.00 | 42.00 | ResMed | | | |
| PP | 60542 | ResMed - Swift 2 Pillow sleeve - Medium | 0 | | | | | 14.00 | - | ResMed | | | |
| PP | 60560 | ResMed - Swift LT Nasal Pillow System | 0 | | | | | 65.00 | - | ResMed | | | |
| PP | 60571 | ResMed - Swift LT Pillow sleeve - Small | 3 | | | | | 14.00 | | ResMed | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 60572 | ResMed - Swift LT Pillow sleeve - Med | 1 | | | | | 12.00 | 12.00 | ResMed | | | |
| | 60573 | ResMed - Swift LT Pillow sleeve - Lrge | 5 | | | | | 12.00 | 60.00 | ResMed | | | |
| | 60588 | | 0 | | | | | 65.00 | - | ResMed | | | |
| PP | 60600 | ResMed - Ultra Mirage Full - Small Standard | 1 | | | | | 105.00 | 105.00 | ResMed | | | |
| PP | 60601 | ResMed - Ultra Mirage Full - Small Shallow | 4 | | | | | 105.00 | 420.00 | ResMed | | | |
| PP | 60602 | ResMed - Ultra Mirage Full - Medium Standard | 2 | | | | | 105.00 | 210.00 | ResMed | | | |
| PP | 60603 | ResMed - Ultra Mirage Full - Medium Shallow | 1 | | | | | 105.00 | 105.00 | ResMed | | | |
| PP | 60604 | ResMed - Ultra Mirage Full - Large Standard | 2 | | | | | 105.00 | 210.00 | ResMed | | | |
| PP | 60605 | ResMed - Ultra Mirage Full - Large Shallow | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 60922 | ResMed - Vista Deep, Cushion only | 4 | | | | | 14.00 | 56.00 | ResMed | | | |
| PP | 61200 | ResMed - Quattro Full Face- X-Small | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61201 | ResMed - Quattro Full Face- Small | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61202 | ResMed - Quattro Full Face- Medium | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61203 | ResMed - Quattro Full Face- Large | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61290 | ResMed - Quattro FF Cushion - X-Small | 19 | | | | | 32.00 | 608.00 | ResMed | | | |
| PP | 61291 | ResMed - Quattro FF Cushion - Small | 61 | | | | | 32.00 | 1,952.00 | ResMed | | | |
| PP | 61292 | ResMed - Quattro FF Cushion - Medium | 23 | | | | | 32.00 | 736.00 | ResMed | | | |
| PP | 61293 | ResMed - Quattro FF Cushion - Large | 55 | | | | | 32.00 | 1,760.00 | ResMed | | | |
| PP | 61300 | ResMed - Liberty Full Face - Small | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61301 | ResMed - Liberty Full Face - Large | 0 | | | | | 105.00 | - | ResMed | | | |
| PP | 61330 | ResMed - Liberty Mouth Cushion - Small | 11 | | | | | 21.00 | 231.00 | ResMed | | | |
| PP | 61331 | ResMed - Liberty Mouth Cushion - Large | 7 | | | | | 21.00 | 147.00 | ResMed | | | |
| PP | 61333 | ResMed - Liberty Pillows - Small | 10 | | | | | 8.00 | 80.00 | ResMed | | | |
| PP | 61334 | ResMed - Liberty Pillows - Medium | 5 | | | | | 8.00 | 40.00 | ResMed | | | |
| PP | 61335 | ResMed - Liberty Pillows - Large | 8 | | | | | 8.00 | 64.00 | ResMed | | | |
| PP | 622038 | | 0 | | | | | 3.60 | | | | | |
| PP | 900HC228 | | 4 | | | | | 1.25 | 5.00 | Fisher & Paykel | | | |
| PP | 900HC240 | | 98 | | | | | 1.25 | 122.50 | Fisher & Paykel | | | |
| PP | 900HC427 | Fisher & Paykel - HC405A foam & seal cushion - Sm | 0 | | | | | 14.00 | - | Fisher & Paykel | | | |
| PP | 900HC428 | Fisher & Paykel - HC405A foam & seal cushion - Lg | 0 | | | | | 14.00 | - | Fisher & Paykel | | | |
| PP | 900HC439 | | 4 | | | | | - | - | | | | |
| PP | 900HC522 | | 4 | | | | | 35.00 | 140.00 | Fisher & Paykel | | | |
| PP | HC300 | Fisher & Paykel - HC300 water chamber | 1 | | | | | 30.00 | 30.00 | Fisher & Paykel | | | |
| PP | HC325 | Fisher & Paykel - HC325 water chamber | 16 | | | | | 30.00 | 480.00 | Fisher & Paykel | | | |
| PP | HC365S | Fisher & Paykel - HC365 water chamber | 8 | | | | | 8.00 | 64.00 | Fisher & Paykel | | | |
| PP | HC385S | Fisher & Paykel - HC385 water chamber | 7 | | | | | 8.00 | 56.00 | Fisher & Paykel | | | |
| PP | HC401A | Fisher & Paykel - Acclaim II Nasal Mask | 1 | | | | | 30.00 | 30.00 | Fisher & Paykel | | | |
| PP | HC405A | Fisher & Paykel - Nasal Mask Standard size HC405A | 0 | | | | | 30.00 | - | Fisher & Paykel | | | |
| PP | HC406A | Fisher & Paykel - Nasal Mask Petite Size HC406A | 6 | | | | | 55.00 | 330.00 | Fisher & Paykel | | | |
| PP | HC407A | Fisher & Paykel - Nasal Mask Standard size HC407A | 50 | | | | | 55.00 | 2,750.00 | Fisher & Paykel | | | |
| PP | HC431A | Fisher & Paykel - Full face mask HC431A | 5 | | | | | 85.00 | 425.00 | Fisher & Paykel | | | |
| PP | HC432AL | Fisher & Paykel - Full face mask HC432 - Lrg | 1 | | | | | 85.00 | 85.00 | Fisher & Paykel | | | |
| PP | HC432AM | Fisher & Paykel - Full face mask HC432 - Med | 3 | | | | | 85.00 | 255.00 | Fisher & Paykel | | | |
| PP | HC432AS | Fisher & Paykel - Full face mask HC432 - Small | 1 | | | | | 85.00 | 85.00 | Fisher & Paykel | | | |
| PP | HC452A | Fisher & Paykel - Oracle Oral appliance | 2 | | | | | 85.00 | 170.00 | Fisher & Paykel | | | |
| PP | HC482A | Fisher & Paykel - Opus Nasal Pillows Mask | 15 | | | | | 55.00 | 825.00 | Fisher & Paykel | | | |
| PP | HYB500 | Innomed Hybrid Nasal Pillow/Oral Mask | 0 | | | | | 125.00 | - | Fisher & Paykel | | | |
| PP | K2LG | InnoMed - Nasal Aire II - Nasal Pillows Mask- LG | 4 | | | | | - | - | | | | |
| PP | K2MP | InnoMed - Nasal - Aire II - Nasal Pillows- Med | 0 | | | | | - | - | | | | |
| PP | K2SM | InnoMed - Nasal - Aire II - Nasal Pillows- SM | 1 | | | | | - | - | | | | |
| PP | TCF-142 | Respironics - Solo/Virtuoso Ultrafine filters-Disp | 4 | | | | | 0.42 | 1.68 | Roscoe | | | |
| PP | TCF-145 | Respironics - Remstar-Ultra fine filters Disp | 144 | | | | | 1.25 | 180.00 | Roscoe | | | |
| PP | TCF-147 | Respironics - BiPap Pro/Plus Ultrafine filter-Disp | 9 | | | | | 1.29 | 11.61 | Roscoe | | | |
| PP | TCF-149 | Respironics - M-series Ultra fine filters Disp. | 1478 | | | | | 0.34 | 502.52 | Roscoe | | | |
| PP | TCF-176 | NPB - 420g disposable filter | 16 | | | | | 2.50 | 40.00 | Roscoe | | | |
| PP | TCF-242 | Respironics - Solo/Virtuoso/Aria Non-Disposable F | 35 | | | | | 2.39 | 83.65 | Roscoe | | | |
| PP | TCF-245 | Respironics - RemStar Pollen Non Disposable Filter | 297 | | | | | 0.88 | 261.36 | Roscoe | | | |
| PP | TCF-247 | Respironics - BiPap Pro w/Bi Flex- Non Disposable | 11 | | | | | 2.89 | 31.79 | Roscoe | | | |
| PP | TCF-249 | Respironics - M- Series Non Disposable Filter | 2195 | | | | | 0.63 | 1,382.85 | Roscoe | | | |
| PP | TCF-276 | NPB - 420g Foam filter Non Disposable | 8 | | | | | 0.90 | 7.20 | Roscoe | | | |
| PP | TCF-161 | | 8 | | | | | 0.59 | | Roscoe | | | |
| PP | TCF-510 | ResMed - S7 filters | 80 | | | | | 0.50 | 40.00 | Roscoe | | | |
| PP | TCF-511 | ResMed - S8 filters | | | | | | 0.50 | | Roscoe | | | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PP | TMS-08 | Tiara (Respironics) - Deluxe Chin Strap | 2 | | | | | 9.95 | 19.90 | Roscoe | | | |
| PP | TMS-30345 | Tiara - Snapp X Direct Nasal Interface Mask | 3 | | | | | 84.50 | 253.50 | Roscoe | | | |
| PP | TSB-10GLT | Tubing - 10 foot | 20 | | | | | 3.95 | 79.00 | Roscoe | | | |
| PP | TSB-2GLT | Tubing - 2 foot | 0 | | | | | 2.95 | - | Roscoe | | | |
| PP | TSB-6GLT | Tubing, Standard 6 ft | 671 | | | | | 2.95 | 1,979.45 | Roscoe | | | |
| PP | TSB-8GLT | Tubing - 8 foot | 19 | | | | | 3.95 | 75.05 | Roscoe | | | |
| PP | Y-101400-00 | NPB - Breeze Nasal pillow apparatus | 9 | | | | | 75.00 | 675.00 | Other | | | |
| PP | Y-261000-27 | | 0 | | | | | | | | | | |
| | | | | | | | | | **61,919.90** | | | | |

**Texas**

| Warehouse | Code | Description | Actual On-hand | Richardson | Richardson Value | Arlington | Arlington Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|
| | **100200C** | Respironics-Modem | | | - | | - | 120.00 | 0.0 |
| | 100200W | Respironics-Modem | | | - | | - | 30.00 | 0.0 |
| | 100200D | Respironics-Modem | | 0 | - | | - | 30.00 | 0.0 |
| TXRT | 1002064 | Respironics Softcap Headgear Med | 0 | 0 | - | 0 | - | 22.47 | 0.0 Respironics |
| TXRT | 1002065 | Respironics Softcap Headgear Large | 0 | 0 | - | 0 | - | - | 0.0 Respironics |
| TXRT | 1002757 | Respironics Simplicity Nasal - Small | 0 | 0 | - | 0 | - | 65.00 | 0.0 Respironics |
| TXRT | 1002759 | Respironics - Simplicity Nasal - Medium | 0 | 0 | - | 0 | - | 65.00 | 0.0 Respironics |
| TXRT | 1002800 | Respironics - Deluxe Headgear | 0 | 0 | - | 0 | - | 9.00 | 0.0 Respironics |
| TXRT | 1003756 | | 3 | | - | 3 | 52.50 | 17.50 | 52.5 |
| TXRT | 1003757 | | 2 | 2 | 35.00 | 0 | - | 17.50 | 35.0 Respironics |
| TXRT | 1004086 | Respironics - Profile Lite Nasal - Petite | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1004087 | Respironics - Profile Lite Nasal - Small | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1004088 | Respironics - Profile Lite Nasal - Medium/Small | 4 | 4 | 220.00 | 0 | - | 55.00 | 220.0 Respironics |
| TXRT | 1004089 | Respironics - Profile Lite Nasal - Medium | 1 | 1 | 55.00 | 0 | - | 55.00 | 55.0 Respironics |
| TXRT | 1004110 | Respironics - Profilr Lite Nasal - Medium Wide | 3 | 3 | 165.00 | 0 | - | 55.00 | 165.0 Respironics |
| TXRT | 1004111 | Respironics - Profile Lite with headgear - Large | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1004112 | Respironics - Profile Lite W/O headgear - Lg Narro | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1004872 | Respironics - Comfort Full - Medium | 5 | 1 | 80.00 | 4 | 320.00 | 80.00 | 400.0 Respironics |
| TXRT | 1004880 | Respironics - Comfort Full - Small | 7 | 2 | 160.00 | 5 | 400.00 | 80.00 | 560.0 Respironics |
| TXRT | 1004950 | Respironics - Comfort Full - Large | 6 | 1 | 80.00 | 5 | 400.00 | 80.00 | 480.0 Respironics |
| TXRT | 1005792 | Respironics - REMstar Heated Humidifier | 0 | 0 | - | 0 | - | - | 0.0 Respironics |
| TXRT | 1005960 | Respironics - REMstar plus | 0 | 0 | - | 0 | - | - | 0.0 Respironics |
| TXRT | 1007919 | Respironics - Comfort Select Nasal - Medium | 13 | 8 | 400.00 | 5 | 250.00 | 50.00 | 650.0 Respironics |
| TXRT | 1007930 | Respironics Comfort Select Nasal - Small | 9 | 2 | 100.00 | 7 | 350.00 | 50.00 | 450.0 Respironics |
| TXRT | 1007931 | Respironics Comfort Select Nasal - Small Wide | 0 | 0 | - | 0 | - | 50.00 | 0.0 Respironics |
| TXRT | 1007936 | Respironics Comfort Select Cushion - Small | 0 | 0 | - | 0 | - | 50.00 | 0.0 Respironics |
| TXRT | 1007963 | Respironics - Comfort Classic Nasal - Small | 0 | 0 | - | 0 | - | 30.00 | 0.0 Respironics |
| TXRT | 1007964 | Respironics - Comfort Classic Nasal - Med | 0 | 0 | - | 0 | - | 30.00 | 0.0 Respironics |
| TXRT | 1009040 | Respironics Comfort Gel mask and headgear - Petite | 4 | 4 | 220.00 | 0 | - | 55.00 | 220.0 Respironics |
| TXRT | 1009041 | Respironics Comfort Gel mask and headgear - Small | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1009042 | Respironics Comfort Gel mask and headgear - Medium | 1 | 1 | 55.00 | 0 | - | 55.00 | 55.0 Respironics |
| TXRT | 1009043 | Respironics Comfort Gel mask and headgear - Large | 4 | 4 | 220.00 | 0 | - | 55.00 | 220.0 Respironics |
| TXRT | 1009048 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | - | 0 | - | 17.00 | 0.0 Respironics |
| TXRT | 1009049 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | - | 0 | - | 17.00 | 0.0 Respironics |
| TXRT | 1009050 | Respironics - Comfort Gel Cushion - Med | 0 | 0 | - | 0 | - | 17.00 | 0.0 Respironics |
| TXRT | 1009051 | Respironics - Comfort Gel Cushion - LG | 0 | 0 | - | 0 | - | 17.00 | 0.0 Respironics |
| TXRT | 1010641 | Respironics Comfort Gel MASK ONLY - Large | 0 | 0 | - | 0 | - | 55.00 | 0.0 Respironics |
| TXRT | 1012911 | Respironics - Premium Chin Strap | 31 | 22 | 220.00 | 9 | 90.00 | 10.00 | 310.0 Respironics |
| TXRT | 1017442 | Respironics - RemStar BiPAP Auto Core package | 0 | 0 | - | 0 | - | - | 0.0 Respironics |
| TXRT | 1019185 | Respironics Comfort Curve | 0 | 0 | - | 0 | - | 95.00 | 0.0 Respironics |
| TXRT | 1021821 | Respironics - Comfort Lite II Cushion - Large | 0 | 0 | - | 0 | - | 18.00 | 0.0 Respironics |
| TXRT | 1021823 | Respironics - Comfort Lite II Cushion - Medium | 0 | 0 | - | 0 | - | 18.00 | 0.0 Respironics |
| TXRT | 1021830 | Respironics - Comfort Lite II Cushion - Small | 0 | 0 | - | 0 | - | 18.00 | 0.0 Respironics |
| TXRT | 1022334 | Respironics - M-Series Heated Humidifier | 0 | 0 | - | 0 | - | - | 0.0 Respironics |
| TXRT | 1029331 | Respironics - M-series Ultra fine filters Disp. | 0 | 0 | - | 0 | - | 5.00 | 0.0 Respironics |
| TXRT | 1029533 | Respironics - M-Series Replacement water chamber | 8 | 7 | 122.50 | 1 | 17.50 | 17.50 | 140.0 Respironics |
| TXRT | 1030494 | Respironics - Comfort Lite 2 - Small/Medium | 1 | 1 | 60.00 | 0 | - | 60.00 | 60.0 Respironics |
| TXRT | 1030495 | Respironics - Comfort Lite 2 - Medium/Large | 4 | 0 | - | 4 | 240.00 | 60.00 | 240.0 Respironics |
| TXRT | 1030503 | Respironics - Comfort Lite II Pillow Repl. - Small | 0 | 0 | - | 0 | - | 14.00 | 0.0 Respironics |
| TXRT | 1030504 | Respironics - Comfort Lite II Pillow Repl. - Med | 0 | 0 | - | 0 | - | 14.00 | 0.0 Respironics |
| TXRT | 1030505 | Respironics - Comfort Lite II Pillow Repl. - Large | 0 | 0 | - | 0 | - | 14.00 | 0.0 Respironics |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TXRT | 1031391 | Respironics - Comfort Gel Cushion - Petite | 0 | 0 | - | 0 | - | | | 22.00 | | 0.0 | Respironics |
| TXRT | 1032907 | Respironics-Performance Tubing ultralight | 0 | 0 | | 0 | | | | 6.00 | | 0.0 | Respironics |
| TXRT | 1033678 | Respironics - Premium Headgear | 0 | 0 | | 0 | | | | 12.00 | | 0.0 | Respironics |
| TXRT | 1035162 | Respironics - REMStar replacement water chamber | 0 | 0 | - | 0 | - | | | 11.81 | | 0.0 | Respironics |
| TXRT | 1036800 | Respironics - Optilife Nasal pillow Mask - Kit | 18 | 13 | 780.00 | 5 | 300.00 | | | 60.00 | | 1,080.0 | Respironics |
| TXRT | 1036838 | Respironics - Optilife Pillow- Pet | 0 | 0 | - | 0 | - | | | 14.00 | | 0.0 | Respironics |
| TXRT | 1036839 | Respironics - Optilife Pillow- Sm | 0 | 0 | - | 0 | - | | | 14.00 | | 0.0 | Respironics |
| TXRT | 1036840 | Respironics - Optilife Pillow- Med | 0 | 0 | - | 0 | - | | | 14.00 | | 0.0 | Respironics |
| TXRT | 1036841 | Respironics - Optilife Pillow- LG | 0 | 0 | - | 0 | - | | | 14.00 | | 0.0 | Respironics |
| | 1037688 | | 0 | 0 | - | 0 | - | | | 30.00 | | 0.0 | |
| | 1040135 | | 5 | 2 | 180.00 | 3 | 270.00 | | | 90.00 | | 450.0 | Respironics |
| | 1040137 | | 3 | 3 | 270.00 | 0 | - | | | 90.00 | | 270.0 | Respironics |
| | 1040768 | | 3 | 2 | 100.00 | 1 | 50.00 | | | 50.00 | | 150.0 | Respironics |
| | 1043237 | Respironics - SleepEasy with Humidifier | 2 | 0 | - | 2 | 410.00 | | | 205.00 | | 410.0 | Respironics |
| | 1049109 | | 0 | 0 | - | 0 | - | | | - | | 0.0 | |
| | 1050003 | Respironics - | 2 | 0 | - | 2 | 100.00 | | | 50.00 | | 100.0 | Respironics |
| | 1050004 | | 2 | 0 | - | 2 | 100.00 | | | 50.00 | | 100.0 | Respironics |
| | 1051158 | | 3 | 1 | - | 2 | - | | | - | | 0.0 | |
| | 1056215 | | 22 | 21 | - | 1 | - | | | - | | 0.0 | |
| | 16333 | | 10 | 4 | 240.00 | 6 | 360.00 | | | 60.00 | | 600.0 | ResMed |
| | 16334 | | 4 | 2 | 120.00 | 2 | 120.00 | | | 60.00 | | 240.0 | ResMed |
| | 16335 | | 9 | 2 | 120.00 | 7 | 420.00 | | | 60.00 | | 540.0 | ResMed |
| TXRT | 16548 | ResMed - Ultra Mirage II Nasal Mask - Standard | 6 | 1 | 55.00 | 5 | 275.00 | | | 55.00 | | 330.0 | ResMed |
| TXRT | 16549 | ResMed - Ultra Mirage II Nasal Mask - Large | 3 | 2 | 110.00 | 1 | 55.00 | | | 55.00 | | 165.0 | ResMed |
| TXRT | 16550 | ResMed - Ultra Mirage II Nasal Mask - Shallow | 3 | 3 | 165.00 | 0 | - | | | 55.00 | | 165.0 | ResMed |
| TXRT | 16557 | ResMed - UM II Nasal Cushion - Large | 0 | 0 | - | 0 | - | | | 16.00 | | 0.0 | ResMed |
| TXRT | 16577 | ResMed - Ultra Mirage II Nasal Mask - Shallow Wide | 0 | 0 | - | 0 | - | | | 55.00 | | 0.0 | ResMed |
| TXRT | 16605 | ResMed - Ult Mirage FF Cushion-Medium Std | 0 | 0 | - | 0 | - | | | 28.00 | | 0.0 | ResMed |
| TXRT | 24101 | ResMed VPAP III - Bilevel device | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 24111 | ResMed VPAP III - ST Bilevel device | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 24116 | ResMed VPAP III - ST-A Bilevel device | 0 | 0 | - | 0 | - | | | 1,950.00 | | 0.0 | ResMed |
| TXRT | 26008 | ResMed VPAP Adapt SV - Bilevel device | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 26201 | ResMed VPAP Malibu - Bilevel device | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 30001 | ResMed - S7 Autoset Spirit | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 30002 | ResMed - S7 Elite | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 30011 | ResMed - S7 Lightweight | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 302218 | Respironics - Contour Nasal - Large | 0 | 0 | - | 0 | - | | | 37.00 | | 0.0 | Respironics |
| TXRT | 302425 | Respironics - Deluxe Chin Strap | 0 | 0 | - | 0 | - | | | 19.00 | | 0.0 | Respironics |
| TXRT | 302465 | Respironics Softcap Headgear Small | 0 | 0 | - | 0 | - | | | - | | 0.0 | Respironics |
| TXRT | 30902 | ResMed Humidaire 2i heated humidifier | 2 | 2 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 30951 | ResMed - H2i replacement water chamber | 0 | 0 | - | 0 | - | | | 22.50 | | 0.0 | ResMed |
| TXRT | 33007 | ResMed - S8 Escape | 0 | 0 | - | 0 | - | | | 305.00 | | 0.0 | ResMed |
| TXRT | 33021 | ResMed - S8 Elite | 0 | 0 | - | 0 | - | | | 305.00 | | 0.0 | ResMed |
| TXRT | 33051 | ResMed - S8 Elite II | 0 | 0 | - | 0 | - | | | 305.00 | | 0.0 | ResMed |
| TXRT | 33112 | ResMed - S8 Autoset Vantage | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 33906 | ResMed Humidaire 3i heated humidifier | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |
| TXRT | 33957 | ResMed - H3i replacement water chamber | 4 | 4 | 90.00 | 0 | - | | | 22.50 | | 90.0 | ResMed |
| TXRT | 34000 | C-Series Tango | 0 | 0 | - | 0 | - | | | 480.00 | | 0.0 | |
| TXRT | 34900 | C-Series Humid | 0 | 0 | - | 0 | - | | | - | | 0.0 | |
| TXRT | 36005 | ResMed - S9 Auto Set | 1 | 1 | 550.00 | 0 | - | | | 550.00 | | 550.0 | ResMed |
| TXRT | 400HC501 | Fisher & Paykel- Cushion/Seal for HC407 - 1 size | 0 | 0 | - | 0 | - | | | 14.00 | | 0.0 | Fisher & Paykel |
| TXRT | 60000 | ResMed - Mirage Vista - Standard nasal | 8 | 5 | 295.00 | 3 | 177.00 | | | 59.00 | | 472.0 | ResMed |
| TXRT | 60001 | ResMed - Mirage Vista - nasal | 5 | 3 | 177.00 | 2 | 118.00 | | | 59.00 | | 295.0 | ResMed |
| TXRT | 60100 | ResMed - Mirage Activa - Standard nasal | 7 | 7 | 455.00 | 0 | - | | | 65.00 | | 455.0 | ResMed |
| TXRT | 60101 | ResMed - Mirage Activa - Large nasal | 0 | 0 | - | 0 | - | | | 65.00 | | 0.0 | ResMed |
| TXRT | 60102 | ResMed - Mirage Activa - Shallow nasal | 7 | 7 | 455.00 | 0 | - | | | 65.00 | | 455.0 | ResMed |
| TXRT | 60117 | ResMed Activa replacement cushion - Standard | 0 | 0 | - | 0 | - | | | 19.00 | | 0.0 | ResMed |
| TXRT | 60118 | ResMed Activa replacement cushion - Large | 0 | 0 | - | 0 | - | | | 19.00 | | 0.0 | ResMed |
| TXRT | 60119 | ResMed Activa replacement cushion - Shallow | 0 | 0 | - | 0 | - | | | 19.00 | | 0.0 | ResMed |
| TXRT | 60148 | | 4 | 0 | - | 4 | 180.00 | | | 49.05 | | 180.0 | ResMed |
| TXRT | 60148 | | 9 | | | | | | | | | | ResMed |
| TXRT | 60512 | ResMed - Swift II Nasal pillow Mask - Kit | 12 | 9 | 666.00 | 3 | 222.00 | | | 74.00 | | 888.0 | ResMed |
| TXRT | 60520 | ResMed - Swift Pillow sleeve - Small | 0 | 0 | - | 0 | - | | | - | | 0.0 | ResMed |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TXRT | 60521 | ResMed - Swift Pillow sleeve - Medium | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 60522 | ResMed - Swift Pillow sleeve - Large | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 60541 | ResMed - Swift 2 Pillow sleeve - Small | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 60542 | ResMed - Swift 2 Pillow sleeve - Medium | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 60543 | ResMed - Swift 2 Pillow sleeve - Large | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 60560 | ResMed - Swift LT Nasal Pillow Mask - Kit | 4 | 0 | - | 4 | 260.00 | | | 65.00 | 260.0 | ResMed | |
| TXRT | 60588 | | 1 | 1 | 65.00 | 0 | - | | | 65.00 | 65.0 | ResMed | |
| TXRT | 60600 | ResMed - Ultra Mirage Full - Small Standard | 6 | 6 | 630.00 | 0 | - | | | 105.00 | 630.0 | ResMed | |
| TXRT | 60601 | ResMed - Ultra Mirage Full - Small Shallow | 2 | 2 | 210.00 | 0 | - | | | 105.00 | 210.0 | ResMed | |
| TXRT | 60602 | ResMed - Ultra Mirage Full - Medium Standard | 10 | 6 | 630.00 | 4 | 420.00 | | | 105.00 | 1,050.0 | ResMed | |
| TXRT | 60603 | ResMed - Ultra Mirage Full - Medium Shallow | 1 | 1 | 105.00 | 0 | - | | | 105.00 | 105.0 | ResMed | |
| TXRT | 60604 | ResMed - Ultra Mirage Full - Large Standard | 6 | 6 | 630.00 | 0 | - | | | 105.00 | 630.0 | ResMed | |
| TXRT | 60605 | ResMed - Ultra Mirage Full - Large Shallow | 1 | 1 | 105.00 | 0 | - | | | 105.00 | 105.0 | ResMed | |
| TXRT | 60922 | ResMed - Vista Deep, Cushion only | 0 | 0 | - | 0 | - | | | 14.00 | 0.0 | ResMed | |
| TXRT | 61010 | ResMed - Kidsta Nasal Mask | 2 | 2 | 118.00 | 0 | - | | | 59.00 | 118.0 | ResMed | |
| TXRT | 61200 | ResMed - Quattro Full Face- X-Small | 1 | 1 | 105.00 | 0 | - | | | 105.00 | 105.0 | ResMed | |
| TXRT | 61201 | ResMed - Quattro Full Face- Small | 9 | 5 | 525.00 | 4 | 420.00 | | | 105.00 | 945.0 | ResMed | |
| TXRT | 61202 | ResMed - Quattro Full Face- Medium | 4 | 2 | 210.00 | 2 | 210.00 | | | 105.00 | 420.0 | ResMed | |
| TXRT | 61203 | ResMed - Quattro Full Face- Large | 3 | 2 | 210.00 | 1 | 105.00 | | | 105.00 | 315.0 | ResMed | |
| TXRT | 61290 | ResMed - Quattro FF Cushion - X-Small | 0 | 0 | - | 0 | - | | | 32.00 | 0.0 | ResMed | |
| TXRT | 61291 | ResMed - Quattro FF Cushion - Small | 0 | 0 | - | 0 | - | | | 32.00 | 0.0 | ResMed | |
| TXRT | 61292 | ResMed - Quattro FF Cushion - Medium | 0 | 0 | - | 0 | - | | | 32.00 | 0.0 | ResMed | |
| TXRT | 61293 | ResMed - Quattro FF Cushion - Large | 0 | 0 | - | 0 | - | | | 32.00 | 0.0 | ResMed | |
| TXRT | 61300 | ResMed - Liberty Full Face - Small | 10 | 4 | 420.00 | 6 | 630.00 | | | 105.00 | 1,050.0 | ResMed | |
| TXRT | 61301 | ResMed - Liberty Full Face - Large | 7 | 4 | 420.00 | 3 | 315.00 | | | 105.00 | 735.0 | ResMed | |
| TXRT | 61333 | ResMed - Liberty Pillows - Small | 0 | 0 | - | 0 | - | | | 8.00 | 0.0 | ResMed | |
| TXRT | 61334 | ResMed - Liberty Pillows - Medium | 0 | 0 | - | 0 | - | | | 8.00 | 0.0 | ResMed | |
| TXRT | 61335 | ResMed - Liberty Pillows - Large | 0 | 0 | - | 0 | - | | | 8.00 | 0.0 | ResMed | |
| TXRT | 61500 | | 2 | 2 | 150.00 | 0 | - | | | 75.00 | 150.0 | ResMed | |
| TXRT | 622038 | Respironics - Tubing, 6 ft, Standard Grey | 0 | 0 | - | 0 | - | | | 3.60 | 0.0 | Respironics | |
| TXRT | DS100 | Respironics - M-Series Core Package | 0 | 0 | - | 0 | - | | | 260.00 | 0.0 | Respironics | |
| TXRT | DS200 | Respironics - M-Series Core Package with Flex | 0 | 0 | - | 0 | - | | | 325.00 | 0.0 | Respironics | |
| TXRT | DS100HS | Respironics - | 0 | 0 | - | 0 | - | | | 292.30 | 0.0 | Respironics | |
| TXRT | DS200HS | Respironics - | 0 | 0 | - | 0 | - | | | 307.00 | 0.0 | Respironics | |
| TXRT | DS400HS | Respironics - | 0 | 0 | - | 0 | - | | | 399.00 | 0.0 | Respironics | |
| TXRT | DS150HS | Respironics - | 6 | 3 | 867.00 | 3 | 867.00 | | | 289.00 | 1,734.0 | Respironics | |
| TXRT | DS250HS | Respironics - | 14 | 5 | 1,625.00 | 9 | 2,925.00 | | | 325.00 | 4,550.0 | Respironics | |
| TXRT | DS450HS | Respironics - | 15 | 11 | 4,345.00 | 4 | 1,580.00 | | | 395.00 | 5,925.0 | Respironics | |
| TXRT | DS550HS | Respironics - | 2 | 1 | 470.00 | 1 | 470.00 | | | 470.00 | 940.0 | Respironics | |
| TXRT | DS500S | Respironics - M-Series Auto w/Flex | 0 | 0 | - | 0 | - | | | 520.00 | 0.0 | Respironics | |
| TXRT | DS510HS | Respironics - M-Series Auto w/A Flex | 0 | 0 | - | 0 | - | | | 492.00 | 0.0 | Respironics | |
| TXRT | DS600H | Respironics - M-Series Auto w/A Flex | 2 | 1 | 1,010.00 | 1 | 1,010.00 | | | 1,010.00 | 2,020.0 | Respironics | |
| TXRT | DS700HS | Respironics - MSeries BiPAP Auto w/Bi-Flex Core pa | 0 | 0 | - | 0 | - | | | 915.00 | 0.0 | Respironics | |
| TXRT | DS750HS | Respironics - | 3 | 0 | - | 3 | 2,745.00 | | | 915.00 | 2,745.0 | Respironics | |
| TXRT | HC233 | Fisher & Paykel- CPAP | 0 | 0 | - | 0 | - | | | - | 0.0 | Fisher & Paykel | |
| TXRT | HC300 | Fisher & Paykel - HC300 water chamber | 0 | 0 | - | 0 | - | | | 30.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC325 | Fisher & Paykel - HC325 water chamber | 0 | 0 | - | 0 | - | | | 30.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC385S | Fisher & Paykel - HC385 water chamber | 0 | 0 | - | 0 | - | | | 8.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC401A | Fisher & Paykel - Acclaim II Nasal Mask | 0 | 0 | - | 0 | - | | | 30.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC405A | Fisher & Paykel - Nasal Mask Standard size HC405A | 6 | 2 | 60.00 | 4 | 120.00 | | | 30.00 | 180.0 | Fisher & Paykel | |
| TXRT | HC406A | Fisher & Paykel - Nasal Mask Petite size HC406A | 0 | 0 | - | 0 | - | | | 55.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC407A | Fisher & Paykel - Nasal Mask Standard size HC407A | 2 | 1 | 55.00 | 1 | 55.00 | | | 55.00 | 110.0 | Fisher & Paykel | |
| TXRT | HC431A | Fisher & Paykel - Full face mask HC431A | 4 | 4 | 340.00 | 0 | - | | | 85.00 | 340.0 | Fisher & Paykel | |
| TXRT | HC432AL | Fisher & Paykel - Full face mask HC432AL | 2 | 2 | 170.00 | 0 | - | | | 85.00 | 170.0 | Fisher & Paykel | |
| TXRT | HC432AM | Fisher & Paykel - Full face mask HC432AM | 4 | 2 | 170.00 | 2 | 170.00 | | | 85.00 | 340.0 | Fisher & Paykel | |
| TXRT | HC432AS | Fisher & Paykel - Full face mask HC432AS | 1 | 0 | - | 1 | 85.00 | | | 85.00 | 85.0 | Fisher & Paykel | |
| TXRT | HC452A | Fisher & Paykel - Oracle Oral appliance | 0 | 0 | - | 0 | - | | | 85.00 | 0.0 | Fisher & Paykel | |
| TXRT | HC482A | Fisher & Paykel - Opus Nasal Pillows Mask | 1 | 0 | - | 1 | 55.00 | | | 55.00 | 55.0 | Fisher & Paykel | |
| TXRT | HYB500 | Innomed Hybrid Nasal Pillow/Oral Mask | 0 | 0 | - | 0 | - | | | 125.00 | 0.0 | | |
| TXRT | K2LG | InnoMed - Nasal Aire II - Nasal Pillows Mask- LG | 0 | 0 | - | 0 | - | | | | 0.0 | | |
| TXRT | K2MD | InnoMed - Nasal - Aire II - Nasal Pillows- MD | 0 | 0 | - | 0 | - | | | | 0.0 | | |
| TXRT | K2SM | InnoMed - Nasal - Aire II - Nasal Pillows- SM | 0 | 0 | - | 0 | - | | | | 0.0 | | |
| TXRT | TCF-142 | Respironics - Solo/Virtuoso Ultrafine filters-Disp | 0 | 0 | - | 0 | - | | | | 0.0 | Roscoe | |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TXRT | TCF-145 | Respironics - Remstar-Ultra fine filters Disp | 0 | 0 | - | 0 | - | | | 1.25 | | 0.0 | Roscoe |
| TXRT | TCF-147 | Respironics - BiPap Pro/Plus Ultrafine filter-Disp | 0 | 0 | | 0 | | | | 1.29 | | 0.0 | Roscoe |
| TXRT | TCF-149 | Respironics - M-series Ultra fine filters Disp. | 4 | 0 | - | 4 | 1.36 | | | 0.34 | | 1.4 | Roscoe |
| TXRT | TCF-176 | NPB - 420g disposable filter | 0 | 0 | - | 0 | - | | | 2.50 | | 0.0 | Roscoe |
| TXRT | TCF-245 | Respironics - RemStar Pollen Non Disposable Filter | 0 | 0 | - | 0 | - | | | 0.88 | | 0.0 | Roscoe |
| TXRT | TCF-247 | Respironics - BiPap Pro w/Bi Flex- Non Disposable | 0 | 0 | - | 0 | - | | | 2.89 | | 0.0 | Roscoe |
| TXRT | TCF-249 | Respironics - M- Series Non Disposable Filter | 27 | 0 | - | 27 | 17.01 | | | 0.63 | | 17.0 | Roscoe |
| TXRT | TCF-276 | NPB - 420g Foam filter Non Disposable | 0 | 0 | - | 0 | - | | | 0.90 | | 0.0 | Roscoe |
| TXRT | TCF-508 | ResMed - S6 filters | 0 | 0 | - | 0 | - | | | 0.59 | | 0.0 | Roscoe |
| TXRT | TCF-510 | ResMed - S7 filters | 0 | 0 | - | 0 | - | | | 0.50 | | 0.0 | Roscoe |
| TXRT | TCF-511 | ResMed - S8 filters | 0 | 0 | - | 0 | - | | | 0.50 | | 0.0 | Roscoe |
| TXRT | TMS-08 | Tiara (Respironics) - Deluxe Chin Strap | 0 | 0 | - | 0 | - | | | 9.95 | | 0.0 | Roscoe |
| TXRT | TMS-09L | Tiara - Ruby Red Chinstrap- Large | 0 | 0 | - | 0 | - | | | 12.00 | | 0.0 | |
| TXRT | TMS-09M | Tiara - Ruby Red Chinstrap- Medium | 0 | 0 | - | 0 | - | | | 12.00 | | 0.0 | |
| TXRT | TMS-09S | Tiara - Ruby Red Chinstrap- Small | 0 | 0 | - | 0 | - | | | 12.00 | | 0.0 | |
| TXRT | TMS-3034S | Tiara - Snapp X Direct Nasal Interface Mask | 0 | 0 | - | 0 | - | | | 84.50 | | 0.0 | |
| TXRT | TSB-6GLT | Tubing, Standard 6 ft | 0 | 0 | - | 0 | - | | | 2.95 | | 0.0 | |
| | | | | | 20,665.50 | | 17,956.97 | | | | 38,622.5 | | |

**Pacific North West**

| Warehouse | Code | Description | Actual On-hand | Astoria | Astoria Value | Gresham | Gresham Value | Hillsboro | Hillsboro Value | Roseburg | Roseburg Value | Vancouver | Vancouver Value | Std. | Inventory Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNW | 1001389 | | 6 | 0 | - | 0 | - | 1 | 5.00 | 0 | - | 0 | - | 5.00 | 5.00 | Respironics |
| PNW | 1001956 | Respironics - Shielded 12 VDC Power Cord 6' | 70 | 0 | - | 2 | 32.00 | 2 | 32.00 | 0 | - | 2 | 32.00 | 16.00 | 96.00 | Respironics |
| PNW | 100200W | Respironics - Wired Data Modem | | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Respironics |
| PNW | 100200D | | | 0 | - | 0 | - | 6 | 180.00 | 0 | - | 0 | - | 30.00 | 180.00 | |
| PNW | 1002064 | Respironics Softcap Headgear Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 22.47 | - | Respironics |
| PNW | 1002065 | Respironics Softcap Headgear Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | | - | Respironics |
| PNW | 1002757 | Respironics Simplicity Nasal - Small | 66 | 0 | - | 0 | - | 0 | - | 1 | 65.00 | 0 | - | 65.00 | 65.00 | Respironics |
| PNW | 1002759 | Respironics - Simplicity Nasal - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 65.00 | - | Respironics |
| PNW | 1002800 | Respironics - Deluxe Headgear | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 9.00 | - | Respironics |
| PNW | 1003756 | | 502.5 | 2 | 35.00 | 19 | 332.50 | 6 | 105.00 | 0 | - | 3 | 52.50 | 17.50 | 525.00 | Respironics |
| PNW | 1003757 | | 18.5 | 0 | - | 0 | - | 0 | - | 1 | 17.50 | 0 | - | 17.50 | 17.50 | Respironics |
| PNW | 1004086 | Respironics - Profile Lite Nasal - Petite | 1 | 0 | - | 0 | - | 0 | - | 0 | - | 1 | 55.00 | 55.00 | 55.00 | Respironics |
| PNW | 1004087 | Respironics - Profile Lite Nasal - Small | 113 | 0 | - | 0 | - | 2 | 110.00 | 0 | - | 1 | 55.00 | 55.00 | 165.00 | Respironics |
| PNW | 1004088 | Respironics - Profile Lite Nasal - Medium/Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | - | Respironics |
| PNW | 1004089 | Respironics - Profile Lite Nasal - Medium | 953 | 0 | - | 0 | - | 17 | 935.00 | 0 | - | 1 | 55.00 | 55.00 | 990.00 | Respironics |
| PNW | 1004110 | Respironics - Profile Lite with headgear - Med. Wide | 225 | 0 | - | 0 | - | 2 | 110.00 | 2 | 110.00 | 1 | 55.00 | 55.00 | 275.00 | Respironics |
| PNW | 1004111 | Respironics - Profile Lite with headgear - Large | 393 | 1 | 55.00 | 0 | - | 4 | 220.00 | 2 | 110.00 | 1 | 55.00 | 55.00 | 440.00 | Respironics |
| PNW | 1004112 | Respironics - Profile Lite W/O headgear - Lg Narro | 113 | 0 | - | 0 | - | 2 | 110.00 | 0 | - | 1 | 55.00 | 55.00 | 165.00 | Respironics |
| PNW | 1004872 | Respironics - Comfort Full - Medium | 973 | 0 | - | 0 | - | 11 | 880.00 | 1 | 80.00 | 1 | 80.00 | 80.00 | 1,040.00 | Respironics |
| PNW | 1004880 | Respironics - Comfort Full - Small | 408 | 0 | - | 1 | 80.00 | 3 | 240.00 | 1 | 80.00 | 3 | 240.00 | 80.00 | 640.00 | Respironics |
| PNW | 1004950 | Respironics - Comfort Full - Large | 407 | 0 | - | 0 | - | 5 | 400.00 | 0 | - | 2 | 160.00 | 80.00 | 560.00 | Respironics |
| PNW | 1005792 | Respironics - REMstar Heated Humidifier | 7 | 1 | - | 2 | - | 1 | - | 3 | - | 0 | - | 2.50 | - | Respironics |
| PNW | 1005964 | | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 2.50 | - | Respironics |
| PNW | 1007919 | Respironics - Comfort Select Nasal - Medium | 1428 | 0 | - | 1 | 50.00 | 24 | 1,200.00 | 3 | 150.00 | 0 | - | 50.00 | 1,400.00 | Respironics |
| PNW | 1007930 | Respironics Comfort Select Nasal - Small | 357 | 0 | - | 0 | - | 6 | 300.00 | 1 | 50.00 | 0 | - | 50.00 | 350.00 | Respironics |
| PNW | 1007931 | Respironics - Comfort Select Nasal - Small Wide | 510 | 0 | - | 0 | - | 6 | 300.00 | 4 | 200.00 | 0 | - | 50.00 | 500.00 | Respironics |
| PNW | 1007935 | Respironics - Comfort Select Nasal - Medium | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PNW | 1007936 | Respironics - Comfort Select Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PNW | 1007937 | Respironics Comfort Select Nasal - Small Wide | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 50.00 | - | Respironics |
| PNW | 1007963 | Respironics - Comfort Classic Nasal - Small | 652 | 2 | 60.00 | 0 | - | 19 | 570.00 | 0 | - | 1 | 30.00 | 30.00 | 660.00 | Respironics |
| PNW | 1007964 | Respironics - Comfort Classic Nasal - Med | 191 | 2 | 60.00 | 0 | - | 3 | 90.00 | 1 | 30.00 | 5 | 150.00 | 30.00 | 330.00 | Respironics |
| PNW | 1008619 | RemStar Water Chamber | 37 | 0 | - | 0 | - | 0 | - | 2 | 35.00 | 0 | - | 17.50 | 35.00 | Respironics |
| PNW | 1009040 | Respironics Comfort Gel mask and headgear - Petite | 448 | 4 | 220.00 | 0 | - | 3 | 165.00 | 1 | 55.00 | 0 | - | 55.00 | 440.00 | Respironics |
| PNW | 1009041 | Respironics Comfort Gel mask and headgear - Small | 114 | 0 | - | 0 | - | 0 | - | 2 | 110.00 | 2 | 110.00 | 55.00 | 220.00 | Respironics |
| PNW | 1009042 | Respironics Comfort Gel mask and headgear - Medium | 224 | 0 | - | 0 | - | 1 | 55.00 | 3 | 165.00 | 0 | - | 55.00 | 220.00 | Respironics |
| PNW | 1009043 | Respironics Comfort Gel mask and headgear - Large | 224 | 0 | - | 0 | - | 1 | 55.00 | 3 | 165.00 | 0 | - | 55.00 | 220.00 | Respironics |
| PNW | 1009048 | Respironics Comfort Gel Cushion - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PNW | 1009049 | Respironics - Comfort Gel Cushion - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 1 | 17.00 | 17.00 | 17.00 | Respironics |
| PNW | 1009050 | Respironics - Comfort Gel Cushion - Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PNW | 1009051 | Respironics - Comfort Gel Cushion - LG | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 17.00 | - | Respironics |
| PNW | 1010641 | Respironics Comfort Gel MASK ONLY - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | - | Respironics |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNW | 1012911 | Respironics - Premium Chin Strap | 79 | 0 | - | 0 | - | 5 | 50.00 | 2 | 20.00 | 2 | 20.00 | 10.00 | 90.00 | Respironics |
| PNW | 1014248 | BiPAP S/T System with Encore Pro SmartCard | 10927 | 1 | 1,820.00 | 3 | 5,460.00 | 2 | 3,640.00 | 0 | - | 1 | 1,820.00 | 1,820.00 | 12,740.00 | Respironics |
| PNW | 1017442 | Respironics - RemStar BiPAP Auto Core package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PNW | 1019185 | Respironics - Comfort Curve | 480 | 1 | 95.00 | 0 | - | 3 | 285.00 | 1 | 95.00 | 0 | - | 95.00 | 475.00 | Respironics |
| PNW | 1021821 | Respironics - Comfort Lite II Cushion - Large | 76 | 0 | - | 0 | - | 0 | - | 4 | 72.00 | 0 | - | 18.00 | 72.00 | Respironics |
| PNW | 1021823 | Respironics - Comfort Lite II Cushion - Medium | 76 | 0 | - | 0 | - | 0 | - | 4 | 72.00 | 0 | - | 18.00 | 72.00 | Respironics |
| PNW | 1021830 | Respironics - Comfort Lite II Cushion - Small | 209 | 0 | - | 0 | - | 0 | - | 11 | 198.00 | 0 | - | 18.00 | 198.00 | Respironics |
| PNW | 1021835 | Respironics - Comfort Lite II Cushion - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 18.00 | - | Respironics |
| PNW | 1022334 | Respironics - M-Series Heated Humidifier | 4 | 0 | - | 0 | - | 2 | - | 0 | - | 2 | - | - | - | Respironics |
| PNW | 1029330 | Respironics - M Series Pollen Filters | 9 | 0 | - | 0 | - | 3 | 6.00 | 0 | - | 0 | - | 2.00 | 6.00 | Respironics |
| PNW | 1029331 | Respironics - M Series Ultra Fine Filters Disp. | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 5.00 | - | Respironics |
| PNW | 1029532 | | 14 | 0 | - | 0 | - | 4 | 10.00 | 0 | - | 0 | - | 2.50 | 10.00 | Respironics |
| PNW | 1029533 | Respironics - M-Series Replacement water chamber | 37 | 0 | - | 0 | - | 2 | 35.00 | 0 | - | 0 | - | 17.50 | 35.00 | Respironics |
| PNW | 1030493 | Respironics - Comfort Lite 2 - Narrow | 61 | 0 | - | 1 | 60.00 | 0 | - | 0 | - | 0 | - | 60.00 | 60.00 | Respironics |
| PNW | 1030494 | Respironics - Comfort Lite 2 - Small/Medium | 488 | 0 | - | 0 | - | 7 | 420.00 | 1 | 60.00 | 0 | - | 60.00 | 480.00 | Respironics |
| PNW | 1030495 | Respironics - Comfort Lite 2 - Medium/Large | 61 | 0 | - | 1 | 60.00 | 0 | - | 0 | - | 0 | - | 60.00 | 60.00 | Respironics |
| PNW | 1030502 | Respironics - Comfort Lite 2 - Petite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 60.00 | - | Respironics |
| PNW | 1030503 | Respironics - Comfort Lite II Pillow Repl. - Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PNW | 1030504 | Respironics - Comfort Lite II Pillow Repl. - Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PNW | 1030505 | Respironics - Comfort Lite II Pillow Repl. - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | - | Respironics |
| PNW | 1031391 | Respironics - Comfort Gel Cushion - Petite | 207 | 5 | 110.00 | 0 | - | 1 | 22.00 | 3 | 66.00 | 0 | - | 22.00 | 198.00 | Respironics |
| PNW | 1031392 | Respironics - Comfort Gel Cushion - Small | 161 | 0 | - | 0 | - | 2 | 44.00 | 5 | 110.00 | 0 | - | 22.00 | 154.00 | Respironics |
| PNW | 1031403 | Respironics - Comfort Gel Cushion - Medium | 345 | 10 | 220.00 | 0 | - | 3 | 66.00 | 2 | 44.00 | 0 | - | 22.00 | 330.00 | Respironics |
| PNW | 1031404 | Respironics - Comfort Gel Cushion - Large | 299 | 0 | - | 0 | - | 3 | 66.00 | 10 | 220.00 | 0 | - | 22.00 | 286.00 | Respironics |
| PNW | 1032907 | Respironics-Performance Tubing ultralight | 63 | 0 | - | 0 | - | 0 | - | 9 | 54.00 | 0 | - | 6.00 | 54.00 | Respironics |
| PNW | 1033678 | Respironics - Premium Headgear | 65 | 1 | 12.00 | 0 | - | 4 | 48.00 | 0 | - | 0 | - | 12.00 | 60.00 | Respironics |
| PNW | 1035162 | Respironics - REMStar replacement water chamber | 221.77 | 2 | 23.62 | 3 | 35.43 | 9 | 106.29 | 3 | 35.43 | 4 | 47.24 | 11.81 | 248.01 | Respironics |
| PNW | 1036800 | Respironics - Optilife Nasal pillow Mask - Kit | 1955 | 2 | 120.00 | 16 | 960.00 | 8 | 480.00 | 6 | 360.00 | 3 | 180.00 | 60.00 | 2,100.00 | Respironics |
| PNW | 1036801 | | 675 | 2 | 120.00 | 4 | 240.00 | 4 | 240.00 | 1 | 60.00 | 4 | 240.00 | 60.00 | 900.00 | Respironics |
| PNW | 1036802 | | 675 | 2 | 120.00 | 4 | 240.00 | 4 | 240.00 | 1 | 60.00 | 4 | 240.00 | 60.00 | 900.00 | Respironics |
| PNW | 1036838 | Respironics - Optilife Pillow- Pet | 390 | 0 | - | 0 | - | 6 | 84.00 | 20 | 280.00 | 0 | - | 14.00 | 364.00 | Respironics |
| PNW | 1036839 | Respironics - Optilife Pillow- Sm | 123 | 0 | - | 0 | - | 2 | 28.00 | 6 | 84.00 | 3 | 42.00 | 14.00 | 154.00 | Respironics |
| PNW | 1036840 | Respironics - Optilife Pillow- Med | 108 | 0 | - | 0 | - | 0 | - | 7 | 98.00 | 3 | 42.00 | 14.00 | 140.00 | Respironics |
| PNW | 1036841 | Respironics - Optilife Pillow- LG | 300 | 0 | - | 0 | - | 0 | - | 20 | 280.00 | 0 | - | 14.00 | 280.00 | Respironics |
| PNW | 1037688 | Respironics - M-series Wired Modem | 279 | 0 | - | 0 | - | 9 | 270.00 | 0 | - | 0 | - | 30.00 | 270.00 | Respironics |
| PNW | 1036846 | | 137 | 0 | - | 0 | - | 2 | 66.50 | 2 | 66.50 | 0 | - | 33.25 | 133.00 | Respironics |
| PNW | 1036847 | | 273 | 0 | - | 1 | 38.00 | 2 | 76.00 | 4 | 152.00 | 0 | - | 38.00 | 266.00 | Respironics |
| PNW | 1036848 | | 195 | 0 | - | 0 | - | 3 | 114.00 | 2 | 76.00 | 0 | - | 38.00 | 190.00 | Respironics |
| PNW | 1036849 | | 156 | 0 | - | 0 | - | 4 | 152.00 | 0 | - | 0 | - | 38.00 | 152.00 | Respironics |
| PNW | 1038917 | Respironics BiPap Auto SV Unit | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 2,450.00 | - | Respironics |
| PNW | 1040135 | Respironics Comfort Gel mask and headgear - Small | 1917 | 4 | 360.00 | 8 | 720.00 | 6 | 540.00 | 3 | 270.00 | 6 | 540.00 | 90.00 | 2,430.00 | Respironics |
| PNW | 1040136 | Respironics Comfort Gel mask and headgear - Medium | 1824 | 4 | 360.00 | 11 | 990.00 | 4 | 360.00 | 1 | 90.00 | 4 | 360.00 | 90.00 | 2,160.00 | Respironics |
| PNW | 1040137 | Respironics Comfort Gel mask and headgear - Lrge | 1006 | 2 | 180.00 | 6 | 540.00 | 2 | 180.00 | 1 | 90.00 | 5 | 450.00 | 90.00 | 1,440.00 | Respironics |
| PNW | 1040716 | Respironics - BiPap Auto SV Core Package | 10044 | 2 | 5,020.00 | 0 | - | 2 | 5,020.00 | 0 | - | 0 | - | 2,510.00 | 10,040.00 | Respironics |
| PNW | 1040768 | Respironics - Comfort Fusion Sm/Med Mask Kit | 1481 | 2 | 100.00 | 23 | 1,150.00 | 4 | 200.00 | 0 | - | 2 | 100.00 | 50.00 | 1,550.00 | Respironics |
| PNW | 1040769 | Respironics - Comfort Fusion Sm/Med Mask Kit | 51 | 0 | - | 0 | - | 1 | 50.00 | 0 | - | 0 | - | 50.00 | 50.00 | Respironics |
| PNW | 1040840 | Respironics - Comfort Fusion Cushion & Ring - Small | 255 | 0 | - | 0 | - | 5 | 250.00 | 0 | - | 0 | - | 50.00 | 250.00 | Respironics |
| PNW | 1040841 | Respironics - Comfort Fusion Cushion & Ring - Med | 204 | 0 | - | 0 | - | 4 | 200.00 | 0 | - | 0 | - | 50.00 | 200.00 | Respironics |
| PNW | 1042907 | BiPAP autoSV Core Package | 7535 | 0 | - | 0 | - | 2 | 5,020.00 | 1 | 2,510.00 | 2 | 5,020.00 | 2,510.00 | 12,550.00 | Respironics |
| PNW | 1047917 | Full Life face mask with headgear- Small | 884 | 2 | 158.00 | 2 | 158.00 | 2 | 158.00 | 0 | - | 4 | 316.00 | 79.00 | 1,185.00 | Respironics |
| PNW | 1047918 | Full Life face mask with headgear- Medium | 643 | 1 | 79.00 | 1 | 79.00 | 1 | 79.00 | 5 | 395.00 | 3 | 237.00 | 79.00 | 869.00 | Respironics |
| PNW | 1049109 | | 9 | 2 | - | 3 | - | 3 | - | 0 | - | 1 | - | - | - | Respironics |
| PNW | 1050001 | | 51 | 0 | - | 0 | - | 1 | 50.00 | 0 | - | 0 | - | 50.00 | 50.00 | Respironics |
| PNW | 1050002 | | 204 | 0 | - | 0 | - | 4 | 200.00 | 0 | - | 0 | - | 50.00 | 200.00 | Respironics |
| PNW | 1050004 | | 102 | 0 | - | 0 | - | 2 | 100.00 | 0 | - | 0 | - | 50.00 | 100.00 | Respironics |
| PNW | 1051158 | Respironics - Heated Humidifier | 12 | 2 | - | 2 | - | 6 | - | 0 | - | 2 | - | - | - | Respironics |
| PNW | 1056215 | Respironics - Heated Humidifier | 34 | 3 | - | 5 | - | 14 | - | 6 | - | 6 | - | - | - | Respironics |
| PNW | 1060801 | FitLife Mask with headgear-Small | 1455 | 1 | 120.00 | 2 | 240.00 | 4 | 480.00 | 5 | 600.00 | 3 | 360.00 | 120.00 | 1,800.00 | Respironics |
| PNW | 1060802 | FitLife Mask with headgear-Medium | 728 | 1 | 120.00 | 0 | - | 0 | - | 5 | 600.00 | 2 | 240.00 | 120.00 | 960.00 | Respironics |
| PNW | 1005945 | | 0 | | | 0 | | 0 | | | | 0 | | 3.00 | | Respironics |
| PNW | 1070038 | Respironics- Blue gel masks | 168 | 0 | - | 0 | - | 3 | 165.00 | 0 | - | 0 | - | 55.00 | 165.00 | Respironics |
| PNW | 1070039 | Respironics- Blue gel masks | | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 55.00 | 110.00 | Respironics |

Case 2:11-bk-02009-RTB    Doc 11    Filed 01/26/11    Entered 01/26/11 18:20:14    Desc Main Document    Page 127 of 232

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNW | 1070040 | Respironics- Blue gel masks | 224 | 0 | - | 0 | - | 4 | 220.00 | 0 | - | 0 | - | 55.00 | 220.00 | Respironics |
| PNW | 16333 | ResMed - Mirage Micro - Small | 1836 | 4 | 240.00 | 10 | 600.00 | 14 | 840.00 | 2 | 120.00 | 6 | 360.00 | 60.00 | 2,160.00 | ResMed |
| PNW | 16334 | ResMed - Mirage Micro - Med and Large | 1411 | 7 | 420.00 | 6 | 360.00 | 7 | 420.00 | 3 | 180.00 | 8 | 480.00 | 60.00 | 1,860.00 | ResMed |
| PNW | 16335 | ResMed - Mirage Micro - Lg Wide and XL | 1043 | 7 | 420.00 | 2 | 120.00 | 6 | 360.00 | 2 | 120.00 | 6 | 360.00 | 60.00 | 1,380.00 | ResMed |
| PNW | 16548 | ResMed - Ultra Mirage II Nasal Mask - Standard | 849 | 4 | 220.00 | 7 | 385.00 | 0 | - | 4 | 220.00 | 9 | 495.00 | 55.00 | 1,320.00 | ResMed |
| PNW | 16549 | ResMed - Ultra Mirage II Nasal Mask - Large | 896 | 0 | - | 8 | 440.00 | 6 | 330.00 | 2 | 110.00 | 0 | - | 55.00 | 880.00 | ResMed |
| PNW | 16550 | ResMed - Ultra Mirage II Nasal Mask - Shallow | 1179 | 3 | 165.00 | 7 | 385.00 | 10 | 550.00 | 1 | 55.00 | 3 | 165.00 | 55.00 | 1,320.00 | ResMed |
| PNW | 16556 | ResMed - UM II Nasal Cushion - Standard | 102 | 0 | - | 3 | 48.00 | 1 | 16.00 | 0 | - | 0 | - | 16.00 | 96.00 | ResMed |
| PNW | 16557 | ResMed - UM II Nasal Cushion - Large | 187 | 0 | - | 5 | 80.00 | 6 | 96.00 | 0 | - | 0 | - | 16.00 | 176.00 | ResMed |
| PNW | 16558 | ResMed - UM II Nasal Cushion - Shallow | 323 | 3 | 48.00 | 6 | 96.00 | 10 | 160.00 | 0 | - | 0 | - | 16.00 | 304.00 | ResMed |
| PNW | 16577 | ResMed - Ultra Mirage II Nasal Mask - Shallow Wide | 616 | 0 | - | 0 | - | 6 | 330.00 | 5 | 275.00 | 0 | - | 55.00 | 605.00 | ResMed |
| PNW | 16604 | ResMed - Ult Mirage FF Cushion-Small Std | 58 | 0 | - | 0 | - | 1 | 28.00 | 1 | 28.00 | 0 | - | 28.00 | 56.00 | ResMed |
| PNW | 16605 | ResMed - Ult Mirage FF Cushion-Medium Std | 116 | 0 | - | 0 | - | 2 | 56.00 | 2 | 56.00 | 0 | - | 28.00 | 112.00 | ResMed |
| PNW | 16606 | ResMed - Ult Mirage FF Cushion-Large Std | 493 | 0 | - | 0 | - | 10 | 280.00 | 7 | 196.00 | 0 | - | 28.00 | 476.00 | ResMed |
| PNW | 16671 | ResMed - Ult Mirage FF Cushion-Sm Shallow | 29 | 0 | - | 0 | - | 1 | 28.00 | 0 | - | 0 | - | 28.00 | 28.00 | ResMed |
| PNW | 16672 | ResMed - Ult Mirage FF Cushion-Med Shallow | 174 | 0 | - | 0 | - | 6 | 168.00 | 0 | - | 0 | - | 28.00 | 168.00 | ResMed |
| PNW | 16673 | ResMed - Ult Mirage FF Cushion-Large Shallow | 58 | 0 | - | 0 | - | 2 | 56.00 | 0 | - | 0 | - | 28.00 | 56.00 | ResMed |
| PNW | 16735 | ResMed - Ult Mirage FF Cushion-Shallow Wide | 29 | 0 | - | 1 | 28.00 | 0 | - | 0 | - | 0 | - | 28.00 | 28.00 | ResMed |
| PNW | 24101 | ResMed VPAP III - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 24111 | ResMed VPAP III - ST Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 24116 | ResMed VPAP III - ST-A Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 1,950.00 | - | ResMed |
| PNW | 26008 | ResMed VPAP Adapt SV - Bilevel device | 2 | 0 | - | 0 | - | 2 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 26013 | | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 2,700.00 | - | |
| PNW | 26110 | ResMed VPAP Adapt ST - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 1,600.00 | - | ResMed |
| PNW | 26122 | ResMed VPAP ST + H4i | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 1,715.00 | - | ResMed |
| PNW | 26201 | ResMed VPAP Malibu - Bilevel device | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 26940 | ResMed Humidaire 4i heated humidifier | 1 | 0 | - | 0 | - | 1 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 26952 | ResMed - H4i Water Chamber | 244 | 4 | 56.00 | 6 | 84.00 | 6 | 84.00 | 0 | - | 4 | 56.00 | 14.00 | 280.00 | ResMed |
| PNW | 26959 | ResMed - H4i Upgrade Water Chamber Kit | 130 | 1 | 15.00 | 1 | 15.00 | 6 | 90.00 | 0 | - | 2 | 30.00 | 15.00 | 150.00 | ResMed |
| PNW | 30001 | ResMed- S7 Autoset Spirit | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 30002 | ResMed- S7 Elite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 30011 | ResMed- S7 Lightweight | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 302218 | Respironics - Contour Nasal - Large | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 37.00 | - | Respironics |
| PNW | 302328 | Respironics - Simple Chin Strap | 20 | 0 | - | 0 | - | 0 | - | 2 | 18.00 | 0 | - | 9.00 | 18.00 | Respironics |
| PNW | 302425 | Respironics - Deluxe Chin Strap | 203 | 1 | 19.00 | 3 | 57.00 | 1 | 19.00 | 5 | 95.00 | 3 | 57.00 | 19.00 | 247.00 | Respironics |
| PNW | 302433 | | 253 | 0 | - | 0 | - | 1 | 125.00 | 1 | 125.00 | 1 | 125.00 | 125.00 | 375.00 | |
| PNW | 302465 | Respironics Softcap Headgear Small | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | Respironics |
| PNW | 30902 | ResMed Humidaire 2i heated humidifier | 15 | 0 | - | 0 | - | 15 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 30927 | ResMed Humidaire Cool | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 30951 | ResMed - H2i replacement water chamber | 94 | 1 | 22.50 | 2 | 45.00 | 0 | - | 1 | 22.50 | 0 | - | 22.50 | 90.00 | ResMed |
| PNW | 33007 | ResMed - S8 Escape | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PNW | 33021 | ResMed - S8 Elite | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | ResMed |
| PNW | 33039 | ResMed - S8 Elite II | 351 | 0 | - | 0 | - | 1 | 350.00 | 0 | - | 0 | - | 350.00 | 350.00 | ResMed |
| PNW | 33051 | | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 305.00 | - | |
| PNW | 33062 | | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 465.00 | - | |
| PNW | 33112 | ResMed - S8 Autoset Vantage | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | ResMed |
| PNW | 33129 | | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 435.00 | - | |
| PNW | 33906 | ResMed Humidaire 3i heated humidifier | 10 | 1 | - | 2 | - | 2 | - | 5 | - | 0 | - | - | - | ResMed |
| PNW | 33918 | S7 Filter - 50pk | 12 | 0 | - | 0 | - | 0 | - | 0 | - | 12 | 756.00 | 63.00 | 756.00 | |
| PNW | 33938 | | 33 | 0 | - | 6 | 27.00 | 0 | - | 0 | - | 0 | - | 4.50 | 27.00 | |
| PNW | 33942 | | 226.5 | 0 | - | 2 | 88.20 | 2 | 88.20 | 1 | 44.10 | 1 | 44.10 | 44.10 | 264.60 | |
| PNW | 33957 | ResMed - H3i replacement water chamber | 24.5 | 0 | - | 1 | 22.50 | 0 | - | 0 | - | 1 | 22.50 | 22.50 | 45.00 | ResMed |
| PNW | 400441 | Fisher & Paykel - Zest Nasa Mask Medium | 795 | 4 | 240.00 | 5 | 300.00 | 1 | 60.00 | 3 | 180.00 | 2 | 120.00 | 60.00 | 900.00 | Fisher & Paykel |
| PNW | 400440 | Fisher & Paykel- Zest nasal mask- Standart | 306 | 1 | 60.00 | 2 | 120.00 | 0 | - | 2 | 120.00 | 1 | 60.00 | 60.00 | 360.00 | Fisher & Paykel |
| PNW | 400439 | Fisher & Paykel- Zest nasal mask- Large | 551 | 0 | - | 5 | 300.00 | 2 | 120.00 | 2 | 120.00 | 2 | 120.00 | 60.00 | 660.00 | Fisher & Paykel |
| PNW | 400471 | Fisher & Paykel - Forma Face mask-Md/Lrg | 97 | 1 | 95.00 | 0 | - | 0 | - | 0 | - | 1 | 95.00 | 95.00 | 190.00 | Fisher & Paykel |
| PNW | 400HC103 | Fisher & Paykel - Lrg Cushion for HC431A | 60 | 0 | - | 0 | - | 0 | - | 4 | 56.00 | 0 | - | 14.00 | 56.00 | Fisher & Paykel |
| PNW | 400HC104 | Fisher & Paykel - Med Cushion for HC431A | 105 | 0 | - | 0 | - | 0 | - | 7 | 98.00 | 0 | - | 14.00 | 98.00 | Fisher & Paykel |
| PNW | 400HC112 | Fisher & Paykel - Small Cushion for HC431A | 15 | 1 | 14.00 | 0 | - | 0 | - | 0 | - | 0 | - | 14.00 | 14.00 | Fisher & Paykel |
| PNW | 400HC113 | Fisher & Paykel - Small Cushion for HC432A | | 1 | 14.00 | | | | | 3 | 42.00 | | | 14.00 | 56.00 | Fisher & Paykel |
| PNW | 400HC115 | Fisher & Paykel - Lrg Cushion for HC432AL | 30 | | | | | | | 2 | 28.00 | | | 14.00 | 28.00 | Fisher & Paykel |
| PNW | 400HC116 | Fisher & Paykel - Opus HC482 Repl. Pillow - Sm | | | | | | 7 | 77.00 | 1 | 11.00 | | | 11.00 | 88.00 | Fisher & Paykel |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNW | 400HC117 | Fisher & Paykel - Opus HC482 Repl. Pillow - Med | 122 | 0 | - | 0 | - | 0 | - | 10 | 110.00 | 2 | 22.00 | 11.00 | 132.00 | Fisher & Paykel |
| PNW | 400HC118 | Fisher & Paykel - Opus HC482 Repl. Pillow - Lrg | 73 | 0 | | 0 | | 0 | | 6 | 66.00 | 1 | 11.00 | 11.00 | 77.00 | Fisher & Paykel |
| PNW | 400HC501 | Fisher & Paykel- Cushion/Seal for HC407 - 1 size | 106 | 3 | 42.00 | 0 | | 0 | | 4 | 56.00 | 1 | 14.00 | 14.00 | 112.00 | Fisher & Paykel |
| PNW | 400HC509 | Fisher & Paykel- Cushion/Seal for HC406 - 1 size | 138 | 0 | | 0 | | 1 | 14.00 | 8 | 112.00 | 3 | 42.00 | 14.00 | 168.00 | Fisher & Paykel |
| PNW | 60000 | ResMed - Mirage Vista - Standard nasal | 120 | 0 | | 0 | | 0 | | 2 | 118.00 | 0 | | 59.00 | 118.00 | ResMed |
| PNW | 60001 | ResMed - Mirage Vista - nasal | 0 | 0 | - | 0 | | 0 | - | 0 | - | 0 | - | 59.00 | - | ResMed |
| PNW | 60100 | ResMed - Mirage Activa - Standard nasal | 794 | 3 | 195.00 | 4 | 260.00 | 1 | 65.00 | 4 | 260.00 | 2 | 130.00 | 65.00 | 910.00 | ResMed |
| PNW | 60101 | ResMed - Mirage Activa - Large nasal | 932 | 0 | | 5 | 325.00 | 5 | 325.00 | 4 | 260.00 | 8 | 520.00 | 65.00 | 1,430.00 | ResMed |
| PNW | 60102 | ResMed - Mirage Activa - Shallow nasal | 1452 | 5 | 325.00 | 10 | 650.00 | 2 | 130.00 | 5 | 325.00 | 0 | | 65.00 | 1,430.00 | ResMed |
| PNW | 60117 | ResMed Activa replacement cushion - Standard | 300 | 5 | 114.00 | 5 | 95.00 | 0 | - | 4 | 76.00 | 0 | | 19.00 | 285.00 | ResMed |
| PNW | 60118 | ResMed Activa replacement cushion - Large | 320 | 5 | 95.00 | 2 | 38.00 | 7 | 133.00 | 2 | 38.00 | 0 | | 19.00 | 304.00 | ResMed |
| PNW | 60119 | ResMed Activa replacement cushion - Shallow | 500 | 7 | 133.00 | 1 | 19.00 | 14 | 266.00 | 3 | 57.00 | 0 | | 19.00 | 475.00 | ResMed |
| | 60148 | ResMed - Mirage Activa LT Nasal Mask - Med | 1227.8 | 5 | 249.75 | 14 | 699.30 | 2 | 99.90 | 3 | 149.85 | 5 | 249.75 | 49.95 | 1,448.55 | ResMed |
| | 60149 | ResMed - Mirage Activa LT Nasal Mask - Lrg | 1223.8 | 5 | 249.75 | 9 | 449.55 | 9 | 449.55 | 1 | 49.95 | 1 | 49.95 | 49.95 | 1,248.75 | ResMed |
| PNW | 60150 | ResMed - Mirage Activa LT Nasal Mask - Lrg Wide | 523.5 | 1 | 49.95 | 7 | 349.65 | 0 | - | 2 | 99.90 | 14 | 699.30 | 49.95 | 1,198.80 | ResMed |
| PNW | 60512 | ResMed - Swift II Nasal pillow Mask - Kit | 1125 | 1 | 74.00 | 9 | 666.00 | 1 | 74.00 | 4 | 296.00 | 0 | | 74.00 | 1,110.00 | ResMed |
| PNW | 60520 | ResMed - Swift Pillow sleeve - Small | 330 | 6 | 84.00 | 13 | 182.00 | 0 | - | 3 | 42.00 | 0 | | 14.00 | 308.00 | ResMed |
| PNW | 60521 | ResMed - Swift Pillow sleeve - Medium | 300 | 6 | 84.00 | 12 | 168.00 | 0 | - | 2 | 28.00 | 0 | | 14.00 | 280.00 | ResMed |
| PNW | 60522 | ResMed - Swift Pillow sleeve - Large | 345 | 8 | 112.00 | 14 | 196.00 | 0 | - | 1 | 14.00 | 0 | | 14.00 | 322.00 | ResMed |
| | 60535 | ResMed - Frame Clip | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 5.40 | - | ResMed |
| PNW | 60541 | ResMed - Swift 2 Pillow sleeve - Small | 271 | 0 | - | 0 | | 17 | 238.00 | 1 | 14.00 | 1 | 14.00 | 14.00 | 266.00 | ResMed |
| PNW | 60542 | ResMed - Swift 2 Pillow sleeve - Medium | 334 | 8 | 112.00 | 4 | 56.00 | 4 | 56.00 | 6 | 84.00 | 4 | 56.00 | 14.00 | 364.00 | ResMed |
| PNW | 60543 | ResMed - Swift 2 Pillow sleeve - Large | 390 | 1 | 14.00 | 0 | - | 21 | 294.00 | 4 | 56.00 | 0 | | 14.00 | 364.00 | ResMed |
| PNW | 60560 | ResMed - Swift LT Nasal pillow Mask - Kit | 1193 | 4 | 260.00 | 4 | 260.00 | 6 | 390.00 | 4 | 260.00 | 5 | 325.00 | 65.00 | 1,495.00 | ResMed |
| PNW | 60571 | ResMed - Swift LT Pillow sleeve - Small | 286 | 13 | 156.00 | 0 | - | 0 | | 9 | 108.00 | 0 | | 12.00 | 264.00 | ResMed |
| PNW | 60572 | ResMed - Swift LT Pillow sleeve - Medium | 286 | 16 | 192.00 | 0 | | 2 | 24.00 | 4 | 48.00 | 0 | | 12.00 | 264.00 | ResMed |
| PNW | 60573 | ResMed - Swift LT Pillow sleeve - Large | 208 | 13 | 156.00 | 0 | | 0 | | 3 | 36.00 | 0 | | 12.00 | 192.00 | ResMed |
| PNW | 60574 | ResMed - Swift LT Pillow sleeve - Extra Small | 26 | 0 | - | 0 | | 0 | | 2 | 24.00 | 0 | | 12.00 | 24.00 | ResMed |
| PNW | 60588 | | 995 | 4 | 260.00 | 4 | 260.00 | 0 | | 7 | 455.00 | 5 | 325.00 | 65.00 | 1,300.00 | ResMed |
| PNW | 60600 | ResMed - Ultra Mirage Full - Small Standard | 106 | 0 | | 0 | | 0 | | 1 | 105.00 | 0 | - | 105.00 | 105.00 | ResMed |
| PNW | 60601 | ResMed - Ultra Mirage Full - Small Shallow | 0 | 0 | | 0 | | 0 | | 0 | | 0 | - | 105.00 | - | ResMed |
| PNW | 60602 | ResMed - Ultra Mirage Full - Medium Standard | 106 | 1 | 105.00 | 0 | - | 0 | | 0 | | 0 | - | 105.00 | 105.00 | ResMed |
| PNW | 60603 | ResMed - Ultra Mirage Full - Medium Shallow | 106 | 0 | | 1 | 105.00 | 0 | | 0 | - | 0 | - | 105.00 | 105.00 | ResMed |
| PNW | 60604 | ResMed - Ultra Mirage Full - Large Standard | 212 | 0 | | 0 | | 1 | 105.00 | 1 | 105.00 | 0 | - | 105.00 | 210.00 | ResMed |
| PNW | 60605 | ResMed - Ultra Mirage Full - Large Shallow | 106 | 0 | | 0 | | 0 | | 1 | 105.00 | 0 | - | 105.00 | 105.00 | ResMed |
| PNW | 60922 | ResMed - Vista Deep, Cushion only | 0 | 0 | | 0 | | 0 | | 0 | | 0 | | 14.00 | - | ResMed |
| PNW | 61010 | ResMed - Kidsta | 60 | 0 | | 0 | | 1 | 59.00 | 0 | | 0 | | 59.00 | 59.00 | ResMed |
| PNW | 61102 | ResMed - Meridian Mask | 4 | 0 | | 0 | | 4 | | 0 | | 0 | | - | - | ResMed |
| PNW | 61200 | ResMed - Quattro Full Face- X-Small | 2123 | 2 | 210.00 | 10 | 1,050.00 | 5 | 525.00 | 3 | 315.00 | 3 | 315.00 | 105.00 | 2,415.00 | ResMed |
| PNW | 61201 | ResMed - Quattro Full Face- Small | 1064 | 4 | 420.00 | 3 | 315.00 | 0 | - | 3 | 315.00 | 4 | 420.00 | 105.00 | 1,470.00 | ResMed |
| PNW | 61202 | ResMed - Quattro Full Face- Medium | 1378 | 3 | 315.00 | 3 | 315.00 | 4 | 420.00 | 3 | 315.00 | 0 | - | 105.00 | 1,365.00 | ResMed |
| PNW | 61203 | ResMed - Quattro Full Face- Large | 1169 | 6 | 630.00 | 2 | 210.00 | 0 | - | 3 | 315.00 | 3 | 315.00 | 105.00 | 1,470.00 | ResMed |
| PNW | 61290 | ResMed - Quattro FF Cushion - X-Small | 198 | 3 | 96.00 | 0 | | 2 | 64.00 | 1 | 32.00 | 0 | | 32.00 | 192.00 | ResMed |
| PNW | 61291 | ResMed - Quattro FF Cushion - Small | 429 | 7 | 224.00 | 0 | | 2 | 64.00 | 4 | 128.00 | 0 | | 32.00 | 416.00 | ResMed |
| PNW | 61292 | ResMed - Quattro FF Cushion - Medium | 396 | 3 | 96.00 | 0 | | 5 | 160.00 | 4 | 128.00 | 0 | | 32.00 | 384.00 | ResMed |
| PNW | 61293 | ResMed - Quattro FF Cushion - Large | 363 | 6 | 192.00 | 0 | | 1 | 32.00 | 4 | 128.00 | 0 | | 32.00 | 352.00 | ResMed |
| PNW | 61300 | ResMed - Liberty Full Face - Small | 954 | 0 | - | 7 | 735.00 | 0 | - | 2 | 210.00 | 0 | | 105.00 | 945.00 | ResMed |
| PNW | 61301 | ResMed - Liberty Full Face - Large | 1273 | 2 | 210.00 | 4 | 420.00 | 3 | 315.00 | 3 | 315.00 | 1 | 105.00 | 105.00 | 1,365.00 | ResMed |
| PNW | 61330 | ResMed - Liberty Mouth Cushion - Small | 66 | 0 | | 0 | - | 1 | 21.00 | 2 | 42.00 | 0 | | 21.00 | 63.00 | ResMed |
| PNW | 61331 | ResMed - Liberty Mouth Cushion - Large | 154 | 0 | | 0 | | 5 | 105.00 | 2 | 42.00 | 0 | | 21.00 | 147.00 | ResMed |
| PNW | 61333 | ResMed - Liberty Pillows - Small | 90 | 0 | | 0 | | 3 | 24.00 | 7 | 56.00 | 0 | | 8.00 | 80.00 | ResMed |
| PNW | 61334 | ResMed - Liberty Pillows - Medium | 54 | 0 | | 0 | | 2 | 16.00 | 4 | 32.00 | 0 | | 8.00 | 48.00 | ResMed |
| PNW | 61335 | ResMed - Liberty Pillows - Large | 63 | 0 | | 0 | | 2 | 16.00 | 5 | 40.00 | 0 | | 8.00 | 56.00 | ResMed |
| PNW | 61353 | ResMed - Lower Clip-2 pack | 0 | 0 | | 0 | | 0 | | 0 | | 0 | | 8.10 | - | ResMed |
| PNW | 61500 | | 152 | 0 | | 0 | | 2 | 150.00 | 0 | | 0 | | 75.00 | 150.00 | ResMed |
| PNW | 61540 | | 228 | 0 | | 0 | | 3 | 225.00 | 0 | | 0 | | 75.00 | 225.00 | ResMed |
| PNW | 61601 | ResMed - | 305.7 | 0 | | 0 | | 6 | 299.70 | 0 | | 0 | | 49.95 | 299.70 | ResMed |
| PNW | 61602 | ResMed - | 152.85 | 0 | | 0 | | 3 | 149.85 | 0 | | 0 | | 49.95 | 149.85 | ResMed |
| PNW | 622038 | Respironics - Tubing, 6 ft, Standard Grey | 46 | 0 | | 0 | | 0 | | 10 | 36.00 | 0 | | 3.60 | 36.00 | Respironics |
| PNW | 900HC010 | | | 0 | | 0 | | 0 | | | | | | 1.25 | 5.00 | Fisher & Paykel |
| PNW | 900HC240 | | | 0 | | 0 | | 4 | 5.00 | | | | | 1.25 | 5.00 | Fisher & Paykel |
| PNW | 900HC427 | Fisher & Paykel - HC405A foam & seal cushion - Sm | | | | | | | | | 70.00 | 0 | - | 14.00 | 84.00 | Fisher & Paykel |

| Warehouse | Code | Description | Actual On-hand | Scottsdale | Scottsdale Value | Central | Central Value | Mesa | Mesa Value | Estrella | Estrella Value | Std. | Inventory Value | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNW | 900HC428 | Fisher & Paykel - HC405A foam & seal cushion - Lg | 45 | 0 | - | 0 | - | 0 | - | 3 | 42.00 | 0 | - | 14.00 | 42.00 | Fisher & Paykel |
| PNW | DS100 | Respironics - M-Series Core Package | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 260.00 | - | Respironics |
| PNW | DS200 | Respironics - M-Series Core Package with Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 325.00 | - | Respironics |
| PNW | DS400HS | Respironics - M-Series Core Package with Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 399.00 | - | Respironics |
| PNW | DS450HS | Respironics - RemStar Pro Core Pack w/SD Card | 2376 | 0 | - | 0 | - | 1 | 395.00 | 5 | 1,975.00 | 0 | - | 395.00 | 2,370.00 | Respironics |
| PNW | DS500S | Respironics - M-Series Auto w/Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 520.00 | - | Respironics |
| PNW | DS510S | Respironics - M-Series Auto w/A Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 490.00 | - | Respironics |
| PNW | DS510HS | Respironics - M-Series Auto w/A Flex | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 492.00 | - | Respironics |
| PNW | DS550HS | Respironics - | 7065 | 0 | - | 0 | - | 15 | 7,050.00 | 0 | - | 0 | - | 470.00 | 7,050.00 | Respironics |
| PNW | DS600H | Respironics - MSeries BiPAP Plus w/Bi Flex Core | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 1,010.00 | - | Respironics |
| PNW | DS700HS | Respironics - MSeries BiPAP Auto w/Bi-Flex Core pa | 2751 | 2 | 1,830.00 | 1 | 915.00 | 0 | - | 0 | - | 3 | 2,745.00 | 915.00 | 5,490.00 | Respironics |
| PNW | DS750HS | | 10078 | 2 | 1,830.00 | 5 | 4,575.00 | 4 | 3,660.00 | 0 | - | 2 | 1,830.00 | 915.00 | 11,895.00 | Respironics |
| PNW | HC234JHU | SleepStyle 234 CPAP with Compliance Data Storage | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 210.00 | - | |
| PNW | HC300 | Fisher & Paykel - HC300 water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PNW | HC325 | Fisher & Paykel - HC325 water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PNW | HC355 | F&P - Resuable/dishwasher safe standard model CPAP | 8 | 0 | - | 5 | - | 0 | - | 0 | - | 3 | - | - | - | |
| PNW | HC385S | Fisher & Paykel - HC385 water chamber | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 8.00 | - | Fisher & Paykel |
| PNW | HC401A | Fisher & Paykel - Acclaim II Nasal Mask | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 30.00 | - | Fisher & Paykel |
| PNW | HC405A | Fisher & Paykel - Nasal Mask Standard size HC405A | 155 | 2 | 60.00 | 0 | - | 0 | - | 3 | 90.00 | 0 | - | 30.00 | 150.00 | Fisher & Paykel |
| PNW | HC406A | Fisher & Paykel - Nasal Mask Petite Size HC406A | 504 | 2 | 110.00 | 2 | 110.00 | 3 | 165.00 | 2 | 110.00 | 0 | - | 55.00 | 495.00 | Fisher & Paykel |
| PNW | HC407A | Fisher & Paykel - Nasal Mask Standard size HC407A | 504 | 0 | - | 0 | - | 3 | 165.00 | 6 | 330.00 | 0 | - | 55.00 | 495.00 | Fisher & Paykel |
| PNW | HC431A | Fisher & Paykel - Full face mask HC431A | 88 | 1 | 85.00 | 0 | - | 0 | - | 0 | - | 2 | 170.00 | 85.00 | 255.00 | Fisher & Paykel |
| PNW | HC432AL | Fisher & Paykel - Full face mask HC432 - Lrg | 863 | 4 | 340.00 | 3 | 255.00 | 0 | - | 3 | 255.00 | 3 | 255.00 | 85.00 | 1,105.00 | Fisher & Paykel |
| PNW | HC432AM | Fisher & Paykel - Full face mask HC432 - Med | 1035 | 1 | 85.00 | 4 | 340.00 | 5 | 425.00 | 2 | 170.00 | 3 | 255.00 | 85.00 | 1,275.00 | Fisher & Paykel |
| PNW | HC432AS | Fisher & Paykel - Full face mask HC432 - Small | 1204 | 1 | 85.00 | 4 | 340.00 | 7 | 595.00 | 2 | 170.00 | 0 | - | 85.00 | 1,190.00 | Fisher & Paykel |
| PNW | HC452A | Fisher & Paykel - Oracle Oral appliance | 516 | 0 | - | 5 | 425.00 | 0 | - | 1 | 85.00 | 0 | - | 85.00 | 510.00 | Fisher & Paykel |
| PNW | HC482A | Fisher & Paykel - Opus Nasal Pillows Mask | 899 | 2 | 110.00 | 9 | 495.00 | 4 | 220.00 | 1 | 55.00 | 3 | 165.00 | 55.00 | 1,045.00 | Fisher & Paykel |
| PNW | HYB500 | Innomed Hybrid Nasal Pillow/Oral Mask | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 125.00 | - | |
| PNW | K2LG | InnoMed - Nasal Aire II - Nasal Pillows Mask- LG | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PNW | K2MP | InnoMed - Nasal - Aire II - Nasal Pillows- Med | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PNW | K2SM | InnoMed - Nasal - Aire II - Nasal Pillows- SM | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | - | - | |
| PNW | TCF-142 | Respironics - Solo/Virtuoso Ultrafine filters-Disp | 201.22 | 0 | - | 30 | 12.60 | 61 | 25.62 | 0 | - | 72 | 30.24 | 0.42 | 68.46 | Roscoe |
| PNW | TCF-145 | Respironics - Remstar-Ultra fine filters Disp | 416.75 | 55 | 68.75 | 56 | 70.00 | 24 | 30.00 | 20 | 25.00 | 68 | 85.00 | 1.25 | 278.75 | Roscoe |
| PNW | TCF-147 | Respironics - BiPap Pro/Plus Ultrafine filter-Disp | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 1.29 | - | Roscoe |
| PNW | TCF-149 | Respironics - M-series Ultra fine filters Disp. | 280.58 | 0 | - | 110 | 37.40 | 70 | 23.80 | 7 | 2.38 | 30 | 10.20 | 0.34 | 73.78 | Roscoe |
| PNW | TCF-176 | NPB - 420g disposable filter | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 2.50 | - | Roscoe |
| PNW | TCF-242 | Respironics - Solo/Virtuoso/Aria Non-Disposable F | 4 | 0 | - | 0 | - | 0 | - | 0 | - | 4 | 9.56 | 2.39 | 9.56 | Roscoe |
| PNW | TCF-245 | Respironics - RemStar Pollen Non Disposable Filter | 75.44 | 32 | 28.16 | 0 | - | 0 | - | 6 | 5.28 | 4 | 3.52 | 0.88 | 36.96 | Roscoe |
| PNW | TCF-247 | Respironics - BiPap Pro w/Bi Flex- Non Disposable | 77.8 | 0 | - | 20 | 57.80 | 0 | - | 0 | - | 0 | - | 2.89 | 57.80 | Roscoe |
| PNW | TCF-249 | Respironics - M- Series Non Disposable Filter | 161.48 | 63 | 39.69 | 12 | 7.56 | 17 | 10.71 | 4 | 2.52 | 5 | 3.15 | 0.63 | 63.63 | Roscoe |
| PNW | TCF-276 | NPB - 420g Foam filter Non Disposable | 11.4 | 0 | - | 0 | - | 6 | 5.40 | 0 | - | 0 | - | 0.90 | 5.40 | Roscoe |
| PNW | TCF-508 | ResMed - S6 filters | 7 | 0 | - | 0 | - | 0 | - | 0 | - | 7 | 4.13 | 0.59 | 4.13 | Roscoe |
| PNW | TCF-510 | ResMed - S7 filters | 63 | 0 | - | 30 | 15.00 | 0 | - | 12 | 6.00 | 0 | - | 0.50 | 21.00 | Roscoe |
| PNW | TCF-511 | ResMed - S8 filters | 131.5 | 35 | 17.50 | 0 | - | 22 | 11.00 | 24 | 12.00 | 10 | 5.00 | 0.50 | 45.50 | Roscoe |
| PNW | TMS-08 | Tiara (Respironics) - Deluxe Chin Strap | 156.3 | 3 | 29.85 | 2 | 19.90 | 0 | - | 9 | 89.55 | 3 | 29.85 | 9.95 | 169.15 | Roscoe |
| PNW | TMS-09S | Tiara Ruby Red Chin Strap- Small | 67 | 3 | 36.00 | 2 | 24.00 | 0 | - | 0 | - | 2 | 24.00 | 12.00 | 84.00 | Roscoe |
| PNW | TMS-09M | Tiara Ruby Red Chin Strap- Medium | 93 | 0 | - | 5 | 60.00 | 2 | 24.00 | 0 | - | 2 | 24.00 | 12.00 | 108.00 | Roscoe |
| PNW | TMS-09L | Tiara Ruby Red Chin Strap- Large | 65 | 5 | 60.00 | 0 | - | 0 | - | 0 | - | 0 | - | 12.00 | 60.00 | Roscoe |
| PNW | TMS-30345 | Tiara - Snapp X Direct Nasal Interface Mask | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 84.50 | - | Roscoe |
| PNW | TSB-10GLT | Tubing - 10 foot | 0 | 0 | - | 0 | - | 0 | - | 0 | - | 0 | - | 3.95 | - | Roscoe |
| PNW | TSB-6GLT | Tubing, Standard 6 ft | 79 | 20 | 59.00 | 0 | - | 0 | - | 0 | - | 0 | - | 2.95 | 59.00 | Roscoe |
| PNW | TSB-8GLT | Tubing - 8 foot | 84.15 | 7 | 27.65 | 0 | - | 0 | - | 0 | - | 10 | 39.50 | 3.95 | 67.15 | Roscoe |
| | | | | | 22,005.17 | | 30,662.39 | | 48,839.02 | | 20,931.96 | | 24,090.99 | | 146,529.53 | |

# EXHIBIT "A"

ADMIN01/999760 0500/3568815.1

# BID PROCEDURES

Set forth herein are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of substantially all of the assets of Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"). On January 25, 2011, the Debtors executed that certain Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser").[1] The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code), and certain other closing conditions.

On January 26, 2011, the Debtors filed the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and Assignment of Unexpired Leases and Executory Contracts; and For an Emergency Hearing on Approval of Certain Auction and Bid Procedures, Including a Break-Up Fee; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Sale Motion"). On _____ 2011, the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") entered the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All The Debtors' Assets (the "Bid Procedures Order"). The Bid Procedures Order set _____, 2011 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Debtors to enter into the Agreement.

The Bid Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified Bidders and Bids, respectively, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), and the ultimate selection of the Successful Bidder(s) (as defined herein). The Debtors intend to consult with, among others, the United States Trustee and, if appointed, the official committee of unsecured creditors (the "Creditors' Committee") throughout the sale process. In the event that the Debtors and any party disagree as to the interpretation or application of these Bid Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

1. <u>Assets To Be Sold</u>. With the exception of those assets designated as Excluded Assets in the Agreement, the Purchased Assets include all Debtors' rights, title and interest in, to and under all assets, rights and properties of the Business (whether real, personal or mixed, tangible and intangible, and of every kind, character and description), which are used, or held for use, in the Business (including the Business as a going concern) or otherwise including any Seller's rights in: (i) tangible personal property, (ii) inventory; (iii) assumed contracts, (iv) business proprietary rights; (v) files and records; (vi) licenses; (vii) security deposits; (viii) warranties; (ix) claims; (x) certifications; and (xi) goodwill.

2. <u>As Is, Where Is</u>. The sale of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their

---

[1] All capitalized terms used but not otherwise defined in these Bid Procedures have the meanings ascribed to them in the Agreement.

agents, or estates, except, with respect to the Proposed Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder (as defined herein), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

3. <u>Free Of Any And All Encumbrances</u>.  All of the Debtors' right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired will be sold free and clear of all Liens except the Permitted Liens (as such terms are defined in the Agreement), and such Liens will attach to the net proceeds of the sale of such Purchased Assets.

4. <u>Participation Requirements</u>.  Any person who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other <u>than</u> the Purchaser, must deliver (unless previously delivered) to the Debtors and their counsel at the addresses provided below, unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Debtors in their sole discretion:

   a.  An executed confidentiality agreement in form and substance satisfactory to Debtors;

   b.  Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, including a portion of the Purchased Assets, current audited financial statements of the equity holders of the Potential Bidder, who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors;

   c.  A preliminary (non-binding) proposal reflecting: (i) the purchase price range, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction, (iv) any anticipated regulatory approvals required to close the transaction, (v) the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) any additional conditions to closing that the Potential Bidder may wish to impose, and (vii) the nature and extent of any additional due diligence that the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

A Potential Bidder who satisfies the requirements above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale if selected as a Successful Bidder, and who the Debtors determine is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder." Notwithstanding the foregoing, the Proposed Purchaser will be deemed a Qualified Bidder for purposes of the bidding process. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors will then promptly allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as described below.

5. <u>Due Diligence</u>. The Debtors will afford each Qualified Bidder due diligence access to the Purchased Assets and the Business Due diligence access may include such management presentations as may be scheduled by Debtors, access to data rooms, on site inspections, and such other matters which a Qualified Bidder may request and as to which the Debtors may agree. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. The Debtors may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. The Debtors (or any of their respective representatives) shall not be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

6. <u>Bid Deadline.</u> A Qualified Bidder who desires to make a bid must deliver the Required Bid Documents to: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, <u>Scottsdale</u>, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; so as to be received not later than _____ a.m. (prevailing Mountain time) on _____, 2011 (the "<u>Bid Deadline</u>"). The Debtors may extend the Bid Deadline once or successively, but are not obligated to do so. If the Debtors extends the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

7. <u>Bid Requirements</u>. All bids must include the following documents (the "<u>Required Bid Documents</u>"):

   a. A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Purchased Assets.

   b. A complete, comprehensive, and binding asset purchase agreement, together with all schedules and exhibits to such agreement (a "<u>Competing Agreement</u>")

   c. A good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Debtors in their sole discretion) payable to the order of Arete Holdings, LLC (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price identified in the Competing Agreement.

   d. Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that is satisfactory to the Debtors and their advisors.

8. <u>Consideration of Qualified Bids</u>. A bid will be considered only if the bid:

   a. Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the Qualified Bidder.

   b. Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtors determine

DB04/810420.0002/3922606.1 DD02

are similar to and are not materially more burdensome or conditional than those contained in the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee and Expense Reimbursement, plus: (i) in the case of the initial Qualified Bid, $190,000, and (ii) in the case of any subsequent Qualified Bids, $50,000 over the immediately preceding highest Qualified Bid.

c. Is not conditioned upon (A) any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment and (B) such bid being deemed the Successful Bid by the Debtors.

d. Includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or a Competing Agreement.

e. Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required Governmental Approvals) within not more than 15 days after entry of the Sale Approval Order, or in the case of any governmental approvals, 60 days after entry of such order.

f. Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, the Debtors will have the right to entertain bids for the Purchased Assets that do not conform to one or more of the requirements specified in this section, and may deem such bids to be Qualified Bids, including bids for a portion of the Purchased Assets. Notwithstanding the foregoing, the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bid Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Proposed Purchaser is referred to herein as a "Subsequent Bid."

If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, the Debtors will report the same to the Bankruptcy Court and will request approval of the Sale pursuant to the terms of the Agreement as soon as reasonably practicable after the Bid Deadline.

9. <u>Bid Protection</u>  Recognizing the Proposed Purchaser's expenditure of time, energy, and resources, the Debtors have agreed to provide certain bidding protections to the Proposed Purchaser.  Specifically, the Debtors have determined that the Agreement furthers the goals of the Bid Procedures by setting a floor which all other Qualified Bids must exceed. As a result, the Debtors have agreed that if they do not close with the Proposed Purchaser because the

Debtors consummate an Alternative Transaction, as that term is defined herein, and the Proposed Purchaser is not in breach of the Agreement or the Bidding Procedures, the Debtors will, in certain circumstances, pay to the Proposed Purchaser a Break-Up Fee and Expense Reimbursement. The payment of the Break-Up Fee and Expense Reimbursement will be governed by the provisions of the Agreement and the Bid Procedures Order.

10. <u>Auction</u>  If the Debtors receive one or more Qualified Bids in addition to the Agreement, the Debtors will conduct an <u>auction</u> (the "<u>Auction</u>") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at _____ (prevailing Mountain time) on _____, 2011 at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than _____, 2011), in accordance with the following procedures:

   a. Only the Debtors, the Proposed Purchaser, a representative of the Office of the United States Trustee, a representative of True North Partners, LLC, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only the Proposed Purchaser and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

   b. At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to participate in the Auction, and, at least one Business Day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer  (the "<u>High Bid</u>") to all Qualified Bidders who have informed the Debtors of their intent to participate in the Auction.

   c. All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

   d. The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids), provided that such rules are not inconsistent with these Bid Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Bankruptcy Court entered in connection herewith.

   e. Bidding at the Auction will begin with the High Bid and continue, on terms and conditions identical to the High Bid (other than the name of the purchaser(s)) in minimum increments of at least $50,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each Qualified Bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Proposed Purchaser), the Debtors may give effect to any Break-Up Fee that may be payable to the Proposed Purchaser under the Agreement.

11. <u>Selection Of Successful Bid</u>.  At the conclusion of the foregoing Auction, the Debtors will identify the highest offer(s) for the <u>Purchased</u> Assets and the Business received at the Auction (the "<u>Successful Bid(s)</u>" and the bidder(s) making such bid, the "<u>Successful Bidder(s)</u>").

The Debtors will sell the Purchased Assets for the highest Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Sellers' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

12. <u>Objections to the Sale Motion</u>.  Objections to the Sale Motion, if any, shall be filed and served no later than _____ (prevailing Mountain time) on _____, 2011 (the "<u>Objection Deadline</u>"). The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to <u>the</u> Sale Motion, the Sale, or the Debtors' consummation and performance of the Agreement (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of liens, claims, and encumbrances), with the exception of any objection to the conduct of the Auction or the Debtors' selection of the Successful Bidder, which may be made two business days following the end of the Auction or at the Sale Hearing, whichever is earlier.

13. <u>The Sale Hearing</u>.  The Sale Hearing will be held before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, on _____, 2011, at _____ (prevailing Mountain time), but may be adjourned or rescheduled in the Debtors' discretion, subject to Bankruptcy Court approval, as necessary, without further notice other than an announcement of the adjourned date at the Sale Hearing.  If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Proposed Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Proposed Purchaser following entry of the Sale Order. If the Debtors do receive additional Qualified Bids, then, at the Sale Hearing, the Debtors will seek approval of the Successful Bid(s) as well as the second highest or best Qualified Bid(s) (the "<u>Alternate Bid(s)</u>," and such bidder(s), the "<u>Alternate Bidder(s)</u>"). Following approval of the Sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder(s) or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such alternate Bidder(s) without further order of the Bankruptcy Court.

14. <u>Return Of Good Faith Deposits</u>.  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders) until two Business Days following the closing of the Sale (the "<u>Return Date</u>"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to

the Successful Bidder(s). If a Successful Bidder breaches its obligations under the Bid Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of the Debtors' estates. On the Return Date, the Debtors will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

15. <u>Reservations Of Rights</u>. The Debtors: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may at any time reject any bid (other than the Proposed Purchaser's initial bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, and their stakeholders as determined by the Debtors in their sole discretion.

16. <u>Notice to Non-Debtor Parties In Interest</u>. The <u>Debtors</u> shall give notice of the Proposed Sale, the Auction, and these Bid Procedures as follows:

    a. Within two business days after entry of the Bid Procedures Order (the "<u>Mailing Date</u>"), the Debtors (or their agent) shall serve a copy of the Sale Motion, the Agreement, the proposed Sale Approval Order, these Bid Procedures, and a copy of the Bid Procedures Order by overnight mail, postage prepaid, upon (i) the Office of the United States Trustee for the District of Arizona, (ii) counsel for the Proposed Purchaser, (iii) counsel for the official committee of unsecured creditors, if any, appointed in these chapter 11 cases, (iv) counsel for True North Partners, LLC, (v) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all United States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counter-parties to the Assumed Contracts, and (ix) the Internal Revenue Service.

    b. On or before _____, 2011, the Debtors shall file with this Court and serve on all non-Debtor counterparties to the Assumed Contracts a notice (the "<u>Assumption/Assignment Notice</u>"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 2, identifying the Proposed Purchaser as the party which will be assigned all of the Debtors' right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bid Procedures. The non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to the Proposed Purchaser on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Proposed Purchaser to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to the Proposed Purchaser must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court,

and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Proposed Purchaser and shall be forever barred from asserting any objection with regard to the assumption and assignment.

c. On or before _____, 2011, the Debtors' shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 3, to be sent to each non-Debtor party to an Assumed Contract identifying: (i) any contract that has been designated as an Assumed Contract in any Qualified Bid, and (ii) all Qualified Bidders. Each non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to any Qualified Bidder on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Qualified Bidder Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Qualified Bidder to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

# EXHIBIT "B"

C. Taylor Ashworth, AZ Bar No. 10143
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
jkahn@stinson.com

Alexander Terras
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ARETE HOLDINGS, LLC, | Case No. 2:11-bk-02009-RTB (Joint Administration Pending) |
| Debtor. | Case No. 2:11-bk-02010; Case No. 2:11-bk-02011; Case No. 2:11-bk-02012; and Case No. 2:11-bk-02020 |

This filing applies to:
■ All Debtors
□ Arete Holdings, LLC
□ Arete NW, LLC
□ Arete Sleep Therapy NW, LLC
□ Arete Sleep, LLC
□ Arete Sleep Therapy, LLC

**ORDER (I) APPROVING BID PROCEDURES, (II) GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE HEARING DATE IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS**

Hearing Date:     **None**
Hearing Time:
Location:            **Courtroom #703**
                         **230 N First Ave**
                         **Phoenix AZ 85003**

Upon the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and Assignment of Unexpired Leases and Executory Contracts; and For an Emergency Hearing on

Approval of Certain Auction and Bid Procedures, Including a Break-Up Fee; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Sale Motion"), dated January 26, 2011, of Areté Holdings, LLC, Areté NW, LLC, Areté Sleep, LLC, Areté Sleep Therapy, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"), Debtors and Debtors-In-Possession in the above-captioned matter, and upon the record of the hearing held on _____, 2011 (the "Bid Procedures Hearing"); and after due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.

B.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.     The relief requested in the Motion and granted herein is in the best interests of the Debtors' their estates, and other parties-in-interest.

D.     The notice of the Motion and the Bid Procedures Hearing given by the Debtors constitutes due and sufficient notice thereof.

E.     The Debtors have articulated good and sufficient reasons for the Court to (i) approve the Bid Procedures, (ii) grant certain bid protections as provided in the Agreement and this order, (iii) approve the manner of notice of the Motion, the Sale Hearing, and the assumption and assignment of the Assumed Contracts, (iv) approve the form of notice of the Motion and the Sale Hearing to be distributed to parties-in-interest, including prospective bidders, (v) approve the form of notice of the assumption and assignment of the Assumed Contracts to be filed with the Court and served on the non-Debtor counterparties thereto, and (vi) set the Sale Hearing.

F.     The Break-Up Fee and the Expense Reimbursement, as those terms are defined in the Agreement: (i) may be payable in accordance with the terms, conditions, and limitations of the Agreement, (ii) if triggered, shall be deemed actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503 and 507 of the Bankruptcy Code, (iii) are of substantial benefit to the Debtors' estates, (iv) are reasonable and appropriate, including in light of the size and nature of the proposed sale and the efforts that have been and will be expended by the

Proposed Purchaser notwithstanding that the proposed sale is subject to higher or better offers for the Purchased Assets, (v) were negotiated by the parties at arms' length and in good faith, and (vi) are necessary to ensure that the Proposed Purchaser will continue to pursue the proposed acquisition of the Purchased Assets. The Break-Up Fee and Expense Reimbursement were material inducements for, and conditions of, the Proposed Purchaser's entry into the Agreement. The Proposed Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Agreement unless it is assured of payment of the Break-Up Fee and the Expense Reimbursement. Thus, assurance to the Proposed Purchaser of payment of the Break-Up Fee and Expense Reimbursement should promote more competitive bidding by inducing the Proposed Purchaser to hold its bid open. Without the Break-Up Fee and the Expense Reimbursement, other bidding would be limited. Further, because the Break-Up Fee and Expense Reimbursement induced the Proposed Purchaser to submit a bid that will serve as a minimum or floor bid on which other bidders can rely, the Proposed Purchaser has provided a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth. Finally, absent authorization of the Break-Up Fee and the Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest or otherwise best available offer for the Purchased Assets.

G.     The Bid Procedures attached hereto as <u>Exhibit 1</u> (the "<u>Bid Procedures</u>") are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

**Bid Procedures**

1.     The Bid Procedures, incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern all events relating to the Agreement, any subsequent bids for the Purchased Assets in these cases, and the Auction, if applicable.

2.     The Debtors may: (i) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer, (ii) consult with the representative of any official committee or significant constituent in connection with the Bid Procedures, and (iii) reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid (other than the Proposed Purchaser's bid)

which is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (c) contrary to the best interests of the Debtors or their estates. The Debtors are authorized: (x) to terminate the bid process or the Auction at any time if they determine, in their business judgment, that the bidding process will not maximize the value of the Purchased Assets to be realized by the Debtors' estates, and (y) to seek Bankruptcy Court approval of the Agreement. If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, or should the Debtors terminate the bidding process or the Auction as set forth above, the Debtors shall report the same to the Bankruptcy Court and shall proceed with the proposed sale pursuant to the terms of the Agreement.

**Sale Hearing**

3.    The Court shall hold a Sale Hearing on _____, 2011 at _____ (prevailing Mountain time), before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, at which time the Court shall consider the remainder of the Motion not approved by this order (the "Sale Motion"), and may approve the sale to the Proposed Purchaser or the Successful Bidder, as the case may be, and confirm the results of the Auction, if any. The Sale Hearing or any portion thereof, such as with respect to the proposed assumption and assignment of a particular executory contract, may be adjourned by the Debtors from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

4.    As detailed more fully in the Bid Procedures, objections to the Sale Motion and/or the assumption or assignment of any Assumed Contract, including objections to any Cure Amount, shall be filed and served no later than _____ (prevailing Mountain time) on _____, 2011 (the "Objection Deadline"). The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Sale, any Cure Amount, the assumption or assignment of any Assumed Contract for any reason other than the Cure Amount, the Debtors' consummation and performance of the Agreement or any other agreement related to a

Successful Bid (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of liens, claims, and encumbrances), with the exception of any objection to the conduct of the Auction or the Debtors' selection of the Successful Bidder, which may be made two business days following the end of the Auction or at the Sale Hearing, whichever is earlier.

**Bid Protections**

5.      The Break-Up Fee and Expense Reimbursement are hereby approved.

6.      The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Agreement shall survive termination of the Agreement and, until paid in accordance with the Agreement, shall constitute an administrative expense claim in favor of the Proposed Purchaser. The Debtors shall be obligated to pay the Break-Up Fee and the Expense Reimbursement to the Proposed Purchaser in accordance with the terms of the Agreement without further order of the Court. Notwithstanding any other language in this order, the Debtors shall be obligated to pay the Break-Up Fee and/or the Expense Reimbursement only if the Proposed Purchaser is not in material breach of the Agreement.

**Notice**

7.      Notice of (i) the Motion, including the proposed Sale of the Purchased Assets to the Proposed Purchaser, (ii) the Sale Hearing, and (iii) the proposed assumption and assignment of the Assumed Contracts to the Proposed Purchaser pursuant to the Agreement or to a Successful Bidder shall be good, sufficient, and timely notice, and no other or further notice shall be required, if notice is given as follows:

8.      Within two business days after entry of this order (the "Mailing Date"), the Debtors (or their agent) shall serve the Motion, the Agreement, the proposed Sale Approval Order, the Bid Procedures, and a copy of this order by overnight mail, postage prepaid, upon (i) the Office of the United States Trustee for the District of Arizona, (ii) counsel for the Proposed Purchaser, (iii) counsel for the official committee of unsecured creditors, if any, appointed in these chapter 11 cases, (iv) counsel for True North Partners, LLC, (v) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all United

DB04/810420.0002/3919652.1 DD02

States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counter-parties to the Assumed Contracts, and (ix) the Internal Revenue Service.

9.     On or before _____, 2011, the Debtors shall file with this Court and serve on all non-Debtor counterparties to the Assumed Contracts a notice (the "Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 2, identifying the Proposed Purchaser as the party which will be assigned all of the Debtors' right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bid Procedures. The non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to the Proposed Purchaser on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Proposed Purchaser to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default.  Any objections to the assumption and assignment of an Assumed Contract to the Proposed Purchaser must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282.  Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the

Assumed Contract to the Proposed Purchaser and shall be forever barred from asserting any objection with regard to the assumption and assignment.

10.     On or before _____, 2011, the Debtors' shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 3, to be sent to each non-Debtor party to an Assumed Contract identifying: (i) any contract that has been designated as an Assumed Contract in any Qualified Bid, and (ii) all Qualified Bidders. Each non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to any Qualified Bidder on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Qualified Bidder Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Qualified Bidder to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

1    11.    Notwithstanding rules 6004(h), 6006(d), 7062, or 9014 of the Federal Rules of
2    Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") or any other Bankruptcy Rule or rule 62(a) of the
3
4    Federal Rules of Civil Procedure, this order shall be immediately effective and enforceable upon its

     entry and there shall be no stay of execution of this order.
5
6    12.    This Court shall retain jurisdiction to hear and determine all matters arising from the

     implementation of this order.
7
        DATED AND SIGNED ABOVE.
8

DB04/810420.0002/3919652.1 DD02

# BID PROCEDURES

Set forth herein are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of substantially all of the assets of Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"). On January 25, 2011, the Debtors executed that certain Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser").[1] The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code), and certain other closing conditions.

On January 26, 2011, the Debtors filed the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and Assignment of Unexpired Leases and Executory Contracts; and For an Emergency Hearing on Approval of Certain Auction and Bid Procedures, Including a Break-Up Fee; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Sale Motion"). On _____ 2011, the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") entered the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All The Debtors' Assets (the "Bid Procedures Order"). The Bid Procedures Order set _____, 2011 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Debtors to enter into the Agreement.

The Bid Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified Bidders and Bids, respectively, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), and the ultimate selection of the Successful Bidder(s) (as defined herein). The Debtors intend to consult with, among others, the United States Trustee and, if appointed, the official committee of unsecured creditors (the "Creditors' Committee") throughout the sale process. In the event that the Debtors and any party disagree as to the interpretation or application of these Bid Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

1.  Assets To Be Sold. With the exception of those assets designated as Excluded Assets in the Agreement, the Purchased Assets include all Debtors' rights, title and interest in, to and under all assets, rights and properties of the Business (whether real, personal or mixed, tangible and intangible, and of every kind, character and description), which are used, or held for use, in the Business (including the Business as a going concern) or otherwise including any Seller's rights in: (i) tangible personal property, (ii) inventory; (iii) assumed contracts, (iv) business proprietary rights; (v) files and records; (vi) licenses; (vii) security deposits; (viii) warranties; (ix) claims; (x) certifications; and (xi) goodwill.

2.  As Is, Where Is. The sale of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their

---

[1] All capitalized terms used but not otherwise defined in these Bid Procedures have the meanings ascribed to them in the Agreement.

agents, or estates, except, with respect to the Proposed Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder (as defined herein), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

3. <u>Free Of Any And All Encumbrances</u>. All of the Debtors' right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired will be sold free and clear of all Liens except the Permitted Liens (as such terms are defined in the Agreement), and such Liens will attach to the net proceeds of the sale of such Purchased Assets.

4. <u>Participation Requirements</u>. Any person who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other <u>than</u> the Purchaser, must deliver (unless previously delivered) to the Debtors and their counsel at the addresses provided below, unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Debtors in their sole discretion:

   a. An executed confidentiality agreement in form and substance satisfactory to Debtors;

   b. Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, including a portion of the Purchased Assets, current audited financial statements of the equity holders of the Potential Bidder, who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors;

   c. A preliminary (non-binding) proposal reflecting: (i) the purchase price range, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction, (iv) any anticipated regulatory approvals required to close the transaction, (v) the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) any additional conditions to closing that the Potential Bidder may wish to impose, and (vii) the nature and extent of any additional due diligence that the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

   A Potential Bidder who satisfies the requirements above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale if selected as a Successful Bidder, and who the Debtors determine is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder." Notwithstanding the foregoing, the Proposed Purchaser will be deemed a Qualified Bidder for purposes of the bidding process. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors will then promptly allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as described below.

5. <u>Due Diligence</u>. The Debtors will afford each Qualified Bidder due diligence access to the Purchased Assets and the Business Due diligence access may include such management presentations as may be scheduled by Debtors, access to data rooms, on site inspections, and such other matters which a Qualified Bidder may request and as to which the Debtors may agree. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. The Debtors may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. The Debtors (or any of their respective representatives) shall not be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

6. <u>Bid Deadline.</u> A Qualified Bidder who desires to make a bid must deliver the Required Bid Documents to: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, <u>Scottsdale</u>, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; so as to be received not later than _____ a.m. (prevailing Mountain time) on _____, 2011 (the "<u>Bid Deadline</u>"). The Debtors may extend the Bid Deadline once or successively, but are not obligated to do so. If the Debtors extends the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

7. <u>Bid Requirements</u>. All bids must include the following documents (the "<u>Required Bid Documents</u>"):

    a. A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Purchased Assets.

    b. A complete, comprehensive, and binding asset purchase agreement, together with all schedules and exhibits to such agreement (a "<u>Competing Agreement</u>")

    c. A good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Debtors in their sole discretion) payable to the order of Arete Holdings, LLC (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price identified in the Competing Agreement.

    d. Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that is satisfactory to the Debtors and their advisors.

8. <u>Consideration of Qualified Bids</u>. A bid will be considered only if the bid:

    a. Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the Qualified Bidder.

    b. Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtors determine

are similar to and are not materially more burdensome or conditional than those contained in the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee and Expense Reimbursement, plus: (i) in the case of the initial Qualified Bid, $190,000, and (ii) in the case of any subsequent Qualified Bids, $50,000 over the immediately preceding highest Qualified Bid.

c. Is not conditioned upon (A) any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment and (B) such bid being deemed the Successful Bid by the Debtors.

d. Includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or a Competing Agreement.

e. Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required Governmental Approvals) within not more than 15 days after entry of the Sale Approval Order, or in the case of any governmental approvals, 60 days after entry of such order.

f. Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, the Debtors will have the right to entertain bids for the Purchased Assets that do not conform to one or more of the requirements specified in this section, and may deem such bids to be Qualified Bids, including bids for a portion of the Purchased Assets. Notwithstanding the foregoing, the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bid Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Proposed Purchaser is referred to herein as a "Subsequent Bid."

If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, the Debtors will report the same to the Bankruptcy Court and will request approval of the Sale pursuant to the terms of the Agreement as soon as reasonably practicable after the Bid Deadline.

9. <u>Bid Protection</u>   Recognizing the Proposed Purchaser's expenditure of time, energy, and resources, the Debtors have agreed to provide certain bidding protections to the Proposed Purchaser.  Specifically, the Debtors have determined that the Agreement furthers the goals of the Bid Procedures by setting a floor which all other Qualified Bids must exceed. As a result, the Debtors have agreed that if they do not close with the Proposed Purchaser because the

Debtors consummate an Alternative Transaction, as that term is defined herein, and the Proposed Purchaser is not in breach of the Agreement or the Bidding Procedures, the Debtors will, in certain circumstances, pay to the Proposed Purchaser a Break-Up Fee and Expense Reimbursement. The payment of the Break-Up Fee and Expense Reimbursement will be governed by the provisions of the Agreement and the Bid Procedures Order.

10. Auction  If the Debtors receive one or more Qualified Bids in addition to the Agreement, the Debtors will conduct an auction (the "Auction") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at _____ (prevailing Mountain time) on _____, 2011 at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than _____, 2011), in accordance with the following procedures:

   a. Only the Debtors, the Proposed Purchaser, a representative of the Office of the United States Trustee, a representative of True North Partners, LLC, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only the Proposed Purchaser and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

   b. At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to participate in the Auction, and, at least one Business Day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer  (the "High Bid") to all Qualified Bidders who have informed the Debtors of their intent to participate in the Auction.

   c. All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

   d. The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids), provided that such rules are not inconsistent with these Bid Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Bankruptcy Court entered in connection herewith.

   e. Bidding at the Auction will begin with the High Bid and continue, on terms and conditions identical to the High Bid (other than the name of the purchaser(s)) in minimum increments of at least $50,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each Qualified Bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Proposed Purchaser), the Debtors may give effect to any Break-Up Fee that may be payable to the Proposed Purchaser under the Agreement.

11. <u>Selection Of Successful Bid</u>.  At the conclusion of the foregoing Auction, the Debtors will identify the highest offer(s) for the <u>Purchased</u> Assets and the Business received at the Auction (the "<u>Successful Bid(s)</u>" and the bidder(s) making such bid, the "<u>Successful Bidder(s)</u>").

The Debtors will sell the Purchased Assets for the highest Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Sellers' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

12. <u>Objections to the Sale Motion</u>.  Objections to the Sale Motion, if any, shall be filed and served no later than _____ (prevailing Mountain time) on _____, 2011 (the "<u>Objection Deadline</u>"). The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to <u>the</u> Sale Motion, the Sale, or the Debtors' consummation and performance of the Agreement (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of liens, claims, and encumbrances), with the exception of any objection to the conduct of the Auction or the Debtors' selection of the Successful Bidder, which may be made two business days following the end of the Auction or at the Sale Hearing, whichever is earlier.

13. <u>The Sale Hearing</u>.  The Sale Hearing will be held before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, on _____, 2011, at _____ (prevailing Mountain time), but may be adjourned or rescheduled in the Debtors' discretion, subject to Bankruptcy Court approval, as necessary, without further notice other than an announcement of the adjourned date at the Sale Hearing.  If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Proposed Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Proposed Purchaser following entry of the Sale Order. If the Debtors do receive additional Qualified Bids, then, at the Sale Hearing, the Debtors will seek approval of the Successful Bid(s) as well as the second highest or best Qualified Bid(s) (the "<u>Alternate Bid(s)</u>," and such bidder(s), the "<u>Alternate Bidder(s)</u>"). Following approval of the Sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder(s) or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such alternate Bidder(s) without further order of the Bankruptcy Court.

14. <u>Return Of Good Faith Deposits</u>.  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders) until two Business Days following the closing of the Sale (the "<u>Return Date</u>"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to

the Successful Bidder(s). If a Successful Bidder breaches its obligations under the Bid Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of the Debtors' estates. On the Return Date, the Debtors will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

15. <u>Reservations Of Rights</u>.  The Debtors: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may at any time reject any bid (other than the Proposed Purchaser's initial bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, and their stakeholders as determined by the Debtors in their sole discretion.

16. <u>Notice to Non-Debtor Parties In Interest</u>.  The <u>Debtors</u> shall give notice of the Proposed Sale, the Auction, and these Bid Procedures as follows:

    a. Within two business days after entry of the Bid Procedures Order (the "<u>Mailing Date</u>"), the Debtors (or their agent) shall serve a copy of the Sale Motion, the Agreement, the proposed Sale Approval Order, these Bid Procedures, and a copy of the Bid Procedures Order by overnight mail, postage prepaid, upon (i) the Office of the United States Trustee for the District of Arizona, (ii) counsel for the Proposed Purchaser, (iii) counsel for the official committee of unsecured creditors, if any, appointed in these chapter 11 cases, (iv) counsel for True North Partners, LLC, (v) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all United States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counter-parties to the Assumed Contracts, and (ix) the Internal Revenue Service.

    b. On or before _____, 2011, the Debtors shall file with this Court and serve on all non-Debtor counterparties to the Assumed Contracts a notice (the "<u>Assumption/Assignment Notice</u>"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 2, identifying the Proposed Purchaser as the party which will be assigned all of the Debtors' right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bid Procedures. The non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to the Proposed Purchaser on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Proposed Purchaser to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default.  Any objections to the assumption and assignment of an Assumed Contract to the Proposed Purchaser must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court,

and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Proposed Purchaser and shall be forever barred from asserting any objection with regard to the assumption and assignment.

   c.   On or before _____, 2011, the Debtors' shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 3, to be sent to each non-Debtor party to an Assumed Contract identifying: (i) any contract that has been designated as an Assumed Contract in any Qualified Bid, and (ii) all Qualified Bidders. Each non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to any Qualified Bidder on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Qualified Bidder Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Qualified Bidder to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

# EXHIBIT "C"

1    C. Taylor Ashworth, AZ Bar No. 10143
     Christopher Graver, AZ Bar #013235
2    Josh Kahn, AZ Bar No. 26284
     **STINSON MORRISON HECKER LLP**
3    1850 N. Central Avenue, Suite 2100
     Phoenix, Arizona 85004-4584
4    Tel: (602) 279-1600
     Fax: (602) 240-6925
5    jkahn@stinson.com

6    Alexander Terras
     **REED SMITH LLP**
7    10 S. Wacker Drive, Suite 4000
     Chicago, Illinois 60606
8    Tel: (312) 207-3870
     Fax: (312) 207-6400
9    aterras@reedsmith.com

10   Proposed Attorneys for Debtors and Debtors-in-Possession

11          **IN THE UNITED STATES BANKRUPTCY COURT**

12             **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re | Chapter 11 |
| ARETE HOLDINGS, LLC, | Case No. 2:11-bk-02009-RTB (Joint Administration Pending) |
| Debtor. | Case No. 2:11-bk-02010; Case No. 2:11-bk-02011; Case No. 2:11-bk-02012; and Case No. 2:11-bk-020 |
| This filing applies to:  ■ All Debtors<br>    □ Arete Holdings, LLC<br>    □ Arete NW, LLC<br>    □ Arete Sleep Therapy NW, LLC<br>    □ Arete Sleep, LLC<br>    □ Arete Sleep Therapy, LLC | **ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN THE ASSUMED CONTRACTS; AND (D) GRANTING RELATED RELIEF** |
| | **Hearing Date:**     **None**<br>**Hearing Time:**<br>**Location:**       **Courtroom #703**<br>                   **230 N First Ave**<br>                   **Phoenix AZ 85003** |

27         Upon the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset

28   Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and

Assignment of Certain Unexpired Leases and Executory Contracts; and for an Emergency Hearing on Approval of Certain Auction and Bid Procedures, including a Break-Up Fees; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Motion")[1], filed by Areté Holdings, LLC, Areté NW, LLC, Areté Sleep, LLC, Areté Sleep Therapy, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"), Debtors and Debtors-In-Possession in the above-captioned matter; this Court having entered an order approving, among other things, the Bid Procedures, the Break-Up Fee and the Expense Reimbursement [Docket No. _____ _____] (the "Bid Procedures Order"); [no other Qualified Bids in having been received in accordance with Bid Procedures Order, and no Auction having been conducted in accordance with the Bid Procedures Order] [Qualified Bids having been received from _____ prior to the Bid Deadline, and the Debtors having conducted the Auction in accordance with the Bid Procedures Order]; Sleep Science, Inc. (the "Purchaser") having submitted the highest or otherwise best offer; the Court having conducted a hearing on the Motion commencing on _____, 2011 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; the Court having reviewed and considered the Motion, the Agreement, the Bid Procedures Order, the record of the hearing before the Court on _____, 2011 (the "Bid Procedures Hearing") at which the Bid Procedures Order was approved and all objections to the Proposed Sale and the Agreement filed in accordance with the Bid Procedures Order; the appearance of all interested parties and all responses and objections to the Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and any objections and responses to the relief requested in the Motion having been heard and overruled, continued or resolved in their entirety, and it appearing that due notice of the Motion, the Agreement, the Bid Procedures Order and the Auction having been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors,

---

[1]     All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined herein) and the Motion, as applicable.

their estates, stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:**

### Jurisdiction, Venue and Final Order

1. This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Notice of the Proposed Sale, Agreement, Sale Hearing, Auction and the Cure Amounts

2. As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the Agreement and the Proposed Sale have been provided in accordance with Sections 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006. The Debtors have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the Agreement and the Proposed Sale as required by the Bid Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Agreement or the Proposed Sale is required for the entry of this Order.

3. A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

4. In accordance with the Bid Procedures Order, the Debtors have served a notice (as amended, modified or otherwise supplemented from time to time, the "Assumption/Assignment Notice") of the potential assumption and assignment of the Assumed Contracts and of the proposed cure amounts (each, a "Cure Amount" and, collectively, the "Cure Amounts") upon each non-Debtors counterparty to an Assumed Contract. The service and provision of the Assumption/Assignment Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of the assumption and assignment of the Assumed Contracts or establishing a Cure

Amount for the respective Assumed Contracts. Non-Debtors counterparties to the Assumed Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the Assumption/Assignment Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtors counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of Section 365(c)(1) of the Bankruptcy Code). The deadline to file an objection to the assumption and assignment to the Purchaser of any Assumed Contract (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled or continued to a later hearing by agreement of the parties. To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the Assumed Contract and (ii) the Cure Amount set forth on the Assumption/Assignment Notice.

**Highest or Otherwise Best Offer**

5.     As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have otherwise complied in all respects with, the Bid Procedures Order. The Auction was duly noticed and the Auction process set forth in the Bid Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase all of the Purchased Assets and assume all of the Assumed Liabilities.

6.     The Purchased Assets were adequately marketed by the Debtors, and the consideration provided by Purchaser under the Agreement constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Purchased Assets and the assumption of all Assumed Liabilities.

7.     Approval of the Motion and the Agreement and the consummation of the Proposed Sale contemplated thereby are in the best interests of the Debtors, their creditors, estates and other parties-in-interest. The Debtors have demonstrated good, sufficient and sound business reasons and

DB04/810420.0002/3919870.1 DD02

justifications for entering into the Proposed Sale and the performance of their obligations under the Agreement.

8.    Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Proposed Sale.

9.    The Agreement was not entered into, and neither the Debtors nor the Purchaser, have entered into the Agreement or proposing to consummate the Proposed Sale, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  Neither the Debtors nor Purchaser is entering into the Agreement, or proposing to consummate the Proposed Sale, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

10.    The offer of Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement:  (i) is the highest and/or otherwise best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Purchased Assets.

11.    The Purchaser is the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order.  The Purchaser has complied in all respects with the Bid Procedures Order and any other applicable order of this Court in negotiating and entering into the Agreement and the Proposed Sale, and the Agreement complies with the Bid Procedures Order and any other applicable order of this Court.

### Good Faith of Debtors and the Purchaser

12.    The sales process conducted by the Debtors, including without limitation, the Bid Procedures set forth in the Bid Procedures Order, was at arm's length, non-collusive, in good faith and substantively and procedurally fair to all parties.

13.    The Debtors and their professionals have complied, in good faith, in all respects with the Bid Procedures Order.  As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bid Procedures Order, the Debtors: (a) afforded interested potential purchaser a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and (c) considered any bids submitted on or before the Bid Deadline.

14.    The Agreement and the Proposed Sale contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and the Purchaser without collusion, in good faith and at arm's length.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Agreement or the Proposed Sale to be avoided under Section 363(n) of the Bankruptcy Code.

15.    Neither the Purchaser nor any of its respective affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code.  The Purchaser is entering into the Proposed Sale in good faith and is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Agreement to be avoided or impose any costs or damages under Section 363(n) of the Bankruptcy Code.

## Section 363 is Satisfied

16.    The Debtors have demonstrated a sufficient basis and compelling circumstances to permit them to (i) enter into the Agreement and (ii) sell the Purchased Assets and assume and assign the Assumed Contracts, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  Such business reasons include,

but are not limited to, the fact that (i) the Agreement constitutes the highest or otherwise best offer for the Purchased Assets; (ii) the Agreement presents the best opportunity to realize the value of the Debtors on a going concern basis and avoid any potential decline and devaluation of the Debtors' business; and (iii) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the Agreement, recoveries of creditors may be diminished.

17.    The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code section 363(b)(1).  Accordingly, appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 363(b)(1) or 332 is not required with respect to the relief requested in the Motion.

18.    The Purchased Assets constitute property of the Debtors' estate and title thereto is presently vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code.

19.    The sale of the Purchased Assets to the Purchaser under the terms of the Agreement meets the applicable provisions of Section 363(f) of the Bankruptcy Code such that the sale of the Purchased Assets will be free and clear of any and all claims, and except as expressly provided in the Agreement with respect to the Assumed Liabilities, the (i) transfer of the Purchased Assets to Purchasers and (ii) assumption and/or assignment to Purchaser of the Assumed Contracts and Assumed Liabilities will be free and clear of all claims and will not subject the Purchaser or any of the Purchaser's assets to any liability for any claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability).  All holders of claims who did not object, or withdrew their objections to the Proposed Sale, are deemed to have consented to the Proposed Sale pursuant to Section 363(f)(2) of the Bankruptcy Code, and all holders of claims are adequately protected — thus satisfying Section 363(e) of the Bankruptcy Code — by having their claims, if any, attach to the proceeds of the Proposed Sale ultimately attributable to the property against or in which they assert a claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such claim holder had prior to the Proposed Sale, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

20.     The Purchaser would not have entered into the Agreement and would not consummate the sale of the Purchased Assets, thus adversely affecting the Debtors, their estate, creditors, employees and other parties in interest, if the sale of the Purchased Assets was not free and clear of all Claims (defined below) or if the Purchaser could be liable for any claims, including, without limitation and as applicable, certain liabilities that expressly are not assumed by Purchaser as set forth in the Agreement or in this Order.  The Purchaser asserts that it will not consummate the Proposed Sale unless the Agreement specifically provides and this Court specifically orders that none of the Purchaser, its assets or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any (i) claim or (ii) successor or transferee liability for the Debtors other than with respect to the Assumed Liabilities.

21.     The transfer of the Purchased Assets to Purchaser under the Agreement  will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and clear of all claims.  The Debtors may sell their interests in the Purchased Assets free and clear of all claims because, in each case, one or more of the standards set forth in Section 363(f) has been satisfied.  The transfer of the Purchased Assets to Purchaser will vest Purchaser with good and marketable title to the Purchased Assets.

22.     The Purchaser is not a continuation of the Debtors or their estates and there is no continuity between Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates and the Proposed Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

**Assumption and Assignment of the Assumed Contracts**

23.     The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Purchaser) that are designated for assumption and assignment pursuant to the terms of this Order and the Agreement are integral to the Agreement, are in the best interests of the Debtors and their estates,

creditors and other parties-in-interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

24.     No section of any Assumed Contract which purports to prohibit, restrict or condition the use, consideration or assignment of any such Assumed Contract in connection with the Proposed Sale shall have any force or effect.

25.     The Debtors have met all requirements of Section 365(b) of the Bankruptcy Code for each of the Assumed Contracts. The Debtors and/or the Purchaser, as applicable under the Agreement, have (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code. Each of the Assumed Contracts is free and clear of all Claims against the Purchaser.

26.     The Purchaser has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Pursuant to Section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

27.     No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in Section 365(b)(1)(A) of the Bankruptcy Code.

28.     There is no legal or equitable reason to delay the Proposed Sale.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

(a)     The Motion is granted in its entirety and approved in all respects.

(b)     All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing and all reservations of rights included therein, are hereby overruled on the merits with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including, without limitation, all non-debtor parties to the Assumed Contracts.

(c)     The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.  To the extent any of the following constitute findings of fact or conclusions of law, they are adopted as such.  To the extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

**Approval of the Agreement**

(d)     The Agreement, all of the terms and conditions thereof, and all of the Proposed Sale contemplated therein are approved in all respects. The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety. The transfer of the Purchased Assets by the Debtors to the Purchaser shall be a legal, valid and effective transfer of the Purchased Assets. The consummation of the Proposed Sale is hereby approved and authorized under Section 363(b) of the Bankruptcy Code.

(e)     The Debtors are authorized and, to the extent not already done, directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Proposed Sale, including the sale to Purchaser of all Purchased Assets, in accordance with the terms and conditions set forth in the Agreement and this Order, including, without limitation, executing, acknowledging and delivering such corporate name change certificates, deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying and confirming to Purchaser, or reducing to possession, any or all of the Purchased Assets and (b) to assume and assign any and all Assumed Contracts to the Purchaser.  The Debtors are further authorized to pay, whether before, at or after the

Closing, any expenses or costs required to be paid in order to consummate the Proposed Sale or perform their obligations under the Agreement.

(f)     The Debtors are authorized, and to the extent not already done, directed, to enter into the Management/Leaseback Agreement detailed in Section 2.6 of the Agreement, pursuant to which the Purchaser will lease back to Debtors certain purchased assets and shall retain management responsibility for key aspects of Debtors' leaseback operations.

(g)     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Agreement and this Order.

(h)     Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Agreement or this Order, and, to the extent of any conflict or derogation between this Order or the Agreement and such future chapter 11 plan or order, the terms of this Order and the Agreement shall control.

### Sale and Transfer Free and Clear of Claims

(i)     Except as otherwise expressly provided in the Agreement and the terms of this Order with respect to Assumed Liabilities, the Purchased Assets shall be sold free and clear of all claims, liens, liabilities, interests, rights and encumbrances, including, without limitation, the following:  all restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments; demands, rights of first refusal, consent rights, offsets, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any

agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases (but, for the avoidance of doubt, in each case prior to the Closing), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability (all of the foregoing collectively being referred to in this Order as "Claims", and, as used in this Order such term includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof) with all such Claims to attach to the consideration to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. As used in this Order, the term "Liens" includes, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof.

(j)     At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in the Purchaser pursuant to Sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims except for Assumed Liabilities. Such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets. All persons or entities, presently or on or after the Closing, in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser or its respective designees on the Closing or at such time thereafter as the Purchaser may request.

(k)     This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims (other than Assumed Liabilities) will be capable of being asserted against the Purchaser or any of its respective assets (including the Purchased Assets), (ii) the Purchased Assets shall have been

DB04/810420.0002/3919870.1 DD02

transferred to Purchaser free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Proposed Sale contemplated by the Agreement. The Purchased Assets are sold free and clear of any reclamation rights.

(l)     Except as otherwise expressly provided in the Agreement with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its property or the Purchased Assets. Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, or based on any action the Debtors may take in their chapter 11 cases.

(m)     If any person or entity that has filed financing statements or other documents or agreements evidencing Claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Purchased Assets or otherwise, then only with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Agreement and this Order (a) the Debtors is hereby

authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser and the applicable Purchased Assets; and (c) the Purchaser may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Purchased Assets other than Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

(n)     To the maximum extent permitted under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

(o)     To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, assigned or conveyed to Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Proposed Sale.

(p)     For the avoidance of doubt, only Purchased Assets that are part of the Debtors' estates are being sold to the Purchaser free and clear of Claims pursuant to Section 363(f) of the Bankruptcy Code.

### No Successor or Transferee Liability

(q)     Except as expressly provided in the Agreement with respect to Assumed Liabilities, the Purchaser shall not be deemed, as a result of any action taken in connection with the Agreement, the consummation of the Proposed Sale contemplated by the Agreement, or the transfer or operation of the Purchased Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations as an assignee under the Assumed Contracts arising after the Closing); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an

alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the NLRA, environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

(r)     Other than as expressly set forth in the Agreement with respect to Assumed Liabilities, the Purchaser shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Purchased Assets, including, without limitation, the Excluded Liabilities or (b) any remaining Claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Agreement with respect to Assumed Liabilities, the Purchaser shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing. Except to the extent

expressly included in the Assumed Liabilities with respect to the Purchaser, the Purchaser shall have no liability or obligation under the WARN or CERCLA, or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities by the Purchaser or an Affiliate of the Purchaser.

(s)     Except as expressly provided in the Agreement for the Assumed Liabilities, with respect to the Purchaser, nothing in this Order or the Agreement shall require the Purchaser to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are parties or have any responsibility including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

(t)     Effective upon the Closing, and except as set forth in the Agreement, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, or its assets (including the Purchased Assets), with respect to any (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

DB04/810420.0002/3919870.1 DD02

**Good Faith of Purchaser**

(u)     The Proposed Sale contemplated by the Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Proposed Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

(v)     Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Proposed Sale to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Purchased Assets under the Agreement is fair and reasonable and the sale may not be avoided under Section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Assumed Contracts**

(w)     The Debtors are authorized and directed at the Closing to assume and assign each of the Assumed Contracts.  The payment of the applicable Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such non-debtor counterparty resulting from such default and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to the Purchaser, constitute adequate assurance of future performance thereof.

(x)     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser or an Affiliate of the Purchaser of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts

DB04/810420.0002/3919870.1 DD02

shall remain in full force and effect for the benefit of the Purchaser. Each non-debtor counterparty to the Assumed Contracts shall be forever barred, estopped and permanently enjoined from (a) asserting against the Debtors or the Purchaser or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against the Purchaser (or its property, including the Purchased Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or capable of being asserted against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

(y)     In the case of licenses, certificates, approvals, authorization, leases, contracts, agreements and other commitments include in the Purchased Assets that (a) cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to Closing, the Debtors shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain such consent and, if any such consent is not obtained, the Debtors shall, following Closing, and subject to any approval of the Bankruptcy Court that may be required, cooperate with the Purchaser in all reasonable respects to provide to the Purchaser the benefits thereof in some other manner or (b) that are otherwise not transferable or assignable, the Debtors shall, following Closing, and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser to provide to the Purchaser the benefits thereof in some other manner (including the exercise of the rights of the Debtors thereunder).

(z)     Upon the Closing and the payment of the relevant Cure Amounts by Debtors or the Purchaser as set forth in the Agreement, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be released, pursuant to Section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

(aa)    Each non-debtor party to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Purchaser, or its property (including without limitation the Purchased Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or other claim asserted or capable of being asserted against the Debtors.

(bb)    Other than the Assumed Contracts, the Purchaser assumed none of the Debtors' other contracts and leases and shall have no liability whatsoever thereunder.

(cc)    The assignments of each of the Assumed Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

## Other Provisions

(dd)    As soon as practicable after Closing, the Debtors shall (a) effectuate a name change to change the name of Debtors.  Upon a filing by the Debtors of a notice that the Closing has occurred, the Clerk of the Bankruptcy Court is directed to change the name of the Debtors on the docket of these Chapter 11 Cases and revise the caption of these Chapter 11 Cases accordingly.

(ee)    The Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transaction contemplated by the Agreement based upon any arrangement made by or on behalf of the Debtors.

(ff)    This Order is binding upon and inures to the benefit of any successors and assigns of the Debtors or the Purchaser, including any trustee appointed in any subsequent case of the Debtors under chapter 7 of the Bankruptcy Code.

(gg)    The provisions of this Order and the Agreement are non-severable and mutually dependent.

(hh)    The Agreement may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

(ii)    Nothing in this Order, the Agreement or any asset purchase agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and

regulatory statutes or regulations that any entity would be subject to as the owner or operator of property from and after the Closing. Nothing in this Order, the Agreement or any asset purchase agreement authorizes the transfer to the Purchaser of any licenses, permits, registrations or governmental authorizations and approvals that would require government approval prior to such transfer without the Purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

(jj) The Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are parties or which has been assigned by the Debtors to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale. This Court retains jurisdiction to compel delivery of the Purchased Assets, to protect the Purchaser and its assets, including the Purchased Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, to transfer the Purchased Assets and the Assumed Contracts to the Purchaser.

(kk) Notwithstanding the possible applicability of Rules 6004(h), 6006(d), 7062 and 9014 of the Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors and Purchaser are authorized to close the sale immediately upon entry of this Order.

(ll) To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the Agreement or the Bid Procedures Order, this Order shall govern and control, and to the extent the Motion conflicts with, or is otherwise inconsistent with, the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern and control.

DATED AND SIGNED ABOVE.

DB04/810420.0002/3919870.1 DD02

# EXHIBIT "B"

C. Taylor Ashworth, AZ Bar No. 10143
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
cgraver@stinson.com

Alexander Terras
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| ARETE HOLDINGS, LLC, | Case No. 2:11-bk-02009-RTB (Joint Administration Pending) |
| Debtor. | Case No. 2:11-bk-02010; Case No. 2:11-bk-02011; Case No. 2:11-bk-02012; and Case No. 2:11-bk-020 |
| This filing applies to: ■ All Debtors □ Arete Holdings, LLC □ Arete NW, LLC □ Arete Sleep Therapy NW, LLC □ Arete Sleep, LLC □ Arete Sleep Therapy, LLC | **NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION** |
| | **Hearing Date: None Hearing Time: Location: Courtroom #_____ 230 N First Ave Phoenix AZ 85003** |

**PLEASE TAKE NOTICE THAT:**

1.      As detailed more fully in the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All the Debtors' Assets, entered on January ___, 2011 (the "Bid Procedures Order"), Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors") entered into an

Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser") for the purchase of substantially all of the Debtors' Assets (the "Purchased Assets").

2.    All interested parties are invited to make an offer to purchase the Purchased Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the "Bid Procedures"). As detailed more fully in the Bid Procedures, any such bids must be accompanied by certain Required Bid Documents, and must be submitted so as to be received by: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003, later than _____ (prevailing Mountain time) on _____, 2011 (the "Bid Deadline").

3.    Pursuant to the Bid Procedures, the Debtors may conduct an auction for the Purchased Assets (the "Auction") beginning at _____(prevailing Mountain time) on _____, 2011 at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids.

4.    Participation at the Auction is subject to the Bid Procedures and the Bid Procedures Order. A copy of the Bid Procedures is available by contacting the undersigned counsel to the Debtors.

5.    A hearing to approve the Sale of the Purchased Assets to the highest and best bidder will be held on _____, 2011 at _____ (prevailing Mountain time) before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona 85003. The hearing on the Sale may be adjourned without notice other than an adjournment in open court.

6.    Objections, if any, to the proposed Sale must be filed and served in accordance with the Bid Procedures Order and actually received no later than 4:00 p.m. (prevailing Mountain time) on _____, 2011.

This notice is qualified in its entirety by the Bidding Procedures Order..

DATED this January 26, 2011.

STINSON MORRISON HECKER LLP

By:    /s/ Josh Kahn (#026284)
       C. Taylor Ashworth
       Josh Kahn
       1850 N. Central Avenue, Suite 2100
       Phoenix, Arizona  85004-4584
       and
       **REED SMITH LLP**
       Alexander Terras
       Proposed Attorneys for Debtors

# EXHIBIT "C"

C. Taylor Ashworth, AZ Bar No. 10143
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
jkahn@stinson.com

Alexander Terras
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re<br><br>ARETE HOLDINGS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:11-bk-02009-RTB<br>(Joint Administration Pending)<br>Case No. 2:11-bk-02010;<br>Case No. 2:11-bk-02011;<br>Case No. 2:11-bk-02012; and<br>Case No. 2:11-bk-02020 |
| This filing applies to: ■ All Debtors<br> □ Arete Holdings, LLC<br> □ Arete NW, LLC<br> □ Arete Sleep Therapy NW, LLC<br> □ Arete Sleep, LLC<br> □ Arete Sleep Therapy, LLC | **ORDER (I) APPROVING BID PROCEDURES, (II) GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE HEARING DATE IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS**<br><br>Hearing Date: **None**<br>Hearing Time:<br>Location: **Courtroom #703**<br> **230 N First Ave**<br> **Phoenix AZ 85003** |

Upon the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and Assignment of Unexpired Leases and Executory Contracts; and For an Emergency Hearing on

Approval of Certain Auction and Bid Procedures, Including a Break-Up Fee; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Sale Motion"), dated January 26, 2011, of Areté Holdings, LLC, Areté NW, LLC, Areté Sleep, LLC, Areté Sleep Therapy, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"), Debtors and Debtors-In-Possession in the above-captioned matter, and upon the record of the hearing held on _____, 2011 (the "Bid Procedures Hearing"); and after due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.

B.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.     The relief requested in the Motion and granted herein is in the best interests of the Debtors' their estates, and other parties-in-interest.

D.     The notice of the Motion and the Bid Procedures Hearing given by the Debtors constitutes due and sufficient notice thereof.

E.     The Debtors have articulated good and sufficient reasons for the Court to (i) approve the Bid Procedures, (ii) grant certain bid protections as provided in the Agreement and this order, (iii) approve the manner of notice of the Motion, the Sale Hearing, and the assumption and assignment of the Assumed Contracts, (iv) approve the form of notice of the Motion and the Sale Hearing to be distributed to parties-in-interest, including prospective bidders, (v) approve the form of notice of the assumption and assignment of the Assumed Contracts to be filed with the Court and served on the non-Debtor counterparties thereto, and (vi) set the Sale Hearing.

F.     The Break-Up Fee and the Expense Reimbursement, as those terms are defined in the Agreement: (i) may be payable in accordance with the terms, conditions, and limitations of the Agreement, (ii) if triggered, shall be deemed actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503 and 507 of the Bankruptcy Code, (iii) are of substantial benefit to the Debtors' estates, (iv) are reasonable and appropriate, including in light of the size and nature of the proposed sale and the efforts that have been and will be expended by the

Proposed Purchaser notwithstanding that the proposed sale is subject to higher or better offers for the Purchased Assets, (v) were negotiated by the parties at arms' length and in good faith, and (vi) are necessary to ensure that the Proposed Purchaser will continue to pursue the proposed acquisition of the Purchased Assets. The Break-Up Fee and Expense Reimbursement were material inducements for, and conditions of, the Proposed Purchaser's entry into the Agreement. The Proposed Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Agreement unless it is assured of payment of the Break-Up Fee and the Expense Reimbursement. Thus, assurance to the Proposed Purchaser of payment of the Break-Up Fee and Expense Reimbursement should promote more competitive bidding by inducing the Proposed Purchaser to hold its bid open. Without the Break-Up Fee and the Expense Reimbursement, other bidding would be limited. Further, because the Break-Up Fee and Expense Reimbursement induced the Proposed Purchaser to submit a bid that will serve as a minimum or floor bid on which other bidders can rely, the Proposed Purchaser has provided a benefit to the Debtors' estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth. Finally, absent authorization of the Break-Up Fee and the Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest or otherwise best available offer for the Purchased Assets.

G.      The Bid Procedures attached hereto as <u>Exhibit 1</u> (the "<u>Bid Procedures</u>") are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

**Bid Procedures**

1.      The Bid Procedures, incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern all events relating to the Agreement, any subsequent bids for the Purchased Assets in these cases, and the Auction, if applicable.

2.      The Debtors may: (i) determine, in their business judgment, which Qualified Bid is the highest or otherwise best offer, (ii) consult with the representative of any official committee or significant constituent in connection with the Bid Procedures, and (iii) reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid (other than the Proposed Purchaser's bid)

which is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (c) contrary to the best interests of the Debtors or their estates. The Debtors are authorized: (x) to terminate the bid process or the Auction at any time if they determine, in their business judgment, that the bidding process will not maximize the value of the Purchased Assets to be realized by the Debtors' estates, and (y) to seek Bankruptcy Court approval of the Agreement. If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, or should the Debtors terminate the bidding process or the Auction as set forth above, the Debtors shall report the same to the Bankruptcy Court and shall proceed with the proposed sale pursuant to the terms of the Agreement.

**Sale Hearing**

3.      The Court shall hold a Sale Hearing on _____, 2011 at _____ (prevailing Mountain time), before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, at which time the Court shall consider the remainder of the Motion not approved by this order (the "Sale Motion"), and may approve the sale to the Proposed Purchaser or the Successful Bidder, as the case may be, and confirm the results of the Auction, if any. The Sale Hearing or any portion thereof, such as with respect to the proposed assumption and assignment of a particular executory contract, may be adjourned by the Debtors from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court or on the Court's calendar on the date scheduled for the Sale Hearing or any adjourned date.

4.      As detailed more fully in the Bid Procedures, objections to the Sale Motion and/or the assumption or assignment of any Assumed Contract, including objections to any Cure Amount, shall be filed and served no later than _____ (prevailing Mountain time) on _____, 2011 (the "Objection Deadline"). The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Sale, any Cure Amount, the assumption or assignment of any Assumed Contract for any reason other than the Cure Amount, the Debtors' consummation and performance of the Agreement or any other agreement related to a

Successful Bid (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of liens, claims, and encumbrances), with the exception of any objection to the conduct of the Auction or the Debtors' selection of the Successful Bidder, which may be made two business days following the end of the Auction or at the Sale Hearing, whichever is earlier.

**Bid Protections**

5.      The Break-Up Fee and Expense Reimbursement are hereby approved.

6.      The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Agreement shall survive termination of the Agreement and, until paid in accordance with the Agreement, shall constitute an administrative expense claim in favor of the Proposed Purchaser. The Debtors shall be obligated to pay the Break-Up Fee and the Expense Reimbursement to the Proposed Purchaser in accordance with the terms of the Agreement without further order of the Court. Notwithstanding any other language in this order, the Debtors shall be obligated to pay the Break-Up Fee and/or the Expense Reimbursement only if the Proposed Purchaser is not in material breach of the Agreement.

**Notice**

7.      Notice of (i) the Motion, including the proposed Sale of the Purchased Assets to the Proposed Purchaser, (ii) the Sale Hearing, and (iii) the proposed assumption and assignment of the Assumed Contracts to the Proposed Purchaser pursuant to the Agreement or to a Successful Bidder shall be good, sufficient, and timely notice, and no other or further notice shall be required, if notice is given as follows:

8.      Within two business days after entry of this order (the "Mailing Date"), the Debtors (or their agent) shall serve the Motion, the Agreement, the proposed Sale Approval Order, the Bid Procedures, and a copy of this order by overnight mail, postage prepaid, upon (i) the Office of the United States Trustee for the District of Arizona, (ii) counsel for the Proposed Purchaser, (iii) counsel for the official committee of unsecured creditors, if any, appointed in these chapter 11 cases, (iv) counsel for True North Partners, LLC, (v) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all United

Case 2:11-bk-02009-RTB   Doc 11   Filed 01/26/11   Entered 01/26/11 18:20:14   Desc
Main Document   Page 187 of 232
DB04/810420.0002/3919652.1 DD02

States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counter-parties to the Assumed Contracts, and (ix) the Internal Revenue Service.

9. On or before _____, 2011, the Debtors shall file with this Court and serve on all non-Debtor counterparties to the Assumed Contracts a notice (the "Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 2, identifying the Proposed Purchaser as the party which will be assigned all of the Debtors' right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bid Procedures. The non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to the Proposed Purchaser on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Proposed Purchaser to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to the Proposed Purchaser must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the

Assumed Contract to the Proposed Purchaser and shall be forever barred from asserting any objection with regard to the assumption and assignment.

10.    On or before _____, 2011, the Debtors' shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached hereto as Exhibit 3, to be sent to each non-Debtor party to an Assumed Contract identifying: (i) any contract that has been designated as an Assumed Contract in any Qualified Bid, and (ii) all Qualified Bidders. Each non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to any Qualified Bidder on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Qualified Bidder Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Qualified Bidder to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default.  Any objections to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A)  Areté  Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona  85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona  85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona  85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282.  Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

DB04/810420.0002/3919652.1 DD02

11.     Notwithstanding rules 6004(h), 6006(d), 7062, or 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") or any other Bankruptcy Rule or rule 62(a) of the Federal Rules of Civil Procedure, this order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution of this order.

12.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

DATED AND SIGNED ABOVE.

DB04/810420.0002/3919652.1 DD02

# BID PROCEDURES

Set forth herein are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of substantially all of the assets of Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"). On January 25, 2011, the Debtors executed that certain Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser").[1] The transaction contemplated by the Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to sections 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code), and certain other closing conditions.

On January 26, 2011, the Debtors filed the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and Assignment of Unexpired Leases and Executory Contracts; and For an Emergency Hearing on Approval of Certain Auction and Bid Procedures, Including a Break-Up Fee; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Sale Motion"). On _____ 2011, the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") entered the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All The Debtors' Assets (the "Bid Procedures Order"). The Bid Procedures Order set _____, 2011 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Debtors to enter into the Agreement.

The Bid Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified Bidders and Bids, respectively, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), and the ultimate selection of the Successful Bidder(s) (as defined herein). The Debtors intend to consult with, among others, the United States Trustee and, if appointed, the official committee of unsecured creditors (the "Creditors' Committee") throughout the sale process. In the event that the Debtors and any party disagree as to the interpretation or application of these Bid Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

1. Assets To Be Sold. With the exception of those assets designated as Excluded Assets in the Agreement, the Purchased Assets include all Debtors' rights, title and interest in, to and under all assets, rights and properties of the Business (whether real, personal or mixed, tangible and intangible, and of every kind, character and description), which are used, or held for use, in the Business (including the Business as a going concern) or otherwise including any Seller's rights in: (i) tangible personal property, (ii) inventory; (iii) assumed contracts, (iv) business proprietary rights; (v) files and records; (vi) licenses; (vii) security deposits; (viii) warranties; (ix) claims; (x) certifications; and (xi) goodwill.

2. As Is, Where Is. The sale of the Acquired Assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their

---

[1] All capitalized terms used but not otherwise defined in these Bid Procedures have the meanings ascribed to them in the Agreement.

agents, or estates, except, with respect to the Proposed Purchaser, to the extent set forth in the Agreement and, with respect to a Successful Bidder (as defined herein), to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

3. <u>Free Of Any And All Encumbrances</u>. All of the Debtors' right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired will be sold free and clear of all Liens except the Permitted Liens (as such terms are defined in the Agreement), and such Liens will attach to the net proceeds of the sale of such Purchased Assets.

4. <u>Participation Requirements</u>. Any person who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other <u>than</u> the Purchaser, must deliver (unless previously delivered) to the Debtors and their counsel at the addresses provided below, unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Debtors in their sole discretion:

   a. An executed confidentiality agreement in form and substance satisfactory to Debtors;

   b. Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, including a portion of the Purchased Assets, current audited financial statements of the equity holders of the Potential Bidder, who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors;

   c. A preliminary (non-binding) proposal reflecting: (i) the purchase price range, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction, (iv) any anticipated regulatory approvals required to close the transaction, (v) the anticipated time frame and any anticipated impediments for obtaining such approvals, (vi) any additional conditions to closing that the Potential Bidder may wish to impose, and (vii) the nature and extent of any additional due diligence that the qualified bidder may wish to conduct and the date by which such due diligence would be completed.

   A Potential Bidder who satisfies the requirements above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale if selected as a Successful Bidder, and who the Debtors determine is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder." Notwithstanding the foregoing, the Proposed Purchaser will be deemed a Qualified Bidder for purposes of the bidding process. As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that the Debtors notify the Potential Bidder that it is a Qualified Bidder, the Debtors will then promptly allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets and the Business as described below.

5. <u>Due Diligence</u>. The Debtors will afford each Qualified Bidder due diligence access to the Purchased Assets and the Business Due diligence access may include such management presentations as may be scheduled by Debtors, access to data rooms, on site inspections, and such other matters which a Qualified Bidder may request and as to which the Debtors may agree. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. The Debtors may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. The Debtors (or any of their respective representatives) shall not be obligated to furnish any information relating to Purchased Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

6. <u>Bid Deadline.</u> A Qualified Bidder who desires to make a bid must deliver the Required Bid Documents to: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, <u>Scottsdale</u>, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; so as to be received not later than _____ a.m. (prevailing Mountain time) on _____, 2011 (the "<u>Bid Deadline</u>"). The Debtors may extend the Bid Deadline once or successively, but are not obligated to do so. If the Debtors extends the Bid Deadline, they will promptly notify all Qualified Bidders of such extension.

7. <u>Bid Requirements</u>. All bids must include the following documents (the "<u>Required Bid Documents</u>"):

   a. A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Purchased Assets.

   b. A complete, comprehensive, and binding asset purchase agreement, together with all schedules and exhibits to such agreement (a "<u>Competing Agreement</u>")

   c. A good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Debtors in their sole discretion) payable to the order of Arete Holdings, LLC (or such other party as the Debtors may determine) in an amount equal to 10% of the purchase price identified in the Competing Agreement.

   d. Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transaction, that is satisfactory to the Debtors and their advisors.

8. <u>Consideration of Qualified Bids</u>. A bid will be considered only if the bid:

   a. Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the Qualified Bidder.

   b. Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtors determine

are similar to and are not materially more burdensome or conditional than those contained in the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price, plus the amount of the Break-Up Fee and Expense Reimbursement, plus: (i) in the case of the initial Qualified Bid, $190,000, and (ii) in the case of any subsequent Qualified Bids, $50,000 over the immediately preceding highest Qualified Bid.

c. Is not conditioned upon (A) any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment and (B) such bid being deemed the Successful Bid by the Debtors.

d. Includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid, (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or a Competing Agreement.

e. Includes a commitment to consummate the purchase of the Purchased Assets (including the receipt of any required Governmental Approvals) within not more than 15 days after entry of the Sale Approval Order, or in the case of any governmental approvals, 60 days after entry of such order.

f. Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, the Debtors will have the right to entertain bids for the Purchased Assets that do not conform to one or more of the requirements specified in this section, and may deem such bids to be Qualified Bids, including bids for a portion of the Purchased Assets. Notwithstanding the foregoing, the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bid Process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Proposed Purchaser is referred to herein as a "Subsequent Bid."

If the Debtors do not receive any Qualified Bids other than the Agreement received from the Proposed Purchaser, the Debtors will report the same to the Bankruptcy Court and will request approval of the Sale pursuant to the terms of the Agreement as soon as reasonably practicable after the Bid Deadline.

9. <u>Bid Protection</u>  Recognizing the Proposed Purchaser's expenditure of time, energy, and resources, the Debtors have agreed to provide certain bidding protections to the Proposed Purchaser. Specifically, the Debtors have determined that the Agreement furthers the goals of the Bid Procedures by setting a floor which all other Qualified Bids must exceed. As a result, the Debtors have agreed that if they do not close with the Proposed Purchaser because the

Debtors consummate an Alternative Transaction, as that term is defined herein, and the Proposed Purchaser is not in breach of the Agreement or the Bidding Procedures, the Debtors will, in certain circumstances, pay to the Proposed Purchaser a Break-Up Fee and Expense Reimbursement. The payment of the Break-Up Fee and Expense Reimbursement will be governed by the provisions of the Agreement and the Bid Procedures Order.

10. <u>Auction</u>  If the Debtors receive one or more Qualified Bids in addition to the Agreement, the Debtors will conduct an <u>auction</u> (the "<u>Auction</u>") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at _____ (prevailing Mountain time) on _____, 2011 at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than _____, 2011), in accordance with the following procedures:

    a.  Only the Debtors, the Proposed Purchaser, a representative of the Office of the United States Trustee, a representative of True North Partners, LLC, and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only the Proposed Purchaser and other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

    b.  At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to participate in the Auction, and, at least one Business Day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe is the highest or otherwise best offer  (the "<u>High Bid</u>") to all Qualified Bidders who have informed the Debtors of their intent to participate in the Auction.

    c.  All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

    d.  The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids), provided that such rules are not inconsistent with these Bid Procedures, the Bankruptcy Code, the Bankruptcy Rules, or any order of the Bankruptcy Court entered in connection herewith.

    e.  Bidding at the Auction will begin with the High Bid and continue, on terms and conditions identical to the High Bid (other than the name of the purchaser(s)) in minimum increments of at least $50,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each Qualified Bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids. For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Proposed Purchaser), the Debtors may give effect to any Break-Up Fee that may be payable to the Proposed Purchaser under the Agreement.

11. <u>Selection Of Successful Bid</u>. At the conclusion of the foregoing Auction, the Debtors will identify the highest offer(s) for the <u>Purchased</u> Assets and the Business received at the Auction (the "<u>Successful Bid(s)</u>" and the bidder(s) making such bid, the "<u>Successful Bidder(s)</u>").

The Debtors will sell the Purchased Assets for the highest Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.

The Debtors' presentation of a particular Qualified Bid to the Court for approval does not constitute the Sellers' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

12. <u>Objections to the Sale Motion</u>. Objections to the Sale Motion, if any, shall be filed and served no later than _____ (prevailing Mountain time) on _____, 2011 (the "<u>Objection Deadline</u>"). The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to <u>the</u> Sale Motion, the Sale, or the Debtors' consummation and performance of the Agreement (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of liens, claims, and encumbrances), with the exception of any objection to the conduct of the Auction or the Debtors' selection of the Successful Bidder, which may be made two business days following the end of the Auction or at the Sale Hearing, whichever is earlier.

13. <u>The Sale Hearing</u>. The Sale Hearing will be held before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053, on _____, 2011, at _____ (prevailing Mountain time), but may be adjourned or rescheduled in the Debtors' discretion, subject to Bankruptcy Court approval, as necessary, without further notice other than an announcement of the adjourned date at the Sale Hearing. If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Proposed Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Proposed Purchaser following entry of the Sale Order. If the Debtors do receive additional Qualified Bids, then, at the Sale Hearing, the Debtors will seek approval of the Successful Bid(s) as well as the second highest or best Qualified Bid(s) (the "<u>Alternate Bid(s)</u>," and such bidder(s), the "<u>Alternate Bidder(s)</u>"). Following approval of the Sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Debtors or the Successful Bidder(s) or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such alternate Bidder(s) without further order of the Bankruptcy Court.

14. <u>Return Of Good Faith Deposits</u>. The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders) until two Business Days following the closing of the Sale (the "<u>Return Date</u>"). Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to

the Successful Bidder(s). If a Successful Bidder breaches its obligations under the Bid Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of the Debtors' estates. On the Return Date, the Debtors will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

15. <u>Reservations Of Rights</u>.  The Debtors: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may at any time reject any bid (other than the Proposed Purchaser's initial bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estates, and their stakeholders as determined by the Debtors in their sole discretion.

16. <u>Notice to Non-Debtor Parties In Interest</u>.  The <u>Debtors</u> shall give notice of the Proposed Sale, the Auction, and these Bid Procedures as follows:

    a. Within two business days after entry of the Bid Procedures Order (the "<u>Mailing Date</u>"), the Debtors (or their agent) shall serve a copy of the Sale Motion, the Agreement, the proposed Sale Approval Order, these Bid Procedures, and a copy of the Bid Procedures Order by overnight mail, postage prepaid, upon (i) the Office of the United States Trustee for the District of Arizona, (ii) counsel for the Proposed Purchaser, (iii) counsel for the official committee of unsecured creditors, if any, appointed in these chapter 11 cases, (iv) counsel for True North Partners, LLC, (v) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past six months, (vi) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the Purchased Assets, (vii) all United States federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) all counter-parties to the Assumed Contracts, and (ix) the Internal Revenue Service.

    b. On or before _____, 2011, the Debtors shall file with this Court and serve on all non-Debtor counterparties to the Assumed Contracts a notice (the "<u>Assumption/Assignment Notice</u>"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 2, identifying the Proposed Purchaser as the party which will be assigned all of the Debtors' right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bid Procedures. The non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to the Proposed Purchaser on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Proposed Purchaser to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default.  Any objections to the assumption and assignment of an Assumed Contract to the Proposed Purchaser must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court,

and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Proposed Purchaser and shall be forever barred from asserting any objection with regard to the assumption and assignment.

c.  On or before _____, 2011, the Debtors' shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached to the Bid Procedures Order as Exhibit 3, to be sent to each non-Debtor party to an Assumed Contract identifying: (i) any contract that has been designated as an Assumed Contract in any Qualified Bid, and (ii) all Qualified Bidders. Each non-Debtor counterparty to an Assumed Contract shall have until the Objection Deadline to object to the proposed assumption and assignment to any Qualified Bidder on any basis, including, but not limited to: (i) an objection to the Cure Amount identified in the Qualified Bidder Assumption/Assignment Notice; (ii) an objection to any perceived or actual inability of the Qualified Bidder to provide adequate assurance of future performance; and/or (c) an objection on account of a postpetition default. Any objections to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (v) be in writing, (w) state with specificity the reasons for such objection, (x) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (y) be filed with the Bankruptcy Court, and (z) be served so that they are actually received by the Objection Deadline by: (A) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (B) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (C) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (D) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (E) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282. Any non-debtor party to an Assumed Contract must state in its objection, with specificity, the legal and factual basis of its objection. If no objection is timely received, the non-Debtor counterparty to the Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection with regard to the assumption and assignment.

# EXHIBIT 2

C. Taylor Ashworth, AZ Bar No. 10143
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
Tel:  (602) 279-1600
Fax:  (602) 240-6925
cgraver@stinson.com

Alexander Terras
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>ARETE HOLDINGS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:11-bk-02009-RTB<br>(Joint Administration Pending)<br>Case No. 2:11-bk-02010;<br>Case No. 2:11-bk-02011;<br>Case No. 2:11-bk-02012; and<br>Case No. 2:11-bk-02020 |
| This filing applies to:  ■  All Debtors<br> □  Arete Holdings, LLC<br> □  Arete NW, LLC<br> □  Arete Sleep Therapy NW, LLC<br> □  Arete Sleep, LLC<br> □  Arete Sleep Therapy, LLC | **NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACT OR UNEXPIRED LEASE TO QUALIFIED BIDDERS WITH SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS**<br><br>**Hearing Date:      None**<br>**Hearing Time:**<br>**Location:        Courtroom #703**<br>**                  230 N First Ave**<br>**                  Phoenix AZ  85003** |

**PLEASE TAKE NOTICE THAT:**

1.      As detailed more fully in the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All the Debtors' Assets, entered on January ___, 2011

(the "Bid Procedures Order"), Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors") entered into an Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser") for the purchase of substantially all of the Debtors' Assets (the "Purchased Assets").[1]

2.      Pursuant to the Bid Procedures set forth in the Bid Procedures Order and the attachments thereto, the following parties, in addition to the Proposed Purchaser, have submitted Qualified Bids for the Purchased Assets and will participate in an Auction to be held on _____, 2011 at the offices of Stinson Morrison Hecker LLP, 1850 N. Central Avenue, Suite 2100, Phoenix, Arizona 85004, or such later time or other place as the Debtors will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than _____, 2011).

3.      Pursuant to the terms of the Agreement (or any asset sale and purchase agreement that the Debtors may enter into with the Successful Bidder), the Debtors may seek to assume and assign the prepetition contracts (the "Assumed Contracts") listed on Exhibit 1 hereto to the Proposed Purchaser or the Successful Bidder, as case may be, subject to approval at the hearing to be held at _____ (prevailing Mountain Time) on _____, 2011 (the "Sale Hearing"), before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona 85003.

4.      Unless otherwise noted on Exhibit 1, non-Debtor counterparties to Assumed Contracts will be entitled to recover only those amounts that the Debtors believe are necessary to assume the Assumed Contracts under section 365 of the Bankruptcy Code (the "Cure Amounts"), and will be barred and enjoined from asserting at the Sale Hearing or otherwise that any other amounts are owing on account of any prepetition default. Cure Amounts, if any, will only be paid to the non-Debtor counterparty to such Assumed Contracts. In addition, should a non-Debtor counterparty to an Assumed Contract wish to object to the adequate assurance of future performance by the Proposed Purchaser

---

[1] Any capitalized term not otherwise defined herein shall have the same meaning ascribed to it in the Bid Procedures Order.

and/or assert that a postpetition default exists which must be cured pursuant to section 365 of the Bankruptcy Code, such counterparty must file an objection as set forth in paragraph 6 below.

5.  The Debtors assert that pursuant to 11 U.S.C. § 365, there is adequate assurance that the Cure Amount set forth on Exhibit 1 hereto will be paid in accordance with the terms of the order approving a sale of substantially all the Debtors' assets (the "Sale Approval Order"). Further, the Debtors assert that there is adequate assurance of the Qualified Bidders' future performance under the executory contract or unexpired lease to be assumed and assigned because of the significant resources of the Qualified Bidders.

6.  Objections, if any, to the assumption and assignment of an Assumed Contract to a Qualified Bidder, who may ultimately become the Successful Bidder, must: (a) be in writing, (b) state with specificity the reasons for such objection, (c) conform to the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the District of Arizona, (d) be filed with the Bankruptcy Court, and (e) be served in hard-copy form so that they are actually received by _____, 2011 (the "Objection Deadline") by: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (v) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282.

7.  If an objection to the assumption and assignment of an Assumed Contract to any Qualified Bidder set forth above is timely filed and received, a hearing with respect to the objection will be held before Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona 85003, at the Sale Hearing or such other date and time as the Court may schedule. If no objection is timely filed and received, each non-Debtor counterparty to an Assumed Contract will be deemed to have consented to the assumption and assignment of the Assumed Contract to the Qualified Bidder that is selected as the Successful Bidder and will be forever barred from asserting any other claims as to

such Assumed Contract, including, but not limited to, the propriety or effectiveness of the assumption and assignment of the Assumed Contract, against the Debtors or the Successful Bidder, or the property of either of them.

8.     Prior to the Closing Date, the Debtors may revise their decision with respect to the assumption and/or assignment of any Assumed Contract and provide a new notice amending the information provided in this notice.

RESPECTFULLY SUBMITTED this January 26, 2011.

**STINSON MORRISON HECKER** LLP

By:     /s/ Josh Kahn (#026284)
C. Taylor Ashworth
Josh Kahn
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
and
**REED SMITH LLP**
Alexander Terras
Proposed Attorneys for Debtors

1

## SCHEDULE A

| CONTRACT DESCRIPTION | CURE AMOUNT |
|---|---|
| | |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DB04/810420.0002/3916211.1 DD02

# EXHIBIT 3

ADMIN01/999760 0500/3568815.1

C. Taylor Ashworth, AZ Bar No. 10143
Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
Tel:  (602) 279-1600
Fax:  (602) 240-6925
cgraver@stinson.com

Alexander Terras
**REED SMITH LLP**
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
Tel: (312) 207-3870
Fax: (312) 207-6400
aterras@reedsmith.com

Proposed Attorneys for Debtors and Debtors-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re<br><br>ARETE HOLDINGS, LLC,<br><br>          Debtor.<br><br>This filing applies to: ■ All Debtors<br>         ☐ Arete Holdings, LLC<br>         ☐ Arete NW, LLC<br>         ☐ Arete Sleep Therapy NW, LLC<br>         ☐ Arete Sleep, LLC<br>         ☐ Arete Sleep Therapy, LLC | Chapter 11<br><br>Case No. 2:11-bk-02009-RTB<br>(Joint Administration Pending)<br>    Case No. 2:11-bk-02010;<br>    Case No. 2:11-bk-02011;<br>    Case No. 2:11-bk-02012; and<br>    Case No. 2:11-bk-02020<br><br>**NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACT OR UNEXPIRED LEASE TO PROPOSED PURCHASER IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS**<br><br>**Hearing Date:**    **None**<br>**Hearing Time:**<br>**Location:**      **Courtroom #703**<br>               **230 N First Ave**<br>               **Phoenix AZ  85003** |

**PLEASE TAKE NOTICE THAT:**

1.      Pursuant to the Order (i) Approving Bid Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date In Connection With Sale Of Substantially All The Debtors' Assets, entered on January __, 2011 (the "Bid

Procedures Order"),Areté Sleep, LLC, Areté Sleep Therapy, LLC Areté Holdings, LLC, Areté NW, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors") have entered into an Asset Purchase Agreement (the "Agreement") with Sleep Science, Inc. (the "Proposed Purchaser") on January 25, 2011 for the purchase of substantially all of the Debtor' assets (the "Purchased Assets").[1]

2.      Pursuant to the terms of the Agreement, and subject to completion of a competitive bidding process described in the Bid Procedures Order and the attachments thereto, the Debtors will seek to assume and assign certain prepetition contracts (collectively, the "Assumed Contracts") listed on Exhibit 1 hereto to the Proposed Purchaser at the hearing to be held at _____ (prevailing Mountain time) on _____, 2011 (the "Sale Hearing") before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona, 80053.

3.      Unless otherwise noted on Exhibit 1, non-Debtor counterparties to Assumed Contracts will be entitled to recover only those amounts that the Debtors believe are necessary to assume the Assumed Contracts under section 365 of the Bankruptcy Code (the "Cure Amounts"), and will be barred and enjoined from asserting at the Sale Hearing or otherwise that any other amounts are owing on account of any prepetition default. Cure Amounts, if any, will only be paid to the non-Debtor counterparty to such Assumed Contracts. In addition, should a non-Debtor counterparty to an Assumed Contract wish to object to the adequate assurance of future performance by the Proposed Purchaser and/or assert that a postpetition default exists which must be cured pursuant to section 365 of the Bankruptcy Code, such counterparty must file an objection as set forth in paragraph 4 below.

4.      Objections, if any, to the assumption and assignment of an Assumed Contract, including objections asserting the existence of a postpetition default that must be cured and/or the anticipated failure of the Proposed Purchaser to provide adequate assurance of future performance under section 365 of the Bankruptcy Code, must (a) be in writing, (b) state with specificity the reasons for such objection, (c) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of Arizona, (d) be filed with the Bankruptcy Court, and (e) be served in hard-copy form so

---

[1] Any capitalized term not otherwise defined herein shall have the same meaning ascribed to it in the Bid Procedures Order.

that it is actually received by _____, 2011 (the "Objection Deadline") by: (i) Areté Holdings, LLC, Attention: Daniel Dempsey, 6263 North Scottsdale Road, Suite 395, Scottsdale, Arizona 85250; (ii) Reed Smith LLP, Attention: Ann E. Pille, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606; (iii) True North Partners, LLC, 8455 North 90th Street, Suite 4, Scottsdale, Arizona 85258; (iv) the Office of the United States Trustee, 230 N. 1st Avenue, Suite 204, Phoenix, Arizona 85003; and (v) Sleep Science, Inc., Attention: Mark Hanley, c/o Clinical Research Advantage Holdings, LLC, 2141 East Broadway Road, Tempe, Arizona 85282.

5.     If an objection to the assumption and assignment of a Assumed Contract is timely filed and received, a hearing with respect to the objection will be held before the Honorable Redfield T. Baum, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Arizona, 230 N. 1st Avenue, Courtroom 703, Phoenix, Arizona 85003, at the Sale Hearing or such other date and time as the Court may schedule. If no objection is timely received, each non-Debtor party to an Assumed Contract will be deemed to have consented to the assumption and assignment of the Assumed Contract to the Proposed Purchaser and will be forever barred from asserting any other claims, including, but not limited to, the propriety or effectiveness of the assumption and assignment of the Assumed Contract, against the Debtors or the Proposed Purchaser, or the property of either of them.

6.     Pursuant to 11 U.S.C. § 365, the Debtors assert there is adequate assurance of future performance that the Cure Amount set forth on Exhibit 1 hereto will be paid in accordance with the terms of any order approving the Proposed Sale. Further, the Debtors assert that there is adequate assurance of the Proposed Purchaser's future performance under the executory contract or unexpired lease to be assumed and assigned because of the significant resources of the Proposed Purchaser.

7.     Prior to the Closing Date, the Debtors may revise their decision with respect to the assumption and/or assignment of any Assumed Contract and provide a new notice amending the information provided in this notice.

1

DATED this January 26, 2011.

2

**STINSON MORRISON HECKER** LLP

3

4

By:     /s/ Josh Kahn (#026284)

5

C. Taylor Ashworth

Josh Kahn

6

1850 N. Central Avenue, Suite 2100

Phoenix, Arizona  85004-4584

7

and

8

**REED SMITH LLP**

Alexander Terras

9

Proposed Attorneys for Debtors

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SCHEDULE A

| CONTRACT DESCRIPTION | CURE AMOUNT |
|---|---|
|  |  |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6

DB04/810420.0002/3916176.1 DD02

# EXHIBIT "D"

1 C. Taylor Ashworth, AZ Bar No. 10143
Christopher Graver, AZ Bar #013235
2 Josh Kahn, AZ Bar No. 26284
**STINSON MORRISON HECKER LLP**
3 1850 N. Central Avenue, Suite 2100
Phoenix, Arizona  85004-4584
4 Tel:  (602) 279-1600
Fax:  (602) 240-6925
5 jkahn@stinson.com

6 Alexander Terras
**REED SMITH LLP**
7 10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
8 Tel: (312) 207-3870
Fax: (312) 207-6400
9 aterras@reedsmith.com

10 Proposed Attorneys for Debtors and Debtors-in-Possession

11 <center>IN THE UNITED STATES BANKRUPTCY COURT</center>

12 <center>FOR THE DISTRICT OF ARIZONA</center>

| | |
|---|---|
| In re | Chapter 11 |
| ARETE HOLDINGS, LLC, | Case No. 2:11-bk-02009-RTB (Joint Administration Pending) |
| Debtor. | Case No. 2:11-bk-02010; Case No. 2:11-bk-02011; Case No. 2:11-bk-02012; and Case No. 2:11-bk-020 |
| This filing applies to: ■ All Debtors ☐ Arete Holdings, LLC ☐ Arete NW, LLC ☐ Arete Sleep Therapy NW, LLC ☐ Arete Sleep, LLC ☐ Arete Sleep Therapy, LLC | **ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT; (C) THE DEBTORS TO ASSUME AND ASSIGN THE ASSUMED CONTRACTS; AND (D) GRANTING RELATED RELIEF** |
| | **Hearing Date:** None **Hearing Time:** **Location:** Courtroom #703 230 N First Ave Phoenix AZ  85003 |

Upon the Debtors' Motion for an Order Approving Sale of Debtors' Assets Under Asset

Purchase Agreement Free and Clear of Liens, Claims and Encumbrances; Approving Assumption and

Assignment of Certain Unexpired Leases and Executory Contracts; and for an Emergency Hearing on Approval of Certain Auction and Bid Procedures, including a Break-Up Fees; Setting Date and Time for Hearing on Proposed Sale; and Approving Form and Notice of Auction and Sale Hearing (the "Motion")[1], filed by Areté Holdings, LLC, Areté NW, LLC, Areté Sleep, LLC, Areté Sleep Therapy, LLC, and Areté Sleep Therapy NW, LLC (collectively, the "Debtors"), Debtors and Debtors-In-Possession in the above-captioned matter; this Court having entered an order approving, among other things, the Bid Procedures, the Break-Up Fee and the Expense Reimbursement [Docket No. _____

_____] (the "Bid Procedures Order"); [no other Qualified Bids in having been received in accordance with Bid Procedures Order, and no Auction having been conducted in accordance with the Bid Procedures Order] [Qualified Bids having been received from _____ prior to the Bid Deadline, and the Debtors having conducted the Auction in accordance with the Bid Procedures Order]; Sleep Science, Inc. (the "Purchaser") having submitted the highest or otherwise best offer; the Court having conducted a hearing on the Motion commencing on _____, 2011 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; the Court having reviewed and considered the Motion, the Agreement, the Bid Procedures Order, the record of the hearing before the Court on _____, 2011 (the "Bid Procedures Hearing") at which the Bid Procedures Order was approved and all objections to the Proposed Sale and the Agreement filed in accordance with the Bid Procedures Order; the appearance of all interested parties and all responses and objections to the Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon all of the proceedings had before the Court, and any objections and responses to the relief requested in the Motion having been heard and overruled, continued or resolved in their entirety, and it appearing that due notice of the Motion, the Agreement, the Bid Procedures Order and the Auction having been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors,

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined herein) and the Motion, as applicable.

their estates, stakeholders and all other parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT EXPRESSLY FINDS AS FOLLOWS:**

### Jurisdiction, Venue and Final Order

1.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Notice of the Proposed Sale, Agreement, Sale Hearing, Auction and the Cure Amounts

2.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the Agreement and the Proposed Sale have been provided in accordance with Sections 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.  The Debtors have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the Agreement and the Proposed Sale as required by the Bid Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Agreement or the Proposed Sale is required for the entry of this Order.

3.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

4.      In accordance with the Bid Procedures Order, the Debtors have served a notice (as amended, modified or otherwise supplemented from time to time, the "Assumption/Assignment Notice") of the potential assumption and assignment of the Assumed Contracts and of the proposed cure amounts (each, a "Cure Amount" and, collectively, the "Cure Amounts") upon each non-Debtors counterparty to an Assumed Contract.  The service and provision of the Assumption/Assignment Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of the assumption and assignment of the Assumed Contracts or establishing a Cure

Amount for the respective Assumed Contracts. Non-Debtors counterparties to the Assumed Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assumed Contracts and the Cure Amount set forth in the Assumption/Assignment Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtors counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of Section 365(c)(1) of the Bankruptcy Code). The deadline to file an objection to the assumption and assignment to the Purchaser of any Assumed Contract (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled or continued to a later hearing by agreement of the parties. To the extent that any such party did not timely file a Contract Objection by the Contract Objection deadline, such party shall be deemed to have consented to (i) the assumption and assignment of the Assumed Contract and (ii) the Cure Amount set forth on the Assumption/Assignment Notice.

**Highest or Otherwise Best Offer**

5. As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors have otherwise complied in all respects with, the Bid Procedures Order. The Auction was duly noticed and the Auction process set forth in the Bid Procedures Order afforded a full, fair and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase all of the Purchased Assets and assume all of the Assumed Liabilities.

6. The Purchased Assets were adequately marketed by the Debtors, and the consideration provided by Purchaser under the Agreement constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of all Purchased Assets and the assumption of all Assumed Liabilities.

7. Approval of the Motion and the Agreement and the consummation of the Proposed Sale contemplated thereby are in the best interests of the Debtors, their creditors, estates and other parties-in-interest. The Debtors have demonstrated good, sufficient and sound business reasons and

DB04/810420.0002/3919870.1 DD02

justifications for entering into the Proposed Sale and the performance of their obligations under the Agreement.

8.      Entry of an order approving the Agreement and all the provisions thereof is a necessary condition precedent to Purchaser's consummation of the Proposed Sale.

9.      The Agreement was not entered into, and neither the Debtors nor the Purchaser, have entered into the Agreement or proposing to consummate the Proposed Sale, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors.  Neither the Debtors nor Purchaser is entering into the Agreement, or proposing to consummate the Proposed Sale, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

10.     The offer of Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement:  (i) is the highest and/or otherwise best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Purchased Assets.

11.     The Purchaser is the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order.  The Purchaser has complied in all respects with the Bid Procedures Order and any other applicable order of this Court in negotiating and entering into the Agreement and the Proposed Sale, and the Agreement complies with the Bid Procedures Order and any other applicable order of this Court.

### Good Faith of Debtors and the Purchaser

12.     The sales process conducted by the Debtors, including without limitation, the Bid Procedures set forth in the Bid Procedures Order, was at arm's length, non-collusive, in good faith and substantively and procedurally fair to all parties.

13. The Debtors and their professionals have complied, in good faith, in all respects with the Bid Procedures Order. As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, substantial marketing efforts and a competitive sale process were conducted in accordance with the Bid Procedures Order, the Debtors: (a) afforded interested potential purchaser a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and (c) considered any bids submitted on or before the Bid Deadline.

14. The Agreement and the Proposed Sale contemplated thereunder were proposed, negotiated and entered into by and among the Debtors and the Purchaser without collusion, in good faith and at arm's length. Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Agreement or the Proposed Sale to be avoided under Section 363(n) of the Bankruptcy Code.

15. Neither the Purchaser nor any of its respective affiliates, present or contemplated members, officers, directors, shareholders or any of their respective successors and assigns is an "insider" of the Debtors, as that term is defined in Section 101(31) of the Bankruptcy Code. The Purchaser is entering into the Proposed Sale in good faith and is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding. Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Agreement to be avoided or impose any costs or damages under Section 363(n) of the Bankruptcy Code.

## Section 363 is Satisfied

16. The Debtors have demonstrated a sufficient basis and compelling circumstances to permit them to (i) enter into the Agreement and (ii) sell the Purchased Assets and assume and assign the Assumed Contracts, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. Such business reasons include,

but are not limited to, the fact that (i) the Agreement constitutes the highest or otherwise best offer for the Purchased Assets; (ii) the Agreement presents the best opportunity to realize the value of the Debtors on a going concern basis and avoid any potential decline and devaluation of the Debtors' business; and (iii) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the Agreement, recoveries of creditors may be diminished.

17.     The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code section 363(b)(1).  Accordingly, appointment of a consumer privacy ombudsman pursuant to Bankruptcy Code sections 363(b)(1) or 332 is not required with respect to the relief requested in the Motion.

18.     The Purchased Assets constitute property of the Debtors' estate and title thereto is presently vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code.

19.     The sale of the Purchased Assets to the Purchaser under the terms of the Agreement meets the applicable provisions of Section 363(f) of the Bankruptcy Code such that the sale of the Purchased Assets will be free and clear of any and all claims, and except as expressly provided in the Agreement with respect to the Assumed Liabilities, the (i) transfer of the Purchased Assets to Purchasers and (ii) assumption and/or assignment to Purchaser of the Assumed Contracts and Assumed Liabilities will be free and clear of all claims and will not subject the Purchaser or any of the Purchaser's assets to any liability for any claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability).  All holders of claims who did not object, or withdrew their objections to the Proposed Sale, are deemed to have consented to the Proposed Sale pursuant to Section 363(f)(2) of the Bankruptcy Code, and all holders of claims are adequately protected — thus satisfying Section 363(e) of the Bankruptcy Code — by having their claims, if any, attach to the proceeds of the Proposed Sale ultimately attributable to the property against or in which they assert a claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such claim holder had prior to the Proposed Sale, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

20.     The Purchaser would not have entered into the Agreement and would not consummate the sale of the Purchased Assets, thus adversely affecting the Debtors, their estate, creditors, employees and other parties in interest, if the sale of the Purchased Assets was not free and clear of all Claims (defined below) or if the Purchaser could be liable for any claims, including, without limitation and as applicable, certain liabilities that expressly are not assumed by Purchaser as set forth in the Agreement or in this Order.  The Purchaser asserts that it will not consummate the Proposed Sale unless the Agreement specifically provides and this Court specifically orders that none of the Purchaser, its assets or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any (i) claim or (ii) successor or transferee liability for the Debtors other than with respect to the Assumed Liabilities.

21.     The transfer of the Purchased Assets to Purchaser under the Agreement  will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and clear of all claims.  The Debtors may sell their interests in the Purchased Assets free and clear of all claims because, in each case, one or more of the standards set forth in Section 363(f) has been satisfied.  The transfer of the Purchased Assets to Purchaser will vest Purchaser with good and marketable title to the Purchased Assets.

22.     The Purchaser is not a continuation of the Debtors or their estates and there is no continuity between Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates and the Proposed Sale does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

**Assumption and Assignment of the Assumed Contracts**

23.     The assumption and assignment of the Assumed Contracts (as such Assumed Contracts may be amended, supplemented or otherwise modified prior to assumption and assignment without further order of the Court with the consent of the Debtors, the contract counterparty and the Purchaser) that are designated for assumption and assignment pursuant to the terms of this Order and the Agreement are integral to the Agreement, are in the best interests of the Debtors and their estates,

DB04/810420.0002/3919870.1 DD02

creditors and other parties-in-interest, and represent the reasonable exercise of sound and prudent business judgment by the Debtors.

24. No section of any Assumed Contract which purports to prohibit, restrict or condition the use, consideration or assignment of any such Assumed Contract in connection with the Proposed Sale shall have any force or effect.

25. The Debtors have met all requirements of Section 365(b) of the Bankruptcy Code for each of the Assumed Contracts. The Debtors and/or the Purchaser, as applicable under the Agreement, have (i) cured and/or provided adequate assurance of cure of any default existing prior to the Closing under all of the Assumed Contracts, within the meaning of Section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any counterparty for actual pecuniary loss to such party resulting from a default prior to the Closing under any of the Assumed Contracts, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code. Each of the Assumed Contracts is free and clear of all Claims against the Purchaser.

26. The Purchaser has demonstrated adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Pursuant to Section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.

27. No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay amounts equal to the Cure Amounts or defaults that are not required to be cured as contemplated in Section 365(b)(1)(A) of the Bankruptcy Code.

28. There is no legal or equitable reason to delay the Proposed Sale.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

(a) The Motion is granted in its entirety and approved in all respects.

(b)     All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing and all reservations of rights included therein, are hereby overruled on the merits with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including, without limitation, all non-debtor parties to the Assumed Contracts.

(c)     The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.  To the extent any of the following constitute findings of fact or conclusions of law, they are adopted as such.  To the extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

### Approval of the Agreement

(d)     The Agreement, all of the terms and conditions thereof, and all of the Proposed Sale contemplated therein are approved in all respects. The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety. The transfer of the Purchased Assets by the Debtors to the Purchaser shall be a legal, valid and effective transfer of the Purchased Assets. The consummation of the Proposed Sale is hereby approved and authorized under Section 363(b) of the Bankruptcy Code.

(e)     The Debtors are authorized and, to the extent not already done, directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Proposed Sale, including the sale to Purchaser of all Purchased Assets, in accordance with the terms and conditions set forth in the Agreement and this Order, including, without limitation, executing, acknowledging and delivering such corporate name change certificates, deeds, assignments, conveyances and other assurance, documents and instruments of transfer and taking any action for purposes of assigning, transferring, granting, conveying and confirming to Purchaser, or reducing to possession, any or all of the Purchased Assets and (b) to assume and assign any and all Assumed Contracts to the Purchaser.  The Debtors are further authorized to pay, whether before, at or after the

Closing, any expenses or costs required to be paid in order to consummate the Proposed Sale or perform their obligations under the Agreement.

(f)     The Debtors are authorized, and to the extent not already done, directed, to enter into the Management/Leaseback Agreement detailed in Section 2.6 of the Agreement, pursuant to which the Purchaser will lease back to Debtors certain purchased assets and shall retain management responsibility for key aspects of Debtors' leaseback operations.

(g)     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Agreement and this Order.

(h)     Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Agreement or this Order, and, to the extent of any conflict or derogation between this Order or the Agreement and such future chapter 11 plan or order, the terms of this Order and the Agreement shall control.

## Sale and Transfer Free and Clear of Claims

(i)     Except as otherwise expressly provided in the Agreement and the terms of this Order with respect to Assumed Liabilities, the Purchased Assets shall be sold free and clear of all claims, liens, liabilities, interests, rights and encumbrances, including, without limitation, the following:  all restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments; demands, rights of first refusal, consent rights, offsets, contract rights, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any

agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option

rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any

kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or

unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or

disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material

or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement

of these chapter 11 cases (but, for the avoidance of doubt, in each case prior to the Closing), and

whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise

arising under any theory, law or doctrine of successor liability (all of the foregoing collectively being

referred to in this Order as "Claims", and, as used in this Order such term includes, without limitation,

any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5)

thereof) with all such Claims to attach to the consideration to be received by the Debtors with the same

validity, force, priority and effect which they now have as against the Purchased Assets and subject to

any claims and defenses the Debtors or other parties may possess with respect thereto.  As used in this

Order, the term "Liens" includes, without limitation, any statutory lien on real and personal property

and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section

101(37) thereof.

(j)     At Closing, all of the Debtors' right, title and interest in and to, and possession of, the

Purchased Assets shall be immediately vested in the Purchaser pursuant to Sections 105(a), 363(b),

363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims except for Assumed

Liabilities.   Such transfer shall constitute a legal, valid, binding and effective transfer of such

Purchased Assets.  All persons or entities, presently or on or after the Closing, in possession of some or

all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the

Purchaser or its respective designees on the Closing or at such time thereafter as the Purchaser may

request.

(k)     This Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims

(other than Assumed Liabilities) will be capable of being asserted against the Purchaser or any of its

respective assets (including the Purchased Assets), (ii) the Purchased Assets shall have been

transferred to Purchaser free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Proposed Sale contemplated by the Agreement. The Purchased Assets are sold free and clear of any reclamation rights.

(l)     Except as otherwise expressly provided in the Agreement with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its property or the Purchased Assets. Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, or based on any action the Debtors may take in their chapter 11 cases.

(m)     If any person or entity that has filed financing statements or other documents or agreements evidencing Claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Purchased Assets or otherwise, then only with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Agreement and this Order (a) the Debtors is hereby

DB04/810420.0002/3919870.1 DD02

authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser and the applicable Purchased Assets; and (c) the Purchaser may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Purchased Assets other than Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

(n)    To the maximum extent permitted under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.

(o)    To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, assigned or conveyed to Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Proposed Sale.

(p)    For the avoidance of doubt, only Purchased Assets that are part of the Debtors' estates are being sold to the Purchaser free and clear of Claims pursuant to Section 363(f) of the Bankruptcy Code.

**No Successor or Transferee Liability**

(q)    Except as expressly provided in the Agreement with respect to Assumed Liabilities, the Purchaser shall not be deemed, as a result of any action taken in connection with the Agreement, the consummation of the Proposed Sale contemplated by the Agreement, or the transfer or operation of the Purchased Assets to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Purchaser, with respect to any obligations as an assignee under the Assumed Contracts arising after the Closing); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an

alter ego or a mere continuation or substantial continuation of the Debtors including, without limitation, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the NLRA, environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

(r)     Other than as expressly set forth in the Agreement with respect to Assumed Liabilities, the Purchaser shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Purchased Assets, including, without limitation, the Excluded Liabilities or (b) any remaining Claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Agreement with respect to Assumed Liabilities, the Purchaser shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing. Except to the extent

expressly included in the Assumed Liabilities with respect to the Purchaser, the Purchaser shall have no liability or obligation under the WARN or CERCLA, or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities by the Purchaser or an Affiliate of the Purchaser.

(s)     Except as expressly provided in the Agreement for the Assumed Liabilities, with respect to the Purchaser, nothing in this Order or the Agreement shall require the Purchaser to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are parties or have any responsibility including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

(t)     Effective upon the Closing, and except as set forth in the Agreement, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, or its assets (including the Purchased Assets), with respect to any (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

DB04/810420.0002/3919870.1 DD02

## Good Faith of Purchaser

(u)     The Proposed Sale contemplated by the Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Proposed Sale (including the assumption and assignment of the Assumed Contracts), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

(v)     Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Proposed Sale to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Purchased Assets under the Agreement is fair and reasonable and the sale may not be avoided under Section 363(n) of the Bankruptcy Code.

## Assumption and Assignment of Assumed Contracts

(w)     The Debtors are authorized and directed at the Closing to assume and assign each of the Assumed Contracts.  The payment of the applicable Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing, (b) compensate for any actual pecuniary loss to such non-debtor counterparty resulting from such default and (c) together with the assumption of the Assumed Contracts by the Debtors and the assignment of the Assumed Contracts to the Purchaser, constitute adequate assurance of future performance thereof.

(x)     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under Sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser or an Affiliate of the Purchaser of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts, and such Assumed Contracts

DB04/810420.0002/3919870.1 DD02

shall remain in full force and effect for the benefit of the Purchaser. Each non-debtor counterparty to the Assumed Contracts shall be forever barred, estopped and permanently enjoined from (a) asserting against the Debtors or the Purchaser or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control in such Assumed Contracts, or any purported written or oral modification to the Assumed Contracts and (b) asserting against the Purchaser (or its property, including the Purchased Assets) any claim, counterclaim, defense, breach, condition, setoff asserted or capable of being asserted against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

(y)     In the case of licenses, certificates, approvals, authorization, leases, contracts, agreements and other commitments include in the Purchased Assets that (a) cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to Closing, the Debtors shall, subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain such consent and, if any such consent is not obtained, the Debtors shall, following Closing, and subject to any approval of the Bankruptcy Court that may be required, cooperate with the Purchaser in all reasonable respects to provide to the Purchaser the benefits thereof in some other manner or (b) that are otherwise not transferable or assignable, the Debtors shall, following Closing, and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser to provide to the Purchaser the benefits thereof in some other manner (including the exercise of the rights of the Debtors thereunder).

(z)     Upon the Closing and the payment of the relevant Cure Amounts by Debtors or the Purchaser as set forth in the Agreement, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts and the Debtors shall be released, pursuant to Section 365(k) of the Bankruptcy Code, from any liability under the Assumed Contracts. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

(aa)    Each non-debtor party to an Assumed Contract is forever barred, estopped and permanently enjoined from asserting against the Purchaser, or its property (including without limitation the Purchased Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or other claim asserted or capable of being asserted against the Debtors.

(bb)    Other than the Assumed Contracts, the Purchaser assumed none of the Debtors' other contracts and leases and shall have no liability whatsoever thereunder.

(cc)    The assignments of each of the Assumed Contracts are made in good faith under Sections 363(b) and (m) of the Bankruptcy Code.

## Other Provisions

(dd)    As soon as practicable after Closing, the Debtors shall (a) effectuate a name change to change the name of Debtors.  Upon a filing by the Debtors of a notice that the Closing has occurred, the Clerk of the Bankruptcy Court is directed to change the name of the Debtors on the docket of these Chapter 11 Cases and revise the caption of these Chapter 11 Cases accordingly.

(ee)    The Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transaction contemplated by the Agreement based upon any arrangement made by or on behalf of the Debtors.

(ff)    This Order is binding upon and inures to the benefit of any successors and assigns of the Debtors or the Purchaser, including any trustee appointed in any subsequent case of the Debtors under chapter 7 of the Bankruptcy Code.

(gg)    The provisions of this Order and the Agreement are non-severable and mutually dependent.

(hh)    The Agreement may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

(ii)    Nothing in this Order, the Agreement or any asset purchase agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and

regulatory statutes or regulations that any entity would be subject to as the owner or operator of property from and after the Closing. Nothing in this Order, the Agreement or any asset purchase agreement authorizes the transfer to the Purchaser of any licenses, permits, registrations or governmental authorizations and approvals that would require government approval prior to such transfer without the Purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

(jj)    The Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are parties or which has been assigned by the Debtors to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the sale. This Court retains jurisdiction to compel delivery of the Purchased Assets, to protect the Purchaser and its assets, including the Purchased Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, to transfer the Purchased Assets and the Assumed Contracts to the Purchaser.

(kk)    Notwithstanding the possible applicability of Rules 6004(h), 6006(d), 7062 and 9014 of the Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors and Purchaser are authorized to close the sale immediately upon entry of this Order.

(ll)    To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the Agreement or the Bid Procedures Order, this Order shall govern and control, and to the extent the Motion conflicts with, or is otherwise inconsistent with, the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern and control.

DATED AND SIGNED ABOVE.

DB04/810420.0002/3919870.1 DD02